# ATTACHMENT 2

*Aranas, et al. v. Napolitano, et al.*, 12-cv-1137



# Office of the Attorney General
## Washington, D. C. 20530

February 23, 2011

The Honorable John A. Boehner
Speaker
U.S. House of Representatives
Washington, DC  20515

      Re:  <u>Defense of Marriage Act</u>

Dear Mr. Speaker:

    After careful consideration, including review of a recommendation from me, the President of the United States has made the determination that Section 3 of the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7,[1] as applied to same-sex couples who are legally married under state law, violates the equal protection component of the Fifth Amendment.  Pursuant to 28 U.S.C. § 530D, I am writing to advise you of the Executive Branch's determination and to inform you of the steps the Department will take in two pending DOMA cases to implement that determination.

    While the Department has previously defended DOMA against legal challenges involving legally married same-sex couples, recent lawsuits that challenge the constitutionality of DOMA Section 3 have caused the President and the Department to conduct a new examination of the defense of this provision.  In particular, in November 2011, plaintiffs filed two new lawsuits challenging the constitutionality of Section 3 of DOMA in jurisdictions without precedent on whether sexual-orientation classifications are subject to rational basis review or whether they must satisfy some form of heightened scrutiny.  *Windsor v. United States*, No. 1:10-cv-8435 (S.D.N.Y.); *Pedersen v. OPM*, No. 3:10-cv-1750 (D. Conn.).  Previously, the Administration has defended Section 3 in jurisdictions where circuit courts have already held that classifications

---

[1] DOMA Section 3 states: "In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."

based on sexual orientation are subject to rational basis review, and it has advanced arguments to defend DOMA Section 3 under the binding standard that has applied in those cases.[2]

These new lawsuits, by contrast, will require the Department to take an affirmative position on the level of scrutiny that should be applied to DOMA Section 3 in a circuit without binding precedent on the issue. As described more fully below, the President and I have concluded that classifications based on sexual orientation warrant heightened scrutiny and that, as applied to same-sex couples legally married under state law, Section 3 of DOMA is unconstitutional.

**Standard of Review**

The Supreme Court has yet to rule on the appropriate level of scrutiny for classifications based on sexual orientation. It has, however, rendered a number of decisions that set forth the criteria that should inform this and any other judgment as to whether heightened scrutiny applies: (1) whether the group in question has suffered a history of discrimination; (2) whether individuals "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"; (3) whether the group is a minority or is politically powerless; and (4) whether the characteristics distinguishing the group have little relation to legitimate policy objectives or to an individual's "ability to perform or contribute to society." *See Bowen v. Gilliard*, 483 U.S. 587, 602-03 (1987); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441-42 (1985).

Each of these factors counsels in favor of being suspicious of classifications based on sexual orientation. First and most importantly, there is, regrettably, a significant history of purposeful discrimination against gay and lesbian people, by governmental as well as private entities, based on prejudice and stereotypes that continue to have ramifications today. Indeed, until very recently, states have "demean[ed] the[] existence" of gays and lesbians "by making their private sexual conduct a crime." *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).[3]

---

[2] *See, e.g., Dragovich v. U.S. Department of the Treasury*, 2011 WL 175502 (N.D. Cal. Jan. 18, 2011); *Gill v. Office of Personnel Management*, 699 F. Supp. 2d 374 (D. Mass. 2010); *Smelt v. County of Orange*, 374 F. Supp. 2d 861, 880 (C.D. Cal.,2005); *Wilson v. Ake*, 354 F.Supp.2d 1298, 1308 (M.D. Fla. 2005); *In re Kandu*, 315 B.R. 123, 145 (Bkrtcy. W.D. Wash. 2004); *In re Levenson*, 587 F.3d 925, 931 (9th Cir. E.D.R. Plan Administrative Ruling 2009).

[3] While significant, that history of discrimination is different in some respects from the discrimination that burdened African-Americans and women. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 216 (1995) (classifications based on race "must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States," and "[t]his strong policy renders racial classifications 'constitutionally suspect.'"); *United States v. Virginia*, 518 U.S. 515, 531 (1996) (observing that "'our Nation has had a long and unfortunate history of sex discrimination'" and pointing out the denial of the right to vote to women until 1920). In the case of sexual orientation, some of the discrimination has been based on the incorrect belief that sexual orientation is a behavioral characteristic that can be changed or subject to moral approbation. *Cf. Cleburne*, 473 U.S. at 441 (heightened scrutiny may be warranted for characteristics "beyond the individual's control" and that "very likely reflect outmoded notions of the relative capabilities of" the group at issue); *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (Stevens, J., dissenting) ("Unfavorable opinions about homosexuals 'have ancient roots.'" (quoting *Bowers*, 478 U.S. at 192)).

Second, while sexual orientation carries no visible badge, a growing scientific consensus accepts that sexual orientation is a characteristic that is immutable, *see* Richard A. Posner, Sex and Reason 101 (1992); it is undoubtedly unfair to require sexual orientation to be hidden from view to avoid discrimination, *see* Don't Ask, Don't Tell Repeal Act of 2010, Pub. L. No. 111-321, 124 Stat. 3515 (2010).

Third, the adoption of laws like those at issue in *Romer v. Evans*, 517 U.S. 620 (1996), and *Lawrence*, the longstanding ban on gays and lesbians in the military, and the absence of federal protection for employment discrimination on the basis of sexual orientation show the group to have limited political power and "ability to attract the [favorable] attention of the lawmakers." *Cleburne*, 473 U.S. at 445. And while the enactment of the Matthew Shepard Act and pending repeal of Don't Ask, Don't Tell indicate that the political process is not closed *entirely* to gay and lesbian people, that is not the standard by which the Court has judged "political powerlessness." Indeed, when the Court ruled that gender-based classifications were subject to heightened scrutiny, women already had won major political victories such as the Nineteenth Amendment (right to vote) and protection under Title VII (employment discrimination).

Finally, there is a growing acknowledgment that sexual orientation "bears no relation to ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality). Recent evolutions in legislation (including the pending repeal of Don't Ask, Don't Tell), in community practices and attitudes, in case law (including the Supreme Court's holdings in *Lawrence* and *Romer*), and in social science regarding sexual orientation all make clear that sexual orientation is not a characteristic that generally bears on legitimate policy objectives. *See, e.g.*, Statement by the President on the Don't Ask, Don't Tell Repeal Act of 2010 ("It is time to recognize that sacrifice, valor and integrity are no more defined by sexual orientation than they are by race or gender, religion or creed.")

To be sure, there is substantial circuit court authority applying rational basis review to sexual-orientation classifications. We have carefully examined each of those decisions. Many of them reason only that if consensual same-sex sodomy may be criminalized under *Bowers v. Hardwick*, then it follows that no heightened review is appropriate – a line of reasoning that does not survive the overruling of *Bowers* in *Lawrence v. Texas*, 538 U.S. 558 (2003).[4] Others rely on claims regarding "procreational responsibility" that the Department has disavowed already in litigation as unreasonable, or claims regarding the immutability of sexual orientation that we do not believe can be reconciled with more recent social science understandings.[5] And none

---

[4] *See Equality Foundation v. City of Cincinnati*, 54 F.3d 261, 266–67 & n. 2. (6th Cir. 1995); *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Padula v. Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987).

[5] *See, e.g., Lofton v. Secretary of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004) (discussing child-rearing rationale); *High Tech Gays v. Defense Indust. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir. 1990) (discussing immutability). As noted, this Administration has already disavowed in litigation the

3

engages in an examination of all the factors that the Supreme Court has identified as relevant to a decision about the appropriate level of scrutiny. Finally, many of the more recent decisions have relied on the fact that the Supreme Court has not recognized that gays and lesbians constitute a suspect class or the fact that the Court has applied rational basis review in its most recent decisions addressing classifications based on sexual orientation, *Lawrence* and *Romer*.[6] But neither of those decisions reached, let alone resolved, the level of scrutiny issue because in both the Court concluded that the laws could not even survive the more deferential rational basis standard.

**Application to Section 3 of DOMA**

In reviewing a legislative classification under heightened scrutiny, the government must establish that the classification is "substantially related to an important government objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Under heightened scrutiny, "a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535-36 (1996). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id.* at 533.

In other words, under heightened scrutiny, the United States cannot defend Section 3 by advancing hypothetical rationales, independent of the legislative record, as it has done in circuits where precedent mandates application of rational basis review. Instead, the United States can defend Section 3 only by invoking Congress' actual justifications for the law.

Moreover, the legislative record underlying DOMA's passage contains discussion and debate that undermines any defense under heightened scrutiny. The record contains numerous expressions reflecting moral disapproval of gays and lesbians and their intimate and family relationships – precisely the kind of stereotype-based thinking and animus the Equal Protection Clause is designed to guard against.[7] *See Cleburne*, 473 U.S. at 448 ("mere negative attitudes, or

---

argument that DOMA serves a governmental interest in "responsible procreation and child-rearing." H.R. Rep. No. 104-664, at 13. As the Department has explained in numerous filings, since the enactment of DOMA, many leading medical, psychological, and social welfare organizations have concluded, based on numerous studies, that children raised by gay and lesbian parents are as likely to be well-adjusted as children raised by heterosexual parents.

[6] *See Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002); *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 292-94 (6th Cir. 1997).

[7] *See, e.g.*, H.R. Rep. at 15–16 (judgment [opposing same-sex marriage] entails both moral disapproval of homosexuality and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality"); *id.* at 16 (same-sex marriage "legitimates a public union, a legal status that most people ... feel ought to be illegitimate" and "put[s] a stamp of approval ... on a union that many people ... think is immoral"); *id.* at 15 ("Civil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality"); *id.* (reasons behind heterosexual marriage—procreation and child-rearing—are "in accord with nature and hence have a moral component"); *id.* at 31 (favorably citing the holding in *Bowers* that an "anti-sodomy law served the rational purpose of expressing the presumed belief ... that homosexual sodomy is immoral and unacceptable"); *id.* at 17 n.56 (favorably citing statement in dissenting opinion in *Romer* that "[t]his Court has no business ... pronouncing that 'animosity' toward homosexuality is evil").

fear" are not permissible bases for discriminatory treatment); *see also Romer*, 517 U.S. at 635 (rejecting rationale that law was supported by "the liberties of landlords or employers who have personal or religious objections to homosexuality"); *Palmore v. Sidotti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

### Application to Second Circuit Cases

After careful consideration, including a review of my recommendation, the President has concluded that given a number of factors, including a documented history of discrimination, classifications based on sexual orientation should be subject to a heightened standard of scrutiny. The President has also concluded that Section 3 of DOMA, as applied to legally married same-sex couples, fails to meet that standard and is therefore unconstitutional. Given that conclusion, the President has instructed the Department not to defend the statute in *Windsor* and *Pedersen*, now pending in the Southern District of New York and the District of Connecticut. I concur in this determination.

Notwithstanding this determination, the President has informed me that Section 3 will continue to be enforced by the Executive Branch. To that end, the President has instructed Executive agencies to continue to comply with Section 3 of DOMA, consistent with the Executive's obligation to take care that the laws be faithfully executed, unless and until Congress repeals Section 3 or the judicial branch renders a definitive verdict against the law's constitutionality. This course of action respects the actions of the prior Congress that enacted DOMA, and it recognizes the judiciary as the final arbiter of the constitutional claims raised.

As you know, the Department has a longstanding practice of defending the constitutionality of duly-enacted statutes if reasonable arguments can be made in their defense, a practice that accords the respect appropriately due to a coequal branch of government. However, the Department in the past has declined to defend statutes despite the availability of professionally responsible arguments, in part because the Department does not consider every plausible argument to be a "reasonable" one. "[D]ifferent cases can raise very different issues with respect to statutes of doubtful constitutional validity," and thus there are "a variety of factors that bear on whether the Department will defend the constitutionality of a statute." Letter to Hon. Orrin G. Hatch from Assistant Attorney General Andrew Fois at 7 (Mar. 22, 1996). This is the rare case where the proper course is to forgo the defense of this statute. Moreover, the Department has declined to defend a statute "in cases in which it is manifest that the President has concluded that the statute is unconstitutional," as is the case here. Seth P. Waxman, *Defending Congress*, 79 N.C. L.Rev. 1073, 1083 (2001).

In light of the foregoing, I will instruct the Department's lawyers to immediately inform the district courts in *Windsor* and *Pedersen* of the Executive Branch's view that heightened scrutiny is the appropriate standard of review and that, consistent with that standard, Section 3 of

DOMA may not be constitutionally applied to same-sex couples whose marriages are legally recognized under state law. If asked by the district courts in the Second Circuit for the position of the United States in the event those courts determine that the applicable standard is rational basis, the Department will state that, consistent with the position it has taken in prior cases, a reasonable argument for Section 3's constitutionality may be proffered under that permissive standard. Our attorneys will also notify the courts of our interest in providing Congress a full and fair opportunity to participate in the litigation in those cases. We will remain parties to the case and continue to represent the interests of the United States throughout the litigation.

Furthermore, pursuant to the President's instructions, and upon further notification to Congress, I will instruct Department attorneys to advise courts in other pending DOMA litigation of the President's and my conclusions that a heightened standard should apply, that Section 3 is unconstitutional under that standard and that the Department will cease defense of Section 3.

A motion to dismiss in the *Windsor* and *Pedersen* cases would be due on March 11, 2011. Please do not hesitate to contact us if you have any questions.

Sincerely yours,

*[signature]*

Eric H. Holder, Jr.
Attorney General