1 | CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
2 | Peter A. Schey (Cal. Bar No. 58232)
Carlos R. Holguín (Cal. Bar No. 90754)
3 | 256 S. Occidental Blvd.
Los Angeles, CA 90057
4 | Telephone: (213) 388-8693 (Schey Ext. 304, Holguín ext. 309)
5 | Facsimile: (213) 386-9484
pschey@centerforhumanrights.org
6 | crholguin@centerforhumanrights.org
7
8 | *Additional counsel listed next page*
9 | *Attorneys for Plaintiffs*
10
11
12
13 | UNITED STATES DISTRICT COURT FOR THE
14 | CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION
15 | MARTIN R. ARANAS, *et al.,*  ) SACV12-01137 CBM (AJWx)
16 |                              )
           Plaintiffs,          ) PLAINTIFFS' SUPPLEMENTAL
17 |                              ) AUTHORITY IN OPPOSITION TO
     -vs-                        ) MOTION TO STAY PROCEEDINGS.
18 |                              )
19 | JANET NAPOLITANO, Secretary of the )
     Department of Homeland Security; *et al.,* )
20 |                              ) Hearing: None
           Defendants.          ) Time: n/a
21 |                              ) Hon. Consuelo B. Marshall
22 | _____ )
23 | / / /
24
25
26
27
28

1

2

3 *Additional counsel for plaintiff Aranas:*

4 PUBLIC LAW CENTER

5 Julie Greenwald (Cal. Bar No. 233714)
Monica Ashiku (Cal. Bar No. 263112)

6 601 Civic Center Drive West

7 Santa Ana, CA 92701
Telephone: (714) 541-1010 (Greenwald Ext. 263, Ashiku Ext. 249)

8 Facsimile: (714) 541-5157

9 jgreenwald@publiclawcenter.org
mashiku@publiclawcenter.org

10

11 ASIAN LAW ALLIANCE
Beatrice Ann M. Pangilinan (Cal. Bar No. 271064)

12 184 Jackson Street, San Jose, CA 95112
Telephone: (408) 287-9710

13 Facsimile: (408) 287-0864

14 Email: bpangilinan@asianlawalliance.org

15 *Additional counsel for plaintiffs Rodriguez and DeLeon:*

16 LAW OFFICES OF MANULKIN & BENNETT

17 Gary H. Manulkin (Cal. Bar No. 41469)
Reyna M. Tanner (Cal. Bar No. 197931)

18 10175 Slater Avenue, Suite 111

19 Fountain Valley, CA 92708
Telephone: 714-963-8951

20 Facsimile: 714-968-4948

21 gmanulkin@mgblaw.com
reynatanner@yahoo.com

22

23 / / /

24

25

26

27

28

SUPPLEMENTAL AUTHORITY IN OPPOSITION TO MOTION TO STAY

This action challenges the discriminatory denial of benefits under the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, to members of lawful marriages solely because the spouses are of the same sex. Defendants refuse to recognize same-sex marriages as valid predicates for the granting of immigration benefits pursuant to § 3(a) of the Defense of Marriage Act, Pub. L. 104-199, § 3(a), 110 Stat. 2419, *codified at* 1 U.S.C. § 7 ("DOMA"), a statue defendants concede is unconstitutional. Defendants refuse to extend to plaintiffs and those similarly situated even *temporary* protection from illegal status, forced unemployment or illegal employment, and detention or removal pending a final determination that DOMA is unconstitutional.

Under submission is defendants' motion to stay all proceedings herein on the ground the Supreme Court may decide in another action whether DOMA § 3 denies equal protection. Dkt. No. 114; *see also* Petition for Writ of Certiorari, *United States v. Windsor*, No. 12-307 (S. Ct. Sept. 11, 2012), 2012 WL 3991414, at I (asking Court to decide "[w]hether Section 3 of DOMA violates the Fifth Amendment's guarantee of equal protection of the laws ....").

In opposing defendants' motion to stay, Dkt. 115, plaintiffs noted the Supreme Court's having appointed *amica curiae* in *Windsor* "to brief and argue 'in support of the positions that the Executive Branch's agreement with the court below that DOMA is unconstitutional deprives this Court of jurisdiction to decide this case, and that the Bipartisan Legal Advisory Group of the United States House of Representatives lacks

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

Article III standing in this case.'" Brief for Court-Appointed *Amica Curiae* Addressing Jurisdiction, January 24, 2013, Exhibit A, at 1-2 (*quoting United States v. Windsor*, 81 U.S.L.W. 3324 (December 7, 2012)). Therefore, plaintiffs suggested that jurisdictional obstacles could well preclude the Supreme Court's reaching in *Windsor* whether DOMA § 3 offends equal protection. Plaintiffs argued that given the obvious and ongoing irreparable harm suffered by plaintiffs and their proposed class members, this action should not be stayed on the off chance the Court might decide DOMA § 3's consonance with equal protection in *Windsor*.

The points and authorities *amica curiae* recently filed at the invitation of the Supreme Court make clear that the Court's disposition in *Windsor* may very well turn on jurisdictional issues and not on the merits of DOMA § 3's discriminating against same-sex couples.

Court-appointed *amica* argues, *inter alia*, that "BLAG lacks Article III standing"; that "any injury that might arise from nondefense of a law would be to the whole Congress, which one House cannot alone assert"; that "BLAG is not the House, but an '[a]dvisory' body that lack[s] authority to represent the House"; and that the "United States' agreement with the courts below … deprives this Court of jurisdiction, because the United States suffers no injury sufficient to invoke Article III jurisdiction." *Id*. at 6, 8.

The authorities *amica* marshals are highly relevant to whether this matter should be stayed pending the Supreme Court's disposition of *Windsor*, and plaintiffs

Supp. Authority re: Motion to Stay

- 2 -

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

accordingly submit her brief herewith for the Court's consideration.

Of course, plaintiffs continue to believe that the very most the Supreme Court could decide in *Windsor* is whether DOMA § 3 denies equal protection and that plaintiffs' due process claim would remain for this Court's resolution regardless.

More importantly, plaintiffs contend that the Supreme Court's granting *certiorari* in *Windsor* does nothing to ameliorate the irreparable injury plaintiffs and their proposed class members are experiencing, and that plaintiffs remain entitled to a preliminary injunction *Windsor* notwithstanding. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (prescribing requirements for preliminary injunction).

This Court should accordingly deny defendants' motion for a stay and decide plaintiffs' pending motions for preliminary injunction, Dkt. No. 12, and class certification, Dkt. No. 13, at its earliest opportunity.

Dated: February 19, 2013.

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Peter A. Schey
Carlos R. Holguín

/s/ Carlos R. Holguín _____

/s/ Peter Schey _____

*Attorneys for Plaintiffs*

Supp. Authority re: Motion to Stay

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

- 3 -

Exhibit A

No. 12-307

# In The
# Supreme Court of the United States

———————

UNITED STATES,

*Petitioner*,

v.

EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS
EXECUTOR OF THE ESTATE OF THEA CLARA SPYER, *ET
AL.*,

*Respondents.*

———————

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———————

**BRIEF FOR COURT-APPOINTED
*AMICA CURIAE* ADDRESSING JURISDICTION**

———————

Patricia A. Millett
Ruthanne M. Deutsch
Akin Gump Strauss Hauer &
Feld LLP
1333 New Hampshire Ave,
NW
Washington, DC 20036
202-887-4000

Michael C. Small
Akin Gump Strauss Hauer &
Feld LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067
(310) 229-1000

Vicki C. Jackson
  *Counsel of Record*
1545 Massachusetts
Avenue
Cambridge, MA 02138
(617) 496-0555
vjackson@law.harvard.edu

## QUESTIONS PRESENTED

I. Whether the Bipartisan Legal Advisory Group of the United States House of Representatives has Article III standing in this case.

II. Whether the Executive Branch's agreement with the court below that DOMA is unconstitutional deprives this Court of jurisdiction to decide this case.

ii

# TABLE OF CONTENTS

QUESTIONS PRESENTED..........................................i

INTERESTS OF THE *AMICA CURIAE* ................... 1

PROCEDURAL BACKGROUND ............................. 2

SUMMARY OF ARGUMENT ................................. 6

I. BLAG LACKS ARTICLE III STANDING............7

    A. BLAG's Generalized Claim of Injury Is
       Insufficient for Article III Standing As No
       Special Congressional Prerogatives Are At
       Stake.....................................................................8

    B. One House Lacks Standing to Assert an
       Injury to Congress .........................................15

    C. BLAG Was Not Authorized to Represent the
       Views of the House .........................................17

    D. Separation of Powers Concerns Counsel
       Against Extending *Chadha* To Uphold
       BLAG's Standing ...........................................20

II. THE EXECUTIVE BRANCH'S AGREEMENT
    WITH THE DECISION BELOW THAT DOMA
    IS UNCONSTITUTIONAL DEPRIVES THIS
    COURT OF JURISDICTION..............................23

    A. *Chadha* Does Not Support This Court's
       Jurisdiction Here ...........................................24

    B. The United States' Effort to Obtain Review
       of a Decision With Which it Agrees Presents
       No Case Or Controversy.................................28

iii

C.  Even if Article III Injury Were Found,
Prudential Standing Considerations
Confirm *This* Court's Lack of Jurisdiction. ...33

D.  The Prevailing Party Rule Bars Appellate
Review ............................................................38

CONCLUSION ......................................................... 40

iv

# TABLE OF AUTHORITIES

<u>C</u>ASES:

*Allen v. Wright,*
    468 U.S. 737 (1984) .......................................... 8, 33

*Alliance to End Repression v. Chicago,*
    820 F.2d 873 (7th Cir. 1987) ......................... 30, 32

*Already LLC v. Nike, Inc.,*
    __ S. Ct. __, 2013 WL 85300 (Jan. 9, 2013) ......... 19

*Alvarez v. Smith,*
    558 U.S. 87 (2009) ................................................ 19

*Arizonans for Official English v. Arizona,*
    520 U.S 43 (1997) ......................................... 11, 16

*ASARCO Inc. v. Kadish,*
    490 U.S. 605 (1989) ....................................*passim*

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983) ............................................. 28

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ............................................. 21

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................. 7, 13, 20, 21

*Camreta v. Greene,*
    131 S. Ct. 2020 (2011) ..................................*passim*

v

*Chadha v. INS,*
    634 F.2d 408 (9th Cir. 1980) ................................. 27

*Cheng Fan Kwok v. INS,*
    392 U.S. 206 (1968) ........................................ 10, 11

*Clinton v. New York,*
    524 U.S. 417 (1989) ............................................ 12

*Coleman v. Miller,*
    307 U.S. 433 (1939) ............................................ 12

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................ 22

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ............................................ 16

*Deposit Guar. Nat'l Bank v. Roper,*
    445 U.S. 326 (1980) .................................. 38, 39, 40

*Diamond v. Charles,*
    476 U.S. 54 (1986) ............................................. 32

*Dickerson v. United States,*
    530 U.S. 428 (2000) ............................................ 25

*Director, OWCP v. Perini N. River Assocs.,*
    459 U.S. 297 (1983) ....................................... 25, 26

*Elk Grove Unified Sch. Dist. v. Newdow,*
    542 U.S. 1 (2004) .......................................... 33, 37

*FEC v. Akins,*
    524 U.S. 11 (1998) ............................................. 35

vi

*Friends of the Earth, Inc. v. Laidlaw Envtl.*
   *Servs., Inc.,*
   528 U.S. 167 (2000) ............................................ 20

*Glidden Co. v. Zdanok,*
   370 U.S. 530 (1962) ............................................ 26

*Grupo Dataflux v. Atlas Global Grp.,*
   541 U.S. 567 (2004) ............................................ 19

*GTE Sylvania, Inc. v. Consumers Union of the*
   *United States, Inc.,*
   445 U.S. 375 (1980) ............................................ 31

*Gunn v. University Comm. to End War,*
   399 U.S. 383 (1970) ............................................ 39

*Heckler v. Edwards,*
   465 U.S. 870 (1984) ................................. 15, 36, 37

*Hohn v. United States,*
   524 U.S. 236 (1998) ............................................ 33

*INS v. Chadha,*
   462 U.S. 919 (1983) ......................................*passim*

*Karcher v. May,*
   484 U.S. 72 (1987) ............................................. 11

*Keene Corp. v. United States,*
   508 U.S. 200 (1993) ............................................ 19

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................ 25

vii

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................ 7, 8, 15, 19

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) ............................................. 13

*Metro Broad., Inc. v. FCC,*
    497 U.S. 547 (1990) ............................................. 25

*Metropolitan Wash. Airports Auth. v. Citizens*
    *for the Abatement of Aircraft Noise, Inc.,*
    501 U.S. 252 (1991) ............................................. 20

*Mollan v. Torrance,*
    22 U.S. (1 Wheat.) 537 (1824) ............................ 19

*Moore v. Charlotte-Mecklenburg Bd. of Educ.,*
    402 U.S. 47 (1971) ............................................... 31

*Morrison v. Olson,*
    487 U.S. 654 (1988) ............................................. 14

*Muskrat v. United States,*
    219 U.S. 346 (1911) .................................. 23, 28, 29

*Myers v. United States,*
    272 U.S. 52 (1926) ............................................... 11

*New York Tel. Co. v. Maltbie,*
    291 U.S. 645 (1934) ............................................. 39

*Powell v. McCormack,*
    395 U.S. 486 (1969) ............................................... 9

viii

*Princeton Univ. v. Schmid,*
    455 U.S. 100 (1982) .................................. 29, 30, 32

*Raines v. Bird,*
    521 U.S. 811 (1997) ......................................*passim*

*Reed v. County Comm'rs of Del. Co., Pa.,*
    277 U.S. 376 (1928) ........................................ 17, 19

*Ruotolo v. Ruotolo,*
    572 F.2d 336 (1st Cir. 1978)................................ 30

*United States v. Alaska S.S. Co.,*
    253 U.S. 113 (1920) ............................................. 32

*United States v. Johnson,*
    319 U.S. 302 (1943) ............................................. 23

*United States v. Lovett,*
    328 U.S. 303 (1946) ....................................... 10, 11

*United States v. Providence Journal Co.,*
    485 U.S. 693 (1988) ............................................. 24

*United States v. Richardson,*
    418 U.S. 166 (1974) ......................................... 8, 35

*United States v. Smith,*
    286 U.S. 6 (1932) ........................................... 11, 17

*Valley Forge Christian Coll. v. Americans United*
    *for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982) ........................................... 9, 34

ix

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................ 16, 17


**CONSTITUTION AND STATUTES:**

U.S. CONST. Art. I, § 1 ............................................... 16

Defense of Marriage Act of 1996, Pub. L. No.
    104-199, 110 Stat. 2419 ......................................... 2

1 U.S.C.
    § 7............................................................................ 4

2 U.S.C.
    § 130f.................................................................... 18
    § 288b.................................................................... 18
    § 288e.................................................................... 18

28 U.S.C.
    § 516...................................................................... 24
    § 518...................................................................... 24
    § 530D(b)(2) ......................................................... 18
    § 1252 (1982) ................................................. 36, 40
    § 1254........................................................... *passim*
    § 1291............................................................. 36, 39
    § 2403...................................................... 3, 18, 19

Pub. L. No. 100-352, § 1, 102 Stat. 662 (1988) ......... 36

Pub. L. No. 249, 78th Cong., 2nd Sess., 58 Stat.
    113 (1944) ............................................................ 18

x

**Rules:**

Fed. R. Civ. P.

    24(a)(1)...................................................................... 3
    24(a)(2)...................................................................... 3
    24(b)(1)(A)................................................................. 3

**Other Authorities:**

Fallon Jr., Richard H. *et al.*, Hart & Wechsler's Federal Courts and the Federal System (6th ed. 2009)........................... 32

Easterbrook, Frank H., *Presidential Review*, 40 Case W. Res. L. Rev. 905 (1990).......................... 14

H.R. Res. 386, 78th Cong., 1st Sess., 89 Cong. Rec. 10882 (1943)................................................ 18

H.R. Res. 49, 97th Cong., 1st Sess. 127 Cong. Rec. 1304 (1981)................................................. 17

H.R. Res. 5, 113th Cong., 1st Sess., 159 Cong. Rec. H8 (2013)..................................................... 5

H.R. Rule II.8, 112th Cong. (rev. 2011) .................. 17

Roberts Jr., John G., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219 (1993) .................................................................. 14

xi

S. Res. 40, 97th Cong., 1st Sess., 127 Cong.
    Rec. 1032 (1981)................................................... 17

In The

# Supreme Court of the United States

———————

No. 12-307

UNITED STATES,

*Petitioner*,

v.

EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS
EXECUTOR OF THE ESTATE OF THEA CLARA SPYER,
*ET AL.*,

*Respondents.*

———————

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

———————

## BRIEF FOR COURT-APPOINTED
## *AMICA CURIAE* ADDRESSING JURISDICTION

## INTERESTS OF THE *AMICA CURIAE*

This brief is submitted in response to the
Court's order of December 11, 2012, appointing
counsel as *amica curiae* to brief and argue "in
support of the positions that the Executive Branch's
agreement with the court below that DOMA is
unconstitutional deprives this Court of jurisdiction to
decide this case, and that the Bipartisan Legal
Advisory Group of the United States House of

(1)

2

Representatives lacks Article III standing in this case."

## PROCEDURAL BACKGROUND

1. In November 2010, Edith Windsor, as executor of the estate of Thea Clara Spyer, sued the United States in district court, seeking a tax refund of $363,053. JA149, 173. That amount represents the additional federal estate tax paid because the Defense of Marriage Act ("DOMA"), Pub. L. No. 104-199, 110 Stat. 2419 (1996), forbade recognition of Windsor's marriage to another woman and thus denied her the marital exemption to the federal estate tax. Windsor argued that DOMA is unconstitutional. JA170-172.

Three months later, the Attorney General notified Congress that he and "the President *** have concluded that classifications based on sexual orientation warrant heightened scrutiny and that, as applied to same-sex couples legally married under state law, Section 3 of DOMA is unconstitutional." JA185. The notification stated that the Executive Branch would continue to enforce DOMA, "consistent with the Executive's obligation to take care that the laws be faithfully executed, unless and until Congress repeals Section 3 or the judicial branch renders a definitive verdict against the law's constitutionality." JA192.

Following the Attorney General's notification, the Bipartisan Legal Advisory Group of the House of Representatives ("BLAG") voted 3-2 to intervene in the litigation to defend the constitutionality of

3

DOMA.  JA195, 196 n.1.  As its title suggests, BLAG
is an "[a]dvisory" body, that is to be "consult[ed]" by
the Speaker of the House, who gives "direction" to the
General Counsel of the House, according to Rule II.8
of the Rules of the U.S. House of Representatives
during all periods of this litigation.  *Id.*

When BLAG moved to intervene in district
court, the Department of Justice ("DOJ"), on behalf of
the United States, argued that although BLAG
lacked Article III standing, it was "unnecessary for
BLAG to have an independent basis for standing"
because the Executive Branch's role "ensures the
continuing existence of a justiciable case or
controversy."  JA207-208.  DOJ urged that BLAG's
intervention be limited to "present[ing] arguments,"
leaving it to DOJ to "file appropriate motions, purely
as a procedural matter, to ensure that" the court
could consider arguments "on both sides of the
constitutional issue" and would have "jurisdiction to
enter judgment."  *Id.*

The court rejected BLAG's argument that it
was entitled to intervene as of right under Federal
Rule of Civil Procedure 24(a)(1) and (b)(1)(A), ruling
that BLAG was not the "United States," which may
intervene as of right under 28 U.S.C. § 2403, and
"there is no statute explicitly authorizing
intervention by the House (or any subgroup or
representative thereof) to defend the constitutionality
of a statute."  JA222 & n.2.  The court then allowed
BLAG to intervene as of right (and "as a full party")
under Rule 24(a)(2), because "BLAG has a cognizable
interest in defending the enforceability of statutes
the House has passed when the President declines to

4

enforce them" and had Article III standing.  JA223, 226-227.

The district court subsequently granted summary judgment for Windsor, holding that Section 3 of DOMA, 1 U.S.C. § 7, was unconstitutional and awarding her $363,053.  JA115.

2.  The United States, represented by the DOJ, noticed an appeal.  JA524.  BLAG also noticed an appeal, JA522, and moved to dismiss DOJ's appeal for lack of appellate standing because the United States "prevailed below."  JA527.  DOJ opposed, arguing that "[b]ecause that judgment prevents the Executive Branch from taking enforcement action it would otherwise take, it is aggrieved by the judgment and has standing to appeal."  JA533.  Prior to the Second Circuit's decision, Windsor and the United States separately petitioned for certiorari before judgment.

On October 18, 2012, the court of appeals denied BLAG's motion to dismiss and affirmed the district court. U.S. Supp. Br. App. at 3a.  As relevant here, the Second Circuit explained: "Notwithstanding the withdrawal of its advocacy, the United States continues to enforce Section 3 of DOMA, which is indeed why Windsor does not have her money.  The constitutionality of the statute will have a considerable impact on many operations of the United States." *Id.* at 4a (citing *INS v. Chadha*, 462 U.S. 919, 931 (1983)).

3. On October 26, 2012 the United States filed a supplemental brief advising this Court of the

5

Second Circuit's decision and suggesting that the
Court "now consider the present petition as one for
certiorari after judgment and, if it were to grant the
petition, review the judgment of the court of appeals."
U.S. Supp. Br. at 7.  Respondent Windsor asked the
Court to grant the United States' petition, Windsor
Supp. Br. at 1, while BLAG opposed the request,
arguing that certiorari should instead be granted in
another case presenting the issue.  BLAG Supp. Br.
at 2.

On December 7, 2012, this Court granted the
United States' petition for writ of certiorari before
judgment on the question of DOMA's
constitutionality, and added the two jurisdictional
questions, which *amica* was later invited to brief and
argue.

4.  On December 28, 2012, BLAG filed a
petition for writ of certiorari from the Second Circuit
decision.  And on January 3, 2013, the House of
Representatives adopted a resolution "authoriz[ing]"
the 113th Congress' BLAG "to act as successor in
interest" to the 112th Congress' BLAG in "civil
actions" in which BLAG had intervened during the
112th Congress to defend the constitutionality of
DOMA Section 3, including this case.  H.R. Res. 5,
113th Cong., §4(a)(1), 1st Sess., 159 CONG. REC. H8
(2013).  The resolution further states that BLAG
"continues to speak for, and articulate the
institutional position of, the House in all litigation
matters in which it appears, including in *Windsor v.
United States*."

6

## SUMMARY OF ARGUMENT

I. BLAG lacks Article III standing. Congress itself would lack standing to defend the constitutionality of laws that do not concern its own specific prerogatives; the interest here in assuring that the law is enforced is a generalized one, insufficient for Article III injury. It is the Executive Branch, not Congress, that is obligated to "take Care" that laws are enforced. Moreover, any injury that might arise from nondefense of a law would be to the whole Congress, which one House cannot alone assert. In *INS v. Chadha*, 462 U.S. 919 (1983), a special legislative prerogative under the Line Item Veto Act was asserted *and* both houses intervened. *Chadha* should not be extended here, especially given *Raines v Byrd*, 521 U.S. 811 (1997). Finally, BLAG lacked authority to speak for the House at relevant times.

II. The United States' agreement with the courts below (and with Windsor) deprives this Court of jurisdiction, because the United States suffers no injury sufficient to invoke Article III jurisdiction. An interest in obtaining a ruling from a higher court does not create standing. Even if the United States' claim of "aggrievement" were sufficient for Article III, prudential concerns involving the Executive Branch's assertion of the generalized interests of others should also preclude this Court from recognizing its standing. The jurisdictional statutes, which have changed since *Chadha*, reinforce the need to respect prudential limitations, if not in the court of appeals at least in this Court. Finally, the United States is a prevailing party, not within the exception of *Camreta*

7

*v. Greene*, 131 S. Ct. 2020 (2011), and thus cannot appeal.

## I.   BLAG LACKS ARTICLE III STANDING.

As this Court explained in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the "doctrine of standing" is central to "setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III ***.  Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," *id.* at 560.

Article III's standing requirements enforce and are reinforced by the Constitution's separation-of-powers principles.  The separation of law-making from law-execution is a distinctive feature of our Constitution.  And as part of this structural separation, this Court has held that the Constitution bars Congress from vesting itself with the power to appoint officers charged with executing federal laws, including through litigation, *Buckley v. Valeo*, 424 U.S. 1, 138-140 (1976).  These general principles frame the congressional standing analysis.

BLAG lacks standing for at least three reasons.  First, BLAG has suffered no injury to a legally cognizable interest beyond the diffuse, generalized interests of all citizens that duly enacted and constitutional laws be enforced; no special prerogatives of BLAG, the House or Congress are threatened.  Second, if there were any distinct

8

legislative injury arising from the Executive Branch's refusal to defend the constitutionality of this statute, that injury would afflict the Congress *as a whole*. A single house (or part thereof) does not have standing to assert that interest, and the Senate has not intervened. Third, BLAG is not the House, but an "[a]dvisory" body that lacked authority to represent the House when it moved to intervene, noticed its appeal to the Second Circuit, and petitioned this Court for certiorari.

### A.   BLAG's Generalized Claim of Injury Is Insufficient for Article III Standing As No Special Congressional Prerogatives Are At Stake

An irreducible component of Article III standing is a "concrete," "personal injury," "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 756 (1984). Yet BLAG asserts only a generalized interest in seeing statutes that Congress enacted implemented, an interest that is widely shared by the people at large. BLAG asserts no judicially cognizable, concrete injury to itself, to the House of Representatives or to Congress. In *Lujan*, 504 U.S. at 575-576, the Court underscored that "injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable." This Court has repeatedly recognized that such a generalized interest is insufficient to confer standing. See, e.g., *United States v. Richardson*, 418 U.S. 166, 176-177 (1974).

9

"[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 483 (1982).

Members of Congress are not exempt from constitutional requirements of standing. They too must show a "personal stake," a "particularized" injury, that is "legally and judicially cognizable," to bring suit in federal courts. *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Because the generalized interest in the constitutionality of its statutes does not confer standing on Congress or its members, this Court's caselaw has upheld legislative standing only in situations where there is a concrete threat to the institutional prerogatives of the legislature or to the personal rights of its members, as in *Powell v. McCormack*, 395 U.S. 486 (1969), where a member-elect alleged that he was wronged when the House refused to seat him. Otherwise, neither legislators nor Congress nor its Houses – or their subparts – have standing.

In *Chadha*, this Court held that Congress was a proper party to defend the constitutionality of a statute that the Executive Branch would not defend.[1]

---

[1] Although it did not use the word "standing," *Chadha's* (admittedly not crystalline) discussion repeatedly referred to Congress as a proper party and stated that its presence assured "concrete adverseness." *See* 462 U.S. at 930 n. 5; 939-940. *Cf. Raines*, 521 U.S. at 818 ("The standing inquiry focuses on whether the plaintiff is the proper party[.]").

10

Under the statute at issue, each House had authority to disallow decisions made by the INS under the law – known as the one-house veto. *See* 462 U.S. at 925. When the House of Representatives voted to invalidate the INS's decision to suspend Chadha's deportation, Chadha sought review, arguing that the legislative veto was unconstitutional. *Id.* at 928. When the Executive Branch declined to defend the constitutionality of this veto, the Houses of Congress defended the law, first as *amici* and, after the Ninth Circuit decision, as intervenors. *Id.* at 928, 930 n.5.

Accordingly, unlike this case, in *Chadha* the legal injury asserted by the intervening Houses went well beyond a generic, broadly held interest in the constitutionality of laws for their own sake. Instead, *Chadha* involved Congress's effort to defend distinct, statutorily created powers of the Houses of Congress that were specifically, concretely and uniquely tied to the provisions of the particular statute the constitutionality of which was at issue.

Overbroad language in *Chadha,* however, suggested that congressional standing was more general and well-settled. *See* 462 U.S. at 940 ("We have long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional."). But the two cases the Court cites in support of this proposition—*United States v. Lovett*, 328 U.S. 303 (1946) and *Cheng Fan Kwok v. INS*, 392 U.S. 206 (1968)—do not sustain it.

11

In *Lovett*, Congress appeared, not as a party or intervenor that requires standing, but "*as amicus curiae.*"  328 U.S. at 304 ("John C. Gall argued the cause for the Congress of the United States, *as amicus curiae*[.]") (emphasis added).[2]   *Cheng Fan Kwok* is even less relevant, because it involved *no* congressional entity at all.   Rather, because the parties both disagreed with the judgment below, the Court appointed an attorney, William H. Dempsey, not identified as having any connection to Congress, to defend that judgment as an *amicus. See* 392 U.S. at 210 n.9.[3]

In another line of cases, the Court has indicated that *state* legislatures or their officers may have standing to defend the constitutionality of state laws, depending on state law.  *See, e.g., Karcher v. May*, 484 U.S. 72, 81-82 (1987); *Arizonans for Official English v. Arizona*, 520 U.S 43, 65 (1997).   But because federal separation-of-powers requirements

---

[2] In *Lovett*, the United States certiorari petition  noted that DOJ had "been requested by the Special Counsel appointed by the subcommittee of the  House Committee on Appropriations to file this petition," and stated its agreement that "the questions presented are worthy of review on certiorari." U.S. Pet. for Writ of Cert. at 9, 328 U.S. 303 (No. 809).

[3] In *United States v. Smith*, 286 U.S. 6, 29-30 (1932), the Attorney General authorized the Senate to bring an action, in the name of the United States; that case too involved a special legislative prerogative – the asserted power of the Senate to withdraw confirmation of an executive branch officer who had already received his commission.  In *Myers v. United States*, 272 U.S. 52 (1926), which also involved a claimed congressional prerogative, a member of the Senate was appointed only "as a friend of the Court," *id.* at 176, to argue in support of the constitutionality of a federal statute that the Executive Branch argued was unconstitutional.

12

do not necessarily apply to the organization of state governments, judicially cognizable injuries for congressional and state legislators may differ.

Nor does *Coleman v. Miller*, 307 U.S. 433 (1939), support BLAG's standing here. Not only did *Coleman* involve state legislators, but there was a special legislative prerogative at stake: voting on proposed constitutional amendments. State senators challenged whether the Lieutenant Governor, who cast a tie-breaking vote on whether to ratify a proposed amendment, was part of the legislature for purposes of U.S. Const. Art. V. *Id.* at 438, 441.

By contrast, in *Raines* this Court held that individual members of Congress lacked Article III standing to challenge the constitutionality of the Line Item Veto Act, which authorized the President to cancel piecemeal, and effectively repeal, the provisions of duly enacted laws. *Raines*, 521 U.S. at 815, 826; *see Clinton v. New York*, 524 U.S. 417, 438 (1989). Members of Congress claimed that the grant of this power to the President undermined the effectiveness of their votes. *Raines*, 521 U.S. at 825. The Court held, however, that this "abstract dilution of institutional legislative power" did not confer standing, unlike the concrete claim of flat-out "vote nullification at issue in *Coleman*." *Raines*, 521 U.S. at 826. Emphasizing that claims of legislative standing must be carefully scrutinized, the Court explained that to find standing there "would require a drastic extension," *id.*, of *Coleman*. No such extension was warranted, however, because of the "vast difference between the level of vote nullification" in *Coleman*, and the "wholly abstract

13

and widely dispersed" claim of institutional injury
alleged in *Raines*.   *Id*. at 823, 826, 829.

BLAG's claim of injury arising from the
constitutional challenge to DOMA and the prospect of
its invalidation as unconstitutional likewise falls
short of Article III's particularized injury
requirement.   In neither *Raines* nor here is there the
kind of specific, concrete threat to any distinct
legislative prerogative – whether it be the right of a
state legislature to vote on constitutional
amendments, or the power of the congressional
houses to exercise a legislative veto – that past cases
indicate could sustain legislative standing.[4]

When the Executive Branch declines to defend
a law it has enforced, members of Congress suffer no
distinct, judicially cognizable injury.   Their votes are
not nullified and the statute stands as enacted.
BLAG seeks only to vindicate a "widely dispersed"
interest – shared by citizens and legislators alike–in
the constitutionality of a federal law.

The Court in *Raines* stressed the importance of
a properly constrained approach to legislative
standing, because of more general concerns about
"decid[ing] whether an action taken by one of the
other two branches of the Federal Government was

---

[4] Congress has powers of investigation relating to its lawmaking
functions, *see Buckley,* 424 U.S. at 137, that may lead it to
become involved in litigation, *e.g.*, to enforce subpoenas.   *Cf.
McGrain v. Daugherty*, 273 U.S. 135 (1927) (upholding
congressional power to compel production of information
germane to its legislative functions). No such congressional
power is involved here.

14

unconstitutional," and the "historical experience" of how inter-branch conflicts at the federal level were handled. *See* 521 U.S. at 819-820, 826-829. That Congress expressly authorized its members to file lawsuits challenging the Act's constitutionality could not override basic Article III principles governing legislative standing. *Id.* at 815-816, 820 n.3. Here, too, whatever authorization BLAG may have obtained cannot overcome Article III standing barriers for lack of cognizable injury. [5]

The Constitution provides Congress with many mechanisms to express disagreement with Executive non-defense decisions. In addition to Congress and its members appearing as *amici*, Congress may hold oversight hearings, or withhold confirmations or appropriations. *See* John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1229 (1993); *cf. Morrison v. Olson*, 487 U.S. 654, 711 (1988) (Scalia, J., dissenting) (noting that Congress can use powers, like impeachment, if it disagrees with Executive enforcement decisions).

But it is the Executive Branch that is charged to "take Care that the Laws" are faithfully executed. Executive Branch decisions not to defend a law based on determinations of its unconstitutionality can function to promote a working constitutional system. Frank H. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 913-914, 928-929 (1990); *see also*

---

[5] In *Raines*, the Court attached some significance to the fact that plaintiffs, though authorized to sue individually, had "not been authorized to represent their respective Houses ***," *id.* at 829. But as argued below, BLAG did not have authorization to speak for the House, at least before January 2013.

15

*Heckler v. Edwards*, 465 U.S. 870, 873 n.2 (1984) (noting DOJ decision to stop enforcing a sex-based Social Security rule after concluding that it "could not be defended under the standards announced by [the] Court"). To allow standing based on an "undifferentiated public interest in executive officers" compliance with the law *** is to *** transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3." *Lujan*, 504 U.S. at 577. Except where constitutional or statutory prerogatives of Congress or its Houses are threatened, Congress, its members and its bodies lack standing to litigate the constitutionality of the laws Congress enacts.

## B.   One House Lacks Standing to Assert an Injury to Congress

Even if it were possible to state a judicially cognizable legislative injury from Executive failure to defend a statute involving no special legislative prerogative, any legislative interest in the constitutionality of Acts of Congress would belong to the entire Congress, not just one house. Accordingly, *both* houses would have to assert that injury by moving to intervene. *Chadha,* for example, referred to the congressional intervenors as "Congress": "[F]rom the time of Congress' formal intervention, *** the concrete adverseness is beyond doubt. Congress is both a proper party to defend the constitutionality of § 244(c)(2) and a proper petitioner under 28 U.S.C. § 1254(1)." *Chadha,* 462 U.S. at 939; s*ee also id*. at 929 ("Both Houses of Congress contend ***") (footnote omitted); *cf. id* at 930 n.5 ("The Senate

16

and House authorized intervention in this case. ***
Both Houses are therefore proper 'parties'[.]").  And
in *Arizonans for Official English*, this Court
described *Chadha* as holding that "Congress [was] a
proper party to defend [a] measure's validity *where
both Houses, by resolution, had authorized
intervention in the lawsuit*."  520 U.S. 43, 65 n.20
(1997) (emphasis added).

Where one house declines to participate (as the
Senate did here), Congress has not spoken, much less
asserted any injury that this Court would be able to
determine.  It is, after all "a Congress" that is
"vested" by the Constitution with "all legislative
Powers herein granted."  U.S. CONST. Art. I, § 1.  As
"Congress" consists of "a Senate and House of
Representatives," *id.*, there can be no judicially
cognizable injury to Congress absent both houses'
action (except perhaps where a chamber-specific
prerogative of one house is at issue).

To hold otherwise would make congressional
interventions far more likely anytime the Executive
declines to defend (or one House disagrees with how a
law is being implemented), thereby increasing the
risks of federal courts being called on to mediate
what might be partisan disagreements between
elected public officials.  Permitting one-house
standing to defend the constitutionality of any federal
law is thus inconsistent with this Court's repeated
concern for the properly limited role of the courts:
"the Framers 'did not make the judiciary the overseer
of our government.'"  *Dames & Moore v. Regan*, 453
U.S. 654, 660 (1981) (quoting *Youngstown Sheet &*

17

*Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952)
(Frankfurter, J., concurring)).

## C. BLAG Was Not Authorized to Represent the Views of the House

BLAG lacked power to act even for one house
of Congress. BLAG is not the House of
Representatives; it is an "[a]dvisory" body,
established by the internal rules of the House of
Representatives. H.R. Rule II.8, 112th Cong. (2011).
BLAG's purpose is to be "consult[ed]" by the Speaker,
who provides "direction" to the "function[ing]" of the
General Counsel of the House, who in turn
"provid[es] legal assistance and representation *to the
House.*" *Id.* (emphasis added). These words invest
BLAG with no authority to intervene as a party in
any litigation, including this case when BLAG
intervened in the courts below or even when BLAG
filed its own certiorari petition. *See Reed v. County
Comm'rs of Del. Co., Pa.*, 277 U.S. 376 (1928) (finding
Senate resolutions insufficient to authorize Senate
committee's resort to courts).[6]

The absence of authorization contrasts with
*Chadha*, where both houses of Congress enacted
resolutions authorizing intervention, and both houses
intervened. *See* H.R. Res. 49, 97th Cong., 1st Sess.,
127 CONG. REC. 1304 (1981); S. Res. 40, 97th Cong.,
1st Sess., 127 CONG. REC. 1032 (1981). Likewise, in

---

[6] Although each house has constitutional authority to make its
own rules, where the rights of those outside a house – like
Windsor or the Executive – are at stake, the interpretation of
those rules becomes a matter for judicial determination. *See
Smith*, 286 U.S. at 33.

18

*Lovett* (where Congress appeared only as an *amicus*), the House passed a resolution authorizing a special subcommittee "to appoint counsel to represent the United States" in defending the statute, H.R. Res. 386, 78th Cong., 1st Sess., 89 Cong Rec. 10882 (1943), and the two houses *together* enacted legislation concerning the terms of government employment of counsel appointed pursuant to the House resolution, Pub. L. No. 249, 78th Cong., 58 Stat. 113 (1944).

Moreover, while legislation clearly authorizes the Senate to intervene in litigation,[7] no comparable legislation authorizes such action by the House. Nor was there any vote or resolution by the House as a whole during the pendency of this litigation in the lower courts. Even if the Court were prepared to recognize Article III injury to Congress from Executive nondefense of a law, at least as a prudential matter, *see Raines*, 521 U.S. at 820 n.3; *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989), it should not do so without clear legislative authorization.[8]

---

[7] *See* 2 U.S.C. § 288b (titled "Requirements for authorizing representation activity"); 2 U.S.C. § 288b(c) (authorizing intervention or appearance as amicus "only when directed to do so by a resolution adopted by the Senate").

[8] The statute establishing the House General Counsel's Office, 2 U.S.C. § 130f, does not authorize the House to intervene but instead authorizes the entry of appearances notwithstanding local bar rules on attorney admission. And while 28 U.S.C. §530D(b)(2) requires the Attorney General to notify the Houses of Congress when the Justice Department decides not to defend the constitutionality of a federal statute so as to facilitate intervention, it does not of itself authorize intervention, in the way that 2 U.S.C § 288e does for the Senate and 28 U.S.C.

19

The authority that BLAG relied on in the
lower courts, *see* JA196 n.1 (a House rule authorizing
BLAG to be "consult[ed]" by the Speaker) falls far
short of the authority this Court held *insufficient* in
*Reed*.    There, two detailed Senate resolutions
authorizing an investigative committee to subpoena
records (like ballots), did not empower committee
members to go to court to compel production of
documents relating to the election under
investigation.  277 U.S. at 386-389.

The post hoc effort to authorize BLAG, by a
House resolution adopted on January 3, 2013, cannot
retroactively cure this defect.    Without
contemporaneous authority, it is difficult to
determine whether the House was aggrieved at all at
the time of BLAG's intervention, appeal, and petition
to this Court.  As this Court has emphasized, "an
'actual controversy' must exist," both "'*at the time the
complaint is filed*,'" and "through 'all stages' of the
litigation."  *Already LLC v. Nike, Inc.*, __ S. Ct. __,
2013 WL 85300, at *4 (Jan. 9, 2013) (emphasis
added) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92
(2009)).    Federal courts' jurisdiction ordinarily is
determined by the facts at the time the suit is filed,
*see Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539
(1824); *Grupo Dataflux v. Atlas Global Grp.*, 541 U.S.
567, 570-71 (2004); *Keene Corp. v. United States*, 508
U.S. 200, 207 (1993).  That general principle applies
to the requirement of standing.  See *Lujan*, 504 U.S.

---

§ 2403 does for the United States.  Unlike the Senate, the House
is not a continuing body, and statutory authorization for
intervention might be thought especially important.

20

at 569 n.4 (plurality opinion); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) (referring to the need for standing at the time the lawsuit is filed).

The critical inquiry is thus whether BLAG had authority to litigate for the House at the outset of its intervention.  It did not – nor at the time of appeal to the court of appeals or petition to this Court.  The House cannot evade the requirements of standing at the outset and retroactively create jurisdiction in the Article III courts "nunc pro tunc."

### D.   Separation of Powers Concerns Counsel Against Extending *Chadha* To Uphold BLAG's Standing

To recognize BLAG's standing risks undermining the basic constitutional structure separating law-making from law-execution, while increasing judicial power, as courts are asked to mediate inter-Branch disputes over what the Constitution or laws require.  BLAG's intervention cannot be easily reconciled with the propositions that executive acts must be done by or under the supervision of those properly appointed to serve *outside* of Congress, while law-making must be done in accord with bicameralism and presentment.  *See Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991).

In *Buckley*, this Court held that Federal Election Commission members appointed by members of Congress could not perform the functions

21

of "Officers of the United States," including
specifically conducting litigation "in the courts of the
United States for vindicating public rights." 424 U.S.
at 140.[9]   Rejecting the argument that the FEC's
litigation functions were ancillary to Congress' power
to regulate elections, the Court declared: "A lawsuit
is the ultimate remedy for a breach of the law, *and it
is to the President, and not to the Congress,* that the
Constitution entrusts the responsibility to 'take Care
that the Laws be faithfully executed.'" *Id.* at 138
(emphasis added).   Under Article II of the
Constitution, "[s]uch functions may be discharged
only by persons who are 'Officers of the United
States'" appointed in accordance with the
Appointments Clause, which does not provide for
congressional appointment. *Id.* at 140.

Thus, "the Legislative Branch may not exercise
executive authority by retaining the power to appoint
those who will execute its laws," *Buckley,* 424 U.S. at
119.   Instead, "[o]nce Congress makes its choice in
enacting legislation, *its participation ends.* Congress
can thereafter control the execution of its enactment
only indirectly – by passing new legislation."
*Bowsher v. Synar*, 478 U.S. 714, 733-34 (1986)
(emphasis added, citations omitted).   Congress may,
of course, establish offices, *outside* of Congress, with
independent litigating authority to enforce and
defend federal law, as in *Morrison*, *supra.*   But
Congress may not seek to retain for itself such
executive functions.

---

[9] The FEC's powers included the power "to initiate ***, *defend,*
or appeal any civil action***."   *Buckley,* 424 U.S. at 166
(emphasis added).

22

In *Chadha,* this Court emphasized that, when a house of Congress acts, it presumptively acts in a legislative capacity, that is, with "the purpose and effect of altering the legal rights, duties, and relations of persons *** outside the Legislative Branch." 462 U.S. at 952. If BLAG's intervention was a legislative act, it was plainly not done through the bicameralism and presentment procedure required for such acts. If, on the other hand, BLAG's action was not a "legislative" act, it is hard to square with *Chadha's* observation that, "when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action." *Id.* at 955.[10]

The question of standing is deeply connected to the "tripartite" structure of our constitutional government. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quotation marks and citations omitted). Absent injury to special congressional prerogatives, this structure counsels that legislative standing should not be expanded beyond the circumstances of *Chadha*.

---

[10] *See also id.* (noting four instances in which the Constitution authorizes one house to act alone). Participating in litigation as a party is not among them. *See also* note 4 above.

23

## II. THE EXECUTIVE BRANCH'S AGREEMENT WITH THE DECISION BELOW THAT DOMA IS UNCONSTITUTIONAL DEPRIVES THIS COURT OF JURISDICTION

The district court plainly had jurisdiction over Windsor's lawsuit.  Although the Executive Branch came to agree with her that DOMA is unconstitutional, its refusal to pay Windsor the estate tax refund injured her and assured a genuine "case-or-controversy" in the district court.  Once that court's judgment was entered, on the United States' constitutional view, Windsor should have been paid.  Instead, DOJ filed a notice of appeal.  Now in the position of "the party attempting to invoke the federal judicial power," *ASARCO,* 490 U.S. at 618, the United States had no Article III injury to present.

Article III's case-or-controversy limits apply at every stage of the litigation, and to litigation with the United States.  "'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies,'" *Raines,* 521 U.S. at 818 (citation omitted).  Although the United States' distinctively governmental interests may afford standing in circumstances denied private parties, it cannot ask Article III courts to resolve disputes unless they meet the case-or-controversy criteria.  *See Muskrat v. United States*, 219 U.S. 346, 356 (1911); *see also United States v. Johnson*, 319 U.S. 302, 304-305 (1943).

24

Represented by the Executive Branch (as
Article II's "take Care" clause contemplates), and
through the Justice Department (as Congress by
statute provided, 28 U.S.C. §§ 516, 518; *see United
States v. Providence Journal Co.*, 485 U.S. 693 (1988),
the United States agrees that the statute blocking
Windsor's refund is an unconstitutional denial of her
rights; it agrees with the decision below that Windsor
merits a refund.  The United States thus offers no
concrete injury to its legal interests from that
judgment sufficient to invoke the jurisdiction of this
Court.

This Court thus lacks jurisdiction.  First,
because the United States agrees with *both* Windsor
and the court below, its appeal fails to present a "case
or controversy" within the meaning of Article III.
Second, even if the Executive Branch's enforcement
of the statute met core Article III requirements for
standing and adverseness, prudential considerations
support a finding of nonjusticiability, at least with
respect to this Court's jurisdiction.  Finally, ordinary
rules of appellate jurisdiction preclude appeals by
prevailing parties, like the United States, which
obtained below the very result it sought.  And no
prior case compels a different conclusion.

### A.   *Chadha* Does Not Support This Court's Jurisdiction Here

To support its claim of Article III injury, the
United States has relied on *Chadha*'s conclusion that
the INS was "aggrieved by the Court of Appeals
decision prohibiting it from taking action it would
otherwise take."   462 U.S. at 930; *see, e.g.*, JA535-

25

536.  *Chadha* and *Lovett* are the only prior cases known to counsel in which this Court exercised jurisdiction to decide the constitutionality of a federal statute that the Executive refused to defend, where that Branch appealed from a lower court judgment with which it agreed.[11]  In both cases, the Executive enforced a statute (while arguing for its unconstitutionality), resulting in injury to individuals who then brought constitutional challenges to court. Neither case supports this Court's jurisdiction here.

In *Lovett* the Court did not address any question of justiciability relating to the parties. "[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect."  *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) (citations omitted).[12]  *Lovett* also largely predates modern Article III case-or-controversy jurisprudence, an additional reason that its exercise of jurisdiction cannot resolve the issue here.  Moreover, in *Lovett*, unlike *Chadha* or here, this Court was the first Article III court seized of the constitutional question, because the Court of Claims at the time was not considered an Article III court.

---

[11] In cases such as *Myers*, *Buckley*, *Metro Broadcasting, Inc. v. FCC.*, 497 U.S. 547 (1990), and *Dickerson v. United States*, 530 U.S. 428 (2000), the United States was *not* the appealing party invoking this Court's jurisdiction.  In *Morrison*, the Independent Counsel sought review of an adverse judgment.  In *Smith*, it was the Senate, acting in the name of the United States, that appealed; its position was adverse to both Smith and the judgment below.

[12] Even when a series of cases entertain jurisdiction without addressing the question, the Court may find jurisdiction absent when that issue is joined.  *See Director, OWCP v. Perini N. River Assocs.*, 459 U.S. 297, 303 n.11 (1983).

26

*See Glidden Co. v. Zdanok*, 370 U.S. 530, 531-532 (1962) (Harlan, J.).

*Chadha* requires more analysis. In responding to arguments that the United States was not a proper party to appeal, the Court spoke only in statutory terms. *See* 462 U.S. at 930-931 & n.6. It was "for purposes of deciding whether the INS is 'any party' within the grant of [mandatory] appellate jurisdiction in [now-repealed 28 U.S.C.] § 1252" that the Court found the INS "sufficiently aggrieved by the Court of Appeals decision prohibiting it from taking action it would otherwise take." *Id.* at 930. This Court repeatedly emphasized that it was construing Section 1252. *See id.* at 930-931 ("Congress intended that this Court take notice of cases that meet the technical prerequisites of § 1252 ***."). It was for purposes of "the agency's status as an *aggrieved party under § 1252*" that the outcome was not "altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional." *Id.* at 931 (emphasis added). In discussing this statutory issue, the Court carefully avoided addressing the INS's Article III standing,[13] noting the presence of the congressional intervenors providing adversity. *See id.* at 931 n.6.

Later, the Court considered the House's argument that the case in the Ninth Circuit was "not a genuine controversy" because Chadha and the INS agreed on the unconstitutionality of the one-House

---

[13] *Cf. Perini N. River Assocs.*, 459 U.S. 297 at 304 ("[Even if a party] has statutory authority to seek review in this Court, [it ] may not have Art. III standing ***.").

27

veto.  *Chadha*, 462 U.S. at 939; *see* Br. of U.S. House of Reps. at 46-47; Reply Br. of U.S. House of Reps. at 13.  The Ninth Circuit had rejected as "untenable" the prospect "that all agencies could insulate unconstitutional orders and procedures from appellate review simply by agreeing that what they did was unconstitutional."  *Chadha v. INS*, 634 F.2d 408, 420 (9th Cir. 1980) (Kennedy, J.).  This Court agreed: "it would be a curious result if *** a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual." *Chadha*, 462 U.S. at 939.  Referring to the period before intervention (which occurred after judgment in the Court of Appeals),[14] the Court held, "there was adequate Art. III adverseness even though the only parties were the INS and Chadha ***.  [T]he INS's agreement with Chadha's position does not alter the fact that the INS would have deported Chadha absent the Court of Appeals' judgment."  *Id.*

This aspect of the Court's holding sustained the justiciability of the case in the Ninth Circuit, where Chadha, who stood to be deported, and not the INS, was the party invoking the court's jurisdiction.  Thus, the Court wrote, we "agree with the Court of Appeals that 'Chadha has asserted a concrete controversy, and our decision will have real meaning: if we rule for Chadha, he will not be deported; if we uphold § 244(c)(2), the INS will execute its order and

---

[14]  *Chadha* distinguished the periods before and after intervention by the Houses of Congress.  462 U.S. at 939 (stating that from the time of Congress' formal intervention, "the concrete adverseness is beyond doubt").

28

deport him.'"  *Chadha*, 462 U.S. at 939-940 (internal
citations omitted).[15]

What the Court in *Chadha* did *not* decide is
whether the INS had Article III standing to appeal
from the Ninth Circuit to this Court or whether,
without the intervenors, a sufficient case or
controversy would have been present on appeal to
this Court.[16]  *Chadha* is therefore not dispositive of
the justiciability of the United States' petition here.

### B.   The United States' Effort to Obtain Review of a Decision With Which it Agrees Presents No Case Or Controversy

The United States, though nominally a
defendant below and a petitioner here, is in fact in
agreement with *both* Windsor and the court below.[17]

-----

[15] While the last quoted statement might be read to refer not
just to jurisdiction in the Ninth Circuit, but also to this Court's
own jurisdiction, that reading is difficult to reconcile with the
Court's unwillingness to reach the INS's Article III standing
earlier in its opinion. *See id.* at 931 n.6. If so read, it would be
dictum, in light of the Court's view of the effect of the
intervenors' participation. *See id.* at 939.

[16] *Chadha*, at 940 n.12, also analogized the case-or-controversy
issue to that presented in *Bob Jones University v. United States*,
461 U.S. 574 (1983).  There, however, it was the University that
sought review in this Court (like Chadha had in the Ninth
Circuit); no question of appellate standing was present.
Moreover, the United States, while largely agreeing with the
University, was continuing to enforce the challenged regulations
pursuant to a court order. *See* 461 U.S. at 585 n.9.

[17] In *Muskrat*, this Court rejected a specific jurisdiction
conferred by Congress to resolve disagreement over the
constitutionality of certain federal statutes where the decision

29

Its only real interest here is in obtaining a precedent from a higher court.  This interest, by the party "attempting to invoke the federal judicial power," *ASARCO*, 490 U.S. at 618, is insufficient for Article III.

*Princeton University v. Schmid*, 455 U.S. 100 (1982) (per curiam), is instructive.  Appellee Schmid was convicted of criminal trespass for leafleting in violation of University regulations.  The New Jersey Supreme Court (after inviting Princeton's intervention) reversed the conviction, concluding that university regulations violated the state constitution. Princeton sought review in this Court, arguing that the state court's decision violated the University's First Amendment rights.  *See id.* at 101-102.  The State joined in seeking review in this Court, but declined to argue either for or against the judgment of its state court; it asserted only an interest in knowing whether the state's right-of-access law was constitutional.  *See id.* at 102; *see also* Br. of Appellant State of New Jersey at 4 (No. 80-1576), 1981 WL 390035.

This Court dismissed the State's appeal for want of jurisdiction, explaining:

> *[I]f the State were the sole appellant and its jurisdictional statement simply asked for*

---

would resolve only an abstract question.  *See* 219 U.S. at 348-351, 360-62 (describing statute's effort to obtain a judicial opinion without disposing of parties' adverse claims to property).  In this case, even more than in *Muskrat*, "[i]t is true the United States is made a defendant to this action, but it has no interest adverse to the claimants."  *Id.* at 361.

30

> *review and declined to take a position on the merits, we would have dismissed the appeal for want of a case or controversy.* We do not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before us."

*Schmid,* 455 U.S. at 102 (emphasis added). If, in *Schmid*, the Court lacked jurisdiction over an appeal where the State had suffered an adverse judgment below and noticed an appeal, but did not argue against the judgment, then the Court equally lacks jurisdiction here, where the United States obtained the very judgment it sought below, noticed an appeal, but continues to argue the court below was correct.[18]

The United States' desire for this Court, rather than a lower court, to have the final word is not a sufficient stake for an Article III case or controversy. "No matter how desirable it may be to have a constitutional question settled, the resolution must await the concrete controversy, for only then does the judge have an adequate justification for giving an opinion." *Alliance to End Repression v. Chicago*, 820 F.2d 873, 876 (7th Cir. 1987); *see Ruotolo v. Ruotolo*, 572 F.2d 336, 338 (1st Cir. 1978) (notwithstanding the government's "strong interest in obtaining a

---

[18] *Schmid* is not on all fours with this case. For one thing, the Court found Princeton's appeal moot, because Princeton had adopted new and less restrictive regulations for outside leafleting. *See* 455 U.S. at 103. But this and other differences do not detract from the force of its analysis of jurisdiction over the State's appeal.

31

ruling *** the desirability of an advisory opinion is
not a substitute for justiciability").[19]

     Because the United States obtained the
judgment it argued for below, *see* JA488, no "injury"
to the United States was "caused" by that judgment,
nor could this Court's overturning of that judgment
provide "redress" – indeed, the United States seeks
affirmance of that judgment.  "[T]here is no Art. III
case or controversy when the parties desire 'precisely
the same result,'" *GTE Sylvania, Inc. v. Consumers
Union of the United States, Inc.*, 445 U.S. 375, 383
(1980) (quoting *Moore v. Charlotte-Mecklenburg Bd.
of Educ.*, 402 U.S. 47, 48 (1971) (per curiam)).[20]  In
*Moore* the parties were in agreement on the result
they sought – "a holding that the anti-busing statute
is constitutional," which led this Court to hold that
"[t]here is, therefore, no case or controversy within
the meaning of Art. III of the Constitution."  402 U.S.
at 47-48.  In *Moore*, the parties both disagreed with
the judgment below; here the parties both *agree* with
the judgment below, affording even less controversy
for review.

     Although the judgment for Windsor imposes a
financial cost on the government, it is one the United

---

[19] Government "confession of error" is quite distinct.  Typically,
the party injured by a lower court ruling invokes appellate
jurisdiction and that injury remains until the judgment is
overturned.  Where the government confesses error, the parties
seek to *undo* a judgment; here, the government *agrees* with the
judgment below – and wants this Court also to agree.

[20] In *GTE* the Court found that adversity remained because the
government believed itself constrained by another court's order
from complying with plaintiffs' FOIA request.  *See* 445 U.S. at
383.

32

States agrees it is obligated to pay. It did not have to appeal: "Government counsel who becomes convinced that the other side deserves to prevail can settle a case before judgment or, if the government is seeking review, withdraw the appeal or other petition." Richard H. Fallon Jr., *et al.*, HART & WECHSLER'S FEDERAL COURTS AND THE FEDERAL SYSTEM 99 (6th ed. 2009). Even "the existence of monetary stakes is not enough to keep a suit alive, if the underlying question has been settled or does not concern the litigants." *Alliance to End Repression*, 820 F.2d at 876.

The filing of a notice of appeal or petition for certiorari cannot foist jurisdiction on Article III courts, overcoming the lack of adversity between the United States and Windsor, the lack of injury to the United States, and the parties' agreement with the lower court's resolution of the "underlying question" of this lawsuit.[21] However important that question is, and however great the public interest in its decision, federal courts can only decide it in the context of a real case or controversy. *See, e.g.*, *Raines,* 521 U.S. at 818; *United States v. Alaska S.S. Co.*, 253 U.S. 113, 116 (1920).

---

[21] In *Diamond v. Charles*, 476 U.S. 54, 62-64 (1986), Illinois' apparent acquiescence in a decision invalidating a state statute by not filing its own notice of appeal was found to deprive the Court of a case or controversy, even though Illinois' stated interests in having the intervenor-appellant defend its statute were adverse to appellee. Illinois' filing of a notice of appeal was a *necessary* condition for appellate standing – but, as *Schmid* implies, not a *sufficient* condition. *See Schmid,* 455 U.S. at 102*; cf. ASARCO*, 490 U.S. at 634-635 (Rehnquist, C.J., concurring in part and dissenting in part) (distinguishing necessary from sufficient conditions for federal jurisdiction).

33

### C. Even if Article III Injury Were Found, Prudential Standing Considerations Confirm *This* Court's Lack of Jurisdiction.[22]

In addition to the core elements of standing, the Court has recognized prudential principles, like "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S. at 751. In applying these prudential limits to define the "outer dimensions" of standing "subject to the control of Congress," *ASARCO*, 490 U.S. at 613, the Court has also recognized the relevance for standing of other jurisdictional rules in a "variety of contexts." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 n.5 (2004) (noting abstention doctrine and case concerning diversity jurisdiction).

---

[22] Counsel was invited to argue that the government's agreement "with the court below" deprives this Court of jurisdiction. The Court granted a petition for certiorari before judgment, but *after* the Court of Appeals had decided, leaving arguably ambiguous the Question's reference to "court below." Accordingly, counsel advances arguments both that any government appeal from the District Court is barred, and that even if the Second Circuit had jurisdiction, the petition to this Court is barred. (If there were no "[c]ase[] in" the Second Circuit, this Court would lack jurisdiction under 28 U.S.C. § 1254 (2006). *Cf. Hohn v. United States*, 524 U.S. 236, 241-42 (1998) (finding a "case in" the court of appeals, with "adversity as well as the other requisite qualities of a 'case'").

34

The United States has claimed to be "aggrieved" because the District Court's judgment will prevent it from enforcing DOMA. Even if this Court were to agree that, by virtue of the Executive Branch's decision to enforce but not defend DOMA, the United States has a sufficient stake to satisfy core Article III requirements, "prudential principles that bear on *** standing," *Valley Forge*, 454 U.S. at 474, suggest that jurisdiction in this Court fails. The President having determined that the statute is unconstitutional, the Executive Branch can be understood no longer to have legally cognizable interests in enforcing that law. Instead, it can be understood to be seeking to vindicate the interests of others (analogous to "third parties"), such as the enacting Congress, and where those interests are widely shared, "generalized grievances."

Prudential concerns are compounded when this Court is asked to decide on the constitutionality of actions of the co-equal Branches. When issues are litigated in the lower courts, the Article III judiciary as a whole has not taken a final position in opposition to the Congress or the President; it is possible that different lower courts may reach divergent results. Should a challenger to DOMA *lose* in the courts below and seek review in this Court, a clearly justiciable case could then be presented. To decide the issue in this case, however, would press beyond the boundaries of appellate standing. Although prudential objections may be overridden by clear legislation, in this case the governing jurisdictional statutes provide no basis for ignoring prudential principles.

35

Where the Executive adopts a posture of
enforcing but not defending the constitutionality of a
statute, it may do so out of regard for Congress, to
allow the constitutionally independent Judiciary to
adjudge Congress' presumed view that the statute it
passed was constitutional.  But once an Article III
court has given judgment for the plaintiff, agreeing
with the Executive on the constitutional question,
further pursuit of appellate rulings cannot ordinarily
be justified by the Executive's concern for the
interests of the enacting legislature.  Such interests
in the continued validity and enforcement of a
statute, which the Executive believes is
unconstitutional, are more like claims of "harm to the
'common concern for obedience to law'" that this
Court has described as too generalized to support
standing.  *FEC v. Akins*, 524 U.S. 11, 23 (1998)
(citation omitted).  Once the judgment was entered
for Windsor, there was no longer a necessity – in
terms of protecting the constitutional rights of
individuals,[23] or having an independent court decide
– for the Article III judiciary to speak further where
the United States also agrees with the judgment.

It might be argued, nonetheless, that there are
prudential reasons favoring the exercise of
jurisdiction by the courts of appeals to obtain a ruling
with *stare decisis* effect within the circuit.  In cases
involving the constitutionality of federal legislation,
there are benefits—to the court system, the litigants
and the government—in allowing a regional court of

---

[23] *Cf. Richardson*, 418 U.S. at 192 (Powell, J., concurring)
(noting the importance of jurisdiction to protect "the
constitutional rights and liberties of individual citizens and
minority groups").

36

appeals to review district court decisions, thereby obviating the need for repetitive litigation of the same question. Congress' decision to make appellate jurisdiction over final district court judgments mandatory, 28 U.S.C. § 1291 (2006), reflects the view that lower court judgments should be appealable as of right. Thus, it may be argued, the absence of conflict between the United States and Windsor should not, at least on prudential grounds, defeat the jurisdiction of the court of appeals.

But that reasoning has no application to review by this Court. The Court's jurisdiction to review decisions like this one is now discretionary. *See* 28 U.S.C. § 1254(1) (2006). By contrast, at the time of *Chadha*, jurisdiction over the Ninth Circuit's judgment was mandatory, under 28 U.S.C § 1252 (1982). Section 1252 manifested Congress' judgment that whenever a lower court struck down the constitutionality of a federal statute in an action to which the United States or its agencies were a party, the case warranted Supreme Court review: such cases were "a category of important cases that the Court is not free to ignore"; they presented "the need for certainty and uniformity *** when an Act may have been declared unconstitutional"; and "the 'decision on the constitutional question may affect the public at large *** [because of the nation's] duty to all the citizens of securing to them their common rights.'" *Edwards*, 465 U.S. at 881-883 (footnotes and citation omitted).

In 1988 Congress repealed Section 1252, making review discretionary with this Court. Pub. L. No. 100-352, § 1, 102 Stat. 662 (1988). *Cf. Edwards*,

37

465 U.S. at 881-883 (stating that the section's
"concerns" about the Court's deciding a "category of
important cases" and about "certainty and
uniformity" "are not implicated in cases in which the
Government concedes statutory unconstitutionality
by its decision not to appeal"). In this case, although
the United States did appeal, it not only conceded but
vigorously argued for unconstitutionality. With
Congress' repeal of mandatory jurisdiction, the
permissive grant of jurisdiction found in 28 U.S.C.
§ 1254 weighs in favor of hewing to prudential limits
on the exercise of jurisdiction where the United
States seeks review of a judgment it actively sought
in the lower courts. *Cf. Newdow,* 542 U.S. at 12-13 &
n.5 (discussing domestic relations exception to federal
jurisdiction as bearing on prudential standing)

Where an Article III court has discretionary
jurisdiction, and the United States agrees with the
other party and with the judgment below, but wants
that higher court to decide the question, prudential
standing considerations ordinarily militate against
justiciability. In *Camreta,* however, this Court
suggested that it may be *more* justified for this Court,
than for a court of appeals, to review a judgment in
favor of public official defendants at their behest,
given the binding effects of circuit precedent. 131 S.
Ct. at 2033 & n.7. But in that case the public officials
were truly aggrieved by the decision below, because
(though they were immunized from damages in that
case) they disagreed with the lower court's
constitutional judgment that, if left untouched,
barred their taking actions in their work that they
considered constitutional. *Id.* at 2029-2030. Here, by
contrast, given the United States' agreement with the

38

constitutional reasoning of the courts below, it suffers no comparable harm from unreviewed lower court decisions.

A decision that, for prudential reasons, the United States lacks standing in this Court, would not necessarily preclude DOMA's constitutionality from coming before this Court.  If a lower court upholds the statute, the party challenging the statute would have standing to invoke the appellate jurisdiction of this Court for review.   Awaiting such a case is consistent with this Court's role in providing a sober second look, after time and reflection in the lower courts, on important constitutional issues.  If all the courts of appeals were in agreement that the statute is unconstitutional, the necessity for decision by this Court would be greatly diminished, because a uniform rule would have been achieved without its intervention and the broader public functions of judicial review adequately served.  As long as the dispute can be resolved in an Article III court, an independent judiciary can protect individual rights, without entertaining appeals by a party who agrees with the judgment below.

## D.   The Prevailing Party Rule Bars Appellate Review

"Ordinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom.  A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it," *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980) (citations omitted).

39

This ordinary rule applies both under 28 U.S.C. § 1291 and 28 U.S.C.§ 1254(1). Although not required by the certiorari statute, *see Camreta*, 131 S. Ct. at 2028, in both this Court and in the courts of appeals, this "rule[] of 'federal appellate practice,'" *id.* at 2029 (quoting *Deposit Guar.,* 445 U.S. at 333), ordinarily bars the exercise of jurisdiction at the behest of a party who has "receive[d] all that he has sought." *Deposit Guar.*, 445 U.S. at 333.[24]

Application of this rule does not depend solely on which party the judgment was nominally entered against. *See, e.g.*, *Camreta,* 131 S. Ct. at 2028-2030. Although here the judgment was entered against the United States, the United States was, in an important sense, a "prevailing" party: indeed, the United States did not simply refuse to defend the statute but actively sought the judgment that was entered. *See, e.g.*, JA488 (United States arguing that the District Court should "grant Plaintiff's motion for summary judgment"). The United States obtained what it had asked the court below to provide; it was

---

[24] *Camreta* described the rule against prevailing party appeals as one of "practice and prudence," 131 S Ct at 2030, citing in direct support cases that appear to treat the rule as jurisdictionally constraining in character. *See Gunn v. University Comm. to End War*, 399 U.S. 383, 390 n.5 (1970) ("Even if the opinion *** of the District Court could be considered a denial of an injunction ***, the appellants could not appeal from an order in their favor."); *New York Tel. Co. v. Maltbie*, 291 U.S. 645, 646 (1934) ("Appellant, having obtained this relief, is not entitled to prosecute an appeal from the decree in its favor ***."). *Camreta* should thus be understood as creating an exception to an ordinary rule of federal jurisdiction barring appeals by prevailing parties, rather than as treating that long-established "rule" as entirely one of judicial discretion.

40

in this sense a prevailing party. Unlike the officials allowed to appeal from a favorable judgment in *Camreta*, the United States faces no adverse collateral consequences from lower court conclusions with which it disagreed, because the United States here agrees with the conclusions below.

Absent the special purposes underlying the former Section 1252,[25] or the special circumstances of *Camreta*, more common-sense standards for determining who is a prevailing party should be utilized. Under those standards, the United States cannot appeal to this Court.

## CONCLUSION

For the foregoing reasons the government's agreement with the Court below that the statute is unconstitutional deprives this Court of jurisdiction, and BLAG lacks Article III standing.

Respectfully submitted.

Patricia A. Millett          Vicki C. Jackson
Ruthanne M. Deutsch             *Counsel of Record*
Michael C. Small
Akin Gump Strauss
Hauer & Feld LLP


January 24, 2013

---

[25] *Chadha* noted the rule of *Deposit Guaranty* in discussing the question of statutory jurisdiction under Section 1252, *see* 462 U.S. at 930, but did not apply it, in light of its interpretation of now-repealed statute Section 1252. *See* Part II.A, *supra*.

CERTIFICATE OF SERVICE

SACV12-01137 CBM (AJWx)

I hereby certify that on this 19th day of February 2013, I electronically filed the

foregoing PARTIAL OPPOSITION TO MOTION TO STAY with the Clerk of Court by

using the CM/ECF system, which provided an electronic notice and electronic link of

the same to all attorneys of record through the Court's CM/ECF system.

Dated:  February 19, 2013.                          /s/ Carlos Holguin

/ / /

Supp. Authority re: Motion to Stay

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693

- 4 -