1  CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
2  Peter A. Schey (Cal. Bar No. 58232)
   Carlos R. Holguín (Cal. Bar No. 90754)
3  256 S. Occidental Blvd.
   Los Angeles, CA 90057
4  Telephone: (213) 388-8693 (Schey Ext. 304, Holguín ext. 309)
5  Facsimile: (213) 386-9484
   pschey@centerforhumanrights.org
6  crholguin@centerforhumanrights.org

7
   *Additional counsel listed next page*
8
   *Attorneys for Plaintiffs*
9

10

11

12
                UNITED STATES DISTRICT COURT FOR THE
13

14       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

15  MARTIN R. ARANAS, *et al.,*              )   SACV12-01137 CBM (AJWx)
                                             )
16            Plaintiffs,                     )   SUPPLEMENTAL EXHIBITS 21-22
                                             )   IN SUPPORT OF MOTIONS FOR
17      -vs-                                  )   CLASS CERTIFICATION AND
                                             )   PRELIMINARY INJUNCTION.
18                                           )
    JANET NAPOLITANO, Secretary of the        )
19  Department of Homeland Security; *et al.,* )
                                             )
20            Defendants.                     )   Hearing: None
                                             )   Time: n/a
21  _____ )   Hon. Consuelo B. Marshall
                                             )
22

23  / / /

24

25

26

27

28

1
2
*Additional counsel for plaintiff Aranas:*

3   PUBLIC LAW CENTER
    Julie Greenwald (Cal. Bar No. 233714)
4   Monica Ashiku (Cal. Bar No. 263112)
    601 Civic Center Drive West
5   Santa Ana, CA 92701
6   Telephone: (714) 541-1010 (Greenwald Ext. 263, Ashiku Ext. 249)
    Facsimile: (714) 541-5157
7   jgreenwald@publiclawcenter.org
8   mashiku@publiclawcenter.org

9   ASIAN LAW ALLIANCE
    Beatrice Ann M. Pangilinan (Cal. Bar No. 271064)
10  184 Jackson Street, San Jose, CA 95112
11  Telephone: (408) 287-9710
    Facsimile: (408) 287-0864
12  Email:  bpangilinan@asianlawalliance.org

13
    *Additional counsel for plaintiffs Rodriguez and DeLeon:*
14
15  LAW OFFICES OF MANULKIN & BENNETT
    Gary H. Manulkin (Cal. Bar No.  41469)
16  Reyna M. Tanner (Cal. Bar No.  197931)
    10175 Slater Avenue, Suite 111
17  Fountain Valley, CA 92708
18  Telephone: 714-963-8951
    Facsimile: 714-968-4948
19  gmanulkin@mgblaw.com
20  reynatanner@yahoo.com

21  */ / /*
22
23
24
25
26
27
28

Supp. Exhibits 21-22 in Support Preliminary Injunction, etc.    - 2 -

INDEX TO EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| 21 | Brief for the United States on the Merits Question, United States of America v. Windsor, No. 12-307 (S.Ct. February 2013) | 1 |
| 22 | Gates, *LGBT Adult Immigrants in the United States*, The Williams Institute, March 2013 | 68 |

Dated: March 18, 2013.

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Peter A. Schey
Carlos R. Holguín

PUBLIC LAW CENTER
Julie Greenwald Marzouk
Monica Ashiku

ASIAN LAW ALLIANCE
Beatrice Ann M. Pangilinan

LAW OFFICES OF MANULKIN &
BENNETT
Gary H. Manulkin
Reyna M. Tanner

/s/ Peter A. Schey _____

/s/ Carlos R. Holguín _____

*Attorneys for Plaintiffs*

/ / /

Exhibit 21

No. 12-307

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, PETITIONER

*v.*

EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS
EXECUTOR OF THE ESTATE OF THEA CLARA SPYER,
ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE UNITED STATES
ON THE MERITS QUESTION**

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
STUART F. DELERY
  *Principal Deputy Assistant
    Attorney General*
SRI SRINIVASAN
  *Deputy Solicitor General*
PRATIK A. SHAH
  *Assistant to the Solicitor
    General*
MICHAEL JAY SINGER
AUGUST E. FLENTJE
HELEN L. GILBERT
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

1

**QUESTION PRESENTED**

Section 3 of the Defense of Marriage Act (DOMA) defines the term "marriage" for all purposes under federal law, including the provision of federal benefits, as "only a legal union between one man and one woman as husband and wife." 1 U.S.C. 7. It similarly defines the term "spouse" as "a person of the opposite sex who is a husband or a wife." *Ibid.* The question presented is:

Whether Section 3 of DOMA violates the Fifth Amendment's guarantee of equal protection of the laws as applied to persons of the same sex who are legally married under the laws of their state.

(I)

## PARTIES TO THE PROCEEDING

Petitioner, who was a defendant in the district court and an appellant in the court of appeals, is the United States of America.

The private individual respondent, who was plaintiff in the district court and an appellee in the court of appeals, is Edith Schlain Windsor.

Respondent Bipartisan Legal Advisory Group of the United States House of Representatives intervened in this case in defense of Section 3 of DOMA.

(II)

3

## TABLE OF CONTENTS

Page

Opinions below ................................................................ 1
Jurisdiction ..................................................................... 1
Constitutional and statutory provisions involved ...................... 2
Statement ...................................................................... 2
Summary of argument ..................................................... 12
Argument:
    Section 3 of DOMA violates equal protection ..................... 16
      A. Classifications based on sexual orientation
        should be subject to heightened scrutiny ............... 18
        1. Gay and lesbian people have been subject
          to a history of discrimination ................... 22
        2. Sexual orientation bears no relation to ability
          to perform or contribute to society ....................... 27
        3. Gay and lesbian people possess a
          distinguishing characteristic that defines
          them as a group ....................................... 29
        4. Gay and lesbian people are minorities
          with limited political power ................... 32
      B. Section 3 of DOMA fails heightened scrutiny ........... 37
        1. Morality ................................................ 38
        2. Traditional definition of marriage ...................... 39
        3. Procreation and child-rearing ........................... 41
        4. Sovereign choice ..................................... 44
        5. Federal fisc .......................................... 45
        6. Other interests asserted by BLAG ...................... 47
          a. Uniformity and administrability ..................... 47
          b. Proceeding with caution ................... 50
      C. The government does not challenge the
        constitutionality of DOMA Section 3 under defer-
        ential rational-basis review, but Section 3 would
        fail a more searching form of that review ............... 51
Conclusion .................................................................. 54
Appendix — Constitutional and statutory provisions ........... 1a

(III)

IV

## TABLE OF AUTHORITIES

Cases:                                                                    Page

*Armour* v. *City of Indianapolis*, 132 S. Ct. 2073
  (2012) ........................................................................51

*Baehr* v. *Lewin*, 852 P.2d 44 (Haw. 1993)...............................3

*Baker* v. *Nelson*, 409 U.S. 810 (1972) ...........................7, 8, 20

*Ben-Shalom* v. *Marsh*, 881 F.2d 454 (7th Cir.
  1989), cert. denied, 494 U.S. 1004 (1990) .....................21, 22

*Bishop* v. *Wood*, 426 U.S. 341 (1976).....................................18

*Board of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356
  (2001) ........................................................................39

*Bolling* v. *Sharpe*, 347 U.S. 497 (1954) ................................16

*Boutilier* v. *INS*, 387 U.S. 118 (1967) ...................................24

*Bowen* v. *Bowen*, 688 So. 2d 1374 (Miss. 1997)....................25

*Bowen* v. *Gilliard*, 483 U.S. 587 (1987)....................20, 30, 32

*Bottoms* v. *Bottoms*, 457 S.E.2d 102 (Va. 1995)..................25

*Bowers* v. *Hardwick*, 478 U.S. 186 (1986), overruled
  by, *Lawrence* v. *Texas*, 539 U.S. 558 (2003)..........21, 39, 40

*Bray* v. *Alexandria Women's Health Clinic*, 506 U.S.
  263 (1993) ..................................................................31

*Califano* v. *Goldfarb*, 430 U.S. 199 (1977) ..........................50

*Christian Legal Soc'y* v. *Martinez*, 130 S. Ct. 2971
  (2010) ........................................................................31

*City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S.
  432 (1985) .............................................................*passim*

*City of Richmond* v. *J. A. Croson Co.*, 488 U.S. 469
  (1989) ........................................................................19

*Clark* v. *Jeter*, 486 U.S. 456 (1988) ...........................19, 29, 37

*Equality Found.* v. *City of Cincinnati*, 54 F.3d 261
  (6th Cir. 1995), vacated by, 518 U.S. 1001 (1996) .......21, 26

*FCC* v. *Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)............52

V

Cases—Continued:                                                Page

*Frontiero* v. *Richardson*, 411 U.S. 677
  (1973) ................................................................14, 20, 28, 29, 35

*Garcia* v. *United States*, 469 U.S. 70 (1984) .......................48

*Golinski* v. *OPM*, 824 F. Supp. 2d 968 (N.D. Cal.
  2012) ...............................................................................49

*Graham* v. *Richardson*, 403 U.S. 365 (1971) ...........11, 30, 46

*H.H., Ex parte*, 830 So. 2d 21 (Ala. 2002)...........................25

*Heller* v. *Doe*, 509 U.S. 312 (1993) ............................11, 40, 51

*Hernandez-Montiel* v. *INS*, 225 F.3d 1084 (9th Cir.
  2000) ...........................................................................30, 32

*High Tech Gays* v. *Defense Indus. Sec. Clearance
  Office*, 895 F.2d 563 (9th Cir. 1990) ..............................21, 22

*Hill* v. *INS*, 714 F.3d 1470 (9th Cir. 1983) .........................24

*INS* v. *Chadha*, 462 U.S. 919 (1983)........................................7

*Jimenez* v. *Weinberger*, 417 U.S. 628 (1974).......................48

*Lalli* v. *Lalli*, 439 U.S. 259 (1978)........................................27

*Lawrence* v. *Texas*, 539 U.S. 558 (2003) .....................*passim*

*Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U.S.
  356 (1973) .......................................................................51

*Lesbian/Gay Freedom Day Comm., Inc.* v. *INS*, 541
  F. Supp. 569 (N.D. Cal. 1982)..........................................24

*Loving* v. *Virginia*, 388 U.S. 1 (1967) .................................45

*Lyng* v. *Castillo*, 477 U.S. 635 (1986) .......................30, 32, 36

*Marriage Cases, In re*, 183 P.3d 384 (Cal. 2008)................34

*Massachusetts* v. *United States Dep't of Health &
  Human Servs.*, 682 F.3d 1 (1st Cir. 2012), petitions
  for cert. pending, Nos. 12-13 (filed June 29, 2012),
  12-15 (filed July 3, 2012), and 12-97 (filed July 20,
  2012) ........................................................................*passim*

*Massachusetts Bd. of Ret.* v. *Murgia*, 427 U.S. 307
  (1976) ...........................................................................28, 36

VI

Cases—Continued:                                          Page

*Mathews* v. *Lucas*, 427 U.S. 495 (1976) ..........................27, 30

*Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718
(1982) ...............................................................................37

*Palmore* v. *Sidoti*, 466 U.S. 429 (1984) ................................39

*Pedersen* v. *OPM*, No. 3:10-cv-1750, 2012 WL
3113883 (D. Conn. July 31, 2012).......................................44

*Plyler* v. *Doe*, 457 U.S. 202 (1982) ...................................15, 46

*Pryor* v. *Municipal Court*, 599 P.2d 636 (Cal. 1979)..........25

*Richenberg* v. *Perry*, 97 F.3d 256 (8th Cir. 1996),
cert. denied, 522 U.S. 807 (1997)........................................21

*Romer* v. *Evans*, 517 U.S. 620 (1996)......19, 26, 39, 46, 52, 53

*San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S.
1 (1973) ...........................................................................36

*Steffan* v. *Perry*, 41 F.3d 677 (D.C. Cir. 1994)....................21

*Thomasson* v. *Perry*, 80 F.3d 915 (4th Cir.),
cert. denied, 519 U.S. 948 (1996)........................................21

*Turner* v. *Safley*, 482 U.S. 78 (1987) .....................................41

*United States* v. *Virginia*, 518 U.S. 515
(1996) ..............................................................14, 15, 19, 37, 40

*United States Dep't of Agric.* v. *Moreno*, 413 U.S. 528
(1973) ...............................................................................52

*Watkins* v. *United States Army*, 847 F.2d 1329
(9th Cir. 1988), rev'd en banc, 875 F.3d 699 (9th Cir.
1989) ................................................................................32

*Watson* v. *City of Memphis*, 373 U.S. 526 (1963)................50

*Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S.
483 (1955) ........................................................................51

*Woodward* v. *United States*, 871 F.2d 1068 (Fed. Cir.
1989), cert. denied, 494 U.S. 1003 (1990) ..........................21

*Zobel* v. *Williams*, 457 U.S. 55 (1982)..................................47

*Zuber* v. *Allen*, 396 U.S. 168 (1969).......................................48

VII

Constitution and statutes:                                               Page

   U.S. Const.:

      Art. I, § 8 (Spending Clause) ..........................................45

      Art. III ................................................................................6

      Amend. V ...................................................................4, 6, 54

         Due Process Clause .....................................................16

      Amend. X...........................................................................45

      Amend. XIV:

         Due Process Clause .....................................................19

         Equal Protection Clause .............................................19

   Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 875 ........................24

   Defense of Marriage Act, Pub. L. No. 104-199, 110
     Stat. 2419:

      § 2, 110 Stat. 2419 (28 U.S.C. 1738C).........................2, 45

      § 3, 110 Stat. 2419 (1 U.S.C. 7) ..............................*passim*

   Immigration Act of 1990, Pub. L. No. 101-649, 104
     Stat. 4978 ............................................................................24

   10 U.S.C. 654 .......................................................................24

   26 U.S.C. 2056(a) ..................................................................4

   28 U.S.C. 530D .....................................................................4

   38 U.S.C 101(3) ...................................................................17

   38 U.S.C 101(31) .................................................................17

   38 U.S.C 1310 ......................................................................17

   38 U.S.C 2402(a)(5)..............................................................17

   38 U.S.C 2402(a)(6)..............................................................17

   Public Statute Laws of the State of Connecticut, 1808
     tit. LXVI, ch. 1, § 2, 294-295 & n.1 (enacted 1642;
     rev. 1750)............................................................................22

   Tenn. House Bill No. 600, Pub. Ch. 278 (2011),
     http://state.tn.us/sos/acts/107/pub/pc0278.pdf..................33

VIII

Miscellaneous:                                                    Page

Am. Acad. of Child and Adolescent Psychiatry, *Gay,*
*Lesbian, Bisexual, or Transgender Parents Policy*
*Statement*, 2009, http://www.aacap.org/cs/root/
policy_statements/gay_lesbian_transgender_and_
bisexual_parents_policy_statement..................................42

Am. Acad. of Pediatrics, *Coparent or Second-Parent*
*Adoption by Same-Sex Parents*, Feb. 2002, http://
aappolicy.aappublications.org/cgi/content/full/
pediatrics;109/2/339..................................................42

Am. Med. Ass'n, *AMA Policies on GLBT Issues*,
http://www.ama-assn.org/ama/pub/about-ama/our-
people/member-groups-sections/glbt-advisory-
committee/ama-policy-regarding-
sexual-orientation.shtml.........................................42

Am. Psychiatric Ass'n, *Position Statement on Ho-*
*mosexuality and Civil Rights* (1973), *reprinted in*
131 Am. J. Psychiatry 497 (1974) ......................................28

Am. Psychological Ass'n,

  *Just the Facts About Sexual Orientation and*
  *Youth*, http://www.apa.org/pi/lgbt/resources/
  just-the-facts.pdf .............................................32

  *Report of the American Psychological Associa-*
  *tion Task Force on Appropriate Therapeutic*
  *Responses to Sexual Orientation* (2009),
  http://www.apa.org/pi/lgbt/resources/
  therapeutic-response.pdf .....................................32

  *Sexual Orientation, Parents, & Children*, July
  2004, http://www.apa.org/about/governance/
  council/policy/parenting.aspx ....................................42

IX

Miscellaneous—Continued:                                    Page

Timothy J. Biblarz & Judith Stacey, *How Does the
Gender of Parents Matter?*, 72 J. Marriage & Fam-
ily 3 (2010), http://www.squareonemd.com/pdf/
Does%20the%20Gender%20of%20Parents%20Matt
er%202010.pdf ............................................................42

Child Welfare League of Am., *Position Statement on
Parenting of Children by Lesbian, Gay, and Bi-
sexual Adults*, http://www.cwla.org/programs/
culture/glbtqposition.htm.............................................42

Cong. Budget Office, *The Potential Budgetary Im-
pact of Recognizing Same-Sex Marriages*, 2004,
http://www.cbo.gov/sites/default/files/
cbofiles/ftpdocs/55xx/doc5559/06-21-same-
sexmarriage.pdf...........................................................46

142 Cong. Rec. (1996):
    p. 22,453 ..................................................................47
    p. 22,459 ..................................................................47

John Hart Ely, *Democracy and Distrust* (1980) ...............21

*Employment of Homosexuals and Other Sex Per-
verts in Government, Interim Report submitted to
the Committee by its Subcommittee on Investiga-
tions pursuant to S. Res. 280*, S. Doc. No. 241, 81st
Cong., 2d Sess. (1950) .....................................................23

William N. Eskridge, Jr., *Privacy Jurisprudence
and the Apartheid of the Closet, 1946-1961*, 24 Fla.
St. U. L. Rev. 703 (1997)....................................................25

FBI:
    *Hate Crime Statistics 2011*, http://www.fbi.gov/
    about-us/cjis/ucr/hate-crime/2011/tables/
    table-1 ....................................................................24

    *Hate Crime Statistics, 2007*, http://www2.fbi.gov/
    ucr/hc2007/table_01.htm ...........................................25

X

Miscellaneous—Continued:                                          Page

    Florida State Legislative Investigation Committee,
        *Report:  Homosexuality and Citizenship in Flori-*
        *da* (1964)...................................................................................26

    H.R. Rep. No. 664, 104th Cong., 2d Sess. (1996)........*passim*

    Douglas C. Haldeman, *The Practice and Ethics of*
        *Sexual Orientation Conversion Therapy*, 62 J.
        Consulting & Clinical Psychol. 221 (1994)........................32

    Gregory M. Herek et al., *Demographic, Psychologi-*
        *cal, and Social Characteristics of Self-Identified*
        *Lesbian, Gay, and Bisexual Adults in a US Prob-*
        *ability Sample*, 7 Sexuality Res. & Soc. Pol'y 176
        (2010), http://www.springerlink.com/content/
        k186244647272924/fulltext.pdf...........................................31

    Andrew Koppelman, *The Difference the Mini-*
        *DOMAs Make*, 38 Loy. U. Chi. L.J. 265 (2007)...............33

    National Conference of State Legislatures, *State*
        *Same-Sex Marriage Laws:  Legislatures and*
        *Courts*, last updated Feb. 14, 2013, http://www.ncsl.
        org/issues-research/human-services/same-sex-
        marriage-laws.aspx ............................................................34

    Richard A. Posner, *Sex and Reason* (1992).........................32

    *Remarks by the President and Vice President at*
        *Signing of the Don't Ask, Don't Tell Repeal Act*
        *of 2010*, Dec. 22, 2010, http://www.whitehouse.
        gov/the-press-office/2010/12/22/remarks-president-
        and-vice-president-signing-dont-ask-dont-tell-
        repeal-a .................................................................................28

    Steven A. Rosen, *Police Harassment of Homosexual*
        *Women and Men in New York City, 1960-1980*, 12
        Colum. Hum. Rts. L. Rev. 159 (1980) ...............................25

XI

Miscellaneous—Continued:                                   Page

Brad Sears et al., The Williams Institute, *Document-
    ing Discrimination on the Basis of Sexual Orien-
    tation and Gender Identity in State Employment*,
    Sept. 2009, http://williamsinstitute.law.ucla.edu/
    research/workplace/documenting-discrimination-on
    -the-basis-of-sexual-orientation-and-gender-
    identity-in-state-employment ......................................23, 24

A.G. Sulzberger, *Ouster of Iowa Judges Sends Sig-
    nal to Bench*, N.Y. Times, Nov. 4, 2010 .............................34

U.S. Gen. Accounting Office, Report No. GAO-04-
    353R, *Defense of Marriage Act:  Update to Prior
    Report* (2004), http://www.gao.gov/assets/100/
    92441.pdf ...........................................................................3

Teresa Welsh, *Should Employers Be Able to Fire
    Someone for Being Gay?,* U.S. News, May 14, 2012,
    http://www.usnews.com/opinion/articles/2012/05/14/
    should-employers-be-able-to-fire-someone-for-
    being-gay .............................................................................35

Robert Wintemute, *Sexual Orientation and Human
    Rights* (1995) .......................................................................26

# In the Supreme Court of the United States

No. 12-307

UNITED STATES OF AMERICA, PETITIONER

*v.*

EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS
EXECUTOR OF THE ESTATE OF THEA CLARA SPYER,
ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE UNITED STATES
ON THE MERITS QUESTION**

### OPINIONS BELOW

The opinion of the court of appeals (Supp. App. 1a-
83a)[1] is reported at 699 F.3d 169.  The opinion of the
district court (Pet. App. 1a-22a) is reported at 833 F.
Supp. 2d 394.

### JURISDICTION

The judgment of the district court was entered on
June 6, 2012.  Notices of appeal were filed on June 8,
2012, and June 14, 2012 (Pet. App. 25a-26a, 27a-29a).
A petition for a writ of certiorari before judgment was
filed on September 11, 2012.  The judgment of the
court of appeals was entered on October 18, 2012.  On

---

[1]  "Supp. App." refers to the appendix to the government's sup-
plemental brief at the certiorari stage.

(1)

2

October 26, 2012, the United States filed a supplemental brief pursuant to Rule 15.8 of the Rules of this Court. The petition for a writ of certiorari was granted on December 7, 2012. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are set forth in an appendix to this brief. App., *infra*, 1a.

### STATEMENT

1. a. Congress enacted the Defense of Marriage Act (DOMA) in 1996. Pub. L. No. 104-199, 110 Stat. 2419. DOMA contains two operative provisions. The first, Section 2, provides that no State is required to give effect to any public act, record, or judicial proceeding of another State that treats a relationship between two persons of the same sex as a marriage under its laws. DOMA § 2, 110 Stat. 2419 (28 U.S.C. 1738C).

The second provision, Section 3, which is at issue in this case, defines "marriage" and "spouse" for all purposes under federal law to exclude marriages between persons of the same sex, regardless of whether a marriage is recognized under state law. Section 3 provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers

3

only to a person of the opposite sex who is a hus-
band or a wife.

DOMA § 3, 110 Stat. 2419 (1 U.S.C. 7).

b. Congress enacted DOMA in response to the
Hawaii Supreme Court's decision in *Baehr* v. *Lewin*,
852 P.2d 44 (1993), which held that the denial of mar-
riage licenses to same-sex couples was presumptively
invalid under the Hawaii Constitution. H.R. Rep. No.
664, 104th Cong., 2d Sess. 2 (1996) (House Report).
Hawaii ultimately did not permit same-sex marriage,
but other states later recognized such marriages un-
der their respective laws.

Section 3 of DOMA does not purport to invalidate
same-sex marriages in those states that permit them.
Section 3, however, excludes such marriages from
recognition for purposes of more than 1000 federal
statutes and programs whose administration turns in
part on individuals' marital status. See U.S. Gen.
Accounting Office, Report No. GAO-04-353R, *Defense
of Marriage Act: Update to Prior Report* 1 (2004),
http://www.gao.gov/assets/100/92441.pdf (identifying
1138 federal laws contingent on marital status or in
which marital status is a factor). Section 3 thus denies
to legally married same-sex couples many substantial
benefits afforded to legally married opposite-sex cou-
ples under federal employment, immigration, public
health and welfare, tax, and other laws. *Id.* at 16-18.

2. In 2007, plaintiff married Thea Spyer, her same-
sex partner of more than 40 years, in Canada. The
couple resided in New York. When Spyer died in
2009, she left her estate for plaintiff's benefit. Pet.
App. 3a; J.A. 152 (Am. Compl. ¶¶ 10, 11).

In her capacity as executor of Spyer's estate, plain-
tiff paid $363,053 in federal estate taxes. She then

4

filed a refund claim under 26 U.S.C. 2056(a), which provides that property that passes from a decedent to a surviving spouse may generally pass free of federal estate taxes.  The Internal Revenue Service (IRS) denied the refund claim solely on the ground that plaintiff is not a "spouse" within the meaning of DOMA Section 3 and thus not a "surviving spouse" within the meaning of Section 2056(a).  Pet. App. 3a-4a; J.A. 169-170 (Am. Compl. ¶¶ 72-78), 245-252 (IRS denial letter).  The IRS did not identify or address any question concerning the recognition of plaintiff's marriage under New York law.  J.A. 251-252.

Plaintiff filed this tax-refund suit challenging the constitutionality of Section 3 in the United States District Court for the Southern District of New York. She contended that, by treating legally married same-sex couples in New York differently from legally married opposite-sex couples in New York, Section 3, as applied by the IRS, violates the equal protection component of the Fifth Amendment.  She sought declaratory and injunctive relief, as well as recovery of the $363,053 in federal estate taxes paid by Spyer's estate. Pet. App. 4a; J.A. 172 (Am. Compl. ¶¶ 82-85).

3. a.  After plaintiff filed her complaint, the Attorney General sent a notification to Congress under 28 U.S.C. 530D that the President and he had determined that Section 3 of DOMA is unconstitutional as applied to same-sex couples who are legally married under state law.  J.A. 183-194.  The letter explained that, while the Department of Justice had previously defended Section 3 where binding precedent in the circuit required application of rational-basis review to classifications based on sexual orientation, the President and the Department of Justice had conducted a

5

new examination of the issue after two lawsuits (this one and *Pedersen* v. *OPM*, petition for cert. before judgment pending, No. 12-231 (filed Aug. 21, 2012)) had been filed in a circuit that had yet to address the appropriate standard of review.  J.A. 184.  The Attorney General explained that, after examining factors identified by this Court as relevant to the applicable level of scrutiny—including the history of discrimination against gay and lesbian individuals and the irrelevance of sexual orientation to legitimate policy objectives—the President and he had concluded that Section 3 warrants application of heightened scrutiny rather than rational-basis review.  J.A. 185-189.  The Attorney General further explained that the President and he had concluded that Section 3 fails that standard and is therefore unconstitutional.  J.A. 189-191.

The Attorney General's letter reported that, notwithstanding this determination, the President had "instructed Executive agencies to continue to comply with Section 3 of DOMA, consistent with the Executive's obligation to take care that the laws be faithfully executed, unless and until Congress repeals Section 3 or the judicial branch renders a definitive verdict against the law's constitutionality."  J.A. 191-192.  The Attorney General explained that "[t]his course of action respects the actions of the prior Congress that enacted DOMA, and it recognizes the judiciary as the final arbiter of the constitutional claims raised."  *Ibid.* In the interim, the Attorney General instructed the Department's lawyers to notify courts of the President's views and cease defense of Section 3.  J.A. 191-193.  Finally, the Attorney General noted that the Department's lawyers would take appropriate steps to "provid[e] Congress a full and fair opportunity to

6

participate" in litigation concerning the constitutionality of Section 3.  J.A. 193.

b. Following the Attorney General's announcement, the Bipartisan Legal Advisory Group of the United States House of Representatives (BLAG), a five-member bipartisan leadership group, moved to intervene in this case in defense of Section 3.[2]  The district court granted the motion.  J.A. 218; see Pet. App. 4a.

Both the government and BLAG moved to dismiss plaintiff's challenge to the constitutionality of Section 3.  While BLAG presented arguments in support of Section 3's constitutionality, the government explained that it was filing a motion to dismiss plaintiff's constitutional claim solely to ensure that the court had Article III jurisdiction to enter judgment for or against the United States. J.A. 437-439.  The government's brief on the merits set forth its view that heightened scrutiny applies to Section 3 and that, under that standard, Section 3 violates the equal protection guarantee of the Fifth Amendment.  J.A. 486-489.

4.  The district court denied the motions to dismiss and granted summary judgment in favor of plaintiff, concluding that Section 3 of DOMA violates equal protection.  Pet. App. 1a-22a.  The court first rejected two threshold arguments advanced by BLAG:  (1) the court concluded that New York law in 2009 (the relevant tax year) required recognition of same-sex marriages performed in other jurisdictions, thus ensuring Article III standing, *id.* at 6a-8a; and (2) the court held that this Court's summary dismissal of the appeal

_____

[2] Two of the group's five members declined to support intervention. J.A. 196 n.1.

7

in *Baker* v. *Nelson*, 409 U.S. 810 (1972), did not fore-
close plaintiff's challenge because Section 3, unlike
the statute at issue in *Baker*, "does not preclude or
otherwise inhibit a state from authorizing same-sex
marriage (or issuing marriage licenses)," Pet. App. 9a.
Turning to the merits of plaintiff's challenge, the
district court declined to decide whether heightened
scrutiny or even "a more 'searching' form of rational
basis scrutiny is required." *Id.* at 13a-14a. The court
instead held that neither the legislative purposes
articulated in support of Section 3 at the time of its
enactment nor additional interests offered by BLAG
bear a rational relationship to a legitimate govern-
mental objective. *Id.* at 13a-22a.

5. The court of appeals affirmed. Supp. App. 1a-
83a.

a. At the outset, the court of appeals rejected
BLAG's argument that the government is not an ag-
grieved party that can take an appeal. Supp. App. 4a-
5a. Relying on *INS* v. *Chadha*, 462 U.S. 919, 931
(1983), the court held that the government is ag-
grieved because "the United States continues to en-
force Section 3" and Section 3's constitutionality "will
have a considerable impact on many operations of the
United States." Supp. App. 4a-5a.

b. The court of appeals then rejected BLAG's
threshold request that it should certify to the New
York Court of Appeals the question, which BLAG
characterized as implicating plaintiff's standing,
whether New York in 2009 recognized same-sex mar-
riages entered into in other jurisdictions. Supp. App.
5a-7a. Relying on the "useful and unanimous" rulings
of New York's intermediate appellate courts on that
question, *id.* at 6a, the court of appeals agreed with

8

the district court and concluded that New York recognized such marriages at the relevant time, *id.* at 6a-7a.

c. The court of appeals also rejected BLAG's argument that this Court's summary dismissal of the appeal in *Baker*, *supra*, controls plaintiff's equal protection challenge. Supp. App. 7a-11a. After noting the limited precedential force of summary dismissals, the court of appeals explained that the "question whether the federal government may constitutionally define marriage as it does in Section 3 of DOMA is sufficiently distinct from the question in *Baker*: whether same-sex marriage may be constitutionally restricted by the *states*." *Id.* at 8a. The court reasoned, moreover, that even if "*Baker* might have had resonance" when it was decided, "it does not today" because of the "manifold changes to the Supreme Court's equal protection jurisprudence" since *Baker*. *Id.* at 9a.

d. Turning to the constitutionality of Section 3, the court of appeals noted that "the existence of a rational basis for Section 3 of DOMA is closely argued," Supp. App. 12a, but concluded that it need not resolve that argument "if heightened scrutiny is available, as it is in this case," *id.* at 14a. In considering the applicable level of scrutiny, the court first looked to whether the class has historically been subjected to discrimination. *Id.* at 16a-17a. The court found "[i]t is easy to conclude that homosexuals have suffered a history of discrimination." *Id*. at 16a. "Perhaps the most telling proof of animus and discrimination," the court determined, "is that, for many years and in many states, homosexual conduct was criminal." *Ibid*. Noting that "BLAG concedes that homosexuals have endured discrimination in this country since at least the 1920s,"

9

the court concluded that "[n]inety years of discrimination is entirely sufficient." *Id*. at 17a.

The court of appeals then assessed whether sexual orientation, the distinguishing class characteristic, typically bears on a person's ability to contribute to society. Supp. App. 17a-18a. The court reasoned that, while "[t]here are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society," sexual orientation "is not one of them." *Id*. at 18a. The court determined that sexual orientation "has nothing to do with aptitude or performance." *Ibid*.

Next, the court of appeals examined the discernibility of sexual orientation, Supp. App. 19a-21a, explaining that "what matters here is whether the characteristic invites discrimination when it is manifest," *id*. at 21a. The court rejected the characterization of this factor as one confined to "immutability," finding that "the test is broader." *Id*. at 19a-20a. Analogizing to classifications based on alienage, illegitimacy, and national origin, *id*. at 19a-21a, the court concluded that "sexual orientation is a sufficiently distinguishing characteristic to identify the discrete minority class of homosexuals," *id*. at 21a.

Finally, the court evaluated the political power of gay and lesbian people. Supp. App. 21a-23a. The court acknowledged that "homosexuals have achieved political successes over the years." *Id*. at 21a. But the relevant question, the court explained, "is whether they have the strength to politically protect themselves from wrongful discrimination." *Ibid*. Pointing to "the seemingly small number of acknowledged homosexuals" in positions of power, among other evidence, *id*. at 22a, the court concluded that gay and

10

lesbian people cannot "adequately protect themselves from the discriminatory wishes of the majoritarian public," *id.* at 23a.

Based "on the weight of the factors and on analogy to the classifications recognized as suspect and quasi-suspect," the court concluded that "the class is quasi-suspect" and thus calls for the application of intermediate scrutiny. Supp. App. 23a.

e. The court of appeals then held that Section 3 of DOMA fails under intermediate scrutiny. Supp. App. 23a-31a. The court concluded that the purposes advanced by BLAG and Congress in support of Section 3 do not bear a substantial relationship to an important governmental objective, *id.* at 24a-30a, noting that "BLAG's counsel all but conceded [at argument] that these reasons for enacting DOMA may not withstand intermediate scrutiny," *id.* at 24a.

The court first determined that an asserted interest in "maintaining a consistent federal definition of marriage" cannot withstand intermediate scrutiny. Supp. App. 24a. The court explained that, among other problems, "DOMA's sweep arguably creates more discord and anomaly than uniformity"; "[b]ecause DOMA defined only a single aspect of domestic relations law, it left standing all other inconsistencies in the laws of the states, such as minimum age, consanguinity, divorce, and paternity." *Id.* at 25a.

Nor could the court of appeals discern a substantial relationship between Section 3 and the interest in "sav[ing] government resources." Supp. App. 26a. "DOMA is so broad," the court concluded, *id.* at 27a, that it "transcends a legislative intent to conserve public resources," *id.* at 28a. And while "[f]iscal prudence is undoubtedly an important government inter-

11

est," *id.* at 27a, the court noted, the "saving of welfare
costs cannot justify an otherwise invidious classifica-
tion," *ibid.* (quoting *Graham* v. *Richardson*, 403 U.S.
365, 375 (1971)).

Turning to the asserted interest in "preserving
traditional marriage as an institution," Supp. App.
28a, the court explained that the "ancient lineage of a
legal concept does not give a law immunity from at-
tack," *ibid.* (quoting *Heller* v. *Doe*, 509 U.S. 312, 326
(1993) (brackets omitted)).   The court concluded,
moreover, that "[e]ven if preserving tradition were in
itself an important goal, DOMA is not a means to
achieve it"; "because the decision of whether same-sex
couples can marry is left to the states, DOMA does
not, strictly speaking, preserve the institution of mar-
riage as one between a man and a woman." *Id.* at 29a
(citation and internal quotation marks omitted).

Finally, the court determined that Section 3 does
not advance an interest in the "encouragement of
responsible procreation and child-rearing," *id.* at 30a,
because "DOMA does not affect in any way" the incen-
tives for opposite-sex couples to engage in such pro-
creation and child-rearing, *id.* at 29a.   "Incentives for
opposite-sex couples to marry and procreate (or not),"
the court concluded, "were the same after DOMA was
enacted as they were before." *Id.* at 30a.

f.  Judge Straub dissented in part.   While he con-
curred with the parts of the court's opinion denying
BLAG's motion to dismiss the government's appeal
and declining to certify to the New York Court of
Appeals the marriage-recognition issue, Supp. App.
31a, he would have held that *Baker* forecloses peti-
tioner's equal protection challenge, *id.* at 40a-48a.
Even if *Baker* did not control, Judge Straub would

12

have upheld Section 3 applying rational-basis scrutiny. *Id.* at 48a-83a.

## SUMMARY OF ARGUMENT

Section 3 of DOMA violates the fundamental constitutional guarantee of equal protection. The law denies to tens of thousands of same-sex couples who are legally married under state law an array of important federal benefits that are available to legally married opposite-sex couples. Because this discrimination cannot be justified as substantially furthering any important governmental interest, Section 3 is unconstitutional.

A. This Court has understandably reserved the application of heightened constitutional scrutiny to a small number of classifications. But the Court has yet to determine whether classifications based on sexual orientation qualify. Under the factors articulated by this Court, such classifications warrant heightened scrutiny.

First, gay and lesbian people have been subject to a significant history of discrimination in this country. Until *Lawrence* v. *Texas*, 539 U.S. 558 (2003), criminal laws in many states prohibited their private sexual conduct. In addition, gay and lesbian people have long suffered discrimination in employment, immigration, criminal violence, child custody, police enforcement, voter referenda, and other contexts.

Second, sexual orientation, unlike disability or age, generally bears no relation to ability to participate in and contribute to society. Rather than dispute that unassailable fact, BLAG seeks to avoid its force by inventing its own query untethered to this Court's precedents (Br. 54): whether the classification turns on a characteristic "relevant to the distinctions actual-

13

ly drawn." But that formulation would drain the constitutional inquiry of any real meaning by conflating the question whether a classification withstands heightened scrutiny in a particular case (the second step of the equal-protection analysis) with the antecedent question whether heightened scrutiny applies to that classification (the first step).

Third, discrimination against gay and lesbian people is based on an immutable or distinguishing characteristic. Sexual orientation is a core aspect of identity. Its expression, particularly in loving and committed relationships, is an "integral part of human freedom." *Lawrence*, 539 U.S. at 577. There is broad scientific and medical consensus that sexual orientation is typically not a voluntary choice, and that efforts to change an individual's sexual orientation are generally futile and potentially harmful. In any event, as long as it distinguishes a group, a characteristic may support application of heightened scrutiny even if—as with illegitimacy or alienage—it is subject to change or not readily visible.

Fourth, gay and lesbian people are a minority group with limited political power. Although some of the harshest and most overt forms of discrimination against gay and lesbian people have receded, that progress has hardly been uniform (either temporally or geographically), and has in significant respects been the result of judicial enforcement of the Constitution, not political action. *E.g.*, *Lawrence*, *supra*. The vast majority of state voter initiatives directed at gay and lesbian people, even within the last decade, have repealed protections against sexual-orientation discrimination or denied gay and lesbian people the ability to marry. In any event, as confirmed by the

14

applicability of heightened scrutiny to classifications based on gender, the fact that gay and lesbian people have achieved some political gains does not tilt this factor against, let alone preclude, heightened scrutiny. See *Frontiero* v. *Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion).

B. Section 3 fails heightened scrutiny. None of Section 3's actual purposes as expressed in the House Report, or any of the additional interests now asserted by BLAG, substantially furthers an important governmental objective.

Congress's stated interest in asserting moral disapproval of homosexuality cannot justify Section 3. BLAG does not contend otherwise. As the Court has explained, "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." *Lawrence*, 539 U.S. at 577 (citation omitted).

Congress's asserted interest in defending the institution of "traditional, heterosexual" marriage (House Report 12) fails for similar reasons. *E.g.*, *United States* v. *Virginia*, 518 U.S. 515, 535-536 (1996) (*VMI*). In any event, because Section 3 imposes no restriction on the ability of any state to provide for same-sex marriage, it does not substantially further any interest in preserving "traditional, heterosexual" marriage.

Nor can DOMA be justified based on the interest in promoting responsible parenting and child-rearing that BLAG identifies as the principal societal justification for recognizing marriage. Even apart from the expert consensus that children raised by gay and lesbian parents are as likely to be well adjusted as children raised by heterosexual parents, Section 3

15

does nothing to promote responsible opposite-sex parenting or to prevent irresponsible same-sex parenting. Denying federal benefits to married same-sex couples creates no additional incentive for heterosexual couples to marry, procreate, or raise children together; nor does it disturb any state-conferred parental rights for same-sex couples.

Congress's interest in "protecting state sovereignty and democratic self-governance" (House Report 12, 18) applies to Section 2, not Section 3, of DOMA. BLAG invokes a parallel sovereign interest in enabling the *federal* government to formulate its own definition of marriage for its own purposes. That asserted interest, however, simply begs the question in this case: whether the exercise of federal authority is consistent with equal protection.

Section 3 also cannot be justified based on an interest in preserving government resources. Even assuming that Section 3 actually saves the government money (a dubious assertion), that would not suffice under heightened scrutiny. *E.g.*, *Plyler* v. *Doe*, 457 U.S. 202, 227 (1982).

The related interests in national uniformity and administrability with respect to federal benefits eligibility are not "actual purposes" expressed either in DOMA itself or the accompanying House Report, and therefore cannot be considered for purposes of heightened scrutiny. *VMI*, 518 U.S. at 535-536. Those interests also fail because the federal government ordinarily has given effect to marriages lawfully recognized under state law despite a number of inconsistencies among state marriage laws. Section 3 breaks from that established practice in a way that creates administrative difficulties, *i.e.*, requiring the

27

16

federal government to determine whether a valid state marriage involves individuals of the same sex.

Finally, the asserted interest in proceeding with caution pending state experimentation with the definition of marriage likewise lacks a basis in DOMA or the House Report. Section 3, at any rate, affects the institution of marriage, if at all, only "at the margin" (BLAG Br. 43). Section 3, moreover, is not framed as a temporary measure designed to facilitate further study.

C. If the Court declines to apply heightened scrutiny to Section 3 of DOMA, the government does not challenge the constitutionality of Section 3 under the highly deferential standard of rational-basis review. Insofar as the Court were to apply a "more searching form of rational basis review" (*Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring in judgment)) because of the unique nature of the classification at issue, however, Section 3 would fail that analysis for largely the same reasons that it fails heightened scrutiny.

## ARGUMENT

### SECTION 3 OF DOMA VIOLATES EQUAL PROTECTION

The Constitution's guarantee of equal protection of the laws, applicable to the federal government through the Due Process Clause of the Fifth Amendment, see *Bolling* v. *Sharpe*, 347 U.S. 497, 500 (1954), embodies a defining constitutional ideal that "all persons similarly situated should be treated alike," *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Section 3 of DOMA stands at odds with that fundamental principle: it allows states to define the category of "similarly situated" persons—those who are legally married under state law—but it then denies federal benefits to legally married same-sex cou-

17

ples that are available to legally married opposite-sex couples.

The present case vividly illustrates the character of this discrimination: Section 3 of DOMA required the federal government to deny plaintiff a $363,000 reduction in estate taxes solely because her marriage, although fully recognized as a matter of state law, was with another woman. The statute inflicts a vast array of similarly severe harms upon the tens of thousands of legally married same-sex couples in this country. A same-sex spouse of an active-duty military service-member is excluded from certain housing, health-insurance, and disability benefits that would be afforded to an opposite-sex spouse. A federal employee is denied leave under the Family and Medical Leave Act to care for a sick same-sex spouse, who is also ineligible for health-insurance coverage. A non-citizen same-sex spouse of a United States citizen cannot qualify as the citizen spouse's immediate relative for purposes of obtaining lawful permanent residence, subjecting the non-citizen spouse to the possibility of removal (if in the United States) or continued separation (if abroad). A same-sex surviving spouse is denied certain Social Security and pension benefits that would be available to an opposite-sex spouse. And a same-sex spouse of a military veteran is ineligible to be buried alongside his or her spouse in a national cemetery (absent a discretionary designation of eligibility by the Secretary of Veterans Affairs), or to receive certain survivor benefits upon a veteran's service-connected death. 38 U.S.C. 1310, 2402(a)(5) and (6); see also 38 U.S.C. 101(3) and (31) (defining "spouse" for Title 38 as a person of the opposite sex who is a wife or husband).

18

The question in this case is whether those results compelled by DOMA are consistent with equal protection.  They are not.[3]

### A. Classifications Based On Sexual Orientation Should Be Subject To Heightened Scrutiny

Legislation is generally presumed valid and sustained as long as the "classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440.  When "individuals in the group affected by a law have distinguishing characteristics relevant to interests the [government] has the authority to implement," courts will not "closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *Id.* at 441-442.  But when legislation classifies on the basis of a factor that "generally provides no sensible ground

---

[3]  BLAG asserts in a footnote (Br. 24 n.6) that "[b]efore it can consider DOMA's constitutionality, this Court must resolve a threshold issue of Article III standing," in that plaintiff "only has standing to challenge DOMA  *  *  *  if New York would have recognized her 2007 Ontario marriage certificate" at the time of Thea Spyer's death.  As explained in our certiorari reply (at 3-4 & nn.1-2), however, both courts below concluded that New York recognized plaintiff's marriage at the relevant time (Supp. App. 5a-7a; *id.* at 31a (Straub, J., dissenting); Pet. App. 6a-8a)—a conclusion entitled to controlling deference by this Court.  See, *e.g.*, *Bishop* v. *Wood*, 426 U.S. 341, 346 (1976).  Notably, BLAG makes no affirmative argument for disturbing the Second Circuit's and district court's common understanding of New York law, instead contending only that the issue is "not free from doubt."  In any event, because IRS's denial of plaintiff's tax-refund claim was based solely on Section 3 of DOMA, without questioning the validity of her marriage under either Ontario or New York law (see p. 4, *supra*), BLAG's objection in fact goes to the merits rather than to standing.

19

for differential treatment"—such as race or gender—equal protection imposes a greater burden on the government to justify the classification. *Id.* at 440-441.

Such suspect or quasi-suspect classifications are subject to heightened scrutiny, under which the government must show, at a minimum, that the classification drawn is "substantially related to an important governmental objective." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988). That more stringent standard enables courts to ascertain whether the government has employed the classification for a significant and proper purpose, and provides a heightened measure of protection in circumstances where there is a greater danger that the classification results from impermissible prejudice or stereotypes. See, *e.g.*, *City of Richmond* v. *J. A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion); *United States* v. *Virginia*, 518 U.S. 515, 533 (1996) (*VMI*).

This Court has yet to resolve the appropriate level of scrutiny for classifications based on sexual orientation. In *Romer* v. *Evans*, 517 U.S. 620 (1996), the Court held that the state law at issue, which repealed existing—and prohibited future—legal protections for gay and lesbian people, failed "even" rational-basis review under the Equal Protection Clause. *Id.* at 632. In *Lawrence* v. *Texas*, 539 U.S. 558 (2003), the Court invalidated a state criminal ban on homosexual sodomy under the Due Process Clause of the Fourteenth Amendment because the law "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Id.* at 578. The Court accordingly had no need in either case to decide whether heightened scrutiny applies for pur-

20

poses of equal-protection review of sexual-orientation classifications.  Nor did the Court decide the question in its one-line summary dismissal in *Baker* v. *Nelson*, 409 U.S. 810 (1972), of an appeal as of right from a state supreme court decision denying a same-sex couple the right to marry under state law.  See Supp. App. 7a-11a.  As BLAG acknowledges (Br. 25-26), the Court's summary order unsurprisingly gives no indication that it considered, much less resolved, the applicable level of scrutiny.

The Court has, however, established a set of factors that guide the determination of whether to apply heightened scrutiny to a classification that singles out a particular group:  (1) whether the class in question has suffered a history of discrimination, *e.g.*, *Bowen* v. *Gilliard*, 483 U.S. 587, 602 (1987); (2) whether the characteristic prompting the discrimination "frequently bears no relation to ability to perform or contribute to society," *Cleburne*, 473 U.S. at 440-441 (quoting *Frontiero* v. *Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion)); (3) whether the discrimination against members of the class is based on "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Gilliard*, 483 U.S. at 602 (citation omitted); and (4) whether the class is "a minority or politically powerless," *ibid*.

The first two considerations—a history of discrimination and the distinguishing characteristic's lack of relation to an individual's capabilities—are at the core of the inquiry and are common to every class this Court has deemed suspect.  That is fully understandable: those factors provide direct and powerful reasons to be suspicious of a classification.  Though relevant, neither immutability nor political powerlessness is a

32

21

precondition or sufficient to warrant heightened scrutiny.   See, *e.g.*, *Cleburne*, 473 U.S. at 443 n.10 ("[T]here's not much left of the immutability theory, is there?") (quoting John Hart Ely, *Democracy and Distrust* 150 (1980)); *id.* at 472 n.24 (Marshall, J., concurring in part and dissenting in part) ("The 'political powerlessness' of a group may be relevant, but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates.").   At any rate, as the court of appeals correctly determined (Supp. App. 16a-23a), all four of the factors demonstrate that classifications based on sexual orientation should be subject to heightened scrutiny.[4]

---

[4] The decisions of other courts of appeals concluding that rational-basis review applies to sexual-orientation classifications are flawed.   Many of those courts relied in whole or in part on *Bowers* v. *Hardwick*, 478 U.S. 186 (1986), which this Court overruled in 2003. *Lawrence*, 539 U.S. at 578.   They reasoned that "[i]f homosexual conduct may constitutionally be criminalized," as *Bowers* held, "then homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny for equal protection purposes."   *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 464 (7th Cir. 1989), cert. denied, 494 U.S. 1004 (1990); see *Equality Found.* v. *City of Cincinnati*, 54 F.3d 261, 266-267 & n.2 (6th Cir. 1995), vacated by, 518 U.S. 1001 (1996); *Steffan* v. *Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc); *High Tech Gays* v. *Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir. 1990); *Woodward* v. *United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989), cert. denied, 494 U.S. 1003 (1990); see also *Richenberg* v. *Perry*, 97 F.3d 256, 260 (8th Cir. 1996) (citing reasoning of prior appellate decisions based on *Bowers*), cert. denied, 522 U.S. 807 (1997); *Thomasson* v. *Perry*, 80 F.3d 915, 928 (4th Cir.) (same), cert. denied, 519 U.S. 948 (1996).

22

### 1. *Gay and lesbian people have been subject to a history of discrimination*

Gay and lesbian people have suffered a significant history of discrimination in this country.  No court to consider the question has concluded otherwise, and any other conclusion would be insupportable.  Supp. App. 16a; see, *e.g.*, *Massachusetts* v. *United States Dep't of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012) ("[G]ays and lesbians have long been the subject of discrimination."), petitions for cert. pending, Nos. 12-13 (filed June 29, 2012), 12-15 (filed July 3, 2012), and 12-97 (filed July 20, 2012); *High Tech Gays* v. *Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990) ("[W]e do agree that homosexuals have suffered a history of discrimination."); *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 465 (7th Cir. 1989) ("Homosexuals have suffered a history of discrimination and still do, though possibly now in less degree."), cert. denied, 494 U.S. 1004 (1990).

Perhaps most stark is the history of criminal prohibitions on the sexual intimacy of gay and lesbian people:  that history ranges from colonial laws ordering the death of "any man [that] shall lie with mankind, as he lieth with womankind," Public Statute Laws of the State of Connecticut, 1808 tit. LXVI, ch. 1, § 2, 294-295 & n.1 (enacted 1642; rev. 1750), to state laws that, until very recently, "demean[ed] the[] existence" of gay and lesbian people "by making their private sexual conduct a crime," *Lawrence*, 539 U.S. at 578.  "[T]hat declaration in and of itself [wa]s an invitation to subject homosexual persons to discrimination both in the public and in the private spheres."  *Id.* at 575.  The federal government, state and local governments, and private parties all have contributed to a

23

regrettable history of discrimination against gay and
lesbian people in a variety of contexts:

- *Employment*: By the 1950s, based on Presiden-
  tial and other directives, the federal government
  investigated its civilian employees for "sexual per-
  version," *i.e.*, homosexuality.   Until 1975, "[t]he
  regulations of the Civil Service Commission for
  many years ha[d] provided that * * * immoral or
  notoriously disgraceful conduct, which includes ho-
  mosexuality or other types of sex perversion, are
  sufficient grounds for denying appointment to a
  Government position or for the removal of a person
  from the Federal service." *Employment of Homo-
  sexuals and Other Sex Perverts in Government, In-
  terim Report submitted to the Committee by its
  Subcommittee on Investigations pursuant to S.
  Res. 280*, S. Doc. No. 241, 81st Cong., 2d Sess. 8
  (1950).   Intrusive investigations by the FBI and
  other agencies forced thousands of federal employ-
  ees out of their jobs based on the suspicion that
  they were gay or lesbian. See, *e.g.*, *id.* at 6-8; Brad
  Sears et al., The Williams Institute, *Documenting
  Discrimination on the Basis of Sexual Orientation
  and Gender Identity in State Employment*, ch. 5 at
  7, Sept. 2009, http://williamsinstitute.law.ucla.edu/
  research/workplace/documenting-discrimination-
  on-the-basis-of-sexual-orientation-and-gender-
  identity-in-state-employment.   The same was true
  on the state and local government level, *id.* at 18-

24

34, and pervasive employment discrimination persists to this day in the private sector, *id.* at 8-9.[5]

• *Immigration*:   For decades, gay and lesbian noncitizens were categorically subject to exclusion from the United States on the ground that they were "persons of constitutional psychopathic inferiority," "mentally . . . defective," or sexually deviant.   *Lesbian/Gay Freedom Day Comm., Inc.* v. *INS*, 541 F. Supp. 569, 571-572 (N.D. Cal. 1982) (quoting Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 875), see *Boutilier* v. *INS*, 387 U.S. 118, 120 (1967) ("The legislative history  of the [Immigration and Nationality] Act indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals."). That exclusion remained in effect until June 1, 1991.   Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978.

• *Hate crimes*:   After racial minorities, gay and lesbian people are the most frequent victims of reported hate crimes.   See FBI, *Hate Crime Statistics 2011*, http://www.fbi.gov/about-us/cjis/ucr/hate-crime/2011/tables/table-1 (hate crimes motivated by victim's sexual orientation constituted second highest category reported with 1508 offenses or over 20% of total).   From 2007 to 2011 (the latest year for which data has been reported), hate crimes motivated by sexual orientation *increased* 3%, even as hate crimes overall *decreased* 19%.   Compare *ibid.*

---

[5] Until September 2011, open military service by gay and lesbian people was prohibited first by regulation and then by statute, 10 U.S.C. 654.

25

with FBI, *Hate Crime Statistics, 2007*, http://
www2.fbi.gov/ucr/hc2007/table_01.htm.

- *Child custody*: States and localities have denied
child custody and visitation rights to gay and lesbi-
an parents based on their intimate relationships.
See, *e.g.*, *Ex parte H.H.*, 830 So. 2d 21, 26 (Ala.
2002) (Moore, C.J., concurring) (concurring in deni-
al of custody to lesbian mother on ground that
"[h]omosexual conduct is * * * abhorrent, immor-
al, detestable, a crime against nature, and a viola-
tion of the laws of nature and of nature's God
* * * [and] an inherent evil against which children
must be protected"); *Bowen* v. *Bowen*, 688 So. 2d
1374, 1381 (Miss. 1997) (holding that trial court did
not err in granting father custody based on public
rumor that son's mother was involved in lesbian re-
lationship); *Bottoms* v. *Bottoms*, 457 S.E.2d 102,
108 (Va. 1995) (noting that while "a lesbian mother
is not *per se* an unfit parent," "[c]onduct inherent in
lesbianism is punishable as a Class 6 felony in the
Commonwealth" and "that conduct is another im-
portant consideration in determining custody").

- *Police enforcement*: Liquor licensing laws were
used to raid establishments patronized by gay and
lesbian people long before the Stonewall riots of
1969. See William N. Eskridge, Jr., *Privacy Juris-
prudence and the Apartheid of the Closet, 1946-
1961*, 24 Fla. St. U. L. Rev. 703, 761-766 (1997). Po-
lice similarly relied on laws prohibiting lewdness,
vagrancy, and disorderly conduct to harass gay and
lesbian people when congregating in public. See,
*e.g.*, *Pryor* v. *Municipal Court*, 599 P.2d 636, 644
(Cal. 1979); Steven A. Rosen, *Police Harassment of
Homosexual Women and Men in New York City*,

26

*1960-1980*, 12 Colum. Hum. Rts. L. Rev. 159, 162-
164 (1980); Florida State Legislative Investigation
Committee, *Report: Homosexuality and Citizen-
ship in Florida* 14 (1964).

• *Voter referenda*: Efforts to combat discrimina-
tion have engendered significant political backlash,
as evidenced by a series of successful state and lo-
cal ballot initiatives, starting in the 1970s, repealing
anti-discrimination protections for gay and lesbian
people. See Robert Wintemute, *Sexual Orientation
and Human Rights* 56 (1995) ("From 1974 to 1993,
at least 21 referendums were held on the sole ques-
tion of whether an existing law or executive order
prohibiting sexual orientation discrimination should
be repealed or retained. In 15 of these 21 cases, a
majority voted to repeal the law or executive or-
der."). The voter initiatives at issue in *Romer*, *su-
pra*, and *Equality Foundation* v. *City of Cincin-
nati*, 54 F.3d 261 (6th Cir. 1995), vacated by, 518
U.S. 1001 (1996), are two of a number of more re-
cent examples. See also pp. 33-34, *infra* (discussing
success of state ballot measures prohibiting mar-
riage of same-sex couples).

BLAG offers two responses to that well-
documented history of discrimination. First, BLAG
observes (Br. 57) that gay and lesbian people, unlike
certain other protected classes, have never been de-
nied the right to vote. But this Court has never enu-
merated political disenfranchisement as a separate
factor, let alone a requirement, for according height-
ened scrutiny, and it would make little sense to do so.
Citizens born out of wedlock, for instance, have never
been denied the right to vote, but the Court has treat-

27

ed them as a quasi-suspect class for equal-protection purposes. See *Lalli* v. *Lalli*, 439 U.S. 259, 265 (1978).

Second, BLAG contends (Br. 57) that, unlike other protected classes, gay and lesbian people have not suffered discrimination "for longer than history has been recorded." Of course, that is not the relevant inquiry; as the court of appeals noted (Supp. App. 17a), "whether such discrimination existed in Babylon is neither here nor there." In any case, in addition to the colonial-era criminal prohibitions on homosexual conduct, BLAG concedes that gay and lesbian people have endured discrimination in this country since the 1920s. Any perceived shortage of evidence of overt or officially sanctioned discrimination before that time is likely attributable to the fact that gay and lesbian people, by and large, kept their sexual orientation hidden for fear of discrimination or persecution. In any event, given its breadth and depth, the undisputed twentieth-century discrimination has lasted long enough.

### 2. *Sexual orientation bears no relation to ability to perform or contribute to society*

A pivotal consideration distinguishing classifications that call for application of heightened scrutiny from classifications that do not is whether the characteristic in question generally bears on an "individual's ability to participate in and contribute to society." *Cleburne*, 473 U.S. at 441 (quoting *Mathews* v. *Lucas*, 427 U.S. 495, 505 (1976)). When the characteristic is ordinarily one that "the government may legitimately take into account," *id.* at 446, this Court declines to apply heightened scrutiny even if other factors would support its application. See *id.* at 442-447 (mental

28

disability); *Massachusetts Bd. of Ret.* v. *Murgia*, 427 U.S. 307, 312-315 (1976) (per curiam) (age). Conversely, "what differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society." *Frontiero*, 411 U.S. at 686 (plurality opinion).

The same is true of sexual orientation. Historically, discrimination against gay and lesbian people had nothing to do with ability or performance, but rested instead on the view that they are, for example, sexual deviants, mentally ill, or immoral. See pp. 22-27, *supra*. As the American Psychiatric Association concluded some forty years ago, however, "homosexuality *per se* implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." American Psychiatric Ass'n, *Position Statement on Homosexuality and Civil Rights* (1973), *reprinted in* 131 Am. J. Psychiatry 497 (1974). Like gender, race, or religion, sexual orientation bears no inherent relation to a person's ability to participate in or contribute to society.

That fact is evident throughout all aspects of society, including military service. "[V]alor and sacrifice are no more limited by sexual orientation than they are by race or by gender or by religion or by creed," and gay and lesbian Americans have served with honor "to protect this nation and the ideals for which it stands." *Remarks by the President and Vice President at Signing of the Don't Ask, Don't Tell Repeal Act of 2010*, Dec. 22, 2010, http://www.whitehouse.gov/the-press-office/2010/12/22/remarks-president-and-vice-president-signing-dont-ask-dont-tell-repeal-a.

29

Gay and lesbian people have made similar contributions beyond the military, even when they could not live openly with regard to their sexual orientation. Plaintiff's own pathbreaking career as a computer programmer, while she kept her long-term relationship with Spyer "invisible," is but one example.  J.A. 154, 156-157 (Am. Comp. ¶¶ 19, 27).

BLAG cannot dispute any of this.  Instead, BLAG would prefer to transform the inquiry into a markedly different, case-specific one (Br. 54):  whether the classification turns on a characteristic "relevant to the distinctions actually drawn," *i.e.*, "whether a married couple is of the opposite sex is relevant to the government's interests in recognizing marriage."  This Court has never framed the inquiry in that way, and for good reason.  As the court of appeals explained, this Court's decisions make clear that the relevance of the classification to the "distinctions actually drawn" by a particular law "bear[s] upon whether the law withstands scrutiny (the second step of analysis) rather than upon the level of scrutiny to apply" in the first place.  Supp. App. 18a (citing *Clark*, 486 U.S. at 461).  When the inquiry is properly framed, the answer is clear.   Sexual orientation—like gender—"frequently bears no relation to ability to perform or contribute to society."   *Frontiero*, 411 U.S. at 686 (plurality opinion).

   3.   *Gay and lesbian people possess a distinguishing characteristic that defines them as a group*

Sexual orientation is a sufficiently discernible characteristic to define a discrete minority group.  BLAG (Br. 54-56) and its amici contend that sexual orientation is not necessarily fixed, suggesting that it may

30

change over time and vary along a spectrum.   That contention is both irrelevant and incorrect.

a.  As the Court's precedents indicate, this factor is broader than "immutability" or "obviousness"; it asks whether there are "obvious, immutable, *or* distinguishing characteristics that define  *  *  * a discrete group."  *Gilliard*, 483 U.S. at 602 (emphasis added; citation omitted); *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986).  A classification may be constitutionally suspect even if it rests on a characteristic, such as illegitimacy or alienage, that is not readily visible or is subject to change.  See *Mathews*, 427 U.S. at 504, 506 ("[I]llegitimacy does not carry an obvious badge, as race or sex do."); *Graham* v. *Richardson*, 403 U.S. 365, 372 (1971) (alienage). As the court of appeals explained (Supp. App. 19a-20a), the salient question "is whether the characteristic of the class calls down discrimination when it is manifest."

Sexual orientation is such a "distinguishing characteristic," and that is true even though so many gay and lesbian people have been forced for so long to hide their identities in order to avoid discrimination.  As this Court has recognized, sexual orientation is a core aspect of human identity, and its expression is an "integral part of human freedom."  *Lawrence*, 539 U.S. at 562, 576-577; see also *Hernandez-Montiel* v. *INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (Sexual orientation is "fundamental to one's identity" and gay and lesbian individuals "should not be required to abandon" it.).

BLAG also contends (Br. 55) that sexual orientation differs from other suspect or quasi-suspect classes because it is defined "by a propensity to engage in a certain kind of conduct."  This Court has squarely

31

rejected such a status/conduct distinction. See *Lawrence*, 539 U.S. at 575 ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination."); *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."); *Christian Legal Soc'y* v. *Martinez*, 130 S. Ct. 2971, 2990 (2010) (rejecting contention that the organization "does not exclude individuals because of sexual orientation, but rather 'on the basis of a conjunction of conduct and the belief that the conduct is not wrong'" because the Court's "decisions have declined to distinguish between status and conduct in this context"); cf. *Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

b. In any event, the broad consensus in the scientific community is that, for the vast majority of people (gay and straight alike), sexual orientation is not a voluntary choice.[6] There is likewise a medical consen-

---

[6] See, *e.g.*, Gregory M. Herek et al., *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults in a US Probability Sample*, 7 Sexuality Res. & Soc. Pol'y 176, 186-188 (2010), http://www.springerlink.com/content/k186244647272924/fulltext.pdf (in national survey of more than 650 self-identified lesbian, gay, and bisexual adults, 95% of gay men and 83% of lesbian women reported "no choice at all" or "a small amount of choice" when asked "How much choice do you feel you had about [your self-described sexual orientation]?"); Am. Psychological Ass'n et al. (APA) C.A. Amicus Br. 6-8 ("Homosexuality is a normal expression of human sexuality, is generally not

32

sus that efforts to change an individual's sexual orientation are generally futile and potentially dangerous to an individual's well-being.[7]   Accordingly, sexual orientation readily constitutes an "obvious, immutable, or distinguishing characteristic" for purposes of equal-protection law.

### 4.   Gay and lesbian people are minorities with limited political power

The final consideration is whether gay and lesbian people are "a minority or politically powerless." *Giliard*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638). They are both.  It is undisputed that gay and lesbian

––––––––––––––

chosen, and is highly resistant to change."); see also *Hernandez-Montiel*, 225 F.3d at 1093 ("Sexual orientation and sexual identity are immutable."); *Watkins* v. *United States Army*, 847 F.2d 1329, 1347-1348 (9th Cir. 1988) ("Scientific proof aside, it seems appropriate to ask whether heterosexuals feel capable of changing *their* sexual orientation."), rev'd en banc, 875 F.3d 699 (9th Cir. 1989).

[7] See, *e.g.*, Am. Psychological Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, at v (2009), http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf   ("[E]fforts   to change sexual orientation are unlikely to be successful and involve some risk of harm."); see also Richard A. Posner, *Sex and Reason* 101 n.35 (1992) (describing "failure of treatment strategies * * * to alter homosexual orientation"); Douglas C. Haldeman, *The Practice and Ethics of Sexual Orientation Conversion Therapy*, 62 J. Consulting & Clinical Psychol. 221, 226 (1994) (describing "lack of empirical support for conversion therapy").

Every major mental health organization has adopted a policy statement cautioning against the use of so-called "conversion" or "reparative" therapies to change the sexual orientation of gay and lesbian people.  Those policy statements are reproduced in a 2008 publication of the American Psychological Association, *Just the Facts about Sexual Orientation and Youth*, http://www.apa.org/pi/lgbt/resources/just-the-facts.pdf.

33

people are a minority group, and, for much of the
history of discrimination against them (see pp. 22-27,
*supra*), they lacked any ability to protect themselves
through the political process.  To be sure, that has
begun to change.  But in critical respects that change
has resulted from judicial enforcement of constitu-
tional guarantees, *e.g.*, *Lawrence*, *supra*, not political
action.  And efforts to combat discrimination against
gay and lesbian individuals frequently have sparked
successful voter referenda or legislative action scaling
back protections.  See p. 26, *supra* (noting numerous
examples including referendum at issue in *Romer*).
As one recent example, in May 2011, the Tennessee
legislature repealed local ordinances prohibiting dis-
crimination on the basis of sexual orientation and
barred future enactment of such ordinances.  Tenn.
House Bill No. 600, Pub. Ch. No. 278, http://state.tn.
us/sos/acts/107/pub/pc0278.pdf.

The recent history of marriage initiatives confirms
that gay and lesbian people continue to lack any con-
sistent or widespread "ability to attract the [favora-
ble] attention of the lawmakers."  *Cleburne*, 473 U.S.
at 445.  BLAG notes (Br. 52) that voters in three
states (Maine, Maryland, and Washington) approved
same-sex marriage this past November—something
that had never happened before at the ballot box.
Focusing on this extremely recent progress, BLAG
ignores the broader context, which overwhelmingly
demonstrates the political challenges faced by the gay
and lesbian minority.  In 1996, at the time DOMA was
enacted, only three states had laws expressly restrict-
ing marriage to opposite-sex couples.  See Andrew
Koppelman, *The Difference the Mini-DOMAs Make*,
38 Loy. U. Chi. L.J. 265, 265-266 (2007).  Today, 39

34

states have such laws, including voter-approved constitutional amendments in 30 states barring same-sex marriage.[8]  Only six states, by comparison, have conferred marriage rights to same-sex couples through the political process; the other three have through judicial decision.[9]  That is not a convincing record of political power rendering protection unnecessary.[10]

In any event, BLAG can find no justification in this Court's precedents for its assertion (Br. 54) that "the

---

[8]  Two other states (New Mexico and Rhode Island) have no express constitutional or statutory ban on marriage for same-sex couples, but those state governments do not permit same-sex couples to marry there.  Both states, as a matter of comity, do recognize validly entered out-of-state marriages of same-sex couples.

[9]  Connecticut (judicial decision), Iowa (judicial decision), Maine (ballot), Maryland (legislature, approved by ballot), Massachusetts (judicial decision), New Hampshire (legislature), New York (legislature), Vermont (legislature), and Washington (legislature, approved by ballot).

[10]  By way of example, in May 2008, the California Supreme Court held that the state was constitutionally required to recognize same-sex marriage.  *In re Marriage Cases*, 183 P.3d 384, 419-420 (Cal. 2008).  In November 2008, California's voters passed Proposition 8, which amended the state constitution to restrict marriage to opposite-sex couples.  (The constitutionality of Proposition 8 is now before this Court.  *Hollingsworth* v. *Perry*, No. 12-144 (cert. granted Dec. 7, 2012).)  In November 2010, Iowa voters recalled all three Iowa state supreme court justices up for reelection after that court's unanimous decision legalizing same-sex marriage.  A.G. Sulzberger, *Ouster of Iowa Judges Sends Signal to Bench*, N.Y. Times, Nov. 4, 2010, at A1.  On May 8, 2012, North Carolina became the thirtieth state to amend its constitution to prohibit same-sex marriages.  National Conference of State Legislatures, *State Same-Sex Marriage Laws: Legislatures and Courts*, http://www.ncsl.org/issues-research/human-services/same-sex-marriage-laws.aspx (last updated Feb. 14, 2013).

35

political strength of gays and lesbians in the political process should be outcome determinative here." When the Court recognized in 1973 that gender-based classifications were subject to heightened scrutiny, *Frontiero*, 411 U.S. 682-688 (plurality opinion), women already had achieved major political victories, including a constitutional amendment granting them the right to vote and protection against employment discrimination under Title VII.[11]  See *id.* at 685-686 (plurality opinion) ("It is true, of course, that the position of women in America has improved markedly in recent decades," but "women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena.").

As *Frontiero* and the subsequent cases applying heightened scrutiny to gender-based classifications demonstrate, any limited measure of political progress achieved by gay and lesbian people in no way compels declining to apply heightened scrutiny.  To the contrary, their status as a minority, and one with a relative lack of political power, reinforces the applicability of heightened scrutiny based on all of the relevant considerations.

\* \* \* \* \*

This Court understandably has been reluctant to recognize new suspect (or quasi-suspect) classes.  See *Cleburne*, 473 U.S. at 441-442, 445-446.  The govern-

---

[11]  Notably, Congress has enacted no similar laws to protect gay and lesbian people from employment discrimination, and most states provide no such protection either.  See Teresa Welsh, *Should Employers Be Able to Fire Someone for Being Gay?*, U.S. News, May 14, 2012, http://www.usnews.com/opinion/articles/2012/05/14/should-employers-be-able-to-fire-someone-for-being-gay.

36

ment has not lightly concluded that the Court's decisions dictate that heightened scrutiny applies to classifications based on sexual orientation.  This is the rare circumstance in which a faithful application of the Court's established criteria compels applying heightened scrutiny to an additional classification.  While those criteria have appropriately and reliably proved, and will continue to prove, difficult to satisfy, none of the Court's reasons for rejecting heightened scrutiny for other classifications—*e.g.*, age,[12] mental disability,[13] kinship,[14] and poverty[15]—applies to sexual orientation.  Rather, sexual orientation falls squarely in the limited category of classifications for which heightened scrutiny is designed.

### B. Section 3 Of DOMA Fails Heightened Scrutiny

Because a classification based on sexual orientation calls for the application of heightened scrutiny, BLAG must establish that DOMA Section 3, at a minimum, is

---

[12]  *Murgia*, 427 U.S. at 313 (rejecting heightened review for classifications based on age because such persons "have not experienced a history of purposeful unequal treatment or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities") (internal quotation marks omitted).

[13]  *Cleburne*, 473 U.S. at 442-443 (rejecting heightened review for mentally disabled persons because they have "a reduced ability to cope with and function in the everyday world" and "[h]ow this large and diversified group is to be treated under the law is a difficult and often a technical matter").

[14]  *Lyng*, 477 U.S. at 638 (rejecting heightened review for kinship classification because it meets none of the four factors).

[15]  *San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 28 (1973) (rejecting heightened review for classifications based on poverty because such a class would be too "large, diverse, and amorphous").

37

"substantially related to an important governmental objective." *Clark*, 486 U.S. at 461.[16]   And under heightened scrutiny, a statute must be defended by reference to the "actual [governmental] purposes" behind it, not different "rationalizations." *VMI*, 518 U.S. at 535-536.   A classification does not withstand heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718, 730 (1982).

The House Report—the only congressional committee report on DOMA—sets forth the specific governmental interests purportedly advanced by DOMA:

> (1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality; (3) protecting state sovereignty and democratic self-governance; and (4) preserving scarce government resources.

House Report 12.   Other than a cursory footnote (Br. 57 n.10), BLAG makes no argument that any of those interests, or any of the other interests BLAG now asserts, could satisfy heightened scrutiny.   See Supp.

---

[16] BLAG states in passing, in a footnote (Br. 25 n.7), that "[b]y its terms, DOMA does not classify based on a married couple's sexual orientation."   Whether or not DOMA "by its terms" classifies on the basis of sexual orientation, it is plainly a law that classifies based on sexual orientation.   Congress left no doubt that the sole and overriding purpose of Section 3 was to exclude "homosexual couples" from the federal definition of marriage.   House Report 2.   Section 3 denies recognition of a class of marriage into which, as a practical matter, only gay and lesbian people enter.   As discussed above, the Court has rejected such distinctions between the status and conduct of gay and lesbian people.   See pp. 30-31, *supra* (citing *Lawrence, Christian Legal Society,* and *Bray*).

38

App. 24a ("BLAG's counsel all but conceded that these reasons for enacting DOMA may not withstand intermediate scrutiny.") (citing C.A. Oral Arg. Tr. 16:24-17:6; reproduced at Pl. Resp. in Supp. of Writ of Cert. Before J. App. a16).   The following analysis of the proffered justifications for Section 3 demonstrates why any such argument would fail.

### 1. *Morality*

The House Report claims that DOMA upholds "traditional notions of morality," but does so by condemning homosexuality and expressing disapproval of the intimate, loving and committed relationships of gay and lesbian people.   *E.g.*, House Report 15-16 (relying on "moral disapproval of homosexuality" and "a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality"); *id.* at 16 (referring to "a union that many people . . . think is immoral") (citation omitted); see also *id.* at 16 n.54, 33 (invoking holding of *Bowers* v. *Hardwick*, 478 U.S. 186, 196 (1986), that criminal prohibition served the purpose of expressing "the presumed belief * * * that homosexual sodomy is immoral and unacceptable").   The House Report also invokes an interest in extending legal preferences to heterosexual couples to "promot[e] heterosexuality" and discourage homosexuality.   *Id.* at 15 n.53 ("Closely related to this interest in protecting traditional marriage is a corresponding interest in promoting heterosexuality.").

BLAG makes no effort to defend Section 3 on the basis of this asserted interest, and for good reason. Moral opposition to homosexuality, though it may reflect deeply held personal views, is not a legitimate policy objective that can justify unequal treatment of

39

gay and lesbian people.  See *Lawrence*, 539 U.S. at 577
("[T]he fact that the governing majority in a State has
traditionally viewed a particular practice as immoral
is not a sufficient reason for upholding a law prohibit-
ing the practice.") (quoting *Bowers*, 478 U.S. at 216
(Stevens, J., dissenting)); *id.* at 582-583 (O'Connor, J.,
concurring in judgment) ("Moral disapproval of [gay
and lesbian people], like a bare desire to harm the
group, is an interest that is insufficient to satisfy ra-
tional basis review under the Equal Protection
Clause."); see also *Romer*, 517 U.S. at 635 (noting that
law cannot disfavor gay and lesbian people because of
"personal or religious objections to homosexuality").

That is not to suggest that Section 3 of DOMA nec-
essarily or universally resulted from hostile animus.
"Prejudice, we are beginning to understand, rises not
from malice or hostile animus alone.  It may result as
well from insensitivity caused by simple want of care-
ful, rational reflection or from some instinctive mech-
anism to guard against people who appear to be dif-
ferent in some respects from ourselves."  *Board of
Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 374
(2001) (Kennedy, J., concurring).  Disapproval may
also be the product of longstanding traditions or sin-
cerely held beliefs.  Cf. *Massachusetts*, 682 F.3d at 16
("[M]any of our own traditions rest largely on belief
and familiarity.").  Still, while "[p]rivate biases may
be outside the reach of the law,  *  *  *  the law cannot,
directly or indirectly, give them effect."  *Palmore* v.
*Sidoti*, 466 U.S. 429, 433 (1984).

### 2.  *Traditional Definition of Marriage*

The House Report also articulated an interest in
"defending and nurturing the institution of traditional,
heterosexual marriage."  House Report 12-15; see also

40

BLAG Br. 43.  Marriage is, of course, a vitally important institution, and one supported by the federal government through benefits and other programs that rely on marital status.  An interest in preserving marriage as limited to heterosexual persons, however, does not justify Section 3.

Tradition, no matter how long established, cannot by itself justify a discriminatory law under equal protection principles.  See *VMI*, 518 U.S. at 535-536 (invalidating longstanding tradition of single-sex education at Virginia Military Institute); see also *Lawrence*, 539 U.S. at 577-578 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (quoting *Bowers*, 478 U.S. at 216 (Stevens, J., dissenting)); *Heller* v. *Doe*, 509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept does not give [a law] immunity from attack for lacking a rational basis.").

In any event, Section 3 of DOMA cannot plausibly be thought to advance any interest in protecting "traditional" marriage limited to opposite-sex couples. States decide what marriages to recognize without any reference to DOMA.  As the court of appeals reasoned, "because the decision of whether same-sex couples can marry is left to the states, DOMA does not, strictly speaking, 'preserve' the institution of marriage as one between a man and a woman." Supp. App. 29a (citation omitted).  Instead, Section 3 denies benefits to individuals, legally married under state law, on the basis of their sexual orientation.  As a result, "[t]his is not merely a matter of poor fit of remedy to perceived problem, but a lack of any demonstrated connection between DOMA's treatment of same-sex couples and its asserted goal of strengthen-

41

ing the bonds and benefits to society of heterosexual marriage." *Massachusetts*, 682 F.3d at 15 (citation omitted).

Even BLAG acknowledges (Br. 43) that "the federal government does not have the same direct effect on the institution of marriage as the sovereigns that directly issue marriage certificates," and that any effect of a federal definition of marriage on the institution is only "at the margin." Any such effects (if they exist at all) are so attenuated that they cannot be said to "substantially further" the interest in preserving tradition.

### 3. *Procreation and child-rearing*

The House Report identified "responsible procreation and child-rearing" not as a separate rationale for Section 3 of DOMA, but as a basis for Congress's general interest in defending "the institution of traditional, heterosexual marriage." *E.g.*, House Report 14 ("Were it not for the possibility of begetting children inherent in heterosexual unions, society would have no particular interest in encouraging citizens to come together in a committed relationship."); see also BLAG Br. 44-49. Even accepting this blinkered understanding of the moral and emotional foundations of marriage, see *Turner* v. *Safley*, 482 U.S. 78, 95-96 (1987), Section 3 does not substantially further any such interest.

First, no sound basis exists for concluding that same-sex couples who have committed to marriage are anything other than fully capable of responsible parenting and child-rearing. To the contrary, many leading medical, psychological, and social-welfare organizations have issued policy statements opposing restrictions on gay and lesbian parenting based on their

42

conclusions, supported by numerous scientific studies,[17] that children raised by gay and lesbian parents are as well adjusted as children raised by heterosexual parents.[18]  Against this weight of expert authority, BLAG offers (Br. 48) only what it calls the "[c]ommon sense" notion that children benefit more from opposite-sex parents than from same-sex parents.  That is (at best) uninformed speculation, and cannot satisfy heightened scrutiny.  Consequently, even assuming Section 3 had the effect of encouraging opposite-sex parenting at the expense of same-sex parenting (but

---

[17] The weight of the scientific literature strongly supports the view that same-sex parents are just as capable as opposite-sex parents. See, e.g., Timothy J. Biblarz & Judith Stacey, *How Does the Gender of Parents Matter?*, 72 J. Marriage & Family 3 (2010), http://www.squareonemd.com/pdf/Does%20the%20Gender%20of% 20Parents%20Matter%202010.pdf; see also APA C.A. Amicus Br. 5-6, 15-23 (concluding, based on a rigorous review of the literature, that "there is no scientific basis for concluding that gay and lesbian parents are any less fit or capable than heterosexual parents, or that their children are any less psychologically healthy and well adjusted").

[18] See, e.g., Am. Acad. of Pediatrics, *Coparent or Second-Parent Adoption by Same-Sex Parents*, Feb. 2002, http://aappolicy. aappublications.org/cgi/content/full/pediatrics;109/2/339;    Am. Psychological Ass'n, *Sexual Orientation, Parents, & Children*, July 2004, http://www.apa.org/about/governance/council/policy/ parenting.aspx; Am. Acad. of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or Transgender Parents Policy Statement*, 2009, http://www.aacap.org/cs/root/policy_statements/gay_lesbian_ transgender_and_bisexual_parents_policy_statement; Am. Med. Ass'n, *AMA Policies on GLBT Issues*, http://www.ama-assn.org/ ama/pub/about-ama/our-people/member-groups-sections/glbt -advisory-committee/ama-policy-regarding-sexual- orientation.shtml; Child Welfare League of Am., *Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults*, http://www.cwla.org/programs/culture/glbtqposition.htm.

43

see pp. 43-44, *infra*), there would be no adequate interest in doing so.

Second, any debate over the relative merits of same-sex parenting is beside the point: Section 3 neither promotes responsible opposite-sex parenting nor prevents irresponsible same-sex parenting. The legislative record contains no evidence that denying federal benefits to same-sex couples legally married under state law in any way serves to encourage responsible procreation or child-rearing, whether by opposite-sex or same-sex couples; and it is hard to imagine what such evidence would be. Congress did express the view that marriage plays an "irreplaceable role" in child-rearing. House Report 14. But it defies reason to suggest that Section 3 makes it any more likely that heterosexual individuals will marry or raise children together. See Supp. App. 29a ("DOMA does not affect in any way" these "incentives for heterosexual couples."). Nor does it deprive gay and lesbian individuals married under state law of the ability to raise children. See *Massachusetts*, 682 F.3d at 14 ("DOMA cannot preclude same-sex couples in Massachusetts from adopting children or prevent a woman partner from giving birth to a child to be raised by both partners."). If anything, the denial of federal benefits otherwise accorded to married individuals undermines the efforts of same-sex couples to raise their children, hindering rather than advancing any interest in promoting child welfare.

BLAG defends (Br. 44-47) the procreation/child-rearing rationale primarily on the ground that the traditional definition of marriage rationally relates to the government's interest in addressing "unplanned and unintended offspring"—a problem unique to

44

opposite-sex relationships. But Section 3 bears no
relationship to that interest at all. If a state elects to
limit marriage to opposite-sex couples because they
alone present a risk of unintended offspring, Section 3
does not disturb that choice. Conversely, if a state
elects to permit same-sex couples to marry, Section 3
does not preclude that choice either. Section 3 there-
fore does not further the end of providing a special
institution at the state level to address unintended
offspring. And Section 3 thus can bear no rational, let
alone substantial, connection to any governmental
interest in responsible parenting. See Supp. App. 30a
("Other courts have likewise been unable to find even
a *rational* connection between DOMA and encour-
agement of responsible procreation and child-
rearing.") (citing *Massachusetts*, 682 F.3d at 14-15;
Pet. App. 18a-19a; *Pedersen* v. *OPM*, No. 3:10-cv-1750,
2012 WL 3113883, at *40-43 (D. Conn. July 31, 2012)).

### 4. *Sovereign Choice*

The House Report states an interest in "protecting
state sovereignty and democratic self-governance."
As the House Report's discussion of that interest
makes clear, Congress was concerned with "pro-
tect[ing] the right of the people, acting through their
*state* legislatures, to retain democratic control over
the manner in which the *States* will define the institu-
tion of marriage." House Report 18 (emphasis added).
But Congress sought to serve that interest through
Section 2, not Section 3. See p. 2, *supra*; see also
*Massachusetts*, 682 F.3d at 14 (interest in protecting
state sovereign choices "was not directed to section 3"
but "was concerned solely with section 2, which re-
served a state's power not to recognize same-sex mar-
riages performed in other states"). BLAG agrees (Br.

45

31), observing that "Section 2 preserved each state's ability to define marriage as it preferred."

BLAG attempts to justify Section 3 based on a parallel *federal* sovereign interest (Br. 30-33), *i.e.*, that the federal government has the "same latitude" as the states to define marriage for its own purposes. It is, of course, true that the federal government has an interest in defining marriage for purposes of federal law. That is why the government has vigorously (and successfully) defended against Tenth Amendment and Spending Clause challenges to Section 3. See *Massachusetts*, 682 F.3d at 12. But that authority cannot be exercised in a manner that runs afoul of equal protection. Just as the federal government could not invoke its "federal sovereign interest" in defining marriage to refuse to recognize a lawful state marriage between individuals of a different race (cf. *Loving* v. *Virginia*, 388 U.S. 1 (1967)), it cannot refuse to recognize a lawful state marriage between individuals of the same sex—at least to the extent that exclusion would violate equal protection. BLAG's reliance on the federal interest in defining marriage for federal purposes thus does no more than beg the question presented by this case.

### 5. *Federal fisc*

The House Report also identifies preservation of scarce government resources as an interest underlying Section 3's denial of federal benefits to same-sex couples married under state law. House Report 18; see also BLAG Br. 37-41. Many of the rights and obligations affected by Section 3, such as spousal evidentiary privileges and nepotism rules, involve no expenditure of federal funds. In other cases, exclusion of state-recognized same-sex marriages *costs* the

46

government money by preserving eligibility for certain federal benefits (*e.g.*, an individual who marries a higher-earning spouse might otherwise lose federal assistance). As the court of appeals concluded, "DOMA transcends a legislative intent to conserve public resources," such that the law is "not substantially related to the important government interest of protecting the fisc." Supp. App. 28a; see *Romer*, 517 U.S. at 635 (rejecting "interest in conserving resources" because "breadth of the amendment is so far removed from" that interest).

Even assuming that DOMA Section 3 saves the government money overall,[19] that interest cannot satisfy heightened scrutiny. The government may not single out a group for exclusion from a benefits program solely to conserve public resources. See, *e.g.*, *Plyler* v. *Doe*, 457 U.S. 202, 227 (1982) ("[A] concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources."); *Graham*, 403 U.S. at 374-375 (rejecting "interest in preserving the fiscal integrity of [governmental] programs" through alienage-based exclusions) (citation omitted); *Massachusetts*, 682 F.3d at 14 (rejecting the preservation of scarce government resources as a basis for DOMA because "where the distinction is drawn against a historically disadvantaged group and has no other basis, Supreme

---

[19] But see *Massachusetts*, 682 F.3d at 14 & n.9 ("[M]ore detailed recent analysis indicates that DOMA is more likely on a net basis to cost the government money.") (citing Cong. Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages*, 2004, http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/55xx/doc5559/06-21-samesexmarriage.pdf).

47

Court precedent marks this as a reason undermining rather than bolstering the distinction").

### 6. *Other Interests Asserted by BLAG*

The "actual purposes" advanced for Section 3—and hence the only purposes relevant in applying heightened scrutiny—are those identified in the House Report and discussed above.  But because BLAG essentially defends Section 3 only under a rational-basis standard, it offers two additional possible rationales: promoting national uniformity for purposes of federal benefits eligibility (Br. 33-37) and proceeding cautiously with a change in the definition of marriage (Br. 41-43).  Those additional rationalizations, even if considered, would fail under heightened scrutiny.

#### a. *Uniformity and administrability*

BLAG contends that Section 3 can be justified based on interests in promoting national uniformity and administrability of federal benefits.  Those related interests, articulated solely in floor statements of individual legislators,[20] are not properly considered as justifications under heightened scrutiny.  They fail application of such scrutiny in any event.

i.  Floor statements of individual legislators, without more, do not evidence the "actual purposes" of a law.  The "actual purposes" of a statutory classification are most evident when set forth in the statute itself.  See *Zobel* v. *Williams*, 457 U.S. 55, 61 n.7 (1982) ("These purposes were enumerated in the first section of the Act  *  *  *  .  Thus we need not speculate as to the objectives of the legislature.").  When a

---

[20]  See BLAG Br. 8-9 (citing 142 Cong. Rec. 22,459 (1996) (Sen. Ashcroft); *id.* at 22,453 (Sen. Murkowski)).

48

statute lacks an express statement of its purposes, as with Section 3 of DOMA, this Court has supported looking to congressional committee reports. See, *e.g.*, *Garcia* v. *United States*, 469 U.S. 70, 76 (1984) ("[W]e have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'") (quoting *Zuber* v. *Allen*, 396 U.S. 168, 186 (1969) (bracket in original)); see also, *e.g.*, *Jimenez* v. *Weinberger*, 417 U.S. 628, 634 & n.3 (1974) (citing Conference Committee Report for "primary purpose" of scheme challenged under heightened scrutiny); BLAG Br. 6-11 (assuming House Report sets forth congressional purposes).

Statements of individual legislators, by contrast, generally shed little light on a statutory classification's actual purposes.  In determining legislative intent, this Court has "eschewed reliance on the passing comments of one Member" of Congress and "casual statements from the floor debates." *Garcia*, 469 U.S. at 76.  Such comments and statements "reflect at best the understanding of individual Congressmen," not that of Congress. *Zuber*, 396 U.S. at 186.  For purposes of heightened scrutiny, therefore, BLAG cannot rely solely on floor statements to defend DOMA under a uniformity/administrability rationale.

ii. That rationale fails in any event.  While the federal government possesses the authority to set the terms of its own benefits and obligations (p. 45, *supra*), its longstanding traditional practice has been to recognize (with narrow, context-specific exceptions, see BLAG Br. 5 n.2) any marriage lawfully recognized

49

under state law.  The federal government has consist-
ently adhered to that practice in the face of inconsist-
encies among state marriage laws with respect to
consanguinity, minimum-age, divorce, and other re-
quirements and limitations concerning marriage.  See
Family Law Professors C.A. Amicus Br. 5-14.  DOMA
Section 3 sharply breaks from that established tradi-
tion of deference to state marriage laws, thereby trad-
ing one form of uniformity (consistent reliance on
state marriage laws) for another (exclusion of a par-
ticular type of marriage, *i.e.*, that between same-sex
couples) without providing a sufficient justification for
preferring one to the other.  See Supp. App. 26a ("Be-
cause DOMA is an unprecedented breach of
longstanding deference to federalism that singles out
same-sex marriage as the only inconsistency (among
many) in state law that requires a federal rule to
achieve uniformity, the rationale premised on uni-
formity is not an exceedingly persuasive justification
for DOMA.").

The latter form of "uniformity," moreover, creates
its own administrative complications that make feder-
al law less, not more, straightforward.  For individuals
from states that permit same-sex couples to marry,
Section 3 places an administrative burden on govern-
ment officials to look beyond a simple declaration of
marriage or license—something many federal agen-
cies had not typically done before DOMA—to deter-
mine whether the marriage involves individuals of the
same sex.  See *Golinski* v. *OPM*, 824 F. Supp. 2d 968,
1001-1002 (N.D. Cal. 2012) ("The passage of DOMA
actually undermined administrative consistency by
requiring that the federal government, for the first
time, discern which state definitions of marriage are

50

entitled to federal recognition and which are not."). Congress gave no thought to that administrative burden relative to the potential burden associated with evaluating a change in domicile potentially affecting a same-sex couple's marital status.  Accordingly, even assuming the asserted interests in uniformity and administrability were sufficiently important, BLAG has not met its burden of showing that Section 3 substantially furthers those interests.  Cf. *Califano* v. *Goldfarb*, 430 U.S. 199, 220 (1977) (Stevens, J., concurring in judgment) ("administrative convenience was not the actual reason for the discrimination").

### b. *Proceeding with caution*

BLAG contends (Br. 42) that Congress "rationally could have concluded that any experimentation with [marriage] should proceed first at the state level." BLAG cites no law for the proposition that an interest in "proceeding with caution" is sufficiently important to justify denying a benefit to a suspect or quasi-suspect class.  Similar arguments could have been made with respect to racial integration and gender equality.  See, *e.g.*, *Watson* v. *City of Memphis*, 373 U.S. 526, 528 (1963) (rejecting city's attempt to "justify its further delay in conforming fully and at once to constitutional mandates by urging the need and wisdom of proceeding slowly and gradually in its desegregation efforts").  In any event, BLAG's contention overlooks that DOMA operates only for purposes of determining federal benefits.  As BLAG itself acknowledges (Br. 43), because DOMA takes state law as a given, the federal definition affects the institution of marriage, if at all, only "at the margin."

There is, moreover, nothing temporary or provisional about Section 3.  It contains no sunset provision

51

and no provision for any further study of the issue. See *Massachusetts*, 682 F.3d at 15 ("[T]he statute was not framed as a temporary time-out; and it has no expiration date, such as one that Congress included in the Voting Rights Act. The House Report's own arguments—moral, prudential and fiscal—make clear that DOMA was not framed as a temporary measure.") (citations omitted). Section 3 thus does not substantially further any interest in proceeding cautiously pending further analysis or study.

C. **The Government Does Not Challenge The Constitutionality Of DOMA Section 3 Under Deferential Rational-Basis Review, But Section 3 Would Fail A More Searching Form Of That Review**

In the event the Court declines to apply heightened scrutiny, the question would be whether Section 3 satisfies rational-basis review. The Court generally applies rational-basis review in a highly deferential manner—for example, when "ordinary commercial transactions are at issue." *Armour* v. *City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012) (citation omitted); see, *e.g.*, *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-488 (1955). Under such review, the Court will uphold a legislative classification if it bears a "rational relationship" to "some legitimate governmental purpose." *Heller*, 509 U.S. at 320. The "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," including post-hoc rationalizations that did not actually motivate its adoption. *Ibid.* (quoting *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The statute generally must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classi-

52

fication," and "a legislative choice  * * *  may be based on rational speculation unsupported by evidence or empirical data." *FCC* v. *Beach Commc'ns, Inc.*, 508 U.S. 307, 313-314, 315 (1993).

The government has concluded that heightened scrutiny governs classifications based on sexual orientation and that DOMA Section 3 cannot be sustained under that standard.  If the Court disagrees and applies rational-basis review, the government has previously defended Section 3 under rational-basis review, and does not challenge the constitutionality of Section 3 under that highly deferential standard.

Some have understood a line of this Court's decisions, however, to apply rational-basis review with added focus in certain circumstances.  In her opinion concurring in the judgment in *Lawrence*, in considering a law "directed toward gay persons as a class," Justice O'Connor stated that "[w]hen a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause."  539 U.S. at 580, 583 (citing *Romer*, *supra*; *Cleburne*, *supra*; *United States Dep't of Agric.* v. *Moreno*, 413 U.S. 528 (1973)); see also, *e.g.*, *Massachusetts*, 682 F.3d at 10 ("Without relying on suspect classifications, Supreme Court equal protection decisions have both intensified scrutiny of purported justifications where minorities are subject to discrepant treatment and have limited the permissible justifications.") (citing *Romer*, *supra*; *Cleburne*, *supra*; *Moreno*, *supra*).

In the government's view, those considerations are best taken into account through the established framework of heightened scrutiny.  Insofar as this

53

Court were instead to apply rational-basis review with added focus, laws targeted at gay and lesbian people would be a particularly strong candidate for that approach. As explained, classifications based on sexual orientation—unlike other classifications for which the Court has denied suspect or quasi-suspect status—distinctively implicate each of the considerations this Court has identified for application of heightened scrutiny. To the extent sexual orientation may be considered to fall short in some dimension, the history of discrimination and the absence of relation to one's capabilities associated with this particular classification would uniquely qualify it for scrutiny under an approach that calls for a measure of added focus to guard against giving effect to a desire to harm an "unpopular group." *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring in judgment).

Section 3 would fail to satisfy any such analysis, largely for the reasons it fails heightened scrutiny. Like the law struck down in *Romer*, Section 3 is "at once too narrow and too broad." *Romer*, 517 U.S. at 633. It imposes a "broad and undifferentiated disability" (*id.* at 632) on the same narrow class of people at issue in *Romer*—gay and lesbian people—by denying effect to their state-recognized marital relationships across the entire spectrum of federal law. And the asserted rationales are sufficiently "far removed from" the effect of the law—particularly given its breadth—that they should not be credited as valid justifications. *Id.* at 635; see *Massachusetts*, 682 F.3d at 15 ("We conclude, without resort to suspect classifications or any impairment of *Baker*, that the rationales offered do not provide adequate support for section 3 of DOMA.").

54

\* \* \* \* \*

BLAG (Br. 58-59) makes an appeal to this Court to allow the democratic process to run its course. That approach would be very well taken in most circumstances. This is, however, the rare case in which deference to the democratic process must give way to the fundamental constitutional command of equal treatment under law. Section 3 of DOMA targets the many gay and lesbian people legally married under state law for a harsh form of discrimination that bears no relation to their ability to contribute to society. It is abundantly clear that this discrimination does not substantially advance an interest in protecting marriage, or any other important interest. The statute simply cannot be reconciled with the Fifth Amendment's guarantee of equal protection. The Constitution therefore requires that Section 3 be invalidated.

## CONCLUSION

For the foregoing reasons, the judgment of the court of appeals should be affirmed.

Respectfully submitted.

DONALD B. VERRILLI, JR.
  *Solicitor General*
STUART F. DELERY
  *Principal Deputy Assistant*
    *Attorney General*
SRI SRINIVASAN
  *Deputy Solicitor General*
PRATIK A. SHAH
  *Assistant to the Solicitor*
    *General*
MICHAEL JAY SINGER
AUGUST E. FLENTJE
HELEN L. GILBERT
  *Attorneys*

FEBRUARY 2013

## APPENDIX

1.  U.S. Const. Amend. V provides, in pertinent part:

No person shall  *  *  *  be deprived of life, liberty, or property, without due process of law  *  *  *  .

2.  28 U.S.C. 1738C (DOMA § 2) provides:

**Certain acts, records, and proceedings and the effect thereof**

No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

3.  1 U.S.C. 7 (DOMA § 3) provides:

**Definition of "marriage" and "spouse"**

In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

(1a)

Exhibit 22

# LGBT Adult Immigrants in the United States



by Gary J. Gates
March 2013

## Executive Summary

As ongoing debates about immigration reform continue in the United States, little is known about how many lesbian, gay, bisexual, and transgender (LGBT) individuals might be affected by the outcome of these debates. While some information is available regarding same-sex couples who include foreign born partners or spouses (Gates and Konnoth, 2012), it is likely that many LGBT immigrants, both documented and undocumented, are not part of a same-sex couple. This research brief uses data about the characteristics of the adult foreign-born immigrant population in the US provided by the Pew Research Hispanic Center[1] along with analyses of Gallup Daily Tracking Survey data and the US Census Bureau's American Community Survey (2011) to estimate the number of LGBT-identified adult (age 18+) undocumented and documented immigrants and describe some of their characteristics. Analyses also provide updated estimates for the number of foreign born residents who are part of a same-sex couple and describes their demographic characterisitics.



**LGBT foreign born adults in the United States**

Undocumented 267,000 30%

Documented 637,000 70%

Key findings regarding adult undocumented immigrants include:
- There are an estimated 267,000 LGBT-identified individuals among the adult undocumented immigrant population, representing approximately 2.7% of undocumented adults in the US.
- Relative to all undocumented immigrants, LGBT undocumented immigrants are more likely to be male and are younger.
- 71% of undocumented LGBT adults are Hispanic.
- 15% of undocumented LGBT adults are Asian or Pacific Islander.

Key findings regarding adult documented immigrants include:
- There are an estimated 637,000 LGBT-identified individuals among the adult documented immigrant population, representing approximately 2.4% of documented adults in the US.
- Like their undocumented counterparts, LGBT documented immigrants are more likely to be male and are younger.
- 30% of documented LGBT adults are Hispanic.
- 35% of documented LGBT adults are Asian or Pacific Islander.

Key findings regarding same-sex couples that include a foreign born spouse or partner:
- There are an estimated 113,300 foreign born individuals (naturalized citizens and non-citizens) who are part of a same-sex couple. An estimated 54,600 of these individuals are not US citizens.
- An estimated 32,300 same-sex couples are binational (one US citizen and one non-citizen) along with 11,700 same-sex couples comprised of two non-citizens.
- Nearly 7,000 same-sex couples that include two non-citizens (58%) are raising an estimated 12,400 children under age 18.

---

[1] Special thanks to Jeffrey Passel and D'Vera Cohn for their assistance in providing the data.

- An estimated 6,200 binational same-sex couples (25%) are raising more than 11,000 children.
- Compared to foreign born individuals in different-sex couples, foreign born individuals in same-sex couples are more likely to be male and younger.
- Non-citizens in both same-sex and different-sex couples are economically disadvantaged. Comparing non-citizens to naturalized citizens in same-sex couples, the median annual personal income of non-citizen men in same-sex couples who are in the labor force is $24,000 versus $40,000 for their naturalized citizen counterparts.   For women in same-sex couples, the comparable figures are $22,400 versus $45,000.
- Despite higher education levels, personal income for men in same-sex couples is lower compared to men in different-sex couples, regardless of citizenship status or labor force participation.

## Adult foreign born immigrants in the United States

The Pew Research Hispanic Center estimates that there are 36.4 million foreign born adult (age 18 and older) immigrants living in the United States.  Of that group, an estimated 10.1 million are undocumented and 26.3 million are documented.[2]  Data that directly assess the number of these undocumented immigrants who identify as LGBT do not exist.

This research brief considers the demographic characteristics of the adult foreign born population along with the characteristics of LGBT-identified adults surveyed in the Gallup Daily Tracking Poll from June-September 2012 (Gates and Newport, 2012) and characteristics of same-sex couples in the US to estimate the number of LGBT adult undocumented immigrants in the US.

The estimation procedure (described in the Methodology section) assumes that differences observed in the percentage of adults who self-identify as LGBT by sex, age, and race/ethnicity are similar within immigrant populations.  The procedure also assumes that differences in the likelihood of being in a same-sex cohabiting couple observed between foreign born residents in the US and the general population provide inference about differences in the likelihood of identifying as LGBT among undocumented and documented immigrants as compared to the general population.

It is important to remember that the estimation procedures only consider LGBT identification and largely assume that such identification is

lower within immigrant populations than the general population.  There are certainly LGBT individuals who are reluctant to identify as such and this reluctance may be even higher among LGBT foreign born immigrants in the US.  As such, all LGBT population figures in this research brief are likely lower-bound estimates of the true LGBT population.

## Undocumented adult immigrants

There are an estimated 267,000 LGBT-identified adult undocumented immigrants living the US, representing 2.7% of that population (see Table 1).

When considering the demographic characteristics of the LGBT population of foreign born immigrants, it is important to remember that they are in part driven by the assumption that patterns of LGBT identity in the general population are also broadly true among undocumented immigrants.    For example, younger people in the general population are much more likely to identity as LGBT.   The estimation procedure assumes that this is also true among undocumented immigrants.



**Figure 1.  Percent male, among undocumented immigrants and LGBT adults**

---

[2] Tabulations by age, sex, and race/ethnicity of the adult undocumented and documented foreign-born immigrant population in the US are based on augmented March Supplements to the Current Population Survey for 2009-2011.  Estimates are consistent with Passel and Cohn, 2012.

Pew Research Hispanic Center data suggest that men comprise more than 57% of adult undocumented immigrants (see Figure 1). Among LGBT undocumented immigrants, the estimated portion of men is higher at 67%. This contrasts with the broader LGBT community, which Gallup Daily Tracking data suggest is majority female (53%).

Estimates suggest that 3.1% of undocumented immigrant men identify as LGBT compared to 2% of comparable women.

LGBT undocumented immigrants are younger than the broader undocumented population. Nearly half (49%) of LGBT undocumented immigrants are estimated to be under age 30 compared to 30% of all undocumented immigrants.

Undocumented immigrants under age 30 are twice as likely as all other undocumented immigrants to identify as LGBT. Approximately 4.4% of that group identify as LGBT compared to 2.5% of those aged 30-44 and 1.6% of those 45 years or older (see Figure 2).



Figure 2.  Percent LGBT among undocumented immigrants, by age

A substantial majority of LGBT undocumented immigrants identify as Hispanic (71%). This is slightly lower than the 77% of all undocumented immigrants who are Hispanic.

Asians and Pacific Islanders comprise 15% of LGBT undocumented immigrants, somewhat higher than the 11% of that group among all undocumented immigrants.

Among racial and ethnic groups, LGBT identity is highest among Asian and Pacific Islander undocumented immigrants at 3.6% and lowest

among Hispanic undocumented immigrants (2.5%).



Figure 3.  LGBT undocumented immigrants, by race and ethnicity

## Documented adult immigrants

The estimation procedure suggests that there are 637,000 LGBT-identified adult documented immigrants living in the US, representing 2.4% of that population (see Table 2).

All of the patterns observed when comparing undocumented LGBT immigrants to the broader undocumented community hold when comparing LGBT documented immigrants to all documented immigrants. LGBT documented immigrants are more male, younger, more likely to be Hispanic and less likely to be Asian.

While women comprise a majority of all documented immigrants (53%), men comprise a substantial majority of LGBT documented immigrants (57%).

Estimates suggest that 2.9% of documented immigrant men identify as LGBT compared to 2% of comparable women.

LGBT adult documented immigrants are twice as likely as the broader documented population to be under age 30 (31% to 15%, respectively).

An estimated 5% of adult documented immigrants under age 30 identify as LGBT compared to 2.4% of those aged 30-44 and less than 2% of those aged 45 and older.

Hispanics comprise a smaller proportion (30%) of LGBT-identified adult documented immigrants when compared to all adult documented immigrants (38%). The converse is

3

true for Asians and Pacific Islanders. They represent 35% of LGBT documented immigrants compared to 28% of all documented immigrants.

Among racial and ethnic groups, LGBT identity is highest among Black and Asian documented immigrants (3.3% and 3.0%, respectively) and lowest among Hispanic documented immigrants (1.9%).

## Same-sex couples with foreign born spouses or partners

An estimated 113,300 foreign born individuals, citizens and non-citizens, in the US are part of a same-sex couple. They comprise 0.54% of all foreign born individuals who have either same-sex or different-sex spouses or partners (see Table 3) and 9% of all individuals in same-sex couples.

In total, 87,900 same-sex couples residing in the US include a foreign born spouse or partner. They comprise 14% of all same-sex couples.

The composition of same-sex couples that include a foreign born spouse or partner with regard to citizenship status of the spouses or partners is quite different from comparable different-sex couples.

Same-sex couples are more likely to be binational, meaning the couple includes a US citizen and one non-citizen (37% v. 27%, respectively) and half as likely to include two non-citizens (13% v. 27%, respectively). These figures imply that there are an estimated 32,300 same-sex binational couples and 11,700 dual non-citizen same-sex couples.

Among dual citizen couples that include a foreign born spouse or partner, same-sex couples are twice as likely as their different-sex counterparts to include a naturalized citizen and a native born citizen (44% v. 22%) and much less likely to include two naturalized citizens (6% v. 24%).

Foreign born individuals in same-sex couples are about as likely as those in different-sex couples to be non-citizens (48% v. 49%, respectively).

Foreign born individuals in same-sex couples, both naturalized citizens and non-citizens, are more likely to be male. Men comprise 62% of

naturalized citizens who have a same-sex spouse or partner and 59% comparable non-citizens.

Compared to foreign born individuals in different-sex couples, those in same-sex couples are younger, particularly among non-citizens. Nearly a quarter of non-citizens in same-sex couples (23%) are under age 30 compared to 15% of non-citizens in different-sex couples. Among naturalized citizens, the comparable figures are 7% and 4%, respectively.

Naturalized citizens in same-sex couples are more likely than their different-sex counterparts to be Hispanic (37% v. 31%, respectively) and White (30% v. 26%), and less likely to be Asian (24% v. 33%).

Among non-citizens, individuals in same-sex couples are also more likely than those in different-sex couples to be White (28% v. 16%, respectively) but less likely to be Hispanic (46% v. 58%) and Asian (16% v. 20%).

## Childrearing among couples with foreign born spouses or partners

An estimated 33,500 foreign born men and women who are part of a same-sex couple are raising children under age 18. Among non-citizens in same-sex couples, 41% (22,500) have children (see Figure 4), compared to 19% (11,000) of naturalized citizens in same-sex couples.



Figure 4. Non-citizens in same-sex couples, by presence of children under age 18 in the home

Children in the home
22,500
41%

No children in the home
32,100
59%

Nearly 41,000 children are being raised by same-sex couples that include a foreign born spouse or partner.

Same-sex couples with two foreign born partners are most likely to be raising children. Nearly 6

4

in 10 (58%) same-sex couples where both spouses or partners are non-citizens, are raising an estimated 12,400 children.  This is true of 47% (3,600) of same-sex couples that include one non-citizen and one naturalized citizen.  A quarter (25%) of binational same-sex couples (6,200) are raising more than 11,000 children.

Nearly 6 in 10 children being raised by same-sex couples with a foreign born spouse or partner are being raised by binational or dual non-citizen couples (see Figure 5).  Approximately 30% live with dual non-citizen couples and 28% live with binational couples.

Figure 5.  Children being raised by same-sex couples that include a foreign partner or spouse, by citizenship status of spouses and partners



## Socio-economic status of foreign born individuals in couples

Most men and women in same-sex couples, regardless of citizenship status, have higher levels of education than their counterparts in different-sex couples (see Table 6).  The one exception is among non-citizen women in same-sex couples.  They are slightly less likely than non-citizen women in different-sex couples to have a college degree (22% versus 24%, respectively).

Labor force participation among women in same-sex couples, regardless of citizenship status, is substantially higher than among comparable women in different-sex couples (see Table 6).  Male citizens in same-sex couples (naturalized and native) also have higher labor force participation than comparable men in different-sex couples.  However, male non-citizens in same-sex couples are less likely to be in the labor force than similar men in different-sex couples (81% versus 90%, respectively).

Levels of employment do not differ substantially between men in different-sex and same-sex couples.  However, naturalized and non-citizen women in same-sex couples report higher levels of employment than their different-sex counterparts.  An estimated 98% of naturalized women in same-sex couples are employed compared to 93% among comparable women in different-sex couples.  For non-citizens, the figures are 90% and 87%, respectively.

Non-citizens in both same-sex and different-sex couples have lower personal incomes than naturalized citizens.  Comparing non-citizens to naturalized citizens in same-sex couples, the median annual personal income of non-citizen men in same-sex couples who are in the labor force is $24,000 versus $40,000 for their naturalized citizen counterparts.  For men in different-sex couples, the comparable figures are $26,000 versus $45,000.

For women in same-sex couples, non-citizens have median annual personal incomes of $22,400 compared to $45,000 among naturalized citizens.  The same comparison among women in different-sex couples is $16,800 versus $30,000.

Despite relatively high levels of education, men in same-sex couples, regardless of citizenship status, report lower median annual personal income compared to men in different-sex couples.

Figure 6.  Median annual personal income among foreign born in the work force, by citizenship status and couple type



Among non-citizen and naturalized citizens in male same-sex couples in the labor force, median annual personal income is $24,000 and $40,000, respectively (see Figure 6).  For their

5

different-sex counterparts, the figures are higher at $26,000 and $45,000, respectively. The difference is greatest among non-citizen men who are not in the labor force. Those in same-sex couples had a median personal income of $0 compared to $7,800 among comparable men different-sex couples.

Regardless of labor force participation or citizenship status, women in same-sex couples report higher median annual personal income as compared to women in different-sex couples (see Table 6). This is consistent with their generally high levels of college education. Not surprisingly, median personal income is the most similar among non-citizen women who are not in the labor force ($2,400 for women in same-sex couples and $0 for women in different-sex couples). These women have very similar levels of college education, 22% among those in same-sex couples and 24% for those in different-sex couples.

**Table 1.  Characteristics of adult undocumented immigrants in the US[3]**

| | LGBT | | All | | |
| | Estimated Total | Percent | Estimated Total | Percent | Estimated %LGBT |
|---|---|---|---|---|---|
| All | 267,000 | - | 10,100,000 | - | 2.7% |
| Male | 180,000 | 67% | 5,777,200 | 57% | 3.1% |
| Female | 87,000 | 33% | 4,282,400 | 43% | 2.0% |
| Age 18-29 | 131,500 | 49% | 3,009,800 | 30% | 4.4% |
| Age 30-44 | 96,500 | 36% | 4,595,500 | 46% | 2.1% |
| Age 45-54 | 29,000 | 11% | 1,818,400 | 18% | 1.6% |
| Age 55+ | 10,000 | 4% | 636,300 | 6% | 1.6% |
| Hispanic | 189,000 | 71% | 7,696,200 | 77% | 2.5% |
| White | 22,600 | 8% | 808,000 | 8% | 2.8% |
| Black | 15,400 | 6% | 444,400 | 4% | 3.5% |
| Asian/Pacific Islander | 40,000 | 15% | 1,111,000 | 11% | 3.6% |

**Table 2. Characteristics of adult documented immigrants in the US**

| | LGBT | | All | | |
| | Estimated Total | Percent | Estimated Total | Percent | Estimated %LGBT |
|---|---|---|---|---|---|
| Total | 637,000 | - | 26,300,000 | - | 2.4% |
| Male | 362,000 | 57% | 12,387,800 | 47% | 2.9% |
| Female | 275,000 | 43% | 13,886,400 | 53% | 2.0% |

---

[3] Estimates on all tables are rounded to the nearest hundred.  Due to this rounding, subtotals may not all exactly sum to totals.

6

| | LGBT | | All | | |
|---|---|---|---|---|---|
| | Estimated Total | Percent | Estimated Total | Percent | Estimated %LGBT |
| Age 18-29 | 197,600 | 31% | 3,945,000 | 15% | 5.0% |
| Age 30-44 | 201,800 | 32% | 8,468,600 | 32% | 2.4% |
| Age 45-54 | 96,900 | 15% | 5,391,500 | 21% | 1.8% |
| Age 55+ | 140,800 | 22% | 8,468,600 | 32% | 1.7% |
| | | | | | |
| Hispanic | 190,600 | 30% | 9,862,500 | 38% | 1.9% |
| White | 146,500 | 23% | 6,706,500 | 26% | 2.2% |
| Black | 79,600 | 12% | 2,393,300 | 9% | 3.3% |
| Asian/Pac Isl | 220,300 | 35% | 7,311,400 | 28% | 3.0% |

**Table 3.  Characteristics of individuals in same-sex couples who are foreign born and living in the US**

| | Foreign born individuals in same-sex couples | | Foreign born individuals in different-sex couples | | |
|---|---|---|---|---|---|
| | Estimated total | Percent | Estimated total | Percent | Estimated %individuals in same-sex couples among all couples |
| Total | 113,300 | - | 21,021,300 | | 0.54% |
| | | | | | |
| Naturalized | 58,700 | 52% | 10,681,400 | 51% | 0.55% |
| Non-citizen | 54,600 | 48% | 10,339,900 | 49% | 0.53% |
| | | | | | |
| Naturalized | | | | | |
| Male | 36,300 | 62% | 5,327,900 | 50% | 0.68% |
| Female | 22,400 | 38% | 5,353,500 | 50% | 0.42% |
| Non-citizen | | | | | |
| Male | 32,100 | 59% | 5,107,800 | 49% | 0.63% |
| Female | 22,500 | 41% | 5,232,100 | 51% | 0.43% |
| | | | | | |
| Naturalized | | | | | |
| Age 18-29 | 3,900 | 7% | 388,000 | 4% | 1.01% |
| Age 30-44 | 21,500 | 37% | 3,276,400 | 31% | 0.66% |
| Age 45-54 | 19,500 | 33% | 2,876,500 | 27% | 0.68% |
| Age 55+ | 13,800 | 23% | 4,140,500 | 39% | 0.33% |
| Non-citizen | | | | | |
| Age 18-29 | 12,700 | 23% | 1,554,700 | 15% | 0.82% |
| Age 30-44 | 27,800 | 51% | 5,335,100 | 52% | 0.52% |
| Age 45-54 | 8,500 | 16% | 2,085,900 | 20% | 0.41% |

7

| Age 55+ | 5,600 | 10% | 1,364,200 | 13% | 0.41% |
|---|---|---|---|---|---|
| | Foreign born individuals in same-sex couples | | Foreign born individuals in different-sex couples | | |
| | Estimated total | Percent | Estimated total | Percent | Estimated %individuals in same-sex couples among all couples |
| Naturalized | | | | | |
| Hispanic | 21,500 | 37% | 3,308,000 | 31% | 0.65% |
| White | 17,700 | 30% | 2,817,300 | 26% | 0.63% |
| Black | 4,300 | 7% | 768,000 | 7% | 0.56% |
| Asian/Pacific Islander | 13,800 | 24% | 3,549,500 | 33% | 0.39% |
| Other | 1,500 | 3% | 238,800 | 2% | 0.63% |
| Non-citizen | | | | | |
| Hispanic | 25,300 | 46% | 6,016,700 | 58% | 0.42% |
| White | 15,200 | 28% | 1,653,300 | 16% | 0.92% |
| Black | 4,300 | 8% | 488,400 | 5% | 0.87% |
| Asian/Pacific Islander | 8,700 | 16% | 2,030,700 | 20% | 0.43% |
| Other | 1,200 | 2% | 150,800 | 1% | 0.80% |
| | | | | | |
| Naturalized | | | | | |
| Children in the home | 11,000 | 19% | 5,296,900 | 50% | |
| No children in the home | 47,700 | 81% | 5,384,500 | 50% | |
| Non-citizen | | | | | |
| Children in the home | 22,500 | 41% | 7,208,800 | 70% | |
| No children in the home | 32,100 | 59% | 3,131,100 | 30% | |

**Table 4.  Couples living in the US that include a foreign born spouse or partner, by citizenship status of spouses/partners**

| | Same-sex couples | | Different-sex couples | | |
|---|---|---|---|---|---|
| | Estimated total | Percent | Estimated total | Percent | Estimated %same-sex couples among all couples |
| Total | 87,900 | | 12,843,600 | | 0.68% |
| | | | | | |
| Naturalized/ Native citizen | 38,700 | 44% | 2,810,600 | 22% | 1.38% |
| Naturalized/Naturalized | 5,200 | 6% | 3,118,800 | 24% | 0.17% |
| Naturalized/Non-citizen | 7,600 | 9% | 1,634,500 | 13% | 0.47% |
| Non-citizen/Non-citizen | 11,700 | 13% | 3,430,400 | 27% | 0.34% |
| Non-citizen/Native citizen | 24,700 | 28% | 1,849,300 | 14% | 1.33% |

8

76

**Table 5.  Childrearing among couples living in the US that include a foreign born spouse or partner, by citizenship status of spouses/partners**

| | Same-sex couples | | Different-sex couples | | |
| --- | --- | --- | --- | --- | --- |
| | Estimated total | Percent | Estimated total | Percent | Estimated %same-sex couples among all couples |
| Total | | | | | |
|   Children in the home | 21,800 | 25% | 7,414,400 | 58% | 0.29% |
|   No children in the home | 66,100 | 75% | 5,429,200 | 42% | 1.20% |
| | | | | | |
| Naturalized/ Native citizen | | | | | |
|   Children in the home | 3,700 | 9% | 1,250,400 | 44% | 0.29% |
|   No children in the home | 35,000 | 91% | 1,560,200 | 56% | 2.20% |
| Naturalized/Naturalized | | | | | |
|   Children in the home | 1,600 | 31% | 1,500,800 | 48% | 0.11% |
|   No children in the home | 3,600 | 69% | 1,618,000 | 52% | 0.22% |
| Naturalized/Non-citizen | | | | | |
|   Children in the home | 3,600 | 47% | 1,044,900 | 64% | 0.34% |
|   No children in the home | 4,000 | 53% | 589,600 | 36% | 0.68% |
| Non-citizen/Non-citizen | | | | | |
|   Children in the home | 6,800 | 58% | 2,550,400 | 74% | 0.26% |
|   No children in the home | 4,900 | 42% | 880,000 | 26% | 0.56% |
| Non-citizen/Native citizen | | | | | |
|   Children in the home | 6,200 | 25% | 1,067,900 | 58% | 0.58% |
|   No children in the home | 18,500 | 75% | 781,400 | 42% | 2.31% |
| | | | | | |
| Children under age 18 in homes with a foreign born spouse or partner | 40,800 | - | 14,884,700 | - | 0.27% |
|   Naturalized/ Native citizen | 6,200 | 15% | 2,388,300 | 16% | 0.26% |
|   Naturalized/Naturalized | 2,900 | 7% | 2,824,500 | 19% | 0.10% |
|   Naturalized/Non-citizen | 8,100 | 20% | 2,051,100 | 14% | 0.39% |
|   Non-citizen/Non-citizen | 12,400 | 30% | 5,476,500 | 37% | 0.23% |
|   Non-citizen/Native citizen | 11,200 | 28% | 2,144,200 | 14% | 0.52% |

9

**Table 6.  Economic status of individuals in couples,
by sex, couple type, and citizenship status**

| | Individuals in same-sex couples | | | Individuals in different-sex couples | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Foreign born | | Native Citizens | Foreign born | | Native Citizens |
| | Non-citizens | Naturalized | | Non-citizens | Naturalized | |
| **College degree** | | | | | | |
| Men | 34% | 50% | 49% | 24% | 38% | 33% |
| Women | 22% | 42% | 45% | 24% | 36% | 32% |
| **In the labor force** | | | | | | |
| Men | 81% | 83% | 81% | 90% | 79% | 75% |
| Women | 74% | 80% | 82% | 52% | 64% | 63% |
| **Employed (among those in the labor force)** | | | | | | |
| Men | 90% | 95% | 93% | 92% | 94% | 94% |
| Women | 90% | 98% | 92% | 87% | 93% | 94% |
| **Median annual personal income** | | | | | | |
| **In the labor force** | | | | | | |
| Men | $24,000 | $40,000 | $48,500 | $26,000 | $45,000 | $50,000 |
| Women | $22,400 | $45,000 | $38,500 | $16,800 | $30,000 | $31,500 |
| **Not in the labor force** | | | | | | |
| Men | $0 | $13,000 | $14,000 | $7,800 | $15,600 | $24,000 |
| Women | $2,500 | $28,000 | $11,500 | $0 | $3,100 | $6,600 |

## Methodology

*Data sources*

- Jeffrey Passel at The Pew Research Hispanic Center provided tabulations by age, sex, and race/ethnicity of the adult undocumented and documented foreign-born immigrant population in the US.  The tabulations are based on augmented March Supplements to the Current Population Survey for 2009-2011.  Estimates are consistent with Passel and Cohn, 2012.
- Gallup Daily Tracking Survey of adults in the United States (June-September 2012) (see Gates and Newport, 2012 for additional details)
- 2011 American Community Survey (ACS) Public Use Microdata Sample

*Estimation procedure for LGBT foreign born immigrants*

The estimation procedure applies an adjusted %LGBT to the undocumented and documented immigrant population, accounting for differences across sex (male and female), age (18-29, 30-44, 45-54, and 55+) and race/ethnicity (Hispanic, White, Black, and Asian) categories.  Data from the 2011 ACS suggest that 0.5% of all adults in the US are part of a same-sex couple compared to 0.3% of foreign-born individuals. This offers evidence that the percent of self-identified LGBT within immigrant populations may be lower than the percent of LGBT identification within the general US adult population.  The estimation procedure attempts to take this difference into account.

The procedure is as follows:

10

78

- Calculate the percentage of all American adults who identify as LGBT separately for each sex, age, and race/ethnicity category described above (Gallup Daily Tracking Survey).
- Calculate the fraction of individuals who are part of a same-sex cohabiting couple among adults within the sex, age, and race/ethnicity categories listed above (ACS 2011).
- Calculate the percent of foreign-born individuals in the US who are part of a same-sex cohabiting couple among adults within each sex, age, and race/ethnicity category (ACS 2011).
- Calculate an adjustment factor within each sex, age, and race/ethnicity category by dividing the fraction of foreign-born adults who are part of the same-sex couple by the fraction for all adults in the US who are part of a same-sex couple (ACS 2011).
- Calculate an adjusted %LGBT for immigrants by multiplying the %LGBT among adults in the US (Gallup Daily Tracking Survey) by the adjustment factor calculated above within each sex, age, and race/ethnicity category.
- Apply the adjusted %LGBT for each sex, age, and race/ethnicity category to the undocumented and documented immigrant population estimates (Pew Hispanic Center).

*Same-sex and different-sex couple estimates*
Characteristics of individuals in same-sex and different-sex couples (foreign born and citizenship status, sex, age, and race/ethnicity) are all derived from analyses of the 2011 American Community Survey Public Use Microdata Sample (ACS PUMS). ACS PUMS estimates are applied to tabulations of the total number of same-sex and different-sex couples from Census 2010 (Gates and Cooke, 2011; O'Connell and Feliz, 2011).

Adjustments to the same-sex couple data in the ACS PUMS are consistent with the procedure described for adjusting Census 2000 data in Carpenter and Gates (2008).

**About the author**
Gary J. Gates, PhD is the Williams Distinguished Scholar and a national expert in the demographic, geographic, and economic characteristics of the LGBT population.

**About the institute**
**The Williams Institute** on Sexual Orientation and Gender Identity Law and Public Policy at UCLA School of Law advances law and public policy through rigorous, independent research and scholarship, and disseminates its work through a variety of education programs and media to judges, legislators, lawyers, other policymakers and the public. These studies can be accessed at the Williams Institute website.

**For more information**
The Williams Institute, UCLA School of Law
Box 951476
Los Angeles, CA 90095-1476
(310)267-4382
williamsinstitute@law.ucla.edu www.law.ucla.edu/williamsinstitute

CERTIFICATE OF SERVICE

SACV12-01137 CBM (AJWx)

I hereby certify that on this 18th day of March, 2013, I electronically filed the foregoing SUPPLEMENTAL EXHIBITS 21-22 with the Clerk of Court by using the CM/ECF system, which provided an electronic notice and electronic link of the same to all attorneys of record through the Court's CM/ECF system.

Dated:  March 18, 2013                              /s/ ___Carlos Holguín_____

/ / /

Center for Human Rights & Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
213/388-8693