1 | CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
2 | Peter A. Schey (Cal. Bar No. 58232)
   | Carlos R. Holguín (Cal. Bar No. 90754)
3 | 256 S. Occidental Blvd.
   | Los Angeles, CA 90057
4 | Telephone: (213) 388-8693 (Schey Ext. 304, Holguín ext. 309)
5 | Facsimile: (213) 386-9484
   | pschey@centerforhumanrights.org
6 | crholguin@centerforhumanrights.org
7
   | *Additional counsel listed next page*
8
   | *Attorneys for Plaintiffs*
9
10
11
12
13 | UNITED STATES DISTRICT COURT FOR THE
14 | CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| 15   MARTIN R. ARANAS, *et al.,* ) | SACV12-01137 CBM (AJWx) |
| 16        Plaintiffs, ) | SUPPLEMENTAL EXHIBITS 23-33. |
| 17    -vs- ) | |
| 18   ) | |
| 19   JANET NAPOLITANO, Secretary of the ) Department of Homeland Security; *et al.,* ) | Hearing: None |
| 20        Defendants. ) | Time: n/a |
| 21   ) | Hon. Consuelo B. Marshall |

22 | _
23 | / / /
24
25
26
27
28

1

1
2
*Additional counsel for plaintiff Aranas:*

3  PUBLIC LAW CENTER
   Julie Greenwald (Cal. Bar No. 233714)
4  Monica Ashiku (Cal. Bar No. 263112)
5  601 Civic Center Drive West
   Santa Ana, CA 92701
6  Telephone: (714) 541-1010 (Greenwald Ext. 263, Ashiku Ext. 249)
   Facsimile: (714) 541-5157
7  jgreenwald@publiclawcenter.org
8  mashiku@publiclawcenter.org

9  ASIAN LAW ALLIANCE
   Beatrice Ann M. Pangilinan (Cal. Bar No. 271064)
10 184 Jackson Street, San Jose, CA 95112
11 Telephone: (408) 287-9710
   Facsimile: (408) 287-0864
12 Email:  bpangilinan@asianlawalliance.org

13 *Additional counsel for plaintiffs Rodriguez and DeLeon:*
14
15 LAW OFFICES OF MANULKIN & BENNETT
   Gary H. Manulkin (Cal. Bar No. 41469)
16 Reyna M. Tanner (Cal. Bar No. 197931)
17 10175 Slater Avenue, Suite 111
   Fountain Valley, CA 92708
18 Telephone: 714-963-8951
   Facsimile: 714-968-4948
19 gmanulkin@mgblaw.com
20 reynatanner@yahoo.com

21 */ / /*
22
23
24
25
26
27
28

Supplemental Exhibits 23-33.          - 2 -          Center for Human Rights & Constitutional Law
                                                     256 S  Occidental Blvd
                                                     Los Angeles, CA 90057
                                                     213/388-8693

2

INDEX TO EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| 23 | Transcript of Proceedings, Aranas v. Napolitano, No. CV12-01137-CBM, November 20, 2012 | 6 |
| 24 | Second Amended Complaint, Golinski v. United States, No. 3:10−cv−00257−JSW (N.D. Cal.) | 89 |
| 25 | Second Amended Complaint, Dragovich, Michael et al. v. United States, No. CV 4:10-01564-CW (N.D. Cal.) | 108 |
| 26 | Complaint, Commonwealth of Massachusetts v. United States Department of Health and Human Services et al., No.1:09-cv-11156-JLT (U.S. Massachusetts) | 133 |
| 27 | Complaint, Blesch et al. v. Holder et al., No. cv12-1578 (E.D. NY) | 166 |
| 28 | Civil Docket, Blesch, Edwin et al. v. Holder et al., No. 1:12-cv-01578-CBA. (E.D. NY) | 192 |
| 29 | First Amended Complaint, O'Connor v. Tobits et al., No. 2:11-cv-00045 (E.D. Pen.) | 197 |
| 30 | Complaint, McLaughlin et al. v. Panetta et al., (U.S.D. Massachusetts) | 205 |
| 31 | Board of Veterans' Appeals, Appeal of Cardona, No. 11-01 921 | 240 |
| 32 | Declaration of Todd Fernandez, March 31, 2013 | 254 |
| 33 | Supplemental Declaration of Elissa Barrett, April 11, 2013 | 257 |

Supplemental Exhibits 23-33.                  - 3 -                  Center for Human Rights & Constitutional Law
256 S  Occidental Blvd
Los Angeles, CA 90057
213/388-8693

3

1 | Dated: April 12, 2013.

2

3

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Peter A. Schey
Carlos R. Holguín

PUBLIC LAW CENTER
Julie Greenwald Marzouk
Monica Ashiku

ASIAN LAW ALLIANCE
Beatrice Ann M. Pangilinan

LAW OFFICES OF MANULKIN &
BENNETT
Gary H. Manulkin
Reyna M. Tanner

/s/ Peter A. Schey

/s/ Carlos R. Holguín

*Attorneys for Plaintiffs*

/ / /

Center for Human Rights & Constitutional Law
256 S  Occidental Blvd
Los Angeles, CA 90057
213/388-8693

1

2

3                              )

4

5   / / /

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Supplemental Exhibits 23-33.

Center for Human Rights & Constitutional Law
256 S  Occidental Blvd
Los Angeles, CA 90057
213/388-8693

Exhibit 23

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3     WESTERN DIVISION

4     - - -

5     HONORABLE CONSUELO B. MARSHALL, DISTRICT JUDGE PRESIDING

6

7     MARTIN R. ARANAS, ET AL.,          )
                                         )
8            Plaintiffs,                 )
                                         )
9                                        )
                                         )
10           vs.                         ) No. CV 12-01137-CBM
                                         )
11                                       )
                                         )
12    JANET NAPOLITANO, ET AL.,          )
                                         )
13           Defendants.                 )
      _____   )

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    *MOTION HEARING*

18             LOS ANGELES, CALIFORNIA

19           TUESDAY, NOVEMBER 20, 2012

20    _____

21                  MARIA R. BUSTILLOS
                OFFICIAL COURT REPORTER
22                   C.S.R. 12254
               UNITED STATES COURTHOUSE
23             312 NORTH SPRING STREET
                     ROOM 404
24          LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739

25

1                          **A P P E A R A N C E S**

2

3

4      **ON BEHALF OF THE PLAINTIFFS,**
       **MARTIN R. ARANAS:**              CENTER FOR HUMAN RIGHTS AND
5                                         CONSTITUTIONAL LAW
                                          BY:  CARLOS HOLGUIN, ESQ.
6                                         256 SOUTH OCCIDENTAL
                                          BOULEVARD
7                                         LOS ANGELES, CALIFORNIA 90057
                                          (213)388-8693
8

9                                         CENTER FOR HUMAN RIGHTS AND
                                          CONSTITUTIONAL LAW
10                                        BY:  PETER A. SCHEY, ESQ.
                                          256 SOUTH OCCIDENTAL
11                                        BOULEVARD
                                          LOS ANGELES, CALIFORNIA 90057
12                                        (213)388-8693

13

14     **ON BEHALF OF THE DEFENDANTS,**
       **JANET NAPOLITANO:**              UNITED STATES DEPARTMENT OF
15                                        JUSTICE
                                          BY:  AUGUST E. FLENTJE, ESQ.
16                                        BY:  HELEN GILBERT
                                          BY:  TIMOTHY BELSAN, ESQ.
17                                        950 PENNSYLVANIA AVENUE NW
                                          WASHINGTON, DC 20530-0009
18                                        (202)514-1278
                                          (202)532-4596
19

20                                        BANCROFT PLLC.
                                          BY:  NICHOLAS NELSON, ESQ.
21                                        1919 M STREET NW
                                          SUITE 470
22                                        WASHINGTON, DC 20036
                                          (202)234-0090
23                                        NNELSON@BANCROFPLLC.COM

24

25

<u>**I N D E X**</u>

<u>PAGE</u>

MOTION HEARING:                                    4

```
 1            LOS ANGELES, CALIFORNIA; TUESDAY, NOVEMBER 20, 2012

 2                            -o0o-

 3                 (COURT IN SESSION AT 11:55 A.M.)

 4            THE CLERK:  In the matter of calendar Item Number

 5   3, Case No. SACV 12-01137-CBM:  Martin Aranas vs. Janet

 6   Napolitano.

 7            Counsel, please state your appearance for the

 8   record.

 9            MR. FLENTJE:  August Flentje, Department of Justice

10   for the defendants.

11            THE COURT:  Good morning.

12            MS. GILBERT:  Helen Gilbert, Department of Justice,

13   for the defendants.

14            THE COURT:  Good morning.

15            MR. BELSAN:  Timothy Belsan, also from the

16   Department of Justice.

17            THE COURT:  Good morning.

18            MR. NELSON:  Nicholas Nelson, Bancroft PLLC, for

19   the intervenor defendant.

20            THE COURT:  Good morning.

21            MR. HOLGUIN:  Carlos Holguin, Center for Human

22   Rights on behalf of plaintiffs.

23            Good morning.

24            MR. SCHEY:  Good morning, Your Honor.

25            Peter Schey, Center for Human Rights and
```

```
 1    Constitutional Law on behalf of the plaintiffs.

 2              THE COURT:  And good morning to all.

 3              So we have a number of motions today.  And so the

 4    question is the best way to organize them:  What do we hear

 5    first and what do you need to address that may not to be

 6    covered as well as you would like it to -- like it to have

 7    been in the papers that you filed with the Court.  So let me

 8    just identify the motion.

 9              So for the plaintiffs, we have two motions.  We

10    have the motion for preliminary injunction; motion to certify

11    the class.  For the defendants, the intervenor has filed a

12    motion to dismiss, and the Department of Justice also a

13    motion to dismiss and a partial motion to dismiss.  So I

14    think in organizing this, that the Court hears the motions to

15    dismiss first and depending upon the Court's position on

16    those motions, then the Court would go to Plaintiff's motion

17    to certify the class and Plaintiff's motion for preliminary

18    injunction.

19              So the parties actually do raise in the motions to

20    dismiss some standing issues.  So it seems to me it would be

21    appropriate to address the standing issue first.  The parties

22    cite to the Court this *Adams* case for the Ninth Circuit --

23    from the Ninth Circuit.  So, tentatively, I would say *Adams*

24    doesn't control this case, just to put that out there so that

25    you don't spend a lot of time on *Adams*, but you -- you've
```

1    addressed it, certainly, in your written papers.  So it may

2    not be the subject of oral statements this morning.

3              There is a *Baker* case from the Supreme Court --

4    *Baker v. Nelson*, and so a similar question as whether *Baker*

5    is going to control this case.  And let's assume for purposes

6    of the discussion this morning, the question is "no" to that

7    question.  So then the question is, where do we go next?

8    *Adams* doesn't control; *Baker* doesn't control.  I think we

9    then go to the 12(b)6 issue.  And, as I understand it,

10   Plaintiff has two claims:  One, is equal protection and the

11   other one is a substantive due process.  And I think the

12   parties have each addressed that, those two claims orally;

13   but that -- we may need to have some further discussion on

14   those.

15             So the substance of due process claims raise issues

16   of the -- the 1-601 waiver and discretionary Government

17   benefits and what effect they have on the -- the substance

18   and due process claim.  There's also a question of

19   fundamental liberty interest and how the due process claim

20   may be affected by that discussion.

21             Then, as I said, we do have standing.  We have

22   three plaintiffs.  And we have Rodriguez who is a U.S.

23   citizen and the question is whether she has standing based

24   upon the case law.  We have, then, two other individuals, a

25   mother and son, I believe, and whether they both have

1     standing.  It seems to me that at least one of the two does

2     have standing and so then the question is:  If the Court

3     concludes that way, how does that affect the other two?

4          Then once we finish that discussion, we go to the

5     class cert.  And I think the question that I have there is,

6     the numerosity issue, and it's not clear to me what position

7     the defendants are taking on that issue.

8          So I would like to have you address that for

9     purposes of the class cert motion if we get to that motion.

10          The commonality issue is one that we should also

11     discuss.

12          And then the other motion before the Court this

13     morning is Plaintiff's motion for preliminary injunction and

14     so the discussion that we will have there is just the typical

15     discussion, and it may be that it's adequate these are --

16     this issue is adequately briefed in your papers.  It's the

17     likelihood of success on the merits which, of course, ties in

18     with what is the Court going to do with the two claims and

19     the 12(b)(6) motion that's pending, as well as the

20     irreparable harm.

21          Tentatively, I think the showing for irreparable

22     harm has been made, but we still may have an issue as to the

23     likelihood of success on the merits.

24          One issue that I have -- or question that I have

25     that I'll ask the parties to address, it appears to me that

1    the parties do expect that in ruling on the matters that are

2    before the Court, the Court will actually issue a ruling on

3    the Defense Marriage Act and whether or not that's

4    constitutional.  So my initial -- the question was:  Is this

5    issue going to be addressed at some later time, or do the

6    parties expect that based upon the briefing that's before the

7    Court, that this issue needs to be addressed in order for the

8    Court to rule on the other motions that are before the Court?

9            So I think that that is the case, that you think

10   you've adequately briefed it here and would expect the Court

11   to address it; but I'll give you an opportunity to tell me

12   that.

13           I do have some questions on the various issues that

14   are before the Court.  And what I thought I would do is just

15   identify what those questions are to give you an

16   opportunity -- I'll take a short recess to give you an

17   opportunity to kind of think about the questions and whether

18   or not you would simply say you're satisfied that that's been

19   answered in the brief that you filed and you'll identify the

20   brief, or whether or not you feel something more needs to be

21   said.

22           So standing the question for the plaintiff is:  In

23   light of the case law below, what is the basis for the

24   Plaintiff's argument that Plaintiff Rodriguez has standing?

25           And the cases that have been cited by the parties,

1    it's the *Magee* case, the M-a-g-e-e case, and the case

2    *Bright vs. Para, which is a Fifth Circuit case, the Singh vs.*

3    *Magee* is a Ninth Circuit case.

4              On the issue of substantive due process, question

5    of the plaintiff, what is the Plaintiff's response to the

6    defendant, Justice Department defendant and intervenor's

7    argument that the substantive due process claim fails because

8    DOMA does not interfere with any fundamental liberties or

9    privacy interest?

10             So it's really having the plaintiff's identify what

11   are the liberty interests and the privacy interest that you

12   arguing should survive the defendant's motion Re: the

13   substantive due process claim?

14             The second question also relates to substantive due

15   process.  Isn't DOMA different from Don't Ask, Don't Tell as

16   interpreted in *Whit* or the statute criminalizing private

17   sexual behavior in *Lawrence vs. Texas*.  So Plaintiff's

18   comment there.

19             And then if the Court were going to grant the

20   defendant's motion to dismiss as to the claims under

21   12(b)(6), would Plaintiff be asking for leave to amend; and,

22   if so, what is it that Plaintiff thinks that you could add to

23   your complaint to state a claim for Rodriguez on the

24   substantive due process or the sexual discrimination?

25             And you're not -- you may not be asking for leave

1    to amend because you may think that you have filed a

2    complaint that should survive these motions; and therefore,

3    if the Court were to grant the motions that Defendant has

4    made on these substantive claims, it may be that you would

5    want to be able to go right to the circuit, rather than

6    spending more time trying to amend, but I don't know what

7    Plaintiff's position would be on that.

8              For Defendants, on the standing issue, the

9    defendants cite a case, *Secretary of the State of Maryland*

10   *vs. Joseph H. Munson Company, Inc.*, for the proposition that

11   a party ordinarily cannot rest his claim to relief on the

12   legal rights or interest of third parties.  The *Munson* case

13   found that a businessman who did business with charities

14   could challenge a law regulating charity fundraising.

15             So doesn't that support Plaintiff's position rather

16   than your position?

17             So you may want to comment on that.

18             Another question on standing for the defendants:

19   Why should the Court follow *Cullman vs. U.S.*, which is a

20   Northern District Illinois case, finding the child has a

21   personal stake in the outcome of a case concerning his

22   parents' removal.

23             So I think that those are questions that I would

24   like to have the parties address.

25             The class cert motion, there are just a few

1   questions, but they go to the issues of numerosity,

2   commonality, typicality, and the Court's concern is more what

3   is the defendant's position as to those three elements that

4   the Court would have to address in certifying the class if we

5   get to the class cert.

6           So what I plan to do is just a take a short recess,

7   say about 5 or 10 minutes.  We do have calendared another

8   11:00 o'clock matter.  It will take less time than your

9   matter.  So if the clerk tells me that those parties are

10  ready, I'll take their case first and then come back to your

11  case, and those are the areas that I'd like to hear comment

12  on.

13          So any questions from either side before you start

14  thinking about what I've said just to make sure that there's

15  an understanding?

16          Plaintiff's counsel, and if you'll go the lectern,

17  please.

18          So when the parties are addressing the Court, I

19  would like you to have you go to the lectern and I just

20  explained is not because I need to have people at the

21  lectern, but, you know, it's an old courthouse, built in the

22  '30's.  The acoustics in this courtroom are such that it is

23  often difficult to hear for the court reporter and the Court.

24  At the mic, at the lectern we can hear you a little bit

25  better.

```
1              So, Counsel, state your name again, please.

2              MR. SCHEY:  Peter Schey.

3              THE COURT:  Yes.

4              MR. SCHEY:  Okay.  Thanks, Your Honor.

5              So I just had one question about your questions.

6    You mentioned as part of the substantive due process that, in

7    essence, if a motion was drawn to dismiss, would the

8    plaintiffs want the opportunity to amend or just going up to

9    the circuit?  And you mentioned in that question, the

10   Rodriguez -- the Rodriguez name.

11             THE COURT:  Yes.

12             MR. SCHEY:  And I was just wondering, did you want

13   Matt to focus on the Rodriguez claims, in essence, Rodriguez

14   standing, or is it more like all of the plaintiff's standing?

15             THE COURT:  Yeah, it would be any of the areas

16   where the Court might grant the motion to dismiss, would you

17   be seeking leave to amend.  So you have two claims, as I

18   understand it.

19             MR. SCHEY:  Right.

20             THE COURT:  They're 12(b)(6) motions directed to

21   those two claims.  Normally, the first time around, if the

22   Court granted those, the Court would grant leave to amend.

23   But, occasionally, a plaintiff will say, no, I actually think

24   there is enough there.  I don't seek to amend.  I would like

25   to have the Court issue an order that's final, that's
```

1    appealable, and I would like to take my chances with the

2    Circuit.  So that's really the question that I'm asking.

3               MR. SCHEY:  Got it.

4               Thank you.

5               THE COURT:  So it's any part of it.

6               Do the defendants have any just preliminary

7    questions just to understand what you should be focusing on

8    when you are ready to argue?

9               MR. FLENTJE:  I don't think so.

10              I do have one question.

11              THE COURT:  And just state your name since there

12   are a number of defense counsel.

13              MR. FLENTJE:  Sorry.

14              August Flentje for the defendants.

15              THE COURT:  And you're Justice Department?

16              MR. FLENTJE:  Yes.

17              THE COURT:  Okay.

18              MR. FLENTJE:  Department of Justice.

19              On -- on your first question on standing --

20              THE COURT:  Right.

21              MR. FLENTJE:  -- you cited a Ninth Circuit case.

22   Could you say the name of that case again?

23              THE COURT:  Yeah.

24              It's Singh, S-i-n-g-h versus M-a-g-e-e.  And the

25   cite is 165 F.3d.  917 is the Ninth Circuit 1998 case,

```
1    agreeing with cases in other circuits that broad -- broadly

2    reject any challenge to a deportation based upon the rights

3    of affected family members.

4              MR. FLENTJE:  Okay.  Thank you very much.

5              THE COURT:  That's the case that I was referring

6    to.

7              MR. NELSON:  Your Honor, Nicholas Nelson, Bancroft

8    for the intervenor.

9              We were discussing beforehand, and maybe this is

10   the appropriate time to ask now, given your questions, do you

11   have a preference as to what order the parties come up and --

12   and discuss the case with you?

13             THE COURT:  I don't.  And as long as I understand

14   what issue you're addressing.  But, as I said, it seems to me

15   we would start with the motions to dismiss and the starting

16   place with those is probably standing.  And then we would go

17   to the what I'm calling 12(b)(6) motions that go to the

18   substantive claims.

19             MR. NELSON:  Thank you.

20             THE COURT:  All right.  Any further inquiry by

21   either side?

22             All right.  Well, then we'll take a recess.  So I'm

23   saying about 5 minutes, or 10 at the most.  But if the

24   parties are here on the other case, you might come back and

25   notice that they're addressing the Court, and so I would just
```

1    finish theirs.  I think it's a motion to dismiss as well.

2            My clerk is saying yes.

3            And so I just think it will take less time than the

4    discussion on the issues that you raise in your case.

5            Thank you.

6            We're in recess.

7                        (Recess.)

8            THE COURT:  All right.  So we can go back on the

9    record.  Counsel has already stated your appearances.  The

10   Court has given at least some guidance as to where we might

11   focus for purposes of discussion.  And so I'm prepared to

12   listen at this point.  And the first question that I raise is

13   just the standing question and directed -- some specific

14   questions of plaintiff's counsel, so -- but I'm willing to

15   hear from defendants first or plaintiffs first.

16           MR. FLENTJE:  August Flentje with the Department of

17   Justice --

18           THE COURT:  Okay.

19           MR. FLENTJE:  -- for the defendants.  And I think

20   you had -- you had a couple of questions on standing for

21   Ms. DeLeon's wife and child.

22           THE COURT:  Yes.

23           MR. BELSAN:  I think the first point as -- as the

24   federal defendants want to make is that the -- the Court does

25   not need to resolve those tricky standing issues in this

1    case.  We agree fully with plaintiffs on that point.  We

2    think standing is really most relevant when you are

3    considering the scope and nature of the class that might be

4    certified in deciding who is in that class and who is out and

5    whether there is numerosity.

6         On the specific cases -- and I think they cited a

7    Ninth Circuit case called *Rosden* that said standing was

8    immaterial when there was a party with standing that was

9    before the Court, and we agree Ms. DeLeon has standing.

10        The next thing you asked was about the Singh v.

11   Magee case from the Ninth Circuit.  I think there are a

12   couple of -- I mean, that -- that Court accepted that -- the

13   courts around country, but not necessarily the Ninth Circuit,

14   have broadly rejected challenges to deportation based on the

15   rights of affected, but -- but not the person who is being

16   subject to the deportation.  So that's in the opinion.  I'd

17   also note that that was a first amendment case.  So it's not

18   directly relevant to the claims here.

19        On the specific standing by Ms. Rodriguez, we argue

20   that there should not be third-party standing under the

21   Supreme Court's *Munson* case.  That case sets up a basic

22   principle that when you have a third party, there needs to be

23   a practical obstacle to the person whose legal rights are

24   being asserted for that -- that party to -- to have -- this

25   is a prudential standing.  It's not an Article III standing

1    case.  And the *Munson* case also said those rules are relaxed

2    and First Amendment free speech cases because of the chill

3    that might be caused, but that -- that relaxation wouldn't

4    apply here.  And here, we obviously have no obstacle to

5    Ms. DeLeon litigating her -- her personal constitutional

6    right.

7             And the last thing on standing, other than what's

8    in our briefs, on the -- you've cited the *Cullman* case from

9    Northern District of Illinois.  That case involved an

10   eight-year-old child.  So I think it implicated a set of

11   issues that are very different than are implicated by the son

12   here, who's an adult and can make decisions on his own.  And

13   that Court did find injury and -- excuse me -- Article III

14   standing.  So we're not disputing that there would be Article

15   III standing.  We're saying sort of as a prudential matter,

16   Ms. DeLeon should be the one asserting her own constitutional

17   rights.

18            And I'd note that while that Court held there was

19   standing, the Court went on to say there was no

20   constitutional right in preventing the parents' deportation.

21   So that's sort of similar to what -- what the Bright and the

22   other circuit courts have said.  You should assert your own

23   constitutional rights in this proceedings, and there's

24   nothing preventing that here.

25            THE COURT:  All right.  Thank you.

1              MR. FLENTJE:  That's what we have on standing.

2              THE COURT:  How about intervenors, maybe that's the

3    place to go to have the record reflect the intervenor's

4    position re: a standing or an Article 3 standing, prudential

5    standing and standing of whom and to what extent do you agree

6    or concede?

7              MR. NELSON:  Thank you, Your Honor.

8              Nicholas Nelson for the intervenor.

9              We -- we do concur with the department's position

10   regarding the third-party standing issues.  We have

11   intervened to defend the constitutionality of Section III of

12   DOMA, obviously, and so our -- our primary thing that we

13   would add to what the department has said is that we do

14   believe that the *Adams vs. Howerton* decision, which I know

15   Your Honor indicated you weren't as interested in hearing

16   about, so I'll say as much as you would like to hear, and

17   nothing more.

18             But we do believe that the *Adams vs. Howerton*

19   decision controls the standing inquiry because we believe

20   that the plaintiffs are essentially asking the Court to issue

21   an advisory opinion about the constitutionality of DOMA,

22   given the fact that even if Your Honor were to wipe DOMA off

23   the books, as the plaintiff's request, we would be back to

24   the status quo ante under the INA, as interpreted, in

25   *Adams vs. Howerton*, under which Ms. DeLeon still would not be

```
 1   eligible for the immigration benefits that she's seeking here
 2   because the Ninth Circuit held that the INA wouldn't --
 3   wouldn't provide that benefit, even long before DOMA had been
 4   enacted.
 5           So, without DOMA, our position is that that
 6   would -- that would still be the case and -- and the relief
 7   that the plaintiffs are seeking wouldn't -- wouldn't redress
 8   their alleged injury.
 9           THE COURT:  Thank you.
10           Plaintiff?
11           So this is the standing issue.
12           MR. HOLGUIN:  Yes, Carlos Holguin on behalf of
13   plaintiffs, Your Honor.
14           I think we're agreed with the defendants on this
15   that there is not a need to resolve the standing of
16   Ms. Rodriguez or Mr. Aranas since all parties concede with
17   the exception of -- of the House Republicans final comment
18   that Ms. DeLeon does, indeed, have standing.
19           With respect to that comment, that -- that she
20   would be regard -- she would be ineligible under the INA
21   regardless, we would respectfully disagree.  The Immigration
22   and Nationality Act has been substantially amended since
23   Adams vs. Howerton was decided.  The portions of the
24   Immigration and Nationality Act which require the exclusion
25   of homosexuals on the basis that they were of pathological
```

1    mental illness had been removed, and so therefore the -- the

2    eligibility of Ms. DeLeon under the Immigration and

3    Nationality Act is quite different from what it was during

4    Howerton.  Obviously, the -- the citizenship and immigration

5    and naturalization services did not reach her eligibility

6    under the INA and it is -- it should be entitled to do so.

7            Finally, I emphasized that what's at issue here is

8    not eligibility under the Immigration and Nationality Act,

9    per se, but rather, the right to equal treatment and to have

10   one -- and to have Government respect one's right to personal

11   autonomy.  And these are very, very different from -- from

12   any argument about whether she is or is not eligible under

13   the INA for the benefit she ultimately seeks.

14           THE COURT:  Okay.  Thank you.

15           I did just raise the question as to whether the

16   parties felt that you had adequately briefed the

17   constitutionality of DOMA and expected in this -- these

18   motions that are before the Court, the Court would actually

19   rule on the constitutionality of DOMA, or were you expecting

20   that that would be left for another day?

21           So I'd like to just hear your comments on that.

22   Anyone from the defense side can just simply tell me.  And

23   you may be in agreement with the position of plaintiffs and

24   defendants, and so I just want to simply want to know how

25   broad the order should be that the Court will issue as a

1    result of these motions.

2              MR. NELSON:  Sure.

3              Nicholas Nelson for the -- for the intervenor.

4              We -- we've moved to dismiss both for lack of

5    jurisdiction or we've added that argument to the Department's

6    and -- and on the merits for 12(b)(6).  So it certainly is

7    our position that the plaintiffs have -- have not pleaded a

8    claim that Section III of the Defense of Marriage Act

9    violates equal protection, and we'd request that the Court

10   dismiss the case on that basis.

11             THE COURT:  So the Court should understand that you

12   would expect that the Court would actually rule on the

13   constitutionality of DOMA?

14             MR. NELSON:  Yes, Your Honor.

15             THE COURT:  And you're satisfied that that's been

16   adequately briefed, at least by the parties that you

17   represent?

18             MR. NELSON:  Yes, Your Honor.

19             THE COURT:  Okay.  Thank you.

20             And does Justice agree with that position?

21             MS. GILBERT:  Yes, Your Honor.  We agree that the

22   constitutionality of DOMA has been fully briefed before the

23   Court and welcome a ruling by -- by this Court.

24             Thank you.

25             THE COURT:  And Counsel's name for the record

1    again?

2            MS. GILBERT:  Helen Gilbert --

3            THE COURT:  Thank you.

4            MS. GILBERT:  -- for the Department of Justice.

5            THE COURT:  Thank you.

6            And then the plaintiff's position, I assume, it's

7    the same, that you agree that it is -- you intended that the

8    Court will rule on the constitutionality of DOMA in ruling on

9    these motions that have been briefed?

10           MR. HOLGUIN:  Carlos Holguin on behalf of the

11   plaintiffs.

12           Actually not, Your Honor.  We -- we're of the mind

13   that all that needs to be established now, which is really

14   important to decide at this juncture, is whether the

15   plaintiffs and the proposed class members are to suffer

16   irreparable injury while this matter is ultimately sorted

17   out.

18           THE COURT:  In other words, the preliminary

19   injunction?

20           MR. HOLGUIN:  The preliminary injunction,

21   precisely, Your Honor.

22           We see no reason that the Court needs to rule

23   definitively at this juncture on the constitutionality of

24   DOMA, Section III.  These matters are -- as you -- as your --

25   as the Court is aware, are currently in front of the

1    appellate courts and even, perhaps, the U.S. Supreme Court.

2    So rushing to judgment on -- on the constitutionality of

3    DOMA, Section III at this juncture, we do not believe is --

4    is required.

5              THE COURT:  Do you feel that you've adequately

6    briefed it since the defendants actually believe that that is

7    an issue before the Court and that the Court included --

8    should include in the orders that issue as a result of the

9    motions that are before the Court, would be the Court's

10   position on constitutionality of DOMA?

11             MR. HOLGUIN:  We would certainly welcome an

12   opportunity to augment our briefing.  It's a very important

13   question.  Obviously, we have -- amongst, I think, all the

14   parties have come in within the page limits prescribed by

15   Local Rule, and -- but if the Court is inclined to rule on

16   the ultimate question before -- for it, the constitutionality

17   of DOMA Section III, the plaintiffs would welcome an

18   opportunity to file supplemental briefing.

19             THE COURT:  So is that to suggest you did not

20   adequately brief it here?

21             MR. HOLGUIN:  Well, we -- we believe we adequately

22   briefed it, but better work could by done, yes.

23             THE COURT:  Well, let me ask this question:  I

24   think in arguing irreparable harm, it seems to me that you do

25   argue that some of the harm that would result -- or some of

1    the relief that these plaintiffs would be entitled to would

2    be the relief that would be provided, as far as immigration

3    benefits are concerned, to couples of opposite sex who were

4    in fact, married.  So it seems to me that kind of goes to the

5    constitutionality of DOMA.  So I'm not looking specifically,

6    at this point, as to the two or three that I have in mind.

7    But I believe that you do address the constitutionality of

8    DOMA as you look at irreparable harm to the plaintiffs.

9           MR. HOLGUIN:  The type of relief we're seeking in

10   the preliminary injunction, Your Honor, is very limited.  It

11   does not require or request that the Court require the

12   Citizenship and Immigration Services to issue the ultimate

13   benefits under the Immigration Act to any same-sex couple.

14   It simply asks for protection from being relegated to the

15   undocumented underground, if you will, while this -- while

16   this matter is being sorted out.  So there are -- there are

17   very, very distinct differences between what we would ask as

18   an ultimate order were DOMA to be declared unconstitutional

19   versus what we're asking for in the way of protection from

20   irreparable injury pendente lite.

21          THE COURT:  All right.  So we'll probably get to

22   that again further in our discussion as the Court looks at

23   what relief is actually being sought, re: the preliminary

24   injunction.

25          MR. HOLGUIN:  Thank you, Your Honor.

```
1              MR. NELSON:  Your Honor, if I can clarify what I
2    said earlier.
3              THE COURT:  Sure.
4              MR. NELSON:  Two small clarifications.
5              THE REPORTER:  I'm sorry.  I can't hear.
6              THE COURT:  Yeah.
7              And, Counsel, just state your name again.
8              MR. NELSON:  Certainly.
9              Nicholas Nelson for the intervenor.
10             Just to clarify in two respects what I said
11   earlier:  First, and this may have been clear, but the
12   House's position is that, you know, primarily that the Court
13   can -- can dismiss the case pursuant to Rule 12(b)(1), and it
14   has to dismiss the case for lack of jurisdiction.  So,
15   obviously, the -- the issue of the constitutionality of the
16   statute would be only if the Court would rule against us
17   on -- on that issue.
18             Second, I think listening to opposing counsel made
19   me realize that the Court may be considering converting the
20   preliminary injunction motion to a motion for summary
21   judgment or granting summary judgment on its own -- on its
22   own -- on its own motion.  I mean, if --
23             THE COURT:  I wasn't thinking of doing that.
24             MR. NELSON:  Okay.  Very good.
25             The House's position would be that it would be
```

1    appropriate to wait for the plaintiffs to file a motion, a

2    dispositive motion before entering judgment in their favor.

3           Thank you.

4           THE COURT:  That wasn't my thinking, that I would

5    convert it or treat it as.

6           MR. NELSON:  Very good.

7           Thank you.

8           THE COURT:  Okay.  All right.  I believe that each

9    has addressed the standing issue and so the next issue that I

10   had on my list was going to the substantive due process

11   claim.  And I'm prepared to hear from the parties.  I did

12   raise some questions about that and so I'm prepared to let

13   you address that.

14          On the other hand, if you, in thinking about the

15   best way to address these issues, feel that the Court should

16   hear your arguments, the procedural arguments at a later

17   time, today, of course, the Court's willing to do that, too.

18          So should we follow the outline that the Court --

19   where the Court stated questions to be answered, or did you

20   feel that there was a better way to organize this?

21          MS. GILBERT:  Helen Gilbert for the Federal

22   Government, Your Honor.

23          We're happy to proceed in the outline that the

24   Court laid out earlier.  You've raised a number of questions

25   about substantive due process, and the Federal Government

1    believes that this is a case, DOMA, Section III is

2    unconstitutional, but not because it's a violation of

3    substantive due process.

4           As the Ninth Circuit has instructed in *Raich,* the

5    Court is to look to the issue quite narrowly and this is a

6    case about the provision of Federal benefits and the change

7    of status.  As the Ninth Circuit recognized in

8    *Munoz vs. Ashcroft*, the denial of discretionary immigration

9    relief cannot violate substantive due process.  Here, the

10   relief that Ms. DeLeon seeks is purely discretionary; and

11   therefore, this is not like the substantive due process

12   issues in cases such as *Lawrence* and *Whit*.  Instead, the

13   Government's position is that this is unconstitutional, but

14   it's unconstitutional because of the line Congress has drawn

15   between providing benefits to married couples who are in

16   same-sex relationships -- excuse me -- married couples who

17   are in opposite sex relationships and not providing those

18   same benefits to married couples in same-sex relationships.

19          THE COURT:  All right.  Intervenor's counsel want

20   to be heard on that, or is your argument pretty much the

21   same?

22          MR. NELSON:  Would Your Honor mind just stating the

23   specific question once more?

24          THE COURT:  Okay.  So the question relates to the

25   substantive due process claim.  And let me get my notes on

1    that...

2              MR. NELSON:  I apologize, Your Honor.  I could --

3              THE COURT:  No, that's -- that's fine.  I just have

4    a lot of notes on the bench here.  I was just trying to get

5    to the list that I was looking at specifically when I raised

6    the question of due process and the arguments to be made, and

7    so I'm just looking for those notes at this moment.

8              Well -- and I'm not finding the note that I was

9    looking at at the time, but I think I can raise the question

10   again.  So a part of the motion that the intervenors make is

11   a 12(b)(6) motion directed at the substantive due process

12   claim and whether it is adequately alleged.  And so I wanted

13   to give you an opportunity really just to comment on that

14   claim again.  Your position may be the same as the Justice

15   Department's position and so there may not be further

16   comments that you wish to make; but that was the sense of the

17   question that I had raised for the defense.

18             MR. NELSON:  Thank you, Your Honor.

19             And, for the record, Nicholas Nelson for the

20   intervenor.

21             We do agree again with the Department of Justice

22   here.  There is no substantive due process right to the kind

23   of discretionary immigration benefit that the plaintiffs are

24   seeking.  I guess I would amplify just briefly why properly

25   conceived that that -- it is that discretionary benefit that

```
 1    the plaintiffs are seeking not the broader right to family

 2    integrity or what have you, that they're trying to seek their

 3    claim on.

 4             The Supreme Court has drawn a fairly bright line

 5    that the way one -- the way a person who has been deprived of

 6    Government benefits can state a substantive due process claim

 7    is to argue that the person was or -- was receiving or would

 8    have been eligible for those benefits before the exercise of

 9    the -- the alleged substantive due process right and then had

10    the Government take away those benefits or take away that

11    eligibility as a consequence of that person's exercise of the

12    alleged right, and that's plainly not what Ms. DeLeon's

13    position is with respect to DOMA.  She did not have lawful

14    status and was not eligible for a waiver of inadmissibility

15    before she began her relationship with Ms. Rodriguez, which

16    she alleges is her -- is her -- is her right at issue here.

17    And she also did not have that status or that eligibility

18    after she began her relationship and does not to the present

19    day.  So there just was no legal consequence of her -- of her

20    beginning that relationship.  That's not how one states a

21    substantive due process claim.  So that -- that's our

22    position with respect to that, Your Honor.

23             THE COURT:  All right.  So why don't I hear from

24    the plaintiff's counsel.

25             So I do have the notes that I used for purposes of
```

1    characterizing the question for the plaintiffs.  So as it

2    relates to the due process claim, one of the questions was:

3    What is your response to the intervenor's argument that the

4    substantive due process claim fails because DOMA does not

5    interfere with any fundamental liberties or privacy

6    interests?

7             Another question was:  Isn't DOMA different from

8    Don't Ask, Don't Tell as interpreted in Whit?

9             MR. HOLGUIN:  Yes, Your Honor.

10            In response to the first question, the Supreme

11   Court has clearly defined for us already in *Lawrence vs.*

12   *Texas* the liberty interest that's at stake here.  There is no

13   reason to -- for -- for -- for this Court or any other Court

14   to be redefining that.  It's quite clearly settled by

15   *Lawrence*, and that's the right to personal autonomy in

16   decisions regarding sexuality and family.

17            There is no question that this -- that DOMA affects

18   that liberty interest fundamentally.  It -- it -- it declares

19   quite clearly that people who exercise their right to

20   personal autonomy are to be penalized.  They're to be denied

21   benefits that would normally be afforded to them simply

22   because of the way in which they have exercised their right

23   to personal autonomy.

24            This is not a case that involves ultimate

25   eligibility for any immigration benefit.  It involves the

```
1    right to be considered for that immigration benefit on the

2    same terms as other couples would be adjudged, and that is

3    the fundamental injury that is -- that's at stake here, not

4    the denial of particular immigration benefit, this or that.

5    But, rather, the right to be free to make -- to exercise

6    one's personal autonomy without suffering adverse

7    consequences by way of Government action.

8            As far as how is this case different -- isn't this

9    case different from the -- for example, the Don't Ask, Don't

10   Tell policy, Plaintiffs believe that it is precisely the

11   same.  In this case, Ms. DeLeon, for some period of time, I

12   believe it went on for one or two years, did have legal

13   status.  She was provided with a -- a work permit and

14   permitted to remain lawful in the United States.

15           When the Government got around to applying DOMA is

16   when she was reverted to the undocumented underground.

17   And -- and this is -- this is -- is indistinguishable from

18   the Government's action, the Don't Ask, Don't Tell case where

19   it stripped or attempted to strip Major Whit of benefits that

20   she had as good -- as a member in good standing of the armed

21   forces.  So in both cases there was a withdrawal of a

22   status -- withdrawal of a benefit based upon DOMA.

23           THE COURT:  And does Plaintiff so allege in the

24   complaint that it was based upon DOMA?

25           MR. HOLGUIN:  Yes, Your Honor, and we also have
```

1   evidence before the Court showing that it was done

2   exclusively on the basis of DOMA and not on anything of the

3   Immigration and Nationality Act.

4          THE COURT:  And the defendants both have responded

5   to the Court's inquiry by talking about the discretionary

6   benefit and because it's a discretionary immigration benefit

7   or discretionary immigration relief, that there can't be a

8   substantive due process claim.

9          And what's Plaintiff's response to that?

10         MR. HOLGUIN:  The response is that there is a

11   constitutional right to be considered for this benefit.  In

12   other words, to be considered for the favorable exercise of

13   discretion without regard to one's sexual orientation and

14   that is the gravamen of this particular complaint.  There has

15   been no exercise of discretion in this case.  Discretion has

16   yet to be exercised because DOMA has, so to speak, cut off

17   these plaintiffs at the knee.

18         So whether or not there's a -- the benefit is

19   ultimately determined to be discretionary, granted or denied

20   is beside the point.  What's at stake in this case is the

21   plaintiff's right to personal autonomy as the Supreme Court

22   has defined it in *Lawrence*.

23         THE COURT:  I'm prepared to move to the equal

24   protection claim on the 12(b)(6) that's directed to that

25   claim, and if there are comments either to the Court's

1    inquiry or just additional comments to be made as to why that

2    claim is not sufficient as presently alleged, I'll hear the

3    parties on that.

4            MR. NELSON:  Nicholas Nelson for the intervenor,

5    Your Honor.

6            The equal protection claim is what the House at

7    least regards is the heart of the plaintiff's complaint, and

8    i think as you were hearing, even as they discuss their

9    supposed substantive due process claim, we heard again and

10   again that they want to be considered on an equal basis with

11   couples who have exercised their right to marry an opposite

12   sex person that, in our view, is not a substantive due

13   process claim.  It's a claim that sounds in equal protection.

14           When we turn to equal protection we see that there

15   are a large number of Supreme Court and Ninth Circuit

16   precedence that require dismissal on the merits.  I know

17   Your Honor was of the view that *Adams vs. Howerton* may not be

18   controlling.  I believe based on the context of your remarks,

19   that that went to the plaintiff's standing.  It's been a bit

20   obscured in the briefing, but we do believe that

21   *Adams vs. Howerton* is actually dispositive of the plaintiff's

22   claims in two different ways.

23           THE COURT:  And if *Adams* is not controlling on this

24   issue either, then where does the Court go?

25           MR. NELSON:  Well, even before *Adams*, one would go

1    to the Supreme Court's decision in *Baker vs. Nelson*.

2           The Supreme Court there squarely concluded that the

3    traditional definition of marriage as being between one man

4    and one woman is consistent with equal protection.  And,

5    really, the only -- the only criticism that gets made of the

6    applicability of *Baker* here is that it involved a State law,

7    the Supreme Court upholding a State statute; whereas DOMA is

8    a Federal one.  But, Your Honor, that distinction does not

9    distinguish.  It runs head-long into the Supreme Court's

10   repeated reminder that equal protection requirements apply

11   exactly the same way to the State's and the Federal

12   Government.

13          Now, one would think that if that rule meant

14   anything, it would mean that when the State and Federal

15   Government's used an identical definition of the word

16   "marriage," that the outcome under an equal protection

17   challenge would be identical.  So, for that reason, we would

18   say that *Baker* is binding.  *Adams* reinforces *Baker's* holding,

19   and I would just note that two other judges in this district

20   have -- have found that to be the case in the *Lui* and

21   *Torres-Barragan* opinions.

22          THE COURT:  We have a judge in the Northern

23   District, I think, who has not found that to be the case.  So

24   do you wish to comment?  Judge Wilkins' case.

25          MR. NELSON:  Judge Wilkins' case, yes, Your Honor.

1          Judge Wilkins said that *Adams* was not binding based

2   on *Lawrence vs. Texas*.  And we would submit that that was

3   basically an inversion of what the Supreme Court said in

4   *Lawrence*, because in -- in the *Lawrence* opinion, the

5   Supreme Court expressly told us that it -- it was not

6   addressing the question of whether the Government needed to

7   give legal recognition to same-sex relationships.  So our

8   position would be that Judge Wilkins basically said, no,

9   Supreme Court, you actually did address this, and, as a

10  matter of fact, you overturned your most significant

11  precedent on this question.  We don't think that's a proper

12  reading of *Lawrence*.

13          The other decision from the Northern District,

14  *Valinski*, that struck down DOMA, we would note, did not even

15  cite *Adams vs. Howerton*.  So we would -- we would regard it

16  as not persuasive on that issue.

17          Even -- even -- even setting aside these binding

18  precedents from -- from the -- from the appellate courts that

19  squarely control, in our view, there's also a long line of

20  Ninth Circuit decisions requiring rational basis scrutiny for

21  sexual orientation classifications under the due process

22  clause.  So this is *High Tech vs. Defense Industrial Security*

23  *Clearance Office*.  This is *Phillips vs. Perry*.  This is

24  *Whit vs. Department of the Air Force*.  I believe there are

25  one or two others as well.  And, again, the Ninth Circuit in

1   *Whit* told us that the Supreme Court's recent sexual

2   orientation decisions, which culminated in *Lawrence*, did not

3   affect the Ninth Circuit's equal protection jurisprudence in

4   this area, so that a rational basis scrutiny still applies

5   here.  And that this is -- again, this is a point where we

6   agree with the Department of Justice that *Whit* is binding on

7   this Court, that rational basis scrutiny applies.  The

8   Department regards that.  I think their phrase is ultimately

9   incorrect, but I think were in agreement that that's an

10  argument for the en banc Ninth Circuit or for the Supreme

11  Court, and that rational basis scrutiny applies if one

12  reaches the merits of the equal protection claim here.

13          So when it comes to applying rational basis

14  scrutiny to DOMA, Section III, there are a number of rational

15  bases that would uphold the law.  We listed some of them in

16  our briefs, but, of course, it's -- the test is whether there

17  is any conceivable rational basis.  The first of which is

18  Congress' interest in uniformity.  In the -- the

19  establishment of a uniform rule that will apply in the same

20  way in every state for whether otherwise similarly-situated

21  same-sex couples will be eligible for Federal marital

22  benefits.

23          What Congress did in 1996 is what it still could

24  very well reasonably do today.  It surveyed the national

25  landscape and it noted that there was likely to be

1    disagreement and controversy among the states at that point

2    and going forward in the future about whether same-sex

3    couples would be eligible for marital benefits under State

4    law.

5         Now, Congress did not presume to shut down that

6    debate among the states.  It -- it has let that debate go

7    forward.  It has not even attempted to interfere.  But it

8    did -- it did regard that when it came to benefits that

9    flowed from the United States citizenship, a person's

10   relationship with the national Government, that it was not

11   appropriate for there to be couples who are otherwise in

12   exactly the same circumstances whose eligibility for Federal

13   marital benefits would turn solely on the fortuity of what

14   state they happen to live in and what -- what that State's

15   law would be, and so Congress enacted a uniform national rule

16   in DOMA that would apply the same way to everyone everywhere.

17        Congress was also concerned about individual

18   same-sex couples who might move from state to state.

19   Congress did not want these couples to be gaining or losing

20   Federal marital status based solely on which state they

21   happened to live in and what that State's law happened to be.

22        Now, the plaintiffs have argued that if Congress

23   was concerned about uniformity, it should have -- it should

24   have gone with uniform deference to whatever varying

25   determinations the State laws might make, but when it comes

1   to pursuing and acknowledge a rational basis of this kind

2   like uniformity, and acknowledge legitimate Government

3   interests, surely the choice whether to pursue substantive

4   uniformity or sort of procedural choice of law uniformity is

5   up to Congress.  Congress rationally chose substantive

6   uniformity in DOMA and it rationally chose to follow the --

7   the majority approach among the states.

8           Another rational basis we've articulated for DOMA

9   is -- is saving money, fiscal prudence conserving the -- the

10  Federal Fifth.  The First Circuit in its Massachusetts

11  decision has already acknowledged that this would be a

12  rational basis that would -- that would support upholding

13  DOMA under rational basis review.  And I don't know that

14  there is really any dispute among the parties that when --

15  when Government declines to extend preexisting eligibility

16  criteria based on a concern for the financial obligations,

17  that that extension would entail, that that is that is a

18  rational basis and that that decision would survive rational

19  basis review.

20          The plaintiffs argue that DOMA did not actually do

21  that because they maintained that -- they maintained that

22  head -- Federal law would have -- prior to DOMA would have

23  picked up State definitions of marriage if the states had

24  recognized same-sex marriage.  We think that the Ninth

25  Circuit's statutory interpretation holding in *Adams* is pretty

| | |
|---|---|
| 1 | clear on that point.  We also cite many different instances |
| 2 | in our briefs where the courts and the executive branch have |
| 3 | interpreted Congress' use of the word "marriage" to mean only |
| 4 | opposite sex couples, regardless of what State law might |
| 5 | mean.  And so we would submit that the plaintiffs are -- are |
| 6 | wrong on that point. |
| 7 | There's also been talk about why DOMA does not |
| 8 | actually save money in this instance because supposedly |
| 9 | granting the immigration benefit that's at issue here would |
| 10 | not cost any money.  We would have two responses to that: |
| 11 | First, it's the plaintiff's burden on rational basis review |
| 12 | to negate every conceivable rational basis.  We think it's |
| 13 | certainly rational for Congress to have concluded that |
| 14 | waiving inadmissibility for someone who is not otherwise |
| 15 | permitted to be in the country might cost the Government |
| 16 | money in some way or another, and we don't think that they |
| 17 | have pleaded facts that would -- that would negate that as a |
| 18 | conceivable rational basis for the law. |
| 19 | But more broadly, Congress surely is not |
| 20 | required -- and the First Circuit recognized this, Congress |
| 21 | is surely not required when considering the fiscal impact of |
| 22 | a definition of a term in Federal law to parcel out every |
| 23 | possible application of that term and to consider whether |
| 24 | individually that application would cost money or not. |
| 25 | Congress surely is permitted to consider the aggregate effect |

 1    of whether the law would save money or not, and, as the First

 2    Circuit recognized in the aggregate, it's surely rational to

 3    conclude that extending marital benefits to an additional

 4    class of people will result in a net benefit to that class of

 5    people and a corresponding net detriment to the Government.

 6            The third legitimate interest, the Government

 7    interest that would be furthered by DOMA is the interest

 8    simply in being cautious in engaging in a novel redefinition

 9    of our fundamental social institution.  I doubt there is a

10    dispute among the parties about the tremendous importance of

11    marriage to our culture, to our -- to our -- to our nation,

12    to our society.  And so when -- when Congress was considering

13    whether to redefine this institution in a way that had been

14    tried only in a very limited number of places for a very,

15    very limited number years, it was rational for Congress to

16    conclude we need to have -- before we engage in this kind

17    of -- in this kind of unprecedented expansion of -- of such a

18    fundamental institution, we need to have good reason to

19    believe that this won't adversely impact the institution

20    itself that is so important to our culture.  And it was

21    rational for Congress to -- to regard the -- the burden of

22    proving that on the people who are advocating the change.

23    And because there simply had not been enough time for data to

24    come in from states or countries that chose to permit

25    same-sex marriage, it was rational for Congress to decide

1    they're simply isn't enough information, at this point, to be

2    comfortable making this change.  There isn't enough

3    information to be comfortable knowing that this won't

4    adversely impact the benefits that marriage endows on our

5    society.

6           THE COURT:  I'm going to stop Counsel there and

7    just -- as far as the rational basis is concerned, is the

8    Department of Justice's position the same as the intervenor's

9    position?

10          And then I'll give Plaintiff's counsel an

11   opportunity to address the rational basis.

12          MS. GILBERT:  Helen Gilbert for the Department of

13   Justice, Your Honor.

14          The Department of Justice takes no position on

15   whether or not this statute survives rational basis, although

16   the Attorney General has instructed us to state that a

17   reasonable argument may be proffered for the rational basis.

18          THE COURT:  Thank you.

19          Plaintiffs, is there anything further that you wish

20   to place on the record concerning the rational basis standard

21   or what standard should apply?

22          MR. HOLGUIN:  Yes, Your Honor.

23          This is a motion to dismiss.  Counsel for the House

24   Republicans has argued that the plaintiffs are under a burden

25   to establish that there is no rationality to this particular

1      statute.  We're fully prepared to do that.  We've made some

2      of the arguments, of course, in the -- in the oppositions and

3      briefing and so forth.  But the key document, at this point,

4      is what's in the complaint.

5              This -- as I said, this is a motion to dismiss, and

6      we have alleged facts in the motion to dismiss, which if to

7      be shown to be true, would establish the irrationality of

8      DOMA even under the most lenient rational basis test.

9      Obviously, our argument here is that DOMA needs to be

10     subjected to heightened scrutiny.  But whether it's

11     heightened scrutiny, as the Second Circuit, has recently held

12     or whether it's rational basis, a toothy rational basis test,

13     as the First Circuit recently held, the fact of the matter

14     remains that in those seminal decisions, the Courts did look

15     at the facts either opposing or sustaining this -- the

16     so-called rational basis for DOMA, Section III.

17             As I've -- as I tried to indicate, we believe that

18     at this stage, in this early stage in these proceedings

19     are -- the allegations are the complaint are fully sufficient

20     to establish DOMA, Section III is unconstitutional even under

21     the most lenient standard, the rational basis test.

22             With regard to the various rationals that counsel

23     for the House Republicans has offered, we have addressed

24     those in our papers.  But, in summary, we do not believe that

25     there is any evidence and any rational case to be made for

1    the idea that singling out individuals based upon their

2    exercise of their personal autonomy furthers the ostensible

3    Government interest in -- in promoting traditional marriage.

4    Traditional marriage is simply a code word for saying this is

5    the way things are.  Obviously, there have been times in

6    history where all sorts of -- of things have been considered

7    traditional; anti-miscegenation laws and so forth.  This is

8    not a rational basis for singling out same-sex couples for

9    discriminatory treatment.

10          With respect to saving money for the fisc, we

11   believe that that is not even a -- a plausible justification,

12   given the context of this case.  There is no way that the

13   Government would save money by excludeing Ms. Aranas from --

14   I mean, Ms. DeLeon from having lawful residence.  If

15   anything, it would cost the family more because she would be

16   unable to engage in employment helping to sustain her family

17   and staying off of the public wheel.

18          I -- I -- I defer to the rest of -- of our

19   arguments.  We've answered these things, I think, quite

20   adequately in the pleadings and we'll just rest on -- on the

21   idea that at this point in this juncture of proceedings,

22   we're on a motion to dismiss.  The complaint is fully

23   adequate to show that DOMA, Section III is wholly irrational.

24          THE COURT:  I am ready to move now to the

25   plaintiff's motions, the motion for a provisional class

```
 1    certification and the request for a preliminary injunction.
 2    Let's look at the class cert motion first.  And I indicated
 3    that what I'd like to hear from the defendants is their
 4    position on numerosity, commonality, and typicality.
 5              MR. BELSAN:  Thank you, Your Honor.
 6              Just a couple of thoughts on those three elements.
 7    On numerosity, when they -- when they filed their motion,
 8    they -- they cited no evidence or anything suggesting
 9    numerosity.  Now, in their reply, they provided another
10    individual who has sought an I-130 benefit and -- and some
11    declarations from some attorneys citing that they've dealt
12    with this many times or hundreds of times.
13              So they have substantiated that record a little bit
14    on numerosity.  We still think it's notable that the -- the
15    only named plaintiff is someone who is in a situation that is
16    much different than most binational couples who are seeking
17    status in this country.  She was found inadmissible based on
18    a misrepresentation she made that has nothing to do with the
19    Defense of Marriage Act.  And that makes her -- that, I
20    think, makes it a concern if you're going to certify a class
21    that goes beyond her specific circumstances.
22              So they have identified this plaintiff with a very
23    specific immigration application, I-601 waiver of
24    inadmissibility and I -- it's -- I think it would be -- she
25    would be an adequate representative of a class of people
```

```
 1   seeking an I-601 waiver of inadmissibility.  I think if you
 2   go beyond that, there are concerns with th adequacy of
 3   representation that we have.
 4          One -- one reason we have a concern is that the
 5   basic inadmissibility determination is something she could
 6   challenge and get turned -- overturned in a -- in an
 7   immigration proceedings.  That would eliminate her interest
 8   in DOMA completely if she was able to -- to convince an
 9   immigration judge, like she has put before the Court, that
10   she didn't really misrepresent anything when she first came
11   to the country.
12          THE COURT:  And just -- I would just ask one
13   question just to make sure that I'm correct on this.  So no
14   immigration judge has been given the opportunity to rule on
15   these issues; correct?
16          MR. BELSAN:  No.  That would only start if -- if
17   removal proceedings commenced.
18          And one other reason we're concerned about the --
19   the size of the class and the scope of the proposed
20   injunction is, is that it would halt the commencement of
21   immigration removal proceedings.  It may be that some class
22   members wouldn't want that relief.  There is some remedies
23   that can be sought in immigration proceedings like
24   cancellation of removal that only come at that time.  Some
25   people might want to make an asylum claim in an immigration
```

```
 1    proceeding before an immigration judge.  So there are

 2    concerns with a ruling that would be that broad that would

 3    halt that part of the process, and there are also

 4    jurisdictional issues with broadly halting the commencement

 5    of removal proceedings that could stem from 1252(g).

 6            On commonality and typicality --

 7            THE COURT:  So I think your position is numerosity,

 8    the plaintiff still has not provided sufficient evidence to

 9    the Court to satisfy that requirement?

10            MR. BELSAN:  I -- we're not as concerned as we were

11    when we first saw the motion.  I just note that some Courts

12    in this district, Castello and Perez have -- have said

13    that -- kind of lawyer declaration saying that they've seen

14    this hundreds of times are not enough on numerosity.  That

15    being said, I -- if -- if we're talking about I-130s as well

16    as I-601s, there -- there probably is no reason to dispute

17    numerosity on -- but on her specific waiver of an

18    inadmissibility claim, she is the only example we have still

19    before the Court.

20            THE COURT:  Commonality?

21            MR. BELSAN:  On commonality, we do not dispute that

22    there is a common issue, the constitutionality of DOMA.  Our

23    concerns are more with the adequacy of her as a class

24    representative and on the -- her claim being typical to the

25    other claims with -- the other claims we've seen are all as
```

1  we -- as I said, I-130s.

2          As you're deciding and thinking about the scope of

3  the class, I really would like to point the Court to a

4  decision by Judge Selna in this -- in this Court, Castello,

5  which is at 258 Federal Rule, Decision 600.  There, that had

6  to do with the Child Protection Act, Child Status Protection

7  Act and the Court was very specific.  He decided that it was

8  more reasonable to have a limited class that had the same

9  where the class members were seeking the same visa as the

10  named plaintiffs, and that was two types of family preference

11  visas.  We think a class of that nature would make a lot

12  more -- we opposed class certification, but we think if a

13  class is to be certified it would make sense to focus on the

14  specific visa that the named plaintiff who has joined this

15  case has -- has sought.  If they have another named plaintiff

16  down the road who has a different kind of visa or -- then

17  this Court could always reconsider that.  And I think that

18  is -- that is the points I have to make on the -- on the

19  class certification.

20          THE COURT:  And typicality, you believe you've

21  adequately covered that?

22          MR. BELSAN:  Yes, I think typicality and adequacy

23  are sort of linked together in this case where we have a

24  plaintiff that has sort of a different visa than the ones we

25  normally see.

```
 1            THE COURT:  Okay.  The intervenor's counsel want to

 2    address the class cert and the Court specifically asks for

 3    comments on numerosity, commonality, and typicality.

 4            MR. NELSON:  Thank you, Your Honor.

 5            Nicholas Nelson for the intervenor.

 6            We concur with the Department's position and have

 7    very little to add to that, other than to -- to note that we

 8    know that this issue is going to be taken up by the appellate

 9    courts soon and that the Supreme Court is scheduled to

10    consider this next week.

11            THE COURT:  And by this issue, you're referring to

12    which issue; the class cert issue or the constitutionality of

13    DOMA?

14            MR. FLENTJE:  The substantive issue.  The

15    constitutional issue.

16            So the Supreme Court is scheduled to consider

17    whether to take that up next week.  There are two Ninth

18    Circuit appeals that are waiting.  They're currently stayed,

19    but they're waiting to spring back to life whenever the

20    Supreme Court proceedings are done.  All of those present

21    this -- this issue.  There is not much -- and, obviously,

22    those decisions will -- will affect a large -- a large group

23    of -- of individuals.  There is no reason to think that

24    the -- the executive branch is not going to be sensitive to

25    the pendency of these appellate proceedings, and so it seems
```

```
1    that there is a prudential consideration in not -- not

2    certifying a class prematurely that would interfere with

3    that.

4              THE COURT:  Thank you.

5              Plaintiffs...

6              MR. SCHEY:  Thank you, Your Honor.

7              Peter Schey for the plaintiffs.

8              On -- on numerosity, as we've pointed out in -- in

9    the briefs, the cases in this -- in this circuit and other

10   circuits are clear that you do not need hundreds or thousands

11   of class members.  If you wanted to certify a class,

12   certainly not in order to provisionally certify a class,

13   which is all that we're seeking here -- can always be

14   modified, obviously, going down the road.

15             But those cases have made clear that a class can be

16   certified with the relatively low number and there are cases

17   where the number of perceived class members is 20, 25, 30, 30

18   people.  It sounds like --

19             THE COURT:  Do you have any idea of what the

20   numbers would be as far as the class?

21             MR. SCHEY:  We -- we believe and -- we believe that

22   they would -- that this case involves approximately 570

23   couples per year and -- and -- and we arrive at that -- of

24   course, we have declarations -- it's not just a couple of

25   declarations from local attorneys.  We have declarations from
```

```
 1    the two probably most prominent and involved national
 2    advocates on this issue who work directly with this
 3    population and they -- and they both conclude -- one was
 4    Kevin Cathcart, C-a-t-h-c-a-r-t, who is the executive
 5    director of Lambda Legal, the oldest and the largest gay
 6    rights organization, in -- in -- and he's based in -- their
 7    headquarters is in New York in New York City.  And another
 8    from a -- Todd Fernandez, who is the one of the leading
 9    national advocates for binationals, same-sex couples, and
10    works on this issue and then -- and then we had some local
11    attorneys who -- who indicate that if -- one of them,
12    Gloria Curiel, indicates that she's counselled over a hundred
13    people in this situation.
14            But the 570, it's -- it's not -- we don't mean to
15    suggest that it's scientifically perfect, but what we
16    basically did was we looked at the Census Bureau.  This is in
17    Plaintiff's reply on class certification in Footnote 8.  And
18    there, what we did is we looked at the Census Bureau, that's
19    the Federal Census Bureau and -- and the percentage of -- of
20    same-sex married couples that they -- that they conclude
21    exist compared to the total number of -- of -- of married
22    couples, and came out it was -- whatever it was, I think it
23    was 132,000 same-sex married couples, and we took that basic
24    percentage and we looked at the number of immigrants
25    typically -- married couples typically applying for immediate
```

1    relative status, which means they're married to a U.S.

2    citizen, we couldn't find that same number for people who

3    have been married to green card holders, which would probably

4    double these numbers -- would certainly not detract -- but

5    when you looked at the number of couples petitioning for --

6    for just whatever, U.S. citizen on a green card holder

7    spouse, that, I think, was 245,000.  And when -- when

8    we applied the -- the Census Bureau statistic of married

9    same-sex couples to the approximate number of couples

10   applying for U.S. citizen binational same sex -- opposite sex

11   couples applying each year, which is 245,000, it comes out to

12   roughly 570,000 a year.  So you kind of have to be a bit of a

13   mathematician to work all that out, but we did that for the

14   Court.

15        We think it's obviously hundreds.  There is just no

16   question that every year there are hundreds of people in this

17   situation.  And that's just with -- where the marriage

18   involves a U.S. citizen and if you took a marriage -- if you

19   include a marriage to the lawful permanent resident, also

20   called a green card holder, that number would, at minimum,

21   double to -- to roughly something over a thousand per year.

22        THE COURT:  What's Plaintiff's position on -- I

23   believe the argument Defendants make is by certifying the

24   class that this may in some way slow the process of getting

25   to the ultimate -- an answer to the ultimate question?

1           MR. SCHEY:  You mean that -- that potentially

2   somehow certifying a class would slow down the ultimate

3   question of the determination of the constitutionality of the

4   DOMA?

5           THE COURT:  Yes.

6           MR. SCHEY:  Okay.  I haven't heard that one before.

7   I'm not quite sure how that would possibly work.

8           THE COURT:  So is it Plaintiff's position that you

9   would expect that those issues that will ultimately be

10  presented to the Supreme Court on constitutionality will just

11  simply go forward, and if the class is certified here,

12  Plaintiff s would simply be working toward what needs to be

13  presented to the Court, RE: the class?

14          MR. SCHEY:  Absolutely.  We -- we -- if that

15  were --

16          THE COURT:  What about the immigration proceedings?

17  Would immigration proceedings be affected in some way since

18  ultimately the benefits or relief that this concerns would be

19  these immigration benefits?

20          MR. SCHEY:  Right.

21          Really, I think it's important for the Court to --

22  to understand that they're really sort of three compartments

23  of the immigration proceedings.  At least I would want the

24  Court to -- to understand.  Compartment number one, we could

25  describe as -- and this doesn't just happen willy-nilly.

 1   There's a -- there's a regulation.  And I'll figure it out in

 2   a second.  There's a regulation in 8 CFR 274 that

 3   specifically sets this out.  And what that says is, you know,

 4   if you come forward and you present us with -- with -- with

 5   an application to get a visa and an application for

 6   adjustment of status -- as two different pieces of paper --

 7   but if you come forward and present those, we will give you a

 8   temporary status which -- which might just be called

 9   authorized presence, and we'll give you a temporary work

10   permit.  And that's under -- under 274.  You're not going to

11   find that.  In a second, for the Court, before I sit down

12   I'll find that for the Court.

13          That happens pursuant to regulation.  It's not even

14   that clear to me that that's discretionary, the way the

15   regulation is written seems to be pretty straightforward.  If

16   you fall within this box, you're going to get temporary

17   authorized status and a temporary work permit.

18          Now, I'll get two boxes two three in a moment, but

19   just why are those important?  Why is it important to give

20   people a temporary -- temporary authorized status and a

21   temporary work permit?

22          And this goes to, I think, the irreparable harm.

23   But why is it important?

24          It's important, number one, to give somebody a

25   temporary authorized status because if you don't they

```
 1   continue to accumulate undocumented status or unauthorized

 2   status and -- and, particularly relevant is when they get to

 3   the point of 12 months of undocumented status, they suddenly

 4   face a 10-year bar and that's a big -- it's a big -- big

 5   problem.

 6          Number two, if they -- if they work illegally while

 7   they're basically in the system, that, number one, obviously,

 8   harms U.S. workers.  I mean, I think we'll all agree to that.

 9   There's a thousand studies on that.  That's why in 1986, in

10   the IRCA, the Immigration Reform and Control Act, Congress

11   enacted Section 274 to penalize employers who hire

12   undocumented workers.  It -- you know, just as sort of --

13   there is nobody that seems to disagree with this.

14          So, on the one hand, the -- the Government, long

15   before this administration, concluded, gees, the sooner we

16   can end some of these illegal employment, the better, or

17   prevent, the better.  It's not good.  It's not good for U.S.

18   citizen workers, especially unskilled U.S. workers.

19          And secondly, if you work illegally, I believe it's

20   for six months or more, you again face a bar to legalizing

21   your status.  So quite logically, the Government long ago,

22   created this -- this -- this regulation and -- and a practice

23   and a policy that you would -- you would get this sort of

24   temporary status like you're in a cocoon that would -- that

25   would protect you while the Government takes, on average,
```

```
 1    probably 12 months that it takes to adjudicate these
 2    applications, and I think it is roughly about 12 months to
 3    adjudicate these -- these things.
 4           Now, that's sort of box number one, and that's the
 5    only box that we focus on in terms of our request for
 6    preliminary injunction.  There's a box number two and we
 7    could call that the actual adjudication of the pending
 8    application and that's like are we going to prove it -- we're
 9    going to deny it.
10           THE COURT:  So this would be the cases that would
11    be before the immigration judge?
12           MR. SCHEY:  They're actually -- they might be
13    before the immigration judge, although, to be honest, like 95
14    percent are not.  95 percent of them are before the U.S.
15    Citizenship and Immigration Service.  That's the real entity.
16    There's a very, very small number in front of the immigration
17    judges, and I'll get to the immigration judges in a moment.
18    I'll call it box number --
19           THE COURT:  So is that your third box?
20           MR. SCHEY:  The third box would be the immigration
21    judges.  But the vast majority -- I'm sure they won't
22    disagree with me that the vast majority of these are decided
23    by USCIS, Citizenship and Immigration Service.  That's their
24    job.  Their job is to decide applications for benefits.
25           And we don't ask -- I mean, the House Republicans
```

1   kind of go on and on in their opposition to our motion for --

2           THE COURT:  So I usually describe them as the

3   intervenors.

4           MR. SCHEY:  The intervenors.  The intervenors sort

5   of suggest that we're asking you to put the whole wall on

6   hold to -- somehow to force them to disregard DOMA.  We're

7   not asking for that.  We're -- we'd be silly to come into

8   this court and ask this Court to issue a preliminary

9   injunction forcing the defendants to approve these

10  applications; to approve the plaintiff's application with

11  this other proposed class member, Olga Martinez, who does

12  have a slightly different I-130.  We're not asking to approve

13  that.  That would be absurd.

14          What we're saying is that -- that's what the

15  Supreme Court will figure out.  When the Supreme Court

16  decides DOMA, we'll know should DOMA serve as a -- as a basis

17  to deny these applications or not.  And that's something

18  we've clearly not asked this Court to do.

19          In fact, under the preliminary --

20          THE COURT:  I'm going to stop Counsel for a moment.

21          MR. SCHEY:  Sure.

22          THE COURT:  Are you satisfied that you have

23  addressed the issue of numerosity, commonality and typicality

24  as far as the class cert is concerned?

25          MR. SCHEY:  I think the only -- I want to make a

```
 1    couple more points about that.  But the only other point I
 2    would make on numerosity, as the Court knows, we did move to
 3    get that information from the defendants because we know they
 4    know how many there are.  And so we initiated discovery, but
 5    that's being put off, and then some of it went to magistrate.
 6    He wisely put that off until after this hearing.  But -- so
 7    it's not -- number one, I think we've established numerosity,
 8    but if they were that concerned about it, then, gee whiz,
 9    they would have just come forward and tell us what the number
10    is.  My guess is it's certainly -- it's certainly in the
11    hundreds.
12             With regards to the -- the -- the commonality, the
13    only issue that they raise of any -- of any substance is --
14    is this idea that well, gee whiz, Jane DeLeon applied for a
15    visa, but somehow these guys are seeking a preliminary
16    injunction for -- for not only people in like Jane DeLeon who
17    applied for a waiver, but also for people who applied who
18    filed this other form called an I-130 seeking a visa -- a
19    visa petition.
20             To me, that is completely a distinction with --
21    with no difference.  In fact, we filed -- and I apologize, I
22    don't have the -- I believe it's Exhibit 20, and I don't have
23    the -- the docket number.  But we filed exhibits at the same
24    time as we filed our reply brief, and then a day later or
25    maybe a day-and-a-half later we filed about two more
```

1    exhibits.  And that's roughly November the 7th.  And we filed

2    the declaration of -- of Jane DeLeon and we filed her denial,

3    and how she's applying under the Immigration of Nationality

4    Act.  She's applying for a waiver based on her marriage,

5    same-sex marriage, and then -- but we also then filed the

6    declaration of a proposed -- of somebody who would be a class

7    member, and that was Olga Martinez, and we filed her denial

8    with the Court.

9         The thing that's interesting is these two files are

10   basically identical.  They both have the same sentence and

11   the only difference was that in one the sentence -- the

12   keyword was underlined and in the other the key -- the

13   keyword was not underlined.  In the case of the plaintiff,

14   the key sentence is so sorry we cannot give you this benefit

15   because you're married to another female.  And then in Olga,

16   who applied for an I-130, which is a visa petition based on

17   her marriage to a same-sex person, there's the same sentence

18   and the only difference is they underline the word "female."

19        Now that, to me, is quite a big difference they're

20   both denied solely and exclusively -- they're both seeking

21   benefits under the Immigration Nationality Act.  They're both

22   involved in the same-sex marriage.  They both applied solely

23   because they're married to another female.  And, in one case,

24   that word was underlined.  In Olga's case, it was underlined.

25   And in Plaintiff DeLeon's case, that word "female" was not

1    underlined.  But other than that, it's -- it's an identical.

2    It's identical.

3           So for them to say, that somehow plaintiff, Jane

4    DeLeon, cannot represent people in Olga's position, to me, is

5    just completely form of a substantive -- why are they --

6    what's the difference?  They're both seeking a family --

7    they're both seeking a benefit of under the Immigration Act

8    that is based on their -- on their marriage.  They're both

9    denied because it's a same-sex marriage.  Both denials, the

10   essence of the denials is in one sentence and those sentences

11   say exactly the same thing.  So, to me, there is no

12   difference.  And they could say, well, in her case -- they

13   were --

14           THE COURT:  Let me stop Counsel for a moment.  How

15   about typicality, did you want to address that?

16           MR. SCHEY:  I think that that is largely kind of

17   the -- the -- the same thing to Rule 23(a)(3) requires that

18   the named plaintiffs, that their claims be typical of the

19   clause.  And in all cases, including we cited several in

20   our -- in both our motion and in our reply brief, including

21   the published decision of *Orvantez Hernandez vs. INS*, which

22   is here, Judge King decided that case, as I recall.  What --

23   what all of these cases seem to -- to say is that meeting the

24   requirement of typicality usually follows from the presence

25   of a common question of law or fact.  And here, the obvious

1    common question of law is -- is -- is DOMA -- is DOMA

2    constitutional or is it unconstitutional.

3         With it -- there is absolutely no difference and

4    certainly in the equal protection analysis.  There isn't the

5    slightest difference in the brief on behalf of Olga or brief

6    on behalf of the plaintiff, DeLeon.  If you're going to argue

7    DOMA is unconstitutional, there would be no reason to have

8    any -- or they could use the identical brief from above.  So

9    I think that typicality really follows from the fact that

10   there was a common --

11        THE COURT:  Some commonality?

12        MR. HOLGUIN:  Common question.

13        And, I guess, the other one point I would make,

14   which maybe also goes to this just a wee bit, and that is

15   that under 23(a)(4), you have to have adequacy of

16   representation, which has two parts.  One which, perhaps, I

17   think also dovetails into typicality and commonality, and

18   that is that the named plaintiff cannot have any interests

19   that are in conflict with the proposed class.  There has to

20   be a coextensive interest between the named plaintiff, and as

21   part of the, quote, "adequacy of representation," under Rule

22   23(a)(4).  The other part is the attorneys know what they're

23   doing.

24        Well -- well, on that part, the attorneys know what

25   they're doing.  A very high number of the cases that we cite

```
1    in our brief, Catholic Social Services, Immigration Systems
2    Project, National Center for Immigrants Rights, three
3    quarters of the briefs that we cite showing that Courts have
4    in the past issued nationwide injunctions in immigration-type
5    cases are our cases.  So it would be hard to find more
6    experienced counsel.  I'm not saying we're good or bad, but
7    with more experience, it would be hard to find.
8              But, number two, more importantly, with regards to
9    this idea of the coextensive nature of the interests, all you
10   have to do, Your Honor, is look at the complaint.  We do not
11   seek -- and there'd be no jurors -- we do not seek an iota of
12   difference in the treatment of -- of the plaintiffs as the
13   class.  There is nothing that we seek for -- for Jane DeLeon,
14   no little favor, no little special treatment that we don't
15   seek for the class.  The interests are coextensive.  It's
16   been that way from the -- from day one.
17             THE COURT:  So I think that argument supports your
18   position that there is no conflict of interest?
19             MR. SCHEY:  Zero conflict of interest.  And if we
20   wanted to go down that road or she wanted to, the opportunity
21   was there.  And -- and she's not going to and we have not
22   wanted to.  This is --
23             THE COURT:  I'm ready to move to the injunction.
24             MR. SCHEY:  Okay.
25             THE COURT:  So since you are there, I'm going to
```

```
1    just raise the questions --

2          MR. SCHEY:  Sure.

3          THE COURT:  -- of you.

4          It's unclear to the Court as to what the plaintiffs

5    seek as far as the scope of the injunction.  So just to point

6    out things that I think have caused the -- making this

7    unclear in the Court's mind... for example, in the proposed

8    order, the injunction is defined as -- and so there are five

9    different things -- removing or detaining Plaintiff DeLeon

10   and other unnamed members of the class, denying employment

11   authorization to the plaintiffs, issuing final administrative

12   denials of applications or petitions filed under the INA,

13   deeming the plaintiffs and unnamed members of the plaintiff's

14   class inadmissible pursuant to 8 United States Code, Section

15   1182(A), 9(B)(1), and in failing to timely provide those in

16   same-sex marriage filing applications or petitions under the

17   INA based upon the same sex of the couple.  But in the notice

18   of the injunction, the request is just slightly different.

19   So I'm not clear as to the scope of the injunction.  So if

20   Counsel could address that...

21         MR. SCHEY:  Yes.  Certainly.

22         I think that -- and obviously as we move forward,

23   we observed the positions of the defendants.  We take

24   their -- their concerns into -- into account.  I think that

25   by far and away, the most significant thing for purposes of
```

1    a -- a -- a preliminary injunction, would simply be -- and

2    I -- I don't have it in front of me -- and I honestly don't

3    recall precisely what we are -- the proposed preliminary

4    injunction --

5            THE COURT:  And that's why I just raise it.  Maybe

6    Counsel could indicate what is the scope of the proposal?

7            MR. SCHEY:  Going off the top of my head, I think

8    that the key things in a preliminary injunction would be

9    number one, to not remove class members from the United

10   States and -- and if the only reason they're not -- that

11   they're not deemed eligible is because of DOMA, but other

12   than that, you look at -- CIS looks at their thing and goes,

13   gees, you would be great, we welcome you into this country.

14   But, for DOMA, I would think, number one, not removing or

15   detaining -- now, again, I want to make clear that I don't

16   mind -- we can submit it if we need to submit a slightly

17   revised proposal, I'm happy to do that -- we've been around

18   the block on this in these other cases.

19           If somebody looks like a criminal, no problem,

20   detain them, deport them.  That's not what we're talking

21   about.  So, I mean, if there's some other ground to think,

22   you know, like with Jane DeLeon, nobody said you're a

23   criminal, nobody said you're a bad person.  They invited her

24   to -- to submit a waiver.  They literally gave her the form

25   and invited her, and that's in the record.  I'm not just

1   making this up.  They invited her to submit the waiver.  But

2   then they went, whoa, married to a female, big problem.  So

3   what I'm saying --

4              THE COURT:  So, in other words, what you would seek

5   in the preliminary injunction is removing or detaining just

6   on the basis of the same-sex marriage?

7              MR. SCHEY:  Exactly.

8              If you got some independent reason to detain the

9   person or remove them, you know, be my guest.  We're not here

10  trying to help some criminals who ought to be deported or

11  somebody who has come here a hundred times illegally and

12  should be deported.  So that's not -- not our purpose.  So

13  that's one thing.

14             THE COURT:  And would your position be the same,

15  the second one that I mentioned was the denying employment

16  authorization?

17             MR. SCHEY:  Yes.  Absolutely.  Same thing.

18             In other words, you basically look at the

19  application and you say to yourself, gees -- and, by the way,

20  they do this everyday of the week under that regulation.  But

21  they do that everyday of the week.  They -- they -- they --

22  the -- here it is.  It's 2784A -- with no parenthesis

23  around it -- point 12, and then parenthesis, small C and

24  parentheses 9.

25             So, yeah, they do this everyday of the week.  They

```
 1    give temporary employment authorization to -- to -- to people
 2    who they think are eligible for legalization based on a
 3    family or on an employment based -- an employment based --
 4              THE COURT:  So I'm going to just remind Counsel
 5    when you walk away from the mic, of course, we can't hear
 6    you.
 7              MR. SCHEY:  I just want to look at what was
 8    submitted to you.
 9              THE COURT:  Maybe the --
10              MR. SCHEY:  So the word --
11              THE COURT:  Maybe the way to approach, if the Court
12    reaches the point of issuing an injunction is to permit
13    Counsel, then, to lodge with the Court the preliminary
14    injunction that you actually seek the Court to issue, giving
15    the defendants an opportunity to comment on the scope of that
16    injunction --
17              MR. SCHEY:  I think that makes sense.  But just
18    looking at it here, I'm not that concerned with -- with
19    enjoining them, although I think it makes imminent sense for
20    them not to issue further denials.  But, to be honest, you
21    know, it's not going to kill us if -- if -- if the -- if a
22    preliminary injunction allowed them to still issue denials,
23    as long as they're not going to pick people up and detain
24    them and deport them and deny them work permits, then it's
25    kind of who cares.  If they really want to that -- it seems
```

1    really kind of silly for them to do, but I don't think it's

2    absolutely critical that -- that -- that a preliminary

3    injunction enjoin them from actually issuing denials if they

4    thought they still want do that --

5              THE COURT:  What about one of the others was

6    described as deeming the plaintiffs inadmissible pursuant to

7    the sections, would -- would your position be the same as you

8    just stated RE: denials?

9              MR. SCHEY:  I think so.

10             THE COURT:  Okay.

11             MR. SCHEY:  And, again, it would -- I think that is

12   something that could be flushed out down the road once we see

13   how the Supreme Court deals with this.  And so I'm not saying

14   that I think those are bad ideas, but I'm going to try to

15   limit what we can do.

16             I'll tell you one thing that does really bother me

17   that I don't think is put in here and that is when DeLeon and

18   this other person, Olga Martinez, when they -- and these

19   declarations that we gave you indicate that this happens all

20   the time -- these declarations -- national declarations we

21   gave you, and that is when they do issue the denial, they

22   basically tell people to leave the country.  That bothers me

23   because as the national declarations state, some people take

24   that to --

25             THE COURT:  So do you mean an order that they must

```
 1    leave the country, or do you mean just it's suggesting that
 2    they should leave the country?
 3         MR. SCHEY:  It's not really an order, but what they
 4    do is they put in the letter -- they say, starting today --
 5    and, by the way, this also does go to all the status quo
 6    business, because the status quo for most of these people is
 7    they did have some status and they yanked it.  Olga Martinez
 8    had a work permit she had authorized; they yanked it.  The
 9    plaintiff, DeLeon, had authorized status and she had a work
10    permit, and they yanked it.
11         But, anyway, going to -- to this final point, when
12    they send those letters, they say your work permit is ended
13    as of now.  So -- so I wouldn't -- clearly, if the
14    preliminary injunction is going to give people work permits
15    they wouldn't -- they shouldn't put that language in.  In
16    fact, they should tell people if you don't -- if you don't
17    have a work permit, you know, we can work this out with you
18    in the meantime.  But, number two, they tell them their
19    authorized presence is ending as of this moment, and then
20    they tell them if you don't leave the country within six
21    months, you're going to face a three-year bar, and if you
22    don't leave within 12 months you're going to face a ten-year
23    bar.  And according to our experience and the declarations
24    that -- that we submitted to the Court, there are some people
25    who take that to heart logically.  You have 500, 600, 700
```

1    class members around the country.

2            THE COURT:  And so what do those individuals do?

3    Is it your concern that they leave?

4            MR. SCHEY:  Yeah.  Some of those people are just

5    going to get that letter and go, oh, my God, I've got to --

6    I've got to pack up.  I've got to sell my stuff.  I've got

7    six months.  I've got to get out of here, and -- and they do.

8    And so --

9            THE COURT:  Let me -- I do want to give the

10   defendants an opportunity to just --

11           MR. SCHEY:  Sure.

12           THE COURT:  -- comment on the scope of the

13   injunction and ask if there is anything further that they

14   wish to place on the record about the class cert.

15           MR. SCHEY:  Thank you, Your Honor.

16           THE COURT:  So, Defense?

17           And, as I indicated to the scope, if I reach that

18   point, what I am likely going to do is to ask Plaintiff's

19   counsel to actually submit a proposed injunction to the

20   Court; but providing it to the defendant so you'd be able to

21   comment on the scope.

22           MR. FLENTJE:  Your Honor, this is August Flentje

23   with the Justice Department.

24           We absolutely think that is a wise course.  The

25   injunction, as written, is sort of much broader than the

 1    relief they described up here that they are looking for.  So

 2    I think it makes a lot of sense to -- to quickly give us a --

 3    a short chance to look at what they've proposed if the Court

 4    determines it needs to enter an injunction.

 5         I just would like to cite a couple of -- when we

 6    look at the scope of the injunction, the first provision on

 7    removing plaintiffs or unnamed members of the plaintiff's

 8    class, that, as written, it -- would -- would prevent any

 9    removal proceedings from being commenced against a class

10    member who might have after the DOMA denial have gone on to

11    commit serious crimes.  So the -- the -- the immigration laws

12    are complex.  And if the injunction extends beyond

13    Ms. DeLeon's personal circumstances, we start to get into

14    unpredictable issues, and I think that's a concern.

15         We think that if the Court -- we don't think an

16    injunction is necessary in this case and we go through that

17    in our brief in some detail.  If the Court is to issue an

18    injunction, we think the third element that they have in

19    there is -- is exactly what Ms. DeLeon seeks and would solve

20    all of the other problems.

21         Thus, if there were an injunction against issuing

22    final -- denying -- excuse me -- an I-601 application solely

23    because the immigrant or nonimmigrant has a spouse of the

24    same sex, that would solve Ms. DeLeon's problem.  The -- the

25    unlawful presence and the work authorization come with

1    that -- that she loses those because of the denial.  So if

2    there's no -- if there is an injunction against denying, that

3    solves both of those problems.  And, of course, I think the

4    removal proceedings is a much more complicated issue with

5    several jurisdictional bars, and we don't think

6    there's any -- there's any serious risk that Ms. DeLeon will

7    face removal proceedings in the short period before the

8    Supreme Court is going to decide this case definitively.  So

9    we don't think the Court should -- should -- can intrude on

10   that process and -- and, as I've mentioned before, there's --

11   there's people in different situations who might want to make

12   claims in removal proceedings and this injunction would halt

13   that and it would -- it would have unpredictable results.  So

14   that's what I would say on -- on the scope of the injunction.

15          If possible, I'd like to know one more thing on the

16   scope of the class.  I didn't mention before, but nationwide

17   classes are disfavored and I think, you know, we have a -- a

18   litigant in another case who has brought a similar case in

19   another court in New York that has, you know, sort of asked

20   to be noticed about the class certification process.  So I

21   want the Court to be aware of that.

22          And, of course, people who are in the First and

23   Second Circuits, they have -- now have sort of have precedent

24   striking down DOMA in those courts.  So it might make sense

25   not to -- to -- to reach that far, given those rulings in the

```
 1   other courts.  And I think one of the reasons not to have a
 2   nationwide class is not to -- when there is other litigation
 3   going on that might be implicated.
 4        And I think that's -- that's all I have on the
 5   injunction.  And unless the Court wants me to talk about the
 6   harm argument -- because we don't think they've shown harm in
 7   this case sufficient to issue an injunction at all.
 8        THE COURT:  I think those are the arguments that
 9   have been made in your papers.  So I don't have additional
10   questions on that at this point.
11        But intervenor's counsel wish to comment any
12   further on the scope of the injunction?
13        As I said, I will probably, if I reach that point,
14   would ask Plaintiff's counsel to file with the Court a
15   proposed injunction that has been presented to the defendant
16   so you would have an opportunity to comment.
17        MR. NELSON:  Thank you, Your Honor.
18        Nicholas Nelson for the intervenor, and we'd
19   appreciate that opportunity to comment as well.
20        I think not to rehash the briefs, but I'd like to
21   just briefly comment on what sounds like the plaintiff's
22   revised injunction request as they've started to articulate
23   it here today.  It sounds like what they really want is just
24   an end to -- to actual deportations and may -- may not be --
25   may not be going to the hilt with all of the other relief
```

 1    that they're request -- that they're requesting.  I think

 2    although the Department of Justice would have the last word

 3    on this, I don't know that there's any evidence that we are

 4    aware of that any of the deportations that they're concerned

 5    about are actually occurring.

 6           And -- and we certainly know, as the Department has

 7    stated in their briefs, that -- that DHS is not interested in

 8    engaging in this kind of enforcement action.  So -- so I

 9    think there are serious questions as to whether there is any

10    harm at all that's been shown with respect to the potential

11    revised -- revised injunction.

12           Of course, our primary position on -- on the

13    preliminary injunction is simply that there has been no

14    showing of likelihood of success on the merits or even --

15    even a serious question under existing precedent.  We don't

16    think that there's much precedent or much prudential support

17    for the idea of issuing an injunction in order to wait for it

18    to see if the appellate courts will overturn their binding

19    precedents that establish the plaintiffs don't have a claim

20    here.  But, in our view, that's essentially what the

21    plaintiffs would be -- would be asking for.

22           Finally -- well, two more points, actually.  I

23    mean, with respect to the broader relief that they're

24    seeking, we would say that it is -- they are seeking

25    affirmative relief.  Ms. DeLeon does not have lawful status

 1    now.  She does not have work authorization now.  Her -- her

 2    I-601 application has already been denied.  So they're asking

 3    for a lot of this to be -- to be affirmative relief that she

 4    would be receiving, which would duplicate the final relief

 5    she would receive in the case.

 6           Just to clarify a point, I think we've heard it

 7    said a couple of types, that DOMA somehow is being enforced

 8    and there are deportations that are occurring as a result of

 9    that.  We would dispute the accuracy of that.  DOMA does not

10    create any grounds for removal from the country.  It does not

11    create any grounds for inadmissibility of the country.  No

12    one becomes removable because they enter into a same-sex

13    relationship or obtain a marriage license with a person of

14    the same sex from a state authority.

15           DOMA simply says that you don't -- you don't get

16    admissibility on that basis.  So there's -- there is no

17    reason to think that because DOMA is somehow being enforced,

18    that people who were not removable before would somehow be --

19    being removed now.  That just underlines the fact the relief

20    they're seeking in the preliminary injunction is affirmative

21    relief, not maintaining the status quo.

22           THE COURT:  Well, I was just going to raise this

23    question, and I don't know to what extent Defendants would

24    have any control over it, but it seems to me one way to

25    resolve this issue of people being removed simply because of

```
 1   the same-sex marriage situation would be if there would be

 2   is -- if there is a way to agree that Immigration would not

 3   take these adverse steps, whether it's removal or denying

 4   benefits that would otherwise be provided such as work

 5   permits and things of that type, pending a decision by the

 6   United States Supreme Court on constitutionality of DOMA.

 7               So it seems like an obvious kind of idea, but it

 8   could be that Defendants just don't think that you have

 9   any -- there's no way that you could bind Immigration by

10   agreeing to such a position.

11               MR. NELSON:  Well, certainly, my client could not

12   do that, Your Honor.  We would have to defer to the executive

13   branch on that.  I mean, we would say that -- that we would

14   like to seat the status quo maintained while -- while the

15   appellate courts consider this.

16               THE COURT:  All right.  So what's the Department of

17   Justice's position on that?

18               MR. FLENTJE:  August Flentje with the Department of

19   Justice.

20               We submitted to the Court sort of an explanation of

21   the prosecutorial discretion policies of the Immigration and

22   Customs Enforcement, and that very clearly says that in

23   looking at whether someone is an Immigration priority,

24   consider their family relationships, including long-term

25   same-sex relationships.  So there is no doubt that someone in
```

1    that type of a relationship would be -- not be an Immigration

2    priority.  However, if someone in the same-sex relationship

3    does something else that makes them an Immigration priority,

4    a crime of certain crimes, that would -- that is where the --

5    the Government would not feel comfortable sort of saying that

6    there's no chance of enforcement against someone who happens

7    to be in the same-sex marriage.

8              THE COURT:  And what is the submission that you

9    provided to the Court, or what's it attached to -- I just

10   would want to focus on it and take another look at it?

11             MR. FLENTJE:  It --

12             THE COURT:  Because it seems to me if there is

13   something in place to help plaintiffs feel comfortable, and

14   I'm thinking of plaintiffs just generally as we look at the

15   class, that they were not going to have adverse action taken

16   against them solely because of the same-sex marriage while

17   this issue is pending before the U.S. Supreme Court, that

18   that might go a long way toward the injunctive relief that's

19   being sought.

20             MR. FLENTJE:  Sure.

21             That's Docket No. 82, which is a Notice of

22   Supplemental Authority we submitted.

23             THE COURT:  Okay.

24             MR. FLENTJE:  I think that -- that authority helps

25   show that there really is not a realistic likelihood of

```
1    deportation -- or removals occurring on that basis.  And I
2    think given the short time frame and -- and the fact that
3    there would need to be removal proceedings where all of these
4    same issues could be raised, including some of them in a
5    petition for review, that -- that prospect is next to
6    nothing.
7              Thank you.
8              THE COURT:  Okay.  Thank you.
9              So just on that comment alone, I would just ask
10   Plaintiff's counsel why would you not feel comfortable with
11   that that has been submitted to the Court as a supplemental
12   authority as opposed to asking for injunctive relief?
13             MR. SCHEY:  First and foremost, Your Honor, as --
14   as the -- the -- the -- as the memo itself, when you read it,
15   it's called the "Morton Memo," it's a very famous memo,
16   everybody doing immigration work is aware of it.  When you
17   read the memo itself, it becomes absolutely clear.  And when
18   you read our -- the declarations that we submitted from
19   Lambda Legal and from Todd Fernandez and any others, they
20   also make very clear that what the Morton memo does is -- is
21   it says that if somebody comes forward to the enforcement
22   branch of Department of Homeland Security, to the ICE, not to
23   CIS where there -- where there are petitions to legalize are
24   pending -- if somebody has to come forward, they have to
25   surrender to ICE; they would have the opportunity to then
```

1    present ICE with an ICE officer, with a -- with a packet or

2    with a plea for the exercise of prosecutorial discretion not

3    to remove them from the country.

4           And what the Morton memo makes clear -- and the

5    Morton memo came out in April, so it's been around for a long

6    time, just after we filed this lawsuit -- they quickly got

7    out of a supplement to say, and, by the way, it covers people

8    with -- that are in same-sex marriage, which we appreciate.

9    It's a small step in the right direction, but what -- what

10   the Morton memo makes very clear is it doesn't give anybody

11   authorized status as every other heterosexual married gets

12   once they file that -- that petition or that application, as

13   I said, under that regulation that I cited to you earlier,

14   the 274, and bam, the heterosexual couple gets protected

15   status and work permits so they don't have to work illegally

16   or they don't have to starve to death, and -- and their time

17   is not accumulating towards the future ten-year bar -- Morton

18   memo doesn't give those two things.  And every --

19          THE COURT:  Well, let me just ask so -- I was just

20   going to raise that question:  Would that memo protect

21   against the scope of the injunction that I think that you are

22   requesting that is removing or detaining or denying

23   employment authorization?

24          MR. SCHEY:  No.  It doesn't cover the employment at

25   all.  It doesn't cover authorized status at all, not in the

1    least, and on the deportation, it -- it -- if -- if -- if

2    you're not afraid and if you can afford to pay an attorney

3    10, $12,000 put together a great packet and go down there and

4    seek this discretionary prosecutorial discretion, you may or

5    may not get it.  We have no guarantee you will get it.  We

6    have no guarantee you won't.  They put out -- ever since the

7    Morton memo was issued, which, as I said, was at least many,

8    many, many months ago, there is no information on the exact

9    standards; there is no information on the number approved;

10   there is no information on the number denied.  And there's --

11   if you just Google Morton memo, there's huge concerns in the

12   immigrant community because immigrants -- as our declaration

13   states, immigrants are afraid to come forward and -- and

14   subjecting themselves to ICE on the wish and the hope that

15   ICE may exercise its prosecutorial discretion not to deport

16   them.

17           And, number two, as the declarations state, it --

18   you have to put together a substantial sort of dog and pony

19   show to convince them, and that's expensive.  That can -- you

20   know, take a lawyer 40 hours to do.

21           So, what we're asking for is a little bit

22   different.  What we're saying is, you know, if this was a

23   heterosexual couple, they wouldn't have to go through this

24   dog and pony show with ICE.  They wouldn't have to go down

25   there and sort of -- it's like you may or may not have

```
 1    committed a crime, but to get the benefit of this, you need

 2    to go down to LAPD and subject yourself to a debriefing.

 3              THE COURT:  So I think that -- I think what you're

 4    suggesting is that what you are seeking is whatever would be

 5    done in the case of a heterosexual couple, simply extend to

 6    the same-sex couple?

 7              MR. SCHEY:  Other than approval of the application;

 8    just that first box that everybody is talking about.

 9              THE COURT:  Right.

10              MR. SCHEY:  The second box I talked about with the

11    actual approval, forget that.  That's coming later.  The

12    third box, I didn't quite get to talk about, were the

13    immigration judges.  The immigration judges --

14              THE COURT:  Well, I suppose if you're not getting

15    to the second box, then you're clearly not getting to the

16    third yet.

17              MR. SCHEY:  Exactly.  But I just want to be clear,

18    immigration judges do not have the authority to declare an

19    act of Congress unconstitutional.  So you can go there and

20    spin your wheels as long as you want and -- and even -- you

21    know -- I'm going to sit down -- but even this Morton memo

22    thing, they keep talking about it in all the footnotes.

23    They talk about another case that what's his name -- what's

24    the name of the judge who dismissed the *Lui* case?

25              THE COURT:  Well, probably not necessary for what
```

1    you're asking me to do at this point?

2             MR. SCHEY:  Yeah.  Just that, you know, in that

3    case, this poor guy, he's been litigating the Ninth Circuit

4    for three years.

5             THE COURT:  So I'm going to stop Counsel at this

6    point.

7             MR. SCHEY:  Okay.

8             THE COURT:  We do have another calendar.

9             MR. SCHEY:  All right.  Thank you.

10            THE COURT:  So I'm going to deem the matter

11   submitted and issue a written order addressing the issues

12   that have been raised in the briefs that have been filed with

13   the Court.

14            Thank you.

15            MR. SCHEY:  Thank you so much.

16            MR. BELSAN:  Your Honor?

17            THE COURT:  Yes?

18            MR. BELSAN:  Defendants also have a motion to stay

19   discovery proceedings pending that will be heard or scheduled

20   to be heard next Monday, and we are prepared to offer

21   argument on that as well in case that would ease the Court's

22   calendar.

23            THE COURT:  Is that pending before the magistrate

24   judge?  It's pending here, but was it noticed for next

25   Monday?

1          MR. BELSAN:  It was, Your Honor.

2          THE COURT:  Oh, okay.  I'm really not prepared to

3     entertain it at this point, but what I can do to assist the

4     parties, why don't I review the papers and then advise you as

5     to whether there's a need for you to appear.

6          Would that be helpful?

7          MR. BELSAN:  Defendants have no objection to that.

8          THE COURT:  Okay.  And plaintiffs would agree.

9          MR. SCHEY:  Likewise with plaintiffs, we would

10    agree.  It seems to makes sense to put that off until you

11    figure out how you want to handle the preliminary injunction

12    business.

13         THE COURT:  All right.  Thanks for bringing that to

14    my attention that it is scheduled, and why don't I just say

15    now that Counsel can plan not to appear on the date that's

16    presently noticed.  But when I issue this order, then I will

17    address it as well.

18         Does that help?

19         MR. BELSAN:  Yes.  Certainly.

20         THE COURT:  All right.  Thank you.

21         MR. SCHEY:  Thank you, Your Honor.

22              (Whereupon proceeding adjourned.)

23                        - - -

24

25

1                        **C E R T I F I C A T E**

2

3

4

5    MARTIN R. ARANAS                      :

6              vs.                          :   No. CV 12-01137-CBM

7    JANET NAPOLITANO                       :

8

9

10   I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22   /S/_____          01/14/2013

23   MARIA R. BUSTILLOS                   DATE
     OFFICIAL REPORTER
24

25

Exhibit 24

1   JAMES R. McGUIRE (CA SBN 189275)
    JMcGuire@mofo.com
2   GREGORY P. DRESSER (CA SBN 136532)
    GDresser@mofo.com
3   RITA F. LIN (CA SBN 236220)
    RLin@mofo.com
4   AARON D. JONES (CA SBN 248246)
    AJones@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone: 415.268.7000
7   Facsimile: 415.268.7522

8   JON W. DAVIDSON (CA SBN 89301)
    JDavidson@lambdalegal.org
9   TARA L. BORELLI (CA SBN 216961)
    TBorelli@lambdalegal.org
10  LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
    3325 Wilshire Boulevard, Suite 1300
11  Los Angeles, California  90010-1729
    Telephone: 213.382.7600
12  Facsimile: 213.351.6050

13  Attorneys for Plaintiff
    KAREN GOLINSKI
14

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17

18  KAREN GOLINSKI,                       Case No.   3:10-cv-0257-JSW

19               Plaintiff,               **SECOND AMENDED
                                          COMPLAINT**
20         v.

21  UNITED STATES OFFICE OF PERSONNEL
    MANAGEMENT, and JOHN BERRY, Director
22  of the United States Office of Personnel
    Management, in his official capacity,
23
                 Defendants.
24

25

26

27

28

**INTRODUCTION**

1.      In this action, plaintiff Karen Golinski challenges federal discrimination against her as a lesbian married to someone of the same sex, and the harm that such discrimination has caused her and her family.

2.      Plaintiff is a citizen of the State of California and of the United States of America. She is legally married to a person of the same sex in accordance with California law.

3.      The federal government does not license marriages, but many of its programs take marital status into account to determine eligibility for federal benefits, protections and responsibilities.  Statutes, precedent, and principles of federalism establish that state law is the touchstone for determining a couple's marital status when establishing eligibility for federal programs.

4.      Plaintiff is an employee of the federal judiciary.  She receives health insurance through her employer and has elected a family health insurance plan to provide coverage to herself and to her son.  She requested that her employer enroll her spouse, Amy Cunninghis, in her family plan, a benefit available to married employees of the federal judiciary.  Defendants, on behalf of the federal government, however, refused and blocked the enrollment, based on plaintiff's sexual orientation, and based on her sex in relation to the sex of her spouse.

5.      As the basis for their denial of the benefits and protections of federal law, defendants invoked Section 3 of the so-called "Defense of Marriage Act," P.L. 104-199, codified in part as 1 U.S.C. § 7 ("DOMA"), and stated that the federal government will only recognize marriages between a man and a woman.

6.      Defendants' application of DOMA has barred plaintiff and her spouse from receiving benefits that are routinely granted to other similarly situated married couples, based on plaintiff's sexual orientation and her sex in relation to the sex of her spouse.

7.      This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and for review of agency action pursuant to 5 U.S.C. §§ 701-706.  It seeks a determination that DOMA, 1 U.S.C. § 7, as applied to plaintiff, violates the United States Constitution by refusing to recognize lawful marriages for purposes of the laws

governing benefits for federal employees.  The result of these violations of the Constitution is that

plaintiff has been denied, and will continue to be denied, legal protections and benefits under

federal law that would be available to her if she were a heterosexual with a different-sex spouse.

## PARTIES

8.      Plaintiff Karen Golinski is a California citizen residing in San Francisco,

California.

9.      Defendant United States Office of Personnel Management is an independent

establishment in the executive branch of the United States government.  5 U.S.C. § 1101.

10.     Defendant John Berry is the Director of the United States Office of Personnel

Management.

## JURISDICTION, VENUE, AND SOVEREIGN IMMUNITY

11.     This action arises under the Constitution of the United States and the laws of the

United States.  This Court has jurisdiction over this action pursuant to 5 U.S.C. § 8912; 28 U.S.C.

§ 1331; and 28 U.S.C. § 1346(a)(2).

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

13.     The United States has waived sovereign immunity under 5 U.S.C. § 702.

14.     Defendant John Berry's actions in this matter were beyond the scope of his

statutory and his constitutional authority.  Accordingly, sovereign immunity does not apply to this

action.

## FACTS

15.     Karen Golinski and Amy Cunninghis have been partners for 21 years.  They met in

the fall of 1989 and have been in a committed relationship ever since.  They became registered

domestic partners with the City and County of San Francisco in 1995 and with the State of

California in 2003.  They have an eight-year-old son whom they have raised from birth together.

16.     On May 15, 2008, the California Supreme Court ruled that the State's laws that

limited the institution of marriage to different-sex couples, while prohibiting same-sex couples

from marrying, violated the California Constitution.  *In re Marriage Cases*, 43 Cal. 4th 757, 855-

56 (2008).  On or about June 17, 2008, San Francisco and other California counties began to issue

SECOND AMENDED COMPLAINT

CASE NO. 3:10-cv-0257-JSW

sf-2973146

2

marriage licenses to same-sex couples.  *See Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 928 (N.D. Cal. 2010).

17.     Ms. Golinski married Amy Cunninghis on August 21, 2008, at San Francisco City Hall, pursuant to a duly issued California marriage license.  Ms. Golinski and Ms. Cunninghis remain lawfully married under the laws of the State of California.

The Federal Employees Health Benefits Program

18.     Ms. Golinski has been employed by the United States Court of Appeals for the Ninth Circuit, now located at 95 Seventh Street in San Francisco, California 94103, for approximately 19 years.  She is currently employed in the Motions Unit of the Office of Staff Attorneys.  The United States Court of Appeals for the Ninth Circuit prohibits employment discrimination based on, among other things, sex or sexual orientation.

19.     As an employee of the federal judiciary, Ms. Golinski obtains health insurance under the Federal Employees Health Benefits Program ("FEHB").  *See generally* 5 U.S.C. § 8901 et seq.  Because she and her spouse have an eight-year-old son, Ms. Golinski has, since his birth, paid for "self and family" health insurance coverage under the Blue Cross and Blue Shield Service Benefit Plan ("Blue Cross/Blue Shield").

20.     The FEHB Handbook described Family Members Eligibility for Coverage as follows:

> Employing Office Responsibilities
>
> Your employing office is responsible for making decisions about whether a family member is eligible for coverage.
>
> *   *   *
>
> General Eligibility for Coverage
>
> Family members eligible for coverage under your Self and Family enrollment are your spouse (including a valid common law marriage) and children under age 22, including legally adopted children and recognized natural (born out of wedlock) children who meet certain dependency requirements.
>
> *   *   *

Eligible Family Members Automatically Covered

When you enroll for Self and Family, you automatically include all
eligible members of your family.  If you don't list an eligible family
member on your Health Benefits Election Form (SF 2809) or other
enrollment request, that person is still entitled to coverage.  If you
list a person who is not an eligible family member, your employing
office will explain why the person is not eligible for coverage and
will remove the name from the list.  The listing of an ineligible
person on the SF 2809 doesn't entitle him/her to benefits.

FEHB Handbook (Oct. 28, 2008).

21.     According to 5 U.S.C. § 8901(5), "member of family" is defined, in relevant part,

to "mean[] the spouse of an employee or annuitant [and] an unmarried dependent child under 22

years of age."

22.     On September 2, 2008, Ms. Golinski sought to enroll her spouse in the family

health plan for which she was paying by submitting the appropriate forms to her employer's

human resources department.  The human resources department forwarded the request to the

Administrative Office of the United States Courts ("AO").

23.     On September 11, 2008, the AO advised the Ninth Circuit's human resources

department that Ms. Cunninghis was ineligible for coverage because Ms. Golinski and her spouse

are both women.

24.     On October 21, 2008, the AO once again advised the Ninth Circuit's human

resources department that Ms. Golinski's election form would not be processed, and that Ms.

Cunninghis was ineligible for coverage, for the same reason.  On both occasions, the AO

indicated that it based its actions on the "Defense of Marriage Act."

25.     If Ms. Golinski were a man, or conversely if Ms. Cunninghis were a man,

Ms. Golinski would be able to add her spouse to her existing family plan at no additional cost to

her.  Similarly situated heterosexual employees in Ms. Golinski's position routinely receive this

significant benefit as a matter of course.  For example, one employee who had recently joined the

Motions Unit under the same title and who, like Ms. Golinski, has a spouse and a young child,

attested that,

as soon as I began to work for the United States Court of Appeals
for the Ninth Circuit, I applied to have both my spouse and my

daughter covered under a family coverage health plan obtained
through my employer.  I completed the "Health Benefits Election
Form," which stated that I wanted my wife and daughter to be
covered under the plan . . . .  Both my wife and daughter received
coverage shortly thereafter.

Ms. Golinski performs work equal to that of her co-workers, and in fact has more experience in

the position than most, yet she does not receive the benefits that her married heterosexual co-

workers receive for their respective spouses.

26.     The government's refusal to provide Ms. Golinski with benefits that similarly

situated different-sex married couples receive burdens and stigmatizes her relationship.

27.     Ms. Golinski has been forced to obtain separate, individual health insurance —

that is, coverage outside of a group health plan — for her spouse that is inferior to the coverage

she would receive under her plan.  In addition to payment of monthly premiums, Ms. Cunninghis

must also pay higher out-of-pocket costs for her health insurance than she would have to pay if

she were covered under plaintiff's employee group plan.  Ms. Cunninghis also receives less

comprehensive coverage with her individual plan.  Ms. Cunninghis has been unable to obtain

individual coverage of similar quality to that offered through Ms. Golinski's employee health

plan because no equivalent individual coverage is available for purchase on the market.  As a

result, Ms. Golinski and her spouse have suffered, and continue to suffer, financial hardship and

severe anxiety about the possibility that Ms. Cunninghis will be unable to obtain the care

necessary to address serious health issues should they develop.

### The "Defense of Marriage Act"

28.     Congress enacted the so-called "Defense of Marriage Act," P.L. 104-199, in 1996,

and it was approved on September 21, 1996.

29.     Section 3 of DOMA, 1 U.S.C. § 7, provides, in part, as follows:

Sec. 3  DEFINITION OF MARRIAGE.

(a)  IN GENERAL – Chapter 1 of title 1, United States Code is
amended by adding at the end the following:

§7.  Definition of 'marriage' and 'spouse'

"In determining the meaning of any Act of Congress, or of
any ruling, regulation, or interpretation of the various

administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."

30.     This law responded to "a very particular development in the State of Hawaii." H.R. Rep. No. 104-664, *reprinted in* 1996 U.S.C.C.A.N. 2905, at 2906.  As the controlling House Judiciary Committee Report explained, "the state courts in Hawaii appear on the verge of requiring that State to issue marriage licenses to same-sex couples," and that development "threatens to have very real consequences . . . on federal law . . . ." *Id.*  More specifically,

> [I]f Hawaii does ultimately permit homosexuals to 'marry,' that development could have profound practical implications for federal law.  For to the extent that federal law has simply accepted state law determinations of who is married, a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits.

*Id.* at 2914.

31.     In passing Section 3 of DOMA, Congress took the unprecedented step of preemptively nullifying a class of marriages that it expected states would begin to license at some point in the future, that is, marriages of same-sex couples.  It withdrew from these marriages, but not from others, all federal responsibilities, protections, and benefits, financial and otherwise.

32.     With regard to a lesbian or gay individual married to someone of the same sex, Section 3 of DOMA has overridden the long-standing deference of federal law to state law in determining the marital status of an individual seeking the benefits or responsibilities of any federal law triggered by a person's marital status, and it categorically denies both rights and responsibilities.

33.     If not for the application of DOMA, Ms. Golinski, as a person legally married under California law, would receive the same benefits, responsibilities, and protections under federal law as other married persons.  Yet DOMA operates to single out one class of marriages legally recognized by the State of California, those of same-sex couples, and to deny their existence for all ends and purposes under federal law.

34.     In a 1997 Report, the General Accounting Office ("GAO")[1] estimated that at least 1,049 federal laws were affected by DOMA, because those laws depended on or in some way related to marital status.  U.S. Gov. Accountability Office, GAO/OGC-97-16 Defense of Marriage Act (1997), *available at* .gao.gov/archive/1997/og97016.pdf.  A follow                    -up study in 2004 found that 1,138 federal laws tied benefits, protections, or responsibilities to marital status.  U.S. Gov. Accountability Office, GAO-04-353R Defense of Marriage Act (2004), *available at* gao.gov/new.items/d04353r.pdf.

35.     Ms. Golinski has been denied legal benefits and protections typically available to spouses under federal law.  Despite the willingness of Ms. Golinski and her spouse to assume the legally imposed responsibilities of marriage at the federal level, they are prevented from doing so by DOMA.

36.     DOMA grants preferred legal status and unique privileges to individuals married to someone of a different sex.

37.     The official House Report on DOMA, H.R. Rep. No. 104-664, advanced four rationales for why the federal government drew a line between its treatment of individuals married to a same-sex spouse and individuals married to a different-sex spouse:

> (1)     H.R. 3396 [the bill number] ADVANCES THE GOVERNMENT'S INTEREST IN DEFENDING AND NURTURING THE INSTITUTION OF TRADITIONAL HETEROSEXUAL MARRIAGE.
>
> (2)     H.R. 3396 ADVANCES THE GOVERNMENT'S INTEREST IN DEFENDING TRADITIONAL NOTIONS OF MORALITY.
>
> (3)     H.R. 3396 ADVANCES THE GOVERNMENT'S INTEREST IN PROTECTING STATE SOVEREIGNTY AND DEMOCRATIC SELF GOVERNANCE.
>
> (4)     H.R. 3396 ADVANCES THE GOVERNMENT'S INTEREST IN PRESERVING SCARCE GOVERNMENT RESOURCES.

---

[1] The General Accounting Office changed its name to the Government Accountability Office in 2004.  (*See* gao.gov/about/namechange.html)

38.     None of these interests is adequate to justify discrimination against married persons in same-sex relationships, and no other federal interest justifies such discrimination.

39.     The first claimed federal "interest" in "defending" "traditional heterosexual marriage" simply restates the government's intent to discriminate against same-sex couples and provides no independent justification for the government's discriminatory action.  The federal government has long accepted state determinations of marital status, even in the face of changes in marriage licensing by the states.  The only state-licensed marriages it categorically refuses to honor are those of same-sex couples.  The federal government's refusal to recognize plaintiff's marriage does not nurture, improve, stabilize, or enhance the marriages of other married couples. Nor would the federal government's recognition of plaintiff's marriage degrade, destabilize, or have any other deleterious effect on the marriages of other married couples.

40.     The second claimed federal interest in "morality" is another reframing of Congress's disapproval of lesbians and gay men.  Lesbians and gay men have suffered a long history of public and private discrimination.  Discrimination for its own sake is not a legitimate purpose upon which disadvantageous classifications may be imposed.  Moreover, sexual orientation bears no relation whatsoever to an individual's ability to participate in or contribute to society.

41.     The third claimed interest in "protecting state sovereignty" is actually subverted by DOMA, not advanced by it.  In enacting DOMA, Congress violated inherent constitutional principles of federalism and failed to honor our nation's system of dual sovereignty, because it is the states, and not the federal government, that regulate marriage and determine family status. Congress did not "protect" state sovereignty in enacting DOMA, since it dishonored the sovereignty of the states that license or recognize marriages of same-sex couples.

42.     As to the fourth claimed interest in preserving government resources, the available data from the Congressional Budget Office establishes that recognizing the marriages of individuals married to a person of the same sex would result in an annual net increase in federal revenue.  Congressional Budget Office, U.S. Congress, The Potential Budgetary Impact of Recognizing Same-Sex Marriages, June 21, 2004.  Furthermore, family health coverage for same-

sex couples would provide countervailing advantages and cost savings for the government by reducing strain on social services and by strengthening the competitiveness of public employers. There was and is no basis for the claim that DOMA "preserv[es] scarce government resources."

43.     While the public fisc is always a matter of concern, the government cannot achieve this interest by singling out a similarly situated vulnerable minority group, such as lesbians and gay men, for discrimination based on their sexual orientation and sex in relation to the sex of their spouse.  There was and is no valid justification to deny lesbian and gay individuals who have met their obligations as taxpaying citizens and who are married to someone of the same sex the protections available to persons who are married to someone of a different sex.

44.     DOMA does not maintain the status quo or promote consistency.  It substantially altered the status quo with respect to the federal government's treatment of marriage and provision of marriage-related benefits and created new inconsistencies in these arenas.

45.     Defendants' categorical denial of equal compensation to plaintiff based on her sexual orientation and sex in relation to the sex of her spouse subjects defendants' conduct to strict or at least heightened scrutiny.  Defendants' conduct cannot withstand such scrutiny because defendants' conduct does not serve any legitimate governmental interests, let alone any important or compelling governmental interests, nor does it serve any such interests in an adequately tailored manner.

46.     At root, DOMA is motivated by disapproval of lesbians and gay men and their relationships, which is an illegitimate federal interest.

Ninth Circuit EDR Review

47.     In December 1997, the United States Court of Appeals for the Ninth Circuit adopted an Employment Dispute Resolution Plan ("EDR Plan").  The EDR Plan was adopted at the direction, and with the approval, of the Judicial Conference of the United States.  The AO is subject to the "supervision and direction of the Judicial Conference of the United States." 28 U.S.C. § 604.  As revised through December 2000, that EDR Plan prohibits employment discrimination based on, among other things, sex or sexual orientation.

48.     Because the AO had informed Ms. Golinski that it would not enroll her spouse in her family plan, on October 2, 2008, Ms. Golinski timely and properly filed a complaint under the EDR Plan seeking redress of the discrimination she was suffering in the terms of her employment.  She alleged that:  (1) the denial of coverage violates the anti-discrimination provisions of the Ninth Circuit's EDR Plan; (2) the FEHB and DOMA do not compel such discriminatory treatment, and under those statutes, she is entitled to coverage for her spouse; and (3) such treatment violates her rights under the Fifth Amendment of the United States Constitution.

49.     As required by the EDR Plan, Ms. Golinski's complaint was heard by the Chief Judge of the Ninth Circuit.  Following a hearing in November 2008, the Chief Judge issued a series of orders dated November 24, 2008, January 13, 2009, November 19, 2009, December 22, 2009, and March 5, 2010.  The Chief Judge's orders are attached hereto as Exhibits A-E, respectively, and are incorporated herein by reference.

50.     By his orders dated November 24, 2008, and January 13, 2009, the Chief Judge ordered the Director of the AO to process Ms. Golinski's health benefit election forms without regard to Ms. Golinski's sexual orientation or the sex of her spouse.  The January 13 order explained that the AO had incorrectly concluded that DOMA prohibited the extension of family health insurance coverage to a same-sex spouse of a judicial employee.  (Exhibit B [January 13, 2009 Order] at 2-7.)

51.     The AO complied with the Chief Judge's orders of November 24, 2008, and January 13, 2009, and submitted the appropriate enrollment papers to Ms. Golinski's insurance carrier, Blue Cross/Blue Shield, to effectuate enrollment.

~~Defendants' Unlawful Interference with the Provision of Benefits~~

52.     Notwithstanding the final decision of Ms. Golinski's employing office and agency that, under the pertinent federal laws, Ms. Golinski is entitled to enroll her spouse in her family plan, OPM intervened to prevent such enrollment.  On February 20, 2009, OPM sent a letter to AO stating, in part:

As you are aware, Title 5, chapter 89 of the United States Code governs the Federal Employees Health Benefits (FEHB) Program. It provides for coverage of the employee and members of the employee's family. Members of the family are defined in the law, and include only certain unmarried dependent children and the spouse of the eligible employee or annuitant. P.L. 104-199, the Defense of Marriage Act (DOMA) requires an agency when interpreting an Act of Congress, to define the word "spouse" as a person of the opposite sex who is a husband or a wife. OPM issued guidance to agencies regarding the definitions of "marriage" and "spouse" in Benefits Administration Letter 96-111, dated November 15, 1996. This Letter is available on the OPM web site at and remains in effect.

Officials of agencies participating in the Federal benefits programs administered by OPM must follow the guidance provided in the Letters.

(Exhibit C [November 19, 2009 Order], at Ex. A thereto.)

53.     OPM's February 20 letter further stated,

We have advised Kaiser Foundation Health and the Blue Cross and Blue Shield Service Benefit Plans that they may not accept the enrollment forms submitted by your agency to provide coverage that is not allowed under Federal law.

(*Id.*)

54.     As a result of OPM's interference, the Chief Judge issued a further order on November 19, 2009, "to protect Ms. Golinski and the integrity of the Judiciary's EDR plans." (Exhibit C at 3.) The Chief Judge explained that, as to judicial employees, the separation of powers doctrine requires that an EDR tribunal's reasonable interpretations of the law take precedence over that of any office or agency of the executive. (Exhibit C at 11-12.) The Chief Judge expressly ordered OPM to remedy its prior, erroneous guidance to Blue Cross/Blue Shield blocking Ms. Cunninghis's enrollment and to cease all prospective interference. (Exhibit C at 15-16.) The Chief Judge ordered the Clerk of the Court to serve the order on OPM (which it did), and he invited OPM to appeal. (*Id.* at 16.)

55.     In that November 19, 2009 order, the Chief Judge also awarded Ms. Golinski ongoing back pay to reimburse her for the cost of purchasing separate individual insurance to cover Ms. Cunninghis. As the Chief Judge found in that order, and in the subsequent March 5, 2010 order calculating the precise amount of the back pay award, the back pay received by Ms. Golinski is inadequate to remedy the discrimination that she suffers. Because comparable

coverage is not available for purchase by individuals on the private market, Ms. Cunninghis's

coverage remains inferior, in terms of both the scope of its coverage and its higher out-of-pocket

costs.  Moreover, as the Chief Judge observed, the award of back pay does nothing to alter Ms.

Golinski's consignment to a "de facto separate, and therefore inherently unequal, benefits system

based on her sex and sexual orientation."

56.    OPM did not appeal the Chief Judge's November 19, 2009 order, and it did not

comply with the order.  Instead, it issued a press release stating, in part:

> Karen Golinski, an employee of the Federal Courts, filed a
> grievance against her employer claiming that the denial of
> enrollment of her same-sex spouse in the Federal Employees Health
> Benefits Plan (FEHBP) violated the Ninth Circuit's Equal
> Employment Opportunity policy.  Ninth Circuit Chief Judge Alex
> Kozinski, sitting in his administrative capacity, and not as a federal
> judge in a court case, said that employees of the court were entitled
> to FEHBP health benefits for their same-sex spouses.  OPM must
> administer the FEHBP in a lawful manner, and the Department of
> Justice (DOJ) has advised OPM that providing those benefits would
> violate the so-called "Defense of Marriage Act."

*   *   *

> In other words, the current federal law means that same-sex spouses
> are ineligible to be enrolled in federal benefit programs that define
> eligibility based on their status as spouses.  As the President has
> explained, the Administration believes that this law is
> discriminatory and needs to be repealed by Congress — that is why
> President Obama has stated that he opposes DOMA and supports its
> legislative repeal.

*   *   *

> The decision in this matter was not reached lightly — after we
> learned of this development, we examined our options and
> consulted with the DOJ.  DOJ advised us that the order issued by
> Judge Kozinski does not supersede our obligation to comply with
> existing law because it is not binding on OPM, as it was issued in
> his administrative capacity, and not as a judge in a court case.

(Statement from Elaine Kaplan, OPM General Counsel, *available at*

washingtonpost.com/wp-srv/nation/documents/statement_from_elaine_kaplan_opm.pdf, attached

hereto as Exhibit F, and incorporated herein by reference.)

57.    On December 22, 2009, the Chief Judge issued a final order holding that the time

to appeal the prior orders had expired, finding that those prior orders are "therefore final and

preclusive on all issues decided therein as to others who could have, but did not appeal, such as the [OPM]," and authorizing Ms. Golinski to take further action to enforce the prior orders. (Exhibit D [December 22, 2009 Order] at 1.)

58.     Defendants continue to block the provision of the spousal health insurance coverage to which Ms. Golinski is entitled.

<u>Procedural History</u>

59.     On January 20, 2010, Ms. Golinski filed the instant lawsuit, and she filed a First Amended Complaint ("FAC") on March 8, 2010.  Therein she sought a writ of mandamus to direct OPM to comply with Chief Judge Kozinski's orders and injunctive relief to compel OPM to rescind its prior guidance blocking Ms. Cunninghis's enrollment, and to cease further interference.

60.     On February 23, 2011, the Attorney General of the United States announced in a letter to Congress that because Section 3 of DOMA is unconstitutional, and because classifications based on sexual orientation warrant heightened scrutiny, the Department of Justice will forego defense of the statute.  The Attorney General indicated, however, that "Section 3 will continue to be enforced by the Executive Branch."[2]

61.     On March 16, 2011, the Court dismissed the FAC without prejudice, stating that "[t]he Court would, if it could, address the constitutionality" of "the legislative decision to enact Section 3 of DOMA to unfairly restrict benefits and privileges to state-sanctioned same-sex marriages . . . .  However, the Court is not able to reach these constitutional issues due to the unique procedural posture of this matter."  (Dkt. No. 98 at 11.)  The Court granted Ms. Golinski leave to amend.

62.     Ms. Golinski files this Second Amended Complaint to challenge defendants' unlawful and unconstitutional action blocking coverage of her spouse on terms equal to those of employees with different-sex spouses.

---

[2] Letter from the Attorney General to Congress on Litigation Involving the Defense of Marriage Act, *available at* .justice.gov/opa/pr/2011/February/11-ag-223.html.

## FIRST CLAIM FOR RELIEF
### (Unlawful Agency Action and Withholding of Benefits)

63.     Plaintiff incorporates and realleges each and every allegation contained in paragraphs 1 through 62 of this Complaint as if set forth fully herein.

64.     The FEHB program is a creature of federal statute, Chapter 89 of Title 5 of the United States Code.  *See* 5 U.S.C. § 8901 *et seq.*

65.     Pursuant to Congressional authority OPM prescribes regulations to carry out the FEHB program and administers the program.  *See* 5 U.S.C. § 8913.  The pertinent regulations promulgated by OPM are contained in Part 890 of Title 5 of the Code of Federal Regulations.

66.     The FEHB program extends to employees of the federal judiciary.  *See generally* 5 U.S.C. §§ 2105(a)(2), 8901(1)(A).

67.     Under existing FEHB statutory and regulatory provisions, the spouse of a covered employee who has elected "Self and Family" coverage is entitled to enroll, and is automatically enrolled, in the employee's health insurance plan under the FEHB program.

68.     FEHB provides that "[a] contract may not be made or a plan approved which excludes an individual because of race, sex, health status, or, at the time of the first opportunity to enroll, because of age."  5 U.S.C. § 8902(f).

69.     Under existing FEHB statutory and regulatory provisions, Ms. Cunninghis would be enrolled in Ms. Golinski's "Self and Family" plan but for defendants' application of DOMA, 1 U.S.C. § 7, which defendants maintain prevents provision of health insurance coverage to the spouse of an employee of the federal judiciary if that spouse is of the same sex as the employee.

70.     Defendants' interference with the enrollment of plaintiff's spouse and the resulting withholding of benefits, based on plaintiff's sexual orientation and her sex in relation to the sex of her spouse, exceeds the authority delegated to defendants by Congress, contravenes the applicable laws governing FEHB, and violates plaintiff's rights under the laws of the United States and the Constitution of the United States, including her rights to equal protection and due process secured by the Fifth Amendment.

71.     The disparity of treatment with regard to federal employment-related benefits

available to Ms. Golinski and other similarly situated individuals is not mandated by DOMA,

1 U.S.C. § 7, but rather reflects an improper and overly narrow construction of the permissible

bounds of the federal government's authority to extend coverage to family members.  Federal

statutory provisions as to employment-related benefits that turn on "member of family," "family,"

or "family members," including but not limited to 5 U.S.C. § 8901, set general guidelines and

minimum requirements of coverage availability but do not establish absolute ceilings or outer

boundaries of coverage.

72.     To the extent that the disparity of treatment with regard to federal employment-

related benefits available to Ms. Golinski is, in fact, mandated by DOMA, 1 U.S.C. § 7, that

disparity of treatment creates a classification that treats similarly situated individuals differently

without adequate justification and improperly burdens and penalizes her relationship, based on

her sexual orientation and her sex in relation to the sex of her spouse, in violation of the rights of

equal protection and due process secured by the Fifth Amendment of the Constitution of the

United States.

73.     An actual controversy exists between and among the parties, and plaintiff has no

other adequate remedy.

### SECOND CLAIM FOR RELIEF
### (Declaratory and Injunctive Relief, 28 U.S.C. §§ 2201-2202)

74.     Plaintiff incorporates and realleges each and every allegation contained in

paragraphs 1 through 73 of this Complaint as if set forth fully herein.

75.     This case presents an actual case or controversy because there is an existing,

ongoing, real, and substantial controversy between plaintiff and defendants, who have adverse

interests.  This controversy is sufficiently immediate, substantial, and real to warrant the issuance

of a declaratory judgment because plaintiff has been denied and will continue to be denied family

coverage by defendants' unlawful actions and enforcement of the unconstitutional law.

76.     This case is ripe for consideration because it presents issues suitable for an

immediate and definitive determination of the legal rights of the parties in this adversarial

proceeding, and plaintiff has been and will continue to be subjected to irreparable injury and
significant hardship by defendants' interference with the provision of family coverage for
plaintiff's spouse.

77.     Plaintiff's claims are not speculative or hypothetical, but rather involve the validity
of a statute that is being implemented and enforced by defendants against plaintiff and all other
lesbian and gay federal employees who are legally married to persons of the same sex.
Defendants' continued enforcement of the unconstitutional law will deprive plaintiff of family
health coverage for her spouse, and will deprive plaintiff of the constitutional rights pleaded
herein.

78.     The injury plaintiff has suffered and will continue to suffer if her rights are not
adjudicated herein is real, immediate, actual, concrete, and particularized and is not just
threatened but certain and ongoing.  No further events need take place to determine that
defendants' enforcement of Section 3 of DOMA has caused and will proximately cause plaintiff
irreparable injuries.

79.     Plaintiff seeks injunctive relief to protect her constitutional rights and to eliminate
the resultant financial and emotional harms described above.  A decision enjoining defendants
would redress and prevent further irreparable injuries from occurring to plaintiff.

80.     The irreparable injuries plaintiff has suffered and will suffer absent injunctive
relief have no adequate remedy at law or in equity.  An injunction is the only way of adequately
protecting plaintiff from the harms of the deprivation of her constitutional rights, the absence of
family coverage to address her spouse's ongoing health needs, and the financial burden of
obtaining separate health coverage for her spouse.  No legal or equitable remedy short of an
injunction can alleviate the stigma of the government's failure to recognize plaintiff's marital
status with respect to family health insurance coverage.

81.     The burden on defendants of maintaining family coverage for plaintiff will be
minor or non-existent.  Under its current contract with the insurer, the federal government would
incur no additional cost by enrolling Ms. Cunninghis because it pays no additional money when
an employee adds additional family members to a family health plan.  Further, there are only a

small number of lesbian and gay federal employees who are legally married and who have sought to obtain family coverage for a spouse. In contrast, the hardship to plaintiff of being deprived of insurance coverage for her spouse is significant, immediate, and ongoing. The balance of hardships thus tips strongly in favor of plaintiff.

## PRAYER

WHEREFORE, plaintiff Karen Golinski prays for relief as follows:

a. A declaration that Section 3 of DOMA, 1 U.S.C. § 7, is unconstitutional as applied to plaintiff to prevent provision of health insurance coverage to her spouse;

b. A declaration that Ms. Golinski and her spouse are entitled to such coverage under the FEHB program;

c. A permanent injunction enjoining defendants, and those acting at their direction or on their behalf, from interfering with the enrollment of Ms. Golinski's spouse in her family health insurance plan;

d. Costs incurred in maintaining this suit, including attorneys' fees and costs, pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

e. Such other and further relief as the Court may deem just and proper.


Dated: April 14, 2011                     MORRISON & FOERSTER LLP

                                          LAMBDA LEGAL DEFENSE AND
                                          EDUCATION FUND, INC.


                                          By:  _____/s/ James R. McGuire_____
                                               JAMES R. McGUIRE

                                          Attorneys for Plaintiff
                                          KAREN GOLINSKI

Exhibit 25

William C. McNeill III, State Bar No. 64392
Claudia Center, State Bar No. 158255
Elizabeth Kristen, State Bar No. 218227
LEGAL AID SOCIETY-
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, CA  94104
Telephone:   (415) 864-8848
Facsimile:    (415) 593-0096

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

MICHAEL DRAGOVICH, MICHAEL
GAITLEY, ELIZABETH LITTERAL,
PATRICIA FITZSIMMONS, CAROLYN
LIGHT, CHERYL LIGHT, DAVID BEERS,
CHARLES COLE, RAFAEL V.
DOMINGUEZ, and JOSE G. HERMOSILLO,
on behalf of themselves and all others similarly
situated,

        Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF THE
TREASURY, TIMOTHY GEITHNER, in his
official capacity as Secretary of the Treasury,
United States Department of the Treasury,
INTERNAL REVENUE SERVICE,
DOUGLAS SHULMAN, in his official
capacity as Commissioner of the Internal
Revenue Service, BOARD OF
ADMINISTRATION OF CALIFORNIA
PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, and ANNE STAUSBOLL, in her
official capacity as Chief Executive Officer,
CalPERS,

        Defendants.

Case No. CV 4:10-01564-CW

**SECOND AMENDED COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF**

**CLASS ACTION**

**INTRODUCTION**

1.      Plaintiffs are employees of the State of California and their spouses or partners who are in long-term committed relationships legally recognized under California law as marriages and domestic partnerships.  But because Plaintiffs are same-sex couples, the federal and state Defendants are unconstitutionally denying them the opportunity to purchase coverage through the state's long-term care insurance program, an essential tool for financial and family security that is offered to all other families of state workers.

2.      As members of the California Public Employees' Retirement System ("CalPERS"), Plaintiffs MICHAEL DRAGOVICH, ELIZABETH LITTERAL, CAROLYN LIGHT, DAVID BEERS, and RAFAEL V. DOMINGUEZ ("Plaintiff employees") are eligible to apply to join the CalPERS Long Term Care ("LTC") Program, and seek this opportunity for their same-sex partners, Plaintiffs MICHAEL GAITLEY, PATRICIA FITZSIMMONS, CHERYL LIGHT, CHARLES COLE, and JOSE G. HERMOSILLO ("Plaintiff spouses" or "Plaintiff partners"). Through participation in the LTC Program, the Plaintiffs seek to ensure an adequate safety net for themselves and their loved ones in the event that future debilitating illness or injury requires long-term care services.

3.      Long-term care insurance provides coverage when a person needs assistance with basic activities of living due to chronic illness, injury, the frailty of old age, or a severe cognitive impairment such as Alzheimer's disease.  In most instances, individuals and their families are not otherwise covered for this type of extended long-term care by health insurance, disability insurance, or Medicare.  Long-term care insurance is thus an important benefit for individuals, couples, and families – regardless of sexual orientation – to enhance financial security, and to ensure access to appropriate care throughout the life cycle.

4.      The U.S. Department of Health and Human Services reports that approximately seventy percent of Americans over the age of 65—approximately nine million people—will need long-term care services.  By the year 2020, the number will increase to twelve million.  At 2009 rates, the average stay in a nursing home lasts 2.4 years and costs more than $170,000.

1    The average cost in 2009 for care provided by a home health aide was $21 per hour, or $27,000

2    annually.

3         5.    Without long-term care insurance, the high costs of care can force families to make

4    painful choices such as selling a family home to pay the bills, or having a working adult give up

5    a job and income to work (unpaid) as a primary caretaker for a loved one who is no longer able

6    to care for herself.  The consequences of such steps can be financially and emotionally

7    devastating, and in some cases may be insufficient, leaving individuals in poverty and

8    dependent upon the limited services provided by MediCal.  Long-term care insurance allows

9    families to avoid such contingencies.

10        6.    Long-term care coverage can allow families and individuals to achieve their

11   preferences with respect to assets, aging, and living arrangements, including community-based

12   care.  According to the U.S. Department of Health and Human Services:  "By planning ahead,

13   you may be able to save your assets and income for uses other than long-term care, including

14   preserving the quality of life for your spouse or other loved ones. . . .  Your choices for

15   receiving care outside of a facility and being able to stay at home or receive services in the

16   community for as long as possible are greater if you have planned ahead."  U.S. Department of

17   Health and Human Services National Clearinghouse for Long-Term Care Information, available

18   at longtermcare.gov/LTC/Main_Site/Planning_LTC/Importance/index.aspx.

19        7.    Maximizing the number of families who purchase long-term health care insurance

20   serves the public interest by spreading the risk of catastrophic expense, and helping individuals

21   receive adequate assistance when they become unable to care for themselves, reducing the

22   burden on publicly funded programs.  Access to long-term care services can also prevent

23   avoidable health problems, reducing the need for emergency care and other expensive medical

24   services.

25        8.    The federal government, recognizing the importance of long term care insurance in

26   protecting families and the contributions to the public good made by public employees, enables

27   states to offer tax-shielded ("qualified") long term care insurance programs to public employees

28

Second Amended Complaint for Declaratory and Injunctive Relief                                    3

111

and their families.  These tax provisions were adopted "to provide an incentive for individuals to take financial responsibility for their long-term care needs."  Joint Committee on Taxation, "Description of Federal Tax Rules and Legislative Background Relating to Long-Term Care Scheduled for a Public Hearing Before the Senate Committee on Finance on March 27, 2001," available at 2001 WL 36044116 (I.R.S.).  "The legislation … provides tax deductibility for long term care and insurance, making it possible for more Americans to avoid financial difficulty as the result of chronic illness."  142 Cong. Rec. S3578-01 at *3608 (Statement of Sen. McCain) (Apr. 18, 1996).

9.    Under the Internal Revenue Code, a state may offer public employees a "qualified," tax-shielded long term care insurance plan that allows an employee to enroll himself or herself, as well as any of the following family members:

- Opposite-sex spouse;
- Children;
- Grandchildren;
- Brothers;
- Sisters;
- Stepbrothers;
- Stepsisters;
- Father;
- Mother;
- Stepfather;
- Stepmother;
- Grandparents;
- Nephews;
- Nieces;
- Aunts;
- Uncles;

- Sons-in-law;
- Daughters-in-law;
- Father-in-law;
- Mother-in-law
- Brothers-in-law; and
- Sisters-in-law.

26 U.S.C. §§ 7702B(f)(1)-(2); 152(d)(2)(A)-(G), 1 U.S.C. § 7.  The rules do not limit the number of family members who can enroll.  **Only one conceivable family member category** – same-sex spouses and other legally recognized same-sex partners such as registered domestic partners – is excluded.

10.  Consistent with federal statutory law, California statutory law mandates that Defendant Board of Administration offer public employees and their families the opportunity to purchase qualified long-term care insurance through the California Public Employees' Retirement System ("CalPERS") during periodic open enrollment.  Cal. Gov't Code § 21661(a).  A state employee may enroll himself or herself, and his or her spouse, brothers, sisters, father, mother, father-in-law, and mother-in-law in the qualified long-term care insurance program offered to California public employees.  Cal. Gov't Code § 21661(d).  There is no limit to the total number of family members who can enroll, so long as they fall into an approved family member category.  However, same-sex domestic partners are excluded under the terms of state and federal statutory law.  26 U.S.C. §§ 7702B(f)(1)-(2); 152(d)(2)(A)-(G), Cal. Fam. Code § 297.5(g).  Same-sex spouses are excluded by virtue of federal statutory law, 1 U.S.C. § 7, which CalPERS has followed and has indicated that it will follow.

11.  Thus, despite the important purposes underlying the establishment and development of qualified long term care programs for public employees – to protect and provide for public employees and their extended families – families headed by same-sex partners are singled out for exclusion, and denied without basis an important tool of financial planning.

12.  Defendants' discrimination against the Plaintiffs with regard to long-term health care

insurance is particularly invidious given the historical exclusion of gay couples and families from social and financial institutions and programs, including insurance plans, that help couples and families protect their financial security and allow them the resources to make caretaking decisions as a family.

13. Moreover, the statutory exclusion of same-sex partners from qualified long-term care plans interferes with California's independent constitutional law. The California Supreme Court has affirmed that "as a matter of constitutional right," California law accords same-sex couples, whether in legally recognized marriages or domestic partnerships, the same respect and dignity and the same substantive legal rights and attributes as married opposite-sex couples. *Strauss v. Horton*, 36 Cal. 4th 364, 411 (2009).

14. As couples in legally recognized committed relationships, Plaintiffs are entitled to respect for their fundamental liberty and privacy interests in marital and familial relationships, and the full and equal protection of the law. The exclusion challenged herein disrespects Plaintiffs' marital and familial relationships, and constitutes irrational discrimination, all in violation of the constitutional guarantees of due process and equal protection.

15. Plaintiffs seek a determination that by excluding same-sex partners and spouses, the federal provisions at issue – 26 U.S.C.A. §§ 7702B(f)(1)-(2) and 152(d)(2)(A)-(G) – violate the due process and equal protection guarantees of the federal Constitution. Plaintiffs seek a further determination that the CalPERS LTC Plan violates the federal Constitution by conforming its requirements to the federal provisions, thereby denying Plaintiffs the same respect and benefits as it grants to similarly situated heterosexual public employees and their spouses.

## JURISDICTION

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this case arises under the Constitution of the United States and presents a federal question under Article III of the United States Constitution; pursuant to 28 U.S.C. § 1343(a)(3), (4) and 42 U.S.C. § 1983 in that this action is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the Constitution of the United States;

Second Amended Complaint for Declaratory and Injunctive Relief                 6

114

and pursuant to 5 U.S.C. § 702 in that the action states a claim that an agency of the United

States or an officer or employee thereof acted or failed to act in an official capacity or under

color of legal authority.  The Court has authority to grant declaratory and injunctive relief

pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a) and § 2202.  The Court has the

authority to award costs and attorneys' fees under 28 U.S.C. § 2412 and 42 U.S.C. § 1988.

**VENUE**

17.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e) in

that this action does not involve real property, Plaintiffs reside in this District, and a substantial

part of the acts and/or omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

18.    Plaintiffs are public employees in the State of California who are eligible to purchase

long-term care coverage offered through CalPERS ("Plaintiff employees") and their legally

recognized spouses and domestic partners ("Plaintiff spouses" or "Plaintiff partners").

19.    Plaintiff MICHAEL DRAGOVICH is a U.S. citizen residing in San Francisco,

California, and is employed by the University of California, San Francisco ("UCSF") Medical

Center, where he has worked as a registered nurse and nurse coordinator in the area of liver

transplants since 1992.  He is 51 years old.  As part of his employee benefits package, he is

eligible for and participates in CalPERS, California's benefit program for public employees.

Plaintiff DRAGOVICH purchased long-term care coverage through the CalPERS program in

1997.

20.    Plaintiff MICHAEL GAITLEY is also a U.S. citizen residing in San Francisco,

California, and he is 51 years old.  Plaintiff GAITLEY is an attorney who runs free legal clinics

for low-wage workers throughout the Bay Area.

21.    Plaintiff DRAGOVICH met Plaintiff GAITLEY in 1979.  They have been a

committed couple for more than 30 years.  Plaintiffs DRAGOVICH and GAITLEY were

married on June 28, 2008 pursuant to a duly issued marriage license; they are legally married

under California law.

Second Amended Complaint for Declaratory and Injunctive Relief

7

22.  Plaintiff ELIZABETH LITTERAL is a U.S. citizen residing in San Francisco, California, and is employed by the UCSF Medical Center, where she has worked as a nurse in the areas of oncology and hematology since approximately 1995.  She is 50 years old.  As part of her employee benefits package, she is eligible for and participates in CalPERS.

23.  Plaintiff PATRICIA FITZSIMMONS is a U.S. citizen residing in San Francisco, California, and she is 59 years old.  Plaintiff FITZSIMMONS is an attorney who directs the Child Advocacy Clinic at the University of San Francisco School of Law.

24.  Plaintiff LITTERAL met Plaintiff FITZSIMMONS in 1992.  They have been a committed couple for more than 17 years.  Plaintiffs LITERRAL and FITZSIMMONS registered as domestic partners with the City and County of San Francisco on June 21, 1994.  In 1997, they adopted their daughter Molly, now 14.  They also registered as domestic partners with the State of California when that registry became available through state law.  Following the decision of Mayor Gavin Newsom to provide marriage licenses on a nondiscriminatory basis, Plaintiffs LITERRAL and FITZSIMMONS were married in San Francisco on February 13, 2004; this marriage was subsequently invalidated by the California Supreme Court.  Plaintiffs LITERRAL and FITZSIMMONS were then married on October 8, 2008 pursuant to a duly issued marriage license; they are legally married under California law.

25.  Plaintiff CAROLYN LIGHT is a U.S. citizen residing in San Francisco, California, and is employed by the UCSF Medical Center, where she has worked as health care administrator since 2005.  She is 32 years old.  As part of her employee benefits package, she is eligible for and participates in CalPERS.

26.  Plaintiff CHERYL LIGHT is a U.S. citizen residing in San Francisco, California, and a massage therapist.

27.  Plaintiffs CAROLYN and CHERYL LIGHT met in college and have been a committed couple for seven years.  They registered as domestic partners under California state law in October 2006.  On June 24, 2008, Plaintiffs CAROLYN and CHERYL LIGHT were married pursuant to a duly issued marriage license; they are legally married under California

Second Amended Complaint for Declaratory and Injunctive Relief                                    8

116

law.

28.   Plaintiff DAVID BEERS is a U.S. citizen residing in Oakland, California, and is employed as a fiscal analyst for the State of California, Department of Public Health, Tuberculosis Control Branch.  He has held this position since 1999.  Plaintiff BEERS is 57 years old, and has been employed by the State of California in various positions for more than 20 years.  As part of his employee benefits package, he is eligible for and participates in CalPERS.  Plaintiff BEERS purchased long-term care coverage through the CalPERS program in 1997.

29.   Plaintiff CHARLES COLE is a U.S. citizen residing in Oakland, California.  For many years, Plaintiff COLE has worked as a consultant assisting health care organizations, senior organizations, and communities of faith with fundraising, organizational development, governance, and marketing.  Since 2004, Plaintiff COLE has served as the Chief Operating Officer of Chaparral House, a nonprofit skilled nursing facility for seniors.  Plaintiff COLE is 59 years old.

30.   Plaintiff BEERS met Plaintiff COLE in 1995.  Plaintiffs BEERS and COLE registered as domestic partners under California state law on July 24, 2000.  They had a commitment ceremony on July 15, 2001.  On July 13, 2008, Plaintiffs BEERS and COLE were married pursuant to a duly issued marriage license; they are legally married under California law.

31.   Plaintiff RAFAEL V. DOMINGUEZ is a U.S. citizen residing in La Mesa, California. Plaintiff DOMINGUEZ is employed as an EEO officer/Title VI liaison with CalTRANS in San Diego, California.  He has held this position since August 2010.  Prior to working for CalTRANS, Plaintiff DOMINGUEZ worked for the California Department of Fair Employment and Housing and for the State Compensation Insurance Fund.  He has been a state employee since June of 2004.  As part of his employee benefits package, he is eligible for and participates in CalPERS.

32.   Plaintiff JOSE G. HERMOSILLO is a U.S. citizen residing in La Mesa, California. For about ten years, he has worked as an independent contractor providing Spanish language

1    interpreting services to federal contractors throughout California and outside California.

2        33.    Plaintiff DOMINGUEZ and Plaintiff HERMOSILLO became a committed couple in

3    2005, and registered as domestic partners under California state law on June 18, 2007.  They are

4    not married.

5        34.    Defendant DEPARTMENT OF THE TREASURY is a federal government

6    department established by Congress.

7        35.    Defendant INTERNAL REVENUE SERVICE is a bureau of the DEPARTMENT OF

8    THE TREASURY that is organized to carry out the responsibilities of the Secretary of the

9    Treasury in executing and applying the internal revenue laws pursuant to 26 U.S.C. § 7801.

10       36.    Defendant TIMOTHY GEITHNER is currently the Secretary of the Treasury and is

11   sued in his official capacity.  In his official capacity, Secretary GEITHNER is responsible for

12   the administration of the DEPARTMENT OF THE TREASURY, including the administration

13   and enforcement of the internal revenue laws.  26 U.S.C. § 7801.

14       37.    Defendant DOUGLAS SHULMAN is currently the Commissioner of Internal

15   Revenue and issued in his official capacity.  In his official capacity, Commissioner SHULMAN

16   is responsible for administering and supervising the execution and application of the internal

17   revenue laws.  26 U.S.C. § 7803.

18       38.    Defendant BOARD OF ADMINISTRATION of California Public Employees'

19   Retirement System ("BOARD") is the thirteen-member body vested with management and

20   control of the Public Employees' Retirement System.  Cal. Gov't Code § 20120.

21       39.    Defendant ANNE STAUSBOLL is Chief Executive Officer of the California Public

22   Employees' Retirement System and is sued in her official capacity.

23                              **CLASS ACTION ALLEGATIONS**

24       40.    Plaintiffs DRAGOVICH, GAITLEY, LITTERRAL, FITZSIMMONS, CAROLYN

25   LIGHT, CHERYL LIGHT, BEERS, COLE, DOMINGUEZ, and HERMOSILLO bring this

26   action on behalf of themselves and all persons similarly situated.  The class they seek to

27   represent is composed of CalPERS members who are in same-sex marriages and registered

28

Second Amended Complaint for Declaratory and Injunctive Relief                                    10

118

1   domestic partnerships legally recognized by the State of California, and their spouses and

2   partners, who as couples and families are denied access to the CalPERS Long-Term Care

3   Program that is equal to similarly situated CalPERS members who are in opposite-sex

4   marriages, and their spouses.

5       41.    The persons in the class are so numerous that joinder of all such persons is

6   impracticable and the disposition of their claims in a class action is a benefit both to the parties

7   and to this Court.  The Williams Institute at the University of California, Los Angeles, has

8   estimated that there are nearly 193,000 current state and local public employees who are

9   lesbian, gay, bisexual, and transgender.

10      42.    There is a well-defined community of interest in the questions of law and fact

11  regarding the parties to be represented, and common questions of law and fact predominate.

12      43.    The claims of Plaintiffs DRAGOVICH, GAITLEY, LITTERRAL, FITZSIMMONS,

13  CAROLYN LIGHT, CHERYL LIGHT, BEERS, COLE, DOMINGUEZ, and HERMOSILLO

14  are typical of those of the class, and Plaintiffs DRAGOVICH, GAITLEY, LITTERRAL,

15  FITZSIMMONS, CAROLYN LIGHT, CHERYL LIGHT, BEERS, COLE, DOMINGUEZ, and

16  HERMOSILLO will fairly and adequately represent the interests of the class.

17                                **STATEMENT OF FACTS**

18      44.    As California public employees, the Plaintiff employees are eligible for and

19  participate in California's public employee benefit program, administered through the

20  California Public Employees' Retirement System ("CalPERS").

21  **The CalPERS Long-Term Care Program.**

22      45.    One benefit included in CalPERS is the opportunity to enroll in the CalPERS Long-

23  Term Care Program.  The Long-Term Care Program ("Program") provides benefit payouts in

24  the event that the beneficiary requires long-term skilled nursing care (for example, due to

25  illness, injury, or advanced age).  The Long-Term Care Program allows California public

26  employees and/or family members of employees, including spouses, adult siblings, parents and

27  parents-in-law to enroll in the Program.  These family members can apply for the Program even

28

Second Amended Complaint for Declaratory and Injunctive Relief            11

1   if the public employee chooses not to enroll.

2      46.   The 2008 CalPERS Long-Term Care Program Information Guide ("Information

3   Guide"), made available to all members of CalPERS including the Plaintiff employees, defines

4   "long-term care" as "the extended care you or a loved one may need when you need assistance

5   with basic Activities of Daily Living (ADLs) like bathing, dressing, or eating." This care can be

6   necessary "because of a chronic illness, injury, or due to the frailty of old age [or] a Severe

7   Cognitive Impairment, such as Alzheimer's Disease." The Program offers coverage options for

8   care provided at home, at an adult day care center, in an assisted living facility, or in a nursing

9   home.

10     47.   In most instances, individuals and their families are not covered for long-term care by

11   other insurance or disability plans. Medicare and employer-sponsored or private health

12   insurance do not pay for the majority of long-term care services. MediCal provides limited

13   coverage for some long-term care only to individuals who meet a state-determined poverty level

14   and certain health-related criteria.

15     48.   In a section entitled "Do Not Forget Your Loved Ones," the Information Guide offers

16   facts to "help you better understand why you should tell your spouse, parents, parents-in-law

17   and adult siblings about the CalPERS Long-Term Care Program." The Information Guide

18   repeatedly offers reminders that employees should enroll their "spouse," "family," and "loved

19   ones."

20     49.   According to CalPERS, three out of five people over age 65 will need some type of

21   long-term care over their lifetime. In 2007, the average cost of care in a nursing home in

22   California was $180 per day, or over $65,000 annually, and the average nursing home stay is 2.6

23   years, costing approximately $170,000. Care received at home can cost more than $20,000 a

24   year. As with other health care costs, the costs of long-term care are rising annually.

25   **Defendants' Exclusion of the Plaintiff Spouses.**

26     50.   Plaintiff DRAGOVICH has been employed as a registered nurse and nurse

27   coordinator at UCSF Medical Center for approximately eighteen years. Plaintiff DRAGOVICH

28

has been in a committed relationship with Plaintiff GAITLEY for more than 30 years, since 1979.  On June 28, 2008, following the decision of the California Supreme Court in *In re Marriage Cases*, 43 Cal. 4th 757 (2008) (holding that denial of the right to marry to same-sex couples violated the California Constitution), Plaintiff DRAGOVICH married Plaintiff GAITLEY, pursuant to a duly issued California marriage license.  Plaintiffs DRAGOVICH and GAITLEY remain lawfully married spouses under the laws of the State of California.  *Strauss v. Horton*, 46 Cal. 4th 364 (2009).

51.    Plaintiffs DRAGOVICH and GAITLEY are each 51 years old.  Like families across the country planning their future, Plaintiffs DRAGOVICH and GAITLEY seek the security that, should either of them experience a debilitating illness or injury or otherwise become unable to care for himself, there will be an adequate safety net in place to provide necessary long-term health care.  Additionally, Plaintiffs DRAGOVICH and GAITLEY seek the administrative convenience of being insured by the same provider, particularly as they age.  Plaintiff DRAGOVICH purchased long-term care coverage through the CalPERS program in 1997; Plaintiff GAITLEY seeks the same coverage.

52.    Plaintiff LITTERAL has been employed as an oncology nurse at UCSF Medical Center for approximately 15 years.  Plaintiffs LITTERAL and FITZSIMMONS have been in a committed relationship for more than 17 years.  Plaintiffs LITTERAL and FITZSIMMONS registered as domestic partners with the City and County of San Francisco on June 21, 1994.  They also registered as domestic partners with the State of California when that registry became available through state law.  Following the decision of Mayor Gavin Newsom to provide marriage licenses on a nondiscriminatory basis, Plaintiffs LITTERAL and FITZSIMMONS were married in San Francisco on February 13, 2004; this marriage was subsequently invalidated by the California Supreme Court.  Following the *In re Marriage* cases, Plaintiffs LITTERAL and FITZSIMMONS were married on October 8, 2008 pursuant to a duly issued marriage license; they are legally married under California law.

53.    For some time, Plaintiffs LITTERAL and FITZSIMMONS have been reviewing their

1  options for obtaining long-term care coverage. They are interested in joining the CalPERS

2  Long-Term Care Program because the benefits are tax-protected, and because, as a publicly

3  operated group plan, the premiums are lower than those charged by private carriers of individual

4  policies. If and when they are able to purchase the coverage, they intend to do so.

5      54.    Plaintiff CAROLYN LIGHT has been employed as health care administrator at UCSF

6  Medical Center since 2005. She and Plaintiff CHERYL LIGHT have been in a committed

7  relationship for seven years. They registered as domestic partners in 2006, and married legally

8  in 2008. They are planning to have children. Plaintiffs CAROLYN and CHERYL LIGHT are

9  interested in coverage through the CalPERS Long-Term Care Program because they view this

10  coverage as a component of their financial planning as a couple. If and when they are able to

11  purchase the coverage, they intend to do so.

12      55.    Plaintiff BEERS has been employed by the State of California for more than 20 years.

13  He currently serves as a fiscal analyst for the Tuberculosis Control Branch of the Department of

14  Public Health, Tuberculosis Control Branch. He has held this position since 1999. He and

15  Plaintiff COLE have been in a committed relationship since 1999. They registered as domestic

16  partners under California state law on July 24, 2000, and had a commitment ceremony on July

17  15, 2001. On July 13, 2008, Plaintiffs BEERS and COLE were married pursuant to a duly

18  issued marriage license; they are legally married under California law. Plaintiff BEERS has

19  long been aware of the need for, and the benefits of, long-term care coverage. He purchased

20  coverage through the CalPERS long-term care plan in 1997.

21      56.    Like Plaintiff BEERS, Plaintiff COLE is intensely aware of the need for long-term

22  care coverage. As Chief Operating Officer for Chaparral House, a skilled nursing facility, and

23  as a consultant for health care organizations, Plaintiff COLE is intimately familiar with the daily

24  costs of long-term care, and the lack of adequate coverage provided by government programs

25  such as MediCal and Medicare. Moreover, during the AIDS epidemic beginning in the early

26  1980s, Plaintiff COLE cared for dozens of individuals living and dying with AIDS who

27  required assistance with basic activities of daily living such as bathing, dressing, and eating. A

28

Second Amended Complaint for Declaratory and Injunctive Relief       14

former Baptist minister, Plaintiff COLE was an active lay leader in the Metropolitan

Community Church of San Francisco; literally hundreds of MCCSF members died during the

AIDS years.  Plaintiffs BEERS and COLE seek long-term care coverage because they want the

security and safety net it provides in the event that either of them experience a debilitating

illness or injury and requires daily care.

57.     Beginning in 2004, Plaintiffs BEERS and COLE began discussing the possibility of

enrolling Plaintiff COLE in the CalPERS long-term care plan.  In 2005, Plaintiff COLE began

sending emails to membership services for the CalPERS long-term care plan, inquiring about

whether he could become covered as a domestic partner.  Eventually he was told via email by a

representative of the CalPERS long-term care plan that coverage was not available to him.

Plaintiff COLE continued to inquire, and finally spoke by telephone with a representative of the

CalPERS long-term care plan; the representative told Plaintiff COLE that there was nothing

CalPERS could do to include domestic partners because of the IRS rules.  Plaintiff COLE

suggested that CalPERS sue the IRS.  Plaintiff COLE made one more effort in about 2007,

emailing CalPERS about obtaining long-term care coverage; he was again told that he is not

eligible.  Plaintiff COLE has surveyed the private long-term care market; however, he has been

unable to find a product comparable to the CalPERS program with respect to benefits,

escalation (also known as inflation protection), and premiums.  As well, Plaintiff COLE seeks

the benefits and protections of being part of the CalPERS plan.  Unlike private plans, the

CalPERS plan is run as a nonprofit, and has access to favorable investment opportunities.

Unlike private plans, increases in premiums are supervised by the Board of Administration, and

are imposed uniformly across the population of insured participants.

58.     Plaintiff DOMINGUEZ and Plaintiff HERMOSILLO are in their 40s, and purchased a

home together in September 2007, shortly after they registered as domestic partners under state

law.  Plaintiff DOMINGUEZ has looked into purchasing long-term care coverage from

CalPERS, and wishes to buy this coverage for himself and for Plaintiff HERMOSILLO.  He is

aware from his own research, and from his mother's experiences of aging while living in her

own home, that long-term care insurance coverage – separate from Medicare – is an important option for protecting family assets while accessing services. He seeks CalPERS long-term care coverage for himself and for Plaintiff HERMOSILLO because he wishes to protect their home and the stability of their household and finances in the event that, as they get older, one or both of them require assistance in their activities of daily living. For the same reasons, Plaintiff HERMOSILLO seeks CalPERS long-term care coverage. If and when they are able to purchase the coverage, they intend to do so.

59. After Plaintiffs DRAGOVICH and GAITLEY married, Plaintiff DRAGOVICH sought to enroll Plaintiff GAITLEY in the CalPERS Long-Term Care Program. In December 2008, Plaintiff DRAGOVICH called the Program's toll-free number to request enrollment materials, but was told by the Program representative with whom he spoke that same-sex spouses are ineligible to enroll in the Program. When Plaintiff DRAGOVICH inquired further, the representative informed him that this restriction was based on federal law.

60. Following Plaintiff DRAGOVICH's telephone conversation with the Long-Term Care Program representative, his attorney wrote a letter to CalPERS on his behalf, objecting to discrimination by CalPERS on the basis of sexual orientation. CalPERS Assistant Chief Counsel responded with a letter explaining that the Program "is a tax-qualified plan for IRS purposes," under which members may make their contributions to the Program using pre-tax dollars, and benefit payouts are not subject to the federal income tax. Counsel stated that in order to maintain the tax-qualified status of the Program:

> [The plan must meet certain IRS provisions, including providing enrollment to certain persons such as employees, former employees, their spouses, and others within a specified relationship. Within this context, the federal Defense of Marriage Act (DOMA) currently recognizes a spouse to mean only a "person of the opposite sex." The enrollment of a same-sex spouse into the [Long-Term Care Program]would therefore make the plan non-compliant with IRC provisions based on DOMA and jeopardize the plan's tax-qualified status.

61. The federal and state rules challenged herein burden the familial relationships of the Plaintiffs, including the ability of the Plaintiff employees to support their families by enrolling

1   their partners in the long-term care program available to spouses of California public

2   employees, and their rights to equal protection under the law.

3        62.    Shortly after Plaintiff DRAGOVICH's attorney inquired on his behalf about

4   enrollment of his spouse, CalPERS suspended enrollment for any new enrollees.  According to

5   the CalPERS website, enrollment remains closed, despite California law requiring that "long-

6   term care insurance plans shall be made available periodically during open enrollment periods

7   determined by the board."  Cal. Gov't Code § 21661(a).  Historically, the board has offered

8   open enrollment periods annually, beginning each April.  At public meetings, CalPERS has

9   stated that it may hold an open enrollment in 2011.

10        63.    Plaintiffs (as well as all others now foreclosed from enrollment) are being adversely

11   affected by the delay in enrollment for the CalPERS program.  Applying for long-term health

12   care at a younger age increases the likelihood of qualifying for the coverage and results in lower

13   premiums because premiums are linked to age at enrollment.  Already almost two years have

14   passed since Plaintiff DRAGOVICH first tried to enroll his spouse.  Moreover, it is important

15   that individuals apply for long-term care insurance when they are in good health because long-

16   term care insurance plans like CalPERS uses underwriting which can prevent people from being

17   approved for coverage.

18        64.    It is impossible to predict when Plaintiffs (and others now foreclosed from

19   enrollment) will need long-term care.  The U.S. Department of Health and Human Services

20   advises about the importance of planning ahead for long-term care because if "people first learn

21   about long-term care when they or a loved one need care … their options are often limited by

22   lack of information, the immediate need for services, and insufficient resources to pay for

23   preferred services."  U.S. Department of Health and Human Services National Clearinghouse

24   for Long-Term Care Information, available at

25   longtermcare.gov/LTC/Main_Site/Planning_LTC/Importance/index.aspx.

26   **Marriage and Domestic Partnerships in California.**

27        65.    As a sovereign State of the United States of America, the State of California has

28

1    exclusively established and ordained the legal requirements for civil marriage and registered

2    domestic partnerships within the State and the status of members of such marriages and

3    partnerships.

4        66.    Effective January 1, 2005, and presently, California law allows same-sex couples to

5    enter into domestic partnerships, legally recognized committed relationships with all of the

6    same substantive legal rights, responsibilities, benefits, and protections as civil marriage affords

7    to opposite-sex couples who enter into civil marriages recognized by the State of California.

8    The California statute governing legal recognition of domestic partnerships, California Family

9    Code 297.5, states that "Registered domestic partners shall have the same rights, protections,

10   and benefits, and shall be subject to the same responsibilities, obligations, and duties under law,

11   whether they derive from statutes, administrative regulations, court rules, government policies,

12   common law, or any other provisions or sources of law, as are granted to and imposed upon

13   spouses."  Cal. Fam. Code § 297.5(a).

14       67.    However, section (g) of the same statute specifically exempts the federally qualified

15   long term care program from this equality guarantee, stating, "No public agency in this state

16   may discriminate against any person or couple of the ground that the person is a registered

17   domestic partner rather than a spouse or that the couple are registered domestic partners rather

18   than spouses, except that nothing in this section applies to modify eligibility for long-term care

19   plans pursuant to Chapter 15 (commencing with Section 21660) of Par 3 of Division 5 of Title 2

20   of the Government Code [Public Employees' Long-Term Care Act]."

21       68.    Effective June 15, 2008, with the implementation of the California Supreme Court's

22   constitutional determination in *In re Marriage Cases*, 43 Cal. 4th 757 (2008), same-sex couples

23   who otherwise complied with the requirements for obtaining a marriage license in the State of

24   California were entitled to marry under California law.

25       69.    Although the California Constitution was modified on November 4, 2008 by the

26   passage of Proposition 8, eliminating the ability of same-sex couples to enter into a legally

27   recognized relationship designated "marriage," marriages of same-sex couples that occurred

28

Second Amended Complaint for Declaratory and Injunctive Relief    18

126

1    prior to the adoption of Proposition 8—including Plaintiffs' marriages—"remain valid in all

2    respects." *Strauss v. Horton*, 36 Cal. 4th 364, 473-74 (2009).

3        70.    Moreover, same-sex couples in California, whether in legally recognized marriages or

4    domestic partnerships, "possess, under the state constitutional privacy and dues process clauses,

5    'the core set of basic substantive legal rights and attributes traditionally associated with

6    marriage,' including, 'most fundamentally, the opportunity of an individual to establish—with

7    the person with whom the individual has chosen to share his or her life—an officially

8    recognized and protected family possessing mutual rights and responsibilities and entitled to the

9    same respect and dignity accorded a union traditionally designated as marriage.' Like opposite-

10   sex couples, same-sex couples enjoy this protection not as a matter of legislative grace, but of

11   constitutional right." *Id.* at 411.

12       71.    Under California constitutional law, the Plaintiff couples must be accorded the same

13   status, responsibilities, and protections as married opposite-sex couples. By failing to offer

14   enrollment equally to the Plaintiffs, the Board is discriminating in violation of California law.

15   **<u>Violation of Federal Constitutional Protections.</u>**

16       72.    The Plaintiff couples are similarly situated to California public employees and their

17   opposite-sex spouses. In excluding same-sex spouses and domestic partners from the vast array

18   of family members permitted to enroll in a qualified long-term care plan, the federal Defendants

19   are violating the Plaintiffs' fundamental liberty and privacy interests in marital and familial

20   relationships, and are discriminating against them in violation of the guarantee of equal

21   protection.

22       73.    By implementing and conforming to the federal rules, and by excluding same-sex

23   spouses and domestic partners from the list of eligible participants in the Long-Term Care

24   Program, without basis, Defendants Board of Administration and Stausboll are violating

25   Plaintiffs' constitutionally protected rights to due process and equal protection.

26       74.    The state and federal statutes challenged herein are particularly noxious in that they

27   interfere and conflict with the State of California's ability to comply with its own state

28

Second Amended Complaint for Declaratory and Injunctive Relief                                    19

constitutional mandates.  Here, the California Supreme Court has articulated and affirmed the State's strong interest under the California Constitution in according couples in same-sex relationships and their families the same legal responsibilities, benefits, and protections as couples in opposite-sex relationships and their families.  In considering the legitimacy of federal governmental interests, federal courts should endeavor to reconcile competing state interests.

## INJUNCTIVE AND DECLARATORY RELIEF ALLEGATIONS

75.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 64 as though fully set forth herein.

76.    A present and actual controversy exists regarding the respective rights and obligations of Plaintiffs and Defendants.  Plaintiffs desire a judicial determination of their rights and Defendants' obligations in a declaration as to whether Defendants' conduct violates the United States Constitution.

77.    Such a declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights.  Such a declaration is also necessary and appropriate to prevent further harm or infringement of Plaintiffs' rights.

78.    Plaintiffs have no adequate remedy at law and unless the relief requested herein is granted, Plaintiffs will suffer irreparable harm by the deprivation of enrollment in a qualified long-term care plan.

### FIRST CLAIM FOR RELIEF
Violation of Fifth Amendment
Due Process
(against Federal Defendants)

79.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 78 as though fully set forth herein.

80.    As United States citizens, Plaintiffs have fundamental liberty and privacy interests in marital and familial relationships protected by the Fifth Amendment to the U.S. Constitution.

81.    Under federal statute, states are authorized to offer tax-shielded long-term care insurance programs to public employees and a vast array of their family members, including

their opposite-sex spouses.  26 U.S.C.A. §§ 7702B(f)(1)-(2); 152(d)(2)(A)-(G).  Same-sex spouses and domestic partners are excluded.  *Id.*; 1 U.S.C. § 7.

82.    Plaintiffs' marriages and domestic partnerships are valid and legally recognized under California law, and are afforded identical rights, responsibilities, benefits, and protections under California law.

83.    By burdening the Plaintiffs' ability and autonomy to engage in financial and long-term care planning with their lawful spouses and domestic partners, the Defendants are violating the fundamental liberty and privacy interests in marital and familial relationships protected by the due process clause of the Fifth Amendment of the U.S. Constitution.

84.    As a proximate result of these unlawful acts, the Plaintiffs have suffered and continue to suffer irreparable injury.

85.    The Plaintiffs are entitled to relief, including declaratory relief and injunctive relief, and attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF
Violation of Fifth Amendment
Equal Protection
(against Federal Defendants)

86.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 85 as if fully set forth herein.

87.    As United States citizens, the Plaintiffs are entitled to equal consideration and treatment from the federal government, and with respect to each and every program operated by the federal government, including the treatment of qualified long-term care insurance.

88.    Under federal statute, states are authorized to offer tax-shielded long-term care insurance programs to public employees and a vast array of their family members, including their opposite-sex spouses.  26 U.S.C.A. §§ 7702B(f)(1)-(2); 152(d)(2)(A)-(G).  Same-sex spouses and domestic partners are excluded.  *Id.*; 1 U.S.C. § 7.

89.    Plaintiffs' marriages and domestic partnerships are valid and legally recognized under California law, and are afforded identical rights, responsibilities, benefits, and protections under California law.

90.     By treating the Plaintiffs differently from similarly situated opposite-sex married couples without basis, the Defendants are violating their right to equal protection secured by the Fifth Amendment of the United States Constitution.

91.     As a proximate result of these unlawful acts, the Plaintiffs have suffered and continue to suffer irreparable injury.

92.     The Plaintiffs are entitled to relief, including declaratory relief, injunctive relief, and attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**
42 U.S.C. § 1983
For Violation of Due Process Clause of Fourteenth Amendment
(against Defendants Board of Administration and Stausboll)

93.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 92 as though fully set forth herein.

94.     Plaintiffs have fundamental liberty and privacy interests in marital and familial relationships protected against state interference by the due process clause of the Fourteenth Amendment of the U.S. Constitution.  Plaintiffs' marriages and domestic partnerships are valid and legally recognized under California law.

95.     By denying Plaintiffs the right to enroll in the CalPERS Long-Term Care Program, and by conforming the plan to the unconstitutional federal standards, Defendants Board of Administration and Stausboll, acting under color of state law, are unconstitutionally burdening Plaintiffs' ability and autonomy to engage in financial and health care planning with their legally recognized spouses and domestic partners, in violation of the due process clause of the Fourteenth Amendment.

96.     As a proximate result of these unlawful acts, the Plaintiffs have suffered and continue to suffer irreparable injury.

97.     The Plaintiffs are entitled to relief, including declaratory relief, injunctive relief, and attorneys' fees and costs.

/ / /

130

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
For Violation of Equal Protection Clause of Fourteenth Amendment
(against Defendants Board of Administration and Stausboll)

98.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 97 as though fully set forth herein.

99.   Plaintiffs have a right of equal protection secured by the Fourteenth Amendment to the Constitution.  Plaintiffs' marriages and domestic partnerships are valid and legally recognized under California law.  The State of California has an interest in treating Plaintiffs in a manner equal to similarly situated state employees and their opposite-sex spouses.

100.  By denying Plaintiffs the right to enroll in the CalPERS Long-Term Care Program, and by conforming the plan to the unconstitutional federal standards, Defendants Board of Administration and Stausboll, acting under color of state law, are unconstitutionally discriminating against Plaintiffs compared to similarly situated California public employees and their opposite-sex spouses in violation of the Fourteenth Amendment of the United States Constitution.

101.  As a proximate result of these unlawful acts, the Plaintiffs have suffered and continue to suffer irreparable injury.

102.  The Plaintiffs are entitled to relief, including declaratory relief, injunctive relief, attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Enter an order declaring that 26 U.S.C.A. §§ 7702B(f)(1)-(2) (cross-referencing 152(d)(2)(A)-(G)) is unconstitutional to the extent it excludes same-sex spouses and registered domestic partners from enrollment in qualified long-term care plans;

2.    Enter an order declaring that Cal. Fam. Code § 297.5(g) is unconstitutional to the extent it excludes same-sex spouses and registered domestic partners from enrollment in the CalPERS Long-Term Care Program;

3.    Enter an order enjoining Defendant Board of Administration and Defendant Stausboll

from complying with these unconstitutional federal and state laws;

4.  Enter an order directing the Defendant Board of Administration and Defendant Stausboll to permit the enrollment of the same-sex spouses and registered domestic partners of state employees during future open enrollment periods for its Long-Term Care Plan;

5.  Enter an order enjoining Defendant United States Department of the Treasury, Defendant Geithner, Defendant Internal Revenue Service, and Defendant Shulman from challenging the tax-shielded "qualified" status of the CalPERS LTC Program;

6.  Award attorneys' fees and costs; and

7.  Grant any other relief that the Court deems just and proper.

Respectfully submitted,

THE LEGAL AID SOCIETY
EMPLOYMENT LAW CENTER

Date: August 12, 2011        By: _____/s/_____
                                  Claudia Center
                                  Attorneys for Plaintiffs

Exhibit 26

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS,

    Plaintiff,

           v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; KATHLEEN
SEBELIUS, in her official capacity as the Secretary
of the United States Department of Health and
Human Services; UNITED STATES
DEPARTMENT OF VETERANS AFFAIRS; ERIC
K. SHINSEKI, in his official capacity as the
Secretary of the United States Department of
Veterans Affairs; and the UNITED STATES OF
AMERICA,

    Defendants.

Civil Action No. _____

# COMPLAINT

# INTRODUCTION

In 2004, the Commonwealth of Massachusetts became the first state to end the exclusion

of same-sex couples from marriage.  Since that time, more than 16,000 qualified and committed

same-sex couples have married in Massachusetts and the security and stability of families has

been strengthened in important ways throughout the state.  Despite these developments, same-

sex couples in Massachusetts are still denied essential rights and protections because the federal

Defense of Marriage Act ("DOMA") interferes with the Commonwealth's sovereign authority to

define and regulate marriage.  As applied to the Commonwealth and its residents, DOMA

constitutes an overreaching and discriminatory federal law.

In this case, the Commonwealth challenges the constitutionality of Section 3 of DOMA,

codified at 1 U.S.C. § 7.  Section 3 of DOMA creates an unprecedented federal definition of

134

marriage limited to a union between one man and one woman.  Congress's decision to enact a federal definition of marriage rejected the long-standing practice of deferring to each state's definition of marriage and contravened the constitutional designation of exclusive authority to the states.  From its founding until DOMA was enacted in 1996, the federal government recognized that defining marital status was the exclusive prerogative of the states and an essential aspect of each state's sovereignty, and consistently deferred to state definitions when the marital status of an individual was used as a marker of eligibility for rights or protections under federal law.

Now, because of Section 3 of DOMA, married individuals in same-sex relationships are both denied access to critically important rights and benefits and not held to the same obligations and responsibilities arising out of marriage or based on marital status.  DOMA precludes same-sex spouses from a wide range of important protections that directly affect them and their families, including federal income tax credits, employment and retirement benefits, health insurance coverage, and Social Security payments.  In enacting DOMA, Congress overstepped its authority, undermined states' efforts to recognize marriages between same-sex couples, and codified an animus towards gay and lesbian people.

Section 3 of DOMA applies to all federal laws retrospectively and prospectively.  In so doing, it affects the Commonwealth in significant ways.  First, DOMA interferes with the Commonwealth's exclusive authority to determine and regulate the marital status of its citizens.  Although the Commonwealth views all married persons identically, Section 3 of DOMA creates two distinct classes of married persons in Massachusetts by denying hundreds of rights and protections to married individuals in same-sex relationships.  Second, Section 3 of DOMA imposes conditions on the Commonwealth's participation in certain federally funded programs

2

135

that require the Commonwealth to disregard marriages validly solemnized under Massachusetts law.  DOMA's sweeping scope exceeds the powers granted to Congress and violates the United States Constitution.

The Commonwealth seeks declaratory and injunctive relief for the narrow but critical purpose of enabling it to define marriage within its own boundaries.  This action does not address the application of DOMA in states that do not recognize marriages between same-sex couples.  It does, however, seek to remedy the fundamental unfairness that DOMA causes to Massachusetts and its residents by denying those residents equal treatment under the law.

## NATURE OF THE ACTION

1.      The Commonwealth, by and through its Attorney General Martha Coakley, brings this action seeking a declaratory judgment that Section 3 of DOMA, codified at 1 U.S.C. § 7, is unconstitutional as well as injunctive relief prohibiting the enforcement of Section 3 against Massachusetts.[1]

2.      Section 3 of DOMA exceeds congressional authority and interferes with the Commonwealth's sovereign authority to define marriage, in violation of the Tenth Amendment to the United States Constitution, Congress's Article I powers, and the Constitution's principles of federalism.  Due to the extensive scope of federal rights, obligations, and protections linked to marital status, Section 3 of DOMA creates two separate and unequal categories of married couples in the Commonwealth.  Despite the Commonwealth's recognition of only one category

---

[1] The Commonwealth's lawsuit does not challenge Section 2 of DOMA, codified at 28 U.S.C. § 1738C, which provides that states shall not be required to recognize marriages between individuals of the same sex that are validly solemnized in other states.  This lawsuit is, instead, limited to the impact of Section 3 of DOMA within the borders of the Commonwealth.  Accordingly, the Commonwealth does not assert any claims regarding the decision of other states to define marriage as a union between one man and one woman.

of married persons, Section 3 of DOMA changes the meaning of marriage in Massachusetts and commandeers state employees into implementing federal policy that contradicts Massachusetts law and violates the United States Constitution.  This usurps the Commonwealth's authority and contravenes constitutionally mandated principles of federalism.

3.     In addition, Section 3 of DOMA, through its application to programs administered by the Commonwealth and funded by the federal government, requires the Commonwealth to treat married individuals in same-sex relationships differently from married individuals in different-sex relationships.  When the Commonwealth receives federal funding for various programs, federal law requires the Commonwealth to implement DOMA's disregard of valid marriages between same-sex couples.  Section 3 of DOMA requires the Commonwealth to treat married individuals in same-sex relationships as single, imposing an impermissible condition on the Commonwealth in violation of the Spending Clause of Article I of the United States Constitution.

4.     This case is an action for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57.

**PARTIES**

5.     The Commonwealth brings this action in its own capacity as a sovereign state. The Commonwealth has a significant interest in treating its residents equally as required by its constitution and laws and as further required by the United States Constitution.  The Commonwealth also has an interest in maintaining its sovereign authority to define the marital status of its citizens, as well as an interest in not being conscripted as an agent implementing federal policy that conflicts with Massachusetts law and violates the United States Constitution.

4

The Commonwealth further has an interest in not being subject to unconstitutional conditions in connection with its receipt of federal funds.

6.     Defendant the United States Department of Health and Human Services is responsible for the administration of the Centers for Medicare and Medicaid Services.

7.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services.  She is named as a defendant in her official capacity only.

8.     Defendant the United States Department of Veterans Affairs is responsible for the National Cemetery Administration and the State Cemetery Grants Service.

9.     Defendant Eric K. Shinseki is the Secretary of the United States Department of Veterans Affairs.  He is named as a defendant in his official capacity only.

10.     The United States of America is named as a defendant because this action challenges the constitutionality of an Act of Congress.  28 U.S.C. § 2403(a).

## JURISDICTION

11.     The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1346(a)(2) because it arises under the Constitution and laws of the United States.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(3), because no real property is involved in this action, the Commonwealth is situated in this judicial district, and the defendants are officers of the United States, agencies of the United States, and the United States.

## MARRIAGE EQUALITY IN MASSACHUSETTS

13.     In *Goodridge v. Department of Public Health*, 798 N.E.2d 941 (Mass. 2003), the Supreme Judicial Court of Massachusetts recognized that, without access to marriage, same-sex couples were "excluded from the full range of human experience and denied full protection of the [Massachusetts] laws." *Id.* at 957.

14.     The Supreme Judicial Court concluded that marriage is among the most basic of liberty interests and due process rights and that excluding same-sex couples from marriage violated the equality and liberty provisions of the Massachusetts Constitution.  798 N.E.2d at 959-961, 968.

15.     The Supreme Judicial Court stayed entry of its ruling for 180 days in order to give the Massachusetts General Court (the state legislature) an opportunity to remedy the constitutional infirmity.  798 N.E.2d at 970.

16.     On February 3, 2004, the Supreme Judicial Court rendered an advisory opinion to the Massachusetts General Court concluding that a bill prohibiting same-sex couples from entering into marriage, but allowing them to form civil unions, would not comply with the *Goodridge* decision and would violate the Massachusetts Constitution.  *In re Opinions of the Justices to the Senate*, 802 N.E.2d 565, 569 (Mass. 2004).

17.     Since May 17, 2004 – 180 days after the *Goodridge* decision – the Commonwealth has recognized a single marital status that is open and available to every qualifying couple, whether same-sex or different-sex.

18.     In September 2005, a Joint Session of the Commonwealth's Legislature (commonly referred to as a state "constitutional convention") overwhelmingly defeated a

legislatively proposed constitutional amendment to prohibit marriages between same-sex couples.

19.    In June 2007, during another Joint Session of the Legislature, state legislators considered a citizen-initiated proposed constitutional amendment to prohibit marriages between individuals of the same sex.  That proposed constitutional amendment failed to obtain the twenty-five percent of votes needed to send it to the electorate in the state elections of November 2008.

20.    On July 31, 2008, the Massachusetts General Court repealed a 1913 law (Mass. Gen. Laws ch. 207, §§ 11-12) that barred couples from marrying in Massachusetts if that marriage was prohibited in their home state.  The repeal had the effect of permitting same-sex couples who resided in other states to obtain marriage licenses in Massachusetts.

## FEDERAL DEFENSE OF MARRIAGE ACT

21.    Prior to 1996, the federal government of the United States recognized that the authority to create and regulate marital status was the exclusive prerogative of the states and consistently deferred to each state's definition of marriage, including when the marital status of an individual was used as a marker of eligibility for a right, responsibility, or protection under federal law.

22.    DOMA was enacted in anticipation of the possibility that Hawai`i might permit marriages between same-sex couples.  In 1993, the Supreme Court of Hawai`i ruled in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), that refusing to grant marriage licenses to same-sex couples was sex-based discrimination.  However, the court remanded the case for further proceedings and did not order the state to begin issuing marriage licenses to same-sex couples.  As a result, at

the time that DOMA was enacted, no state recognized marriages between individuals of the same sex.

23.     DOMA, when it was enacted, eviscerated more than 200 years of federal government deference to the states with respect to defining marriage.

24.     DOMA prospectively invalidated marriages between same-sex couples for purposes of all federal laws, whether enacted before or after DOMA.  It provides:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7.

25.     DOMA applies to all facets of the federal government.  It also applies to the states when the states implement federal programs or are subject to federal law, including federal tax requirements applicable when the a state acts as an employer.

26.     But for DOMA, married individuals in same-sex relationships in the Commonwealth would receive the same status, obligations, responsibilities, rights, and protections as married individuals in different-sex relationships under local, state, and federal laws.

27.     DOMA was enacted for the purported purpose of defending "the institution of traditional heterosexual marriage," H.R. REP. NO. 104-664, at 2, 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906, notwithstanding the fact that the determination of marital status is a power reserved exclusively to the states.  At the time of DOMA's enactment, several members of Congress expressed doubts about DOMA's constitutionality because Congress had never previously defined marriage.  *See*, *e.g.*, 142 CONG. REC. H7446 (daily ed. July 11, 1996)

(DOMA "defines marriage in Federal law for the first time and says to any State, 'No matter what you do, whether you do it by referendum or by public decision or by legislative action, the Federal Government won't recognize a marriage contracted in your state if we don't like the definition. We are going to trample the States' rights' . . . .") (statement of Rep. Jerrold Nadler); *id.* at H7449 ("[DOMA] is an unnecessary intrusion into the State domain of family law.  It tears at the fabric of our Constitution.  Historically, States have the primary authority to regulate marriage based upon the Tenth amendment of the Constitution. . . .  If there is any area of law to which States can lay a claim to exclusive authority, it is the field of family relations.") (statement of Rep. Neil Abercrombie); 142 CONG. REC. S10120 (daily ed. Sept. 10, 1996) ("[I]t is not clear that this is even an appropriate area for Federal legislation.  Historically, family law matters, including marriage, divorce, and child custody laws, have always been within the jurisdiction of State governments, not the Federal Government.") (statement of Sen. Russell Feingold).

28.    Although DOMA was enacted for the purported purpose of preserving state sovereignty, H.R. REP. NO. 104-664, at 2, Section 3 of DOMA actually interferes with each state's authority to define marriage.  Congress intended that marriages between same-sex couples not be given the same "imprimatur of legal sanction" as marriages between different-sex couples. 142 CONG. REC. H7446 (daily ed. July 11, 1996) (statement of Rep. Jim Talent); *see also* 142 CONG. REC. S10101 (daily ed. Sept. 10, 1996) ("Inaction on the part of Congress would be equivalent to approval of what the Hawaiian courts may do.  We can't afford such action.") (statement of Sen. Trent Lott).

29.    DOMA was enacted to codify animus against gay and lesbian people.  H.R. REP. NO. 104-664, at 15-16; 142 CONG. REC. H7444 (daily ed. July 11, 1996) ("[N]o society that has lived through the transition to homosexuality and the perversion which it lives and what it

9

142

brought forth.") (statement of Rep. Tom Coburn); 142 Cong. Rec. H7482 (daily ed. July 12, 1996) ("The very foundations of our society are in danger of being burned.  The flames of hedonism, the flames of narcissism, the flames of self-centered morality are licking at the very foundations of our society….") (statement of Rep. Bob Barr); 142 Cong. Rec. S10068 (daily ed. Sept. 9, 1996) (DOMA "will safeguard the sacred institutions of marriage and the family from those who seek to destroy them and who are willing to tear apart America's moral fabric in the process.") (statement of Sen. Jesse Helms).

30.     DOMA was enacted to deny federal rights and protections to same-sex couples who are validly married under state law.  H.R. Rep. No. 104-664, at 18.  For example, DOMA was enacted so that the federal government would not have to provide survivorship benefits to the surviving same-sex spouse of a veteran of the Armed Services.  *Id.* (without DOMA, "these marital [survivorship] benefits would … have to be made available to homosexual couples and surviving spouses of homosexual 'marriages' on the same terms as they are now available to opposite-sex married couples and spouses.").

31.     DOMA was also enacted for the purported purpose of preserving federal resources by denying benefits and entitlements to married individuals in same-sex relationships who would qualify for such benefits if they were in a different-sex relationship.  H.R. Rep. No. 104-664, at 18.  The Congressional Budget Office, however, has estimated that, if marriages between same-sex couples were recognized in all fifty states and by the federal government, the federal budget would benefit by $500 million to $900 million annually.  Congressional Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* (June 21, 2004) at 1, *available at* cbo.gov/ftpdocs/55xx/doc5559/06-21-SameSexMarriage.pdf.  This

net benefit is due to estimated increased revenues through income and estate taxes and decreased outlays for Supplemental Security Income, Medicaid, and Medicare. *Id.* at 2, 5.

## FEDERAL REGULATION OF MARRIAGE

32.     Section 3 of DOMA trespasses on a core area of state sovereignty by creating two distinct and unequal categories of married persons in states, such as Massachusetts, in which the legal status of marriage extends to both same-sex and different-sex couples.

33.     Since the founding of the United States, the determination of who can marry and who is recognized as being married has been made by state law. Prior to DOMA's enactment, federal law referring to marital status incorporated state definitions of marriage. In contravention of this longstanding respect for states' prerogative to define the institution of marriage, Section 3 of DOMA creates a federal definition of marriage and regulates the meaning of marriage within the sovereign states.

34.     The federal General Accounting Office identified 1,138 statutory provisions in which marital status is a factor in determining eligibility for or entitlement to federal benefits, rights, and privileges. General Accounting Office, *Defense of Marriage Act: Update to Prior Report*, GAO/OGC-04-353R (January 23, 2004), *updating* General Accounting Office, *Defense of Marriage Act*, GAO/OGC-97-16 (January 31, 1997), *available at* gao.gov/new.items/d04353r.pdf.

35.     These federal laws create rights, obligations, and protections pertaining to a wide range of areas, including the workplace, healthcare, taxes, Social Security, retirement, intellectual property, and court proceedings. They significantly affect the lives of every married person throughout the United States. By disregarding Massachusetts's definition of marriage,

DOMA prevents legally married same-sex couples in the Commonwealth from having access to hundreds of rights and protections provided to married different-sex couples.

36.     For example, Social Security benefits are affected by marital status in a variety of ways.  Spouses qualify for up to fifty percent of a disabled worker's benefit, spouses are entitled to a higher benefit upon the retirement or death of their spouse, and surviving spouses are given a one-time lump-sum death benefit.

37.     Eligibility for Medicare benefits is likewise affected by marital status.  Being married allows an otherwise ineligible individual to qualify for free hospital insurance (Medicare Part A) based on his or her spouse's work record.  Once a person qualifies for Medicare Part A, he or she can enroll in Part B (medical insurance) and, in turn, becomes eligible for Medicare Parts C (Medicare Advantage Plans) and D (prescription drug coverage).

38.     In the workplace, spouses enjoy rights relating to retirement and benefits plans, medical leave, and healthcare coverage.  Under most private employee benefit plans, which are federally regulated, spouses are guaranteed annuities, spousal approval is required to secure loans with pension benefits, and spouses are the automatic beneficiaries of many plans.  When a spouse is ailing, an employee is ensured at least twelve weeks of unpaid leave to care for his or her spouse.  In addition, spouses are entitled to enroll in an employer's healthcare plan outside of the open enrollment period and are allowed to maintain healthcare coverage through the employer even after employment is terminated.  A flexible spending account, which is exempt from federal income taxes, can be used to pay for medical expenses incurred by a spouse.

39.     Marital status also has a significant impact on federal income tax liability.  Spouses are permitted to file a joint income tax return and pool deductions.  The value of healthcare coverage provided by an employer to a spouse is not considered taxable income.

Money and property transferred between spouses is not taxable, and spouses are permitted to contribute portions of their income to Individual Retirement Accounts of their spouses.

40.    Spouses of public safety officers (police officers, firefighters, etc.), railroad workers, military veterans, and federal employees are afforded certain rights, including payments for tuition fees, annuities, and healthcare coverage.

41.    Other examples of the severe impact of DOMA's discrimination against Massachusetts citizens who are legally married to a spouse of the same sex are set forth in the Addendum to this Complaint, incorporated here by reference.  Under DOMA, all of the rights and protections listed above and in the Addendum are denied to married same-sex couples and their families.

42.    Additionally, the severe impact of DOMA is amplified by the fact that the Commonwealth is conscripted as an agent to implement this discriminatory federal scheme.

43.    When the Commonwealth acts as an employer, DOMA's regulation of marriage requires the Commonwealth to disregard the lawful marriages of its own employees.  For example, the Commonwealth's employees have the option of including their spouses as a recipient of health benefits.  The Commonwealth, like other employers, is not required to treat the health benefits they provide to different-sex spouses as taxable income.  However, because DOMA restricts the meaning of spouse under the Internal Revenue Code, the Commonwealth is required to treat health benefits provided to a same-sex spouse as taxable income for the purpose of federal income and Medicare tax withholding.

44.    Approximately 550 employees of the Commonwealth include their same-sex spouses on their health insurance plans.  DOMA requires the Commonwealth to collect both federal income and Medicare taxes based on the fair market value of health benefits provided to

the same-sex spouses of these employees. In order to accommodate DOMA's requirements, the Commonwealth must undertake a multi-step process involving several different offices and agencies. These additional steps impose a burden on the Commonwealth's resources.

45.     In implementing any federally funded program that is subject to Section 3 of DOMA, the Commonwealth is required to choose between applying the state definition of marriage and applying DOMA's federal definition. In making that choice, the Commonwealth is faced with an unconstitutional dilemma: maintain federal funding by disregarding marriages that are valid under state law and discriminating against same-sex couples or risk losing federal funding by honoring marriages valid under state law and treating all married couples equally.

## FEDERALLY FUNDED PROGRAMS

46.     The Massachusetts Executive Office of Health and Human Services provides healthcare coverage to eligible low- and moderate-income individuals and families in Massachusetts through the Commonwealth's Medicaid program, known as MassHealth. *See*, *e.g.*, MASS. GEN. LAWS ch. 118E, § 9; 130 MASS. CODE REGS. ("CMR") § 501.002. Originally enacted in 1965, Medicaid offers assistance to those who have insufficient incomes and resources to meet the costs of necessary medical services.

47.     MassHealth is jointly funded by the federal government and the Commonwealth. It is administered exclusively by Massachusetts, and it is overseen by the Defendant United States Department of Health and Human Services through its Centers for Medicare and Medicaid Services ("CMS"). *See*, *e.g.*, 42 U.S.C. § 1396a (state plans complying with federal mandates receive funds); MASS. GEN. LAWS ch. 118E, § 9 (establishing MassHealth "pursuant to and in conformity with the provisions of" the federal Medicaid statute, 42 U.S.C. §§ 1396 *et seq.*).

14

147

48.     In general, the federal government reimburses half of the qualifying health benefits paid out by MassHealth.  Each year, MassHealth receives billions of dollars in federal funding.  For the fiscal year ending on June 30, 2008, MassHealth received approximately $5.3 billion in funding from the United States Department of Health and Human Services for the medical assistance program.  Commonwealth of Massachusetts, OMB Circular A-133 Report (June 30, 2008) at 9, *available at* mass.gov/Aosc/docs/reports_audits/SA/2008/2008_single_audit.pdf.

49.     The marital status of an individual seeking or receiving coverage affects MassHealth's determinations in several ways.

50.     MassHealth coverage is provided based on financial eligibility, which is determined based on the applicant's available income and assets.  In assessing eligibility of a married individual, the individual's income and assets are combined with those of his or her spouse, subject to certain exceptions.

51.     Because marital status is a key marker in the eligibility process, the conflict between Section 3 of DOMA and the Commonwealth's definition of marriage creates two constitutional problems in the implementation of MassHealth.  First, federal law requires MassHealth to assess married individuals in same-sex relationships as though they were "single," whereas married individuals in different-sex relationships must be assessed as married.   As a result, in order to comply with federal law, MassHealth must treat married individuals differently depending only on whether they are married to a person of the same sex.  Second, MassHealth cannot obtain federal financial participation ("FFP") for coverage provided to individuals in same-sex marriages who qualify when their marriages are honored in the eligibility analysis.

52.     In 2004, soon after the *Goodridge* decision, MassHealth sought clarification from CMS as to how to comply with federal law in light of the Commonwealth's recognition of marriages between individuals of the same sex.

53.     CMS informed MassHealth that it must apply the federal definition of marriage, as provided in DOMA, when assessing eligibility for Medicaid benefits.  Letter from Charlotte S. Yeh, Regional Administrator, Centers for Medicare & Medicaid Services, to Kristen Reasoner Apgar, General Counsel, Commonwealth of Massachusetts, Executive Office of Health and Human Services (May 28, 2004), attached as Exhibit 1.

54.     CMS specifically asserted that MassHealth cannot treat an individual in a same-sex marriage as eligible for Medicaid benefits on the basis of combined income or assets with a same-sex spouse, if the individual would be ineligible for benefits when considered as "single." CMS explicitly stated that FFP would not be available for the Commonwealth's expenditures for such an individual: "DOMA does not give [CMS] the discretion to recognize same-sex marriage for purposes of the Federal portion of Medicaid."  Ex. 1 at 1.

55.     CMS also asserted that federal Medicaid law requires MassHealth to provide coverage to married individuals in same-sex relationships who qualify when assessed as "single."

56.     On July 31, 2008, the Commonwealth enacted the MassHealth Equality Act, codified at MASS. GEN. LAWS ch. 118E, § 61.  The law provides that "[n]otwithstanding the unavailability of federal financial participation, no person who is recognized as a spouse under the laws of the commonwealth shall be denied benefits that are otherwise available under this chapter due to the provisions of [DOMA] or any other federal non-recognition of spouses of the same sex."  *Id.*

16

57.     In response to enactment of that law, in 2008, CMS again informed the Commonwealth that DOMA "limits the availability of FFP by precluding recognition of same sex couples as 'spouses' in the Federal program." CMS further stated that, "because same sex couples are not spouses under Federal law, the income and resources of one may not be attributed to the other without actual contribution, i.e. you must not deem income or resources from one to the other." Letter from Richard R. McGreal, Associate Regional Administrator, Centers for Medicare & Medicaid Services, to JudyAnn Bigby, M.D., Secretary, Commonwealth of Massachusetts, Executive Office of Health and Human Services (August 21, 2008), attached as Exhibit 2.

58.     CMS further asserted that the Commonwealth "must pay the full cost of administration of a program that does not comply with Federal law." Ex. 2 at 2.

59.     MassHealth makes eligibility determinations for married couples without regard to whether the marriage is between persons of the same sex or different sexes, as is required by the United States Constitution. As a result, married individuals in same-sex relationships who would qualify under federal law for Medicaid benefits but for the application of DOMA, are nevertheless covered by MassHealth. Because FFP is not available for expenditures relating to such individuals, under the MassHealth Equality Act, described above, the Commonwealth pays for the entire cost of MassHealth coverage provided to those individuals.

60.     The Commonwealth has estimated that the annual amount of FFP that is unavailable due to DOMA is $2.37 million.

61.     Additionally, because the United States Constitution compels MassHealth to treat similarly all individuals validly married under Massachusetts law, Massachusetts's compliance with the Equal Protection Clause requires MassHealth to treat certain married individuals in

17

same-sex relationships as ineligible for MassHealth coverage even though they would be eligible

for Medicaid benefits if the federal definition of marriage were applied (and their marriages

ignored).

62.     Section 3 of DOMA creates an unconstitutional dilemma for the Commonwealth

by requiring MassHealth to choose between, on the one hand, violating the Equal Protection

Clause of the Fourteenth Amendment by applying DOMA's federal definition of marriage in

order to receive federal funding from CMS and, on the other hand, losing FFP for otherwise

eligible individuals and risking enforcement for non-compliance by CMS if MassHealth

continues to treat all married individuals equally in assessing MassHealth eligibility.

63.     Marital status is also relevant to the operations of veterans' cemeteries at Agawam

and Winchendon, Massachusetts, by the Massachusetts Department of Veterans Services

("DVS").   These cemeteries are maintained for the burial of Massachusetts veterans, their

spouses, and their children.  The cemeteries are operated solely by the Commonwealth and are

located on land owned by the Commonwealth.

64.     These cemeteries were constructed, expanded, and improved through the

expenditure of federal funding provided by the Defendant United States Department of Veterans

Affairs ("VA").  38 U.S.C. § 2408(b); 38 C.F.R. § 39.5.  This federal funding is provided by a

grant program administered by the VA's State Cemetery Grants Service, which is a part of the

VA's National Cemetery Administration.

65.     The State Cemetery Grants Program was created in 1978 to complement the

service provided by the VA's system of veterans' cemeteries operated by the National Cemetery

Administration.  Through the combination of federal- and state-operated burial sites, the VA

seeks to make a veterans' cemetery available within seventy-five miles of the homes of 90% of

the veterans across the country.  United States Department of Veterans Affairs, State Cemetery

Grants Program, .cem.va.gov/scg/scgkit.asp (last visited June 19, 2009).

66.     To be eligible for burial as a veteran in a Massachusetts veterans' cemetery, an

individual must satisfy federal requirements pertaining to military service and a state requirement

of a sufficient connection to Massachusetts, such as having a home of record in Massachusetts or

being a Massachusetts resident.  United States Department of Veterans Affairs, Federal Benefits

for Veterans, Dependents & Survivors at 59 (2009), *available at*

.va.gov/opa/vadocs/fedben.pdf; Massachusetts Veterans' Memorial Cemeteries,

Interment Registration Instructions and Requirements for Agawam and Winchendon (Feb. 2002)

at 2-3, *available at* .ci.woburn.ma.us/documents/Veterans%20Office/MA%20

cemetary%20pre%20registration.pdf.

67.     To be eligible for burial as the spouse of a veteran in a Massachusetts veterans'

cemetery, federal regulations require that an individual produce a marriage certificate and

demonstrate that the veteran spouse is eligible for burial.  Federal Benefits for Veterans,

Dependents & Survivors at 59; Interment Registration Instructions and Requirements for

Agawam and Winchendon at 2-3.

68.     In operating and maintaining these cemeteries, the Commonwealth is required to

comply with regulations promulgated by the Secretary of the VA.  38 U.S.C. § 2408(c).

69.     The regulations contain the requirement that these cemeteries "must be operated

solely for the interment of veterans, their spouses, [and] surviving spouses."  38 C.F.R. § 39.5(a).

70.     The VA can recapture from the Commonwealth any funds provided by the VA for

the construction, expansion, or improvement of the cemeteries at Agawam and Winchendon if

19

either is deemed to be no longer operated solely as a veterans' cemetery. 38 U.S.C. § 2408(b)(3); 38 C.F.R. § 39.18(a).

71.     The Commonwealth has received three federal grants for the Agawam and Winchendon cemeteries. In 1999, $6,818,011 in federal funds was provided for the construction of the Agawam cemetery. In 2003, $4,780,375 in federal funds was provided for the expansion of the Agawam cemetery. In 2003, $7,422,013 in federal funds was provided for the construction of the Winchendon cemetery.

72.     Soon after Massachusetts recognized the right to marry for individuals of the same sex, DVS sought clarification from the VA as to how to comply with federal law. In response to this inquiry, the VA informed the Commonwealth that the "VA would be entitled to recapture Federal grant funds provided to DVS for either [the Agawam or Winchendon] cemeteries should [Massachusetts] decide to bury the same-sex spouse of a veteran in the cemetery, unless that individual is independently eligible for burial." Letter from Tim S. McClain, General Counsel to the Department of Veteran Affairs, to Joan E. O'Connor, General Counsel, Massachusetts Department of Veterans' Services at 1 (June 18, 2004), attached as Exhibit 3.

73.     The VA further stated that, in light of DOMA, the cemeteries at Agawam and Winchendon "would not be operated solely for the interment of veterans and their spouses and children if [Massachusetts] allowed the interment of a person solely on the basis that the person is recognized under [Massachusetts] law as being the same-sex spouse of a veteran." Ex. 3 at 2.

74.     On June 4, 2008, the National Cemetery Administration published NCA Directive 3210/1, which states that "individuals in a same-sex civil union or marriage are not eligible for burial in a national cemetery or State veterans cemetery that receives federal grant funding based

on being the spouse or surviving spouse of a same-sex veteran." NCA Directive 3210/1 (June 4, 2008), attached as Exhibit 4.

75.     Massachusetts veterans and their family members regularly apply for burial in either the Agawam or Winchendon cemetery far in advance of their deaths. DVS either pre-approves or denies these applications by determining whether the applicants are eligible for burial in either of these cemeteries, based on the federally mandated and state-specific criteria described herein.

76.     DVS treats identically the applications of married veterans in same-sex and different-sex relationships.

77.     DVS has pre-approved an application for burial submitted by a Massachusetts veteran and his same-sex spouse. This same-sex spouse is not otherwise eligible for burial in a Massachusetts veterans' cemetery.

78.     The VA has taken the position that it has the authority to withhold federal funding from the Commonwealth due to the Commonwealth's equal and identical treatment of married individuals in assessing eligibility for interment.

79.     Section 3 of DOMA creates an unconstitutional dilemma for the Commonwealth by requiring DVS to choose between, on the one hand, violating the Equal Protection Clause of the Fourteenth Amendment by refusing burial of the same-sex spouses of Massachusetts veterans in a Massachusetts veterans' cemetery and, on the other hand, risking enforcement for non-compliance by the VA if DVS continues to apply the state definition of marriage in assessing eligibility for burial in a veterans' cemetery.

**CAUSES OF ACTION**

**COUNT ONE – VIOLATION OF THE TENTH AMENDMENT
AND CONSTITUTIONAL PRINCIPLES OF FEDERALISM**
**(U.S. CONST. amend. X)**

80.     The allegations contained in paragraphs 1 through 79 are re-alleged and incorporated into this count as though fully set forth herein.

81.     The Tenth Amendment to the United States Constitution expressly reserves to the states all powers except those limited powers granted to the federal government.

82.     The Tenth Amendment ensures the division of powers between the states and federal government that is necessary for the dual sovereignty of the federal system.

83.     The Tenth Amendment preserves for the states the authority to regulate and define marriage for their citizens.

84.     Congress lacks the authority under Article I of the United States Constitution to regulate the field of domestic relations, including marriage.

85.     Section 3 of DOMA violates the Tenth Amendment, exceeds Congress's Article I powers, and runs afoul of the Constitution's principles of federalism by creating an extensive federal regulatory scheme that interferes with and undermines the Commonwealth's sovereign authority to define marriage and to regulate the marital status of its citizens.

86.     Enforcement of Section 3 of DOMA unconstitutionally commandeers the Commonwealth and its employees as agents of the federal government's regulatory scheme and requires the Commonwealth to facilitate the implementation of a discriminatory federal policy.

22

## COUNT TWO – VIOLATION OF THE SPENDING CLAUSE
### (U.S. Const. art. I, § 8)

87.     The allegations contained in paragraphs 1 through 86 are re-alleged and incorporated into this count as though fully set forth herein.

88.     Article I, § 8 of the United States Constitution limits the power of Congress to attach conditions to the receipt of federal funds.  One such limitation is that Congress may not exercise its spending power in a manner that induces a state to violate the constitutional rights of its citizens.

89.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

90.     Massachusetts recognizes a unitary status of married persons, irrespective of whether they are part of a same-sex or a different-sex couple.  Section 3 of DOMA, as applied to the Medicaid statute, 42 U.S.C. §§ 1396 *et seq.*, requires the Commonwealth to violate the Equal Protection Clause by treating married individuals in same-sex relationships and married individuals in different-sex relationships differently for purposes of determining eligibility for Medicaid benefits.

91.     Section 3 of DOMA, as applied to the State Cemetery Grants Program, 38 U.S.C. § 2408, likewise requires the Commonwealth to violate the Equal Protection Clause by treating married individuals in same-sex relationships and married individuals in different-sex relationships differently for the purposes of determining eligibility for burial in a Massachusetts veterans' cemetery.

23

92.     None of the interests purportedly furthered by DOMA, as it applies to these programs, justifies discrimination against married individuals in same-sex relationships. Because all of these individuals are married under Massachusetts law, there is no basis for DOMA's required differential treatment of same-sex and different-sex couples.  As a result, DOMA, as applied to these programs, violates the Spending Clause.

93.     Another limitation on Congress's authority pursuant to the Spending Clause is that Congress may not attach conditions to the receipt of federal funds that lack a sufficient nexus to the purpose(s) advanced by the program's implementation.

94.     Medicaid funding is given to MassHealth for the purpose of providing healthcare coverage to low- and moderate-income residents of the Commonwealth.

95.     CMS has mandated that MassHealth must disregard the valid marriages of same-sex couples in order to continue to receive federal funds.

96.     Veterans' cemetery funding is given to DVS for the purpose of constructing and improving cemeteries that provide a convenient burial site for military veterans and their families.

97.     The VA has mandated that DVS must disregard the valid marriages of veterans and their same-sex spouses in order to continue to receive federal funds.

98.     Because there is no nexus between discriminating against individuals in same-sex marriages and the purposes advanced by these programs, Section 3 of DOMA, as applied to these programs, violates the Spending Clause.

## COUNT THREE – DECLARATORY JUDGMENT
### (28 U.S.C. § 2201)

99.     As demonstrated by the allegations set forth in paragraphs 1 through 98, which

are incorporated into this count as though fully set forth herein, there is an actual controversy of

sufficient immediacy and concreteness relating to the legal rights and duties of the

Commonwealth and the proper legal relations between the Commonwealth and the Defendants to

warrant relief under 28 U.S.C. § 2201.

100.    The harm to the Commonwealth as a direct result of DOMA is sufficiently real

and/or imminent to warrant the issuance of a conclusive declaratory judgment usefully clarifying

the legal relations of the parties.


## PRAYER FOR RELIEF

The Commonwealth of Massachusetts respectfully requests that the Court:

A.      Enter an order declaring that 1 U.S.C. § 7 is unconstitutional as applied in

Massachusetts, where state law recognizes marriages between same-sex couples;

B.      Enter an order declaring that 1 U.S.C. § 7 as applied to 42 U.S.C. §§ 1396 *et seq.*

and 42 C.F.R. pts. 430 *et seq.* is unconstitutional as applied in Massachusetts,

where state law recognizes marriages between same-sex couples;

C.      Enter an order declaring that 1 U.S.C. § 7 as applied to 38 U.S.C. § 2408 and 38

C.F.R. pt. 39 is unconstitutional as applied in Massachusetts, where state law

recognizes marriages between same-sex couples;

  D.  Enjoin Defendants and any other agency or official acting on behalf of Defendant the United States of America from enforcing 1 U.S.C. § 7 against Massachusetts and any of its agencies or officials;

  E.  Award attorneys' fees and costs; and

  F.  Grant any other relief that the Court considers proper.


Dated:  July 8, 2009    Respectfully submitted:
Boston, Massachusetts

         COMMONWEALTH OF MASSACHUSETTS
         MARTHA COAKLEY
         ATTORNEY GENERAL


         */s/ Maura T. Healey*
         */s/ Jonathan B. Miller*
         Maura T. Healey, BBO No. 640856
         Jonathan B. Miller, BBO No. 663012
         Christopher K. Barry-Smith, BBO No. 565698
         David S. Friedman, BBO No. 635807
         Assistant Attorneys General
         One Ashburton Place
         Boston, MA 02108
    Tel:     (617) 727-2200
    Fax:     (617) 727-5762
         Maura.Healey@state.ma.us
         Jonathan.Miller@state.ma.us
         CBarry-Smith@state.ma.us
    David.S.Fried    man@state.ma.us

### ADDENDUM OF FEDERAL LAW REGULATING MARRIAGE

| Topic | Citation | Effect on Marriage |
|---|---|---|
| **Federal Employee Benefits** | 5 U.S.C. §§ 6382-6383 | Most federal employees may use up to a total of twelve administrative work weeks of sick leave each year to care for a spouse with a serious health condition. |
| | 5 U.S.C. § 8133 | If a federal employee's death resulted from an injury sustained in the performance of duty, the employee's surviving spouse is eligible for compensation equal to a percentage of the employee's monthly pay. The compensation for a surviving spouse is paid for life, unless he or she re-marries before the age of fifty-five. |
| | 5 U.S.C. §§ 8331, 8401; 5 U.S.C. §§ 8331(10), 8401(23) | Federal employees with permanent appointment are eligible for retirement and disability benefits under either the Civil Service Retirement System ("CSRS") or the Federal Employees Retirement System ("FERS"). Both CSRS and FERS provide survivor benefits for the spouse of a deceased federal employee or retiree. |
| | 5 U.S.C. §§ 8341(b)(1), 8442(a)(1) | Married federal employees who retire under either CSRS or FERS receive a joint and survivor annuity. |
| | 5 U.S.C. § 8341(b)(1) | Under CSRS, the surviving spouse of a federal employee is eligible for an annuity equal to 55% of the retirement benefit that the deceased employee had accrued at the time of death. |
| | 5 U.S.C. § 8442(a)(1) | Under FERS, the surviving spouse is eligible for a lump-sum survivor benefit equal to one-half of the employee's annual basic pay plus a lump-sum payment. |
| | 5 U.S.C. § 8901(5) | Spouses of federal employees can obtain health insurance through the Federal Employees Health Benefits Program ("FEHB") as a member of the employee's family. |
| | 5 U.S.C. §§ 8905, 8905a U.S. Office of Personnel Management, *Death Benefits*, .opm.gov/retire/faq/po st/faq4.asp#family (last visited July 7, 2009) | Spouses who survive a deceased federal employee who was enrolled in the FEHB may continue to participate in that program at the same cost as a federal employee if, prior to the employee's death, the spouse was covered as a family member under the plan. |
| | 5 U.S.C. §§ 8981-8992 | Spouses of federal employees can obtain dental insurance and vision benefits as a member of the employee's family. |
| | Federal Retirement Thrift Investment Board, *TSP Features for Civilians*, .tsp.gov/features/chapt er15.html (last visited July 7, 2009) | Under FERS, federal employees participate in a Thrift Savings Plan. The employee's spouse has the right to consent before money is borrowed from the account as well as to approve withdrawal. |
| | FSAFeds Program, *Summary of Benefits with Frequently Asked Questions*, fsafeds.com/fsafeds/ SummaryofBenefits.asp#HCFSA (last visited July 7, 2009) | Spouses of federal employees can participate in the employee's Health Care Flexible Savings Account. |

| Topic | Citation | Effect on Marriage |
|-------|----------|--------------------|
| **Federal Employee Benefits** | U.S. Department of Labor, *Employment Standards Administration, Division of Federal Employees' Compensation*, CA-11, dol.gov/esa/regs/com pliance/owcp/ca-11.htm (last visited July 7, 2009) | If a federal employee becomes disabled from a work-related injury, the employee is paid one-third of his or her salary if he of she has no dependents, but three-quarters of his or her salary if he or she has dependents. A spouse can be considered a dependent. |
| **Bankruptcy** | 11 U.S.C. § 302 | Spouses are permitted to file jointly for bankruptcy protection. |
| | Administrative Office of the United States Courts, *Bankruptcy Basics* (April 2006), .uscourts.gov/bankrup tcycourts/bankbasics0908.pdf | The ability to file jointly allows creditors to file only one claim and the married couple to pay only one filing fee. |
| | 11 U.S.C. §§ 507, 1328 | A former spouse of a debtor making a claim for payments required as part of a divorce or separation agreement is given a higher priority than some other creditors. |
| **National Housing Act** | 12 U.S.C. § 1701j-3(d)(6) | Banks sometimes utilize a due-on-sale clause in mortgage agreements that permit them to declare a loan payable in full if the borrower sells the property without the bank's consent. Use of a due-on-sale clause is prohibited in cases of transfers of residential property from one spouse to another. |
| **Consumer Credit Protection Act** | 15 U.S.C. §§ 1673(a), (b)(2) | Up to 25% of a person's disposable weekly earning can be subject to garnishment, but if the purpose of the garnishment is to enforce an order for the support of any person, including a spouse or former spouse, the maximum that can be garnished is 60%. |
| **Copyright** | 17 U.S.C. § 203(a)(2)(A) | When an author is dead, his or her right to terminate the licensing of a copyright may be exercised by the author's surviving spouse. |
| | 17 U.S.C. § 304(a)(1)(C)(2) | A surviving spouse is entitled to the renewal and extension of a copyright for a further term of sixty-seven years. |
| **Education Loans** | 20 U.S.C. § 1087e(e)(2) | Various federal student loans are eligible for income contingent repayment. If the borrower is married, the repayment schedule is based upon the adjusted gross income of the borrower and his or her spouse. |
| | 20 U.S.C. §§ 1087nn(a), (b)(1), (b)(4), (b)(7); 20 U.S.C. § 1087vv(d)(5) | Eligibility for federal financial assistance for education is determined based on information provided in the Free Application for Federal Student Aid ("FAFSA"), which requires identification of a student's marital status as well as information about the available income, assets, and additional expenses of the student's spouse. A student is considered an independent applicant if he or she is married. |
| | 20 U.S.C. § 1087oo(a); 20 U.S.C. § 1087oo(f)(1) | The expected family contribution of any dependent student includes consideration of both parents' income and assets if the parents are married. If a student's parents are not married or are divorced, parental contribution includes only the income and assets of one of the parents. |
| **Tax** | 26 U.S.C. § 1 | Spouses are permitted to file a joint federal tax return. |
| | 26 U.S.C. § 105 | A healthcare flexible spending account, which is exempt from income tax, can be used to pay for medical expenses of an employee or a spouse. |
| | 26 U.S.C. § 106 | When a married employee receives employer-provided health benefits, the value of the health insurance for the employee's spouse is not considered taxable compensation to the employee. |

| Topic | Citation | Effect on Marriage |
|-------|----------|--------------------|
| Tax | 26 U.S.C. § 163(h)(3) | Taxpayers are limited to $1,000,000 in mortgage interest deductions for acquisition indebtedness and $100,000 for home equity indebtedness on either a joint return or a single return; married taxpayers filing individually are limited to $500,000 for acquisition indebtedness and $50,000 for home equity indebtedness. |
| | 26 U.S.C. § 213 | Married couples filing jointly may pool deductions, such as the deduction for certain uncompensated medical expenses. |
| | 26 U.S.C. § 215(a) | Alimony payments are excluded from the taxable income of the spouse making alimony payments. |
| | 26 U.S.C. § 219 | An employed spouse is permitted to make an Individual Retirement Account contribution on behalf of a non-working spouse or a spouse who has little income. |
| | 26 U.S.C. § 401 | Spouses receive preferential treatment in retirement savings and use of retirement funds. |
| | 26 U.S.C. § 1041 | The transfer of property (including retirement funds) to a spouse, or to a former spouse incident to a divorce, is not a taxable transfer. |
| | 26 U.S.C. § 1211(b)(1) | Taxpayers are limited to a $3,000 net capital loss deduction on a joint or single return; married taxpayers filing individually are limited to a $1,500 net capital loss deduction. |
| | 26 U.S.C. § 2056(a) | The value of the taxable estate is determined by deducting the value of any interest in property that passes or has passed from the decedent to a surviving spouse. |
| | 26 U.S.C. § 2603; 26 U.S.C. § 1041; Internal Revenue Service, *Frequently Asked Questions on Gift Taxes*, .irs.gov/businesses/sm all/article/0,,id=108139,00.html (last visited July 7, 2009) | An individual can give another individual who is not a spouse no more than $13,000 in a calendar year without having to file a gift tax return. There is no limit on the amount one spouse can give another. |
| | 26 U.S.C. § 6013(d)(3) | Spouses have joint and several liability for the income tax on a joint return unless innocent spouse relief applies. |
| Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) | 29 U.S.C. § 1166(a); U.S. Department of Labor, *Continuation of Health Coverage*, .dol.gov/dol/topic/heal th-plans/cobra.htm (last visited July 7, 2009) | If an employer chooses to provide an employee and his or her spouse with healthcare coverage, COBRA requires the employer upon termination of employment to offer the employee's spouse the opportunity to continue their healthcare coverage for a prescribed period, provided that the spouse pays the applicable premium. |
| Employee Retirement Income Security Act (ERISA) | 26 U.S.C. §§ 401(a)(11); 401(a)(17) | Pension plans are required to provide spouses with certain protections, including a Qualified Preretirement Survivor Annuity while the employee is working and a Qualified Joint and Survivor Annuity at retirement. |
| | 26 U.S.C. § 401(a)(11)(B)(iii) | Under a profit-sharing plan, a spouse is the automatic beneficiary of the employee's benefit, unless waived by the spouse. |
| | 26 U.S.C. § 417(a)(2) | An employee must obtain his or her spouse's approval to waive a Qualified Joint and Survivor Annuity or a Qualified Pre-retirement Survivor Annuity. |
| | 26 U.S.C. § 417(a)(4) | An employee must obtain his or her spouse's approval to use his or her accrued pension benefit as a security for a loan. |

3

| Topic | Citation | Effect on Marriage |
|---|---|---|
| ERISA | 29 U.S.C. § 1055 | Defined contribution plans, such as 401(k) plans, pay the account balance to the designated beneficiary if the participant dies. The employee's spouse is the automatic beneficiary upon the employee's death, unless the employee has specifically designated someone else. |
| | 29 U.S.C. § 1056(d)(3); 26 U.S.C. § 401(a)(13)(B) | Benefits from a retirement plan subject to ERISA may not be pledged, attached, levied upon or awarded by a court to another private party. One major exception is divorce proceedings, where the retirement assets may be viewed as marital property. Federal law permits benefits to be awarded to a former spouse through a Qualified Domestic Relations Order. |
| Family and Medical Leave Act | 29 U.S.C. § 2612(a)(1)(C) | Requires covered employers to offer employees up to twelve weeks of unpaid leave to care for a spouse. |
| Veterans Benefits | 38 U.S.C. § 1115 | Veterans who have at least a 30% disability are entitled to additional disability compensation if they have dependents. For this purpose, a spouse is considered a dependent. |
| | 38 U.S.C. §§ 1121, 1141 | A surviving spouse of a veteran is entitled to receive a monthly pension if the veteran's death was service connected. |
| | 38 U.S.C. §§ 1158 | A veteran's spouse may receive compensation if a veteran disappears. |
| | 38 U.S.C. §§ 1311, 1317 | A surviving spouse of a veteran is entitled to receive monthly dependency or indemnity compensation payments if the veteran's death was service connected. |
| | 38 U.S.C. §§ 1701, 1781 | The spouses of certain veterans are entitled to medical care provided by the government. |
| | 38 U.S.C. § 1722 | In determining, based on income and assets, whether a veteran has the ability to defray necessary home care and medical expenses, the property of the spouse of the veteran is included as an asset of the veteran. |
| | 38 U.S.C. § 1901 | Spouses of veterans may be beneficiaries of National Service Life Insurance. |
| | 38 U.S.C. § 2402 | Spouses of veterans are eligible for interment in national cemeteries if the veteran is eligible. |
| | 38 U.S.C. §§ 3500, 3501, 3511, 3512, 3534 | The surviving spouse of a veteran who died of a service-connected disability is entitled to educational assistance for up to 45 months and to job counseling, training, and placement services. |
| | 38 U.S.C. § 3701(b)(2) | The loan guarantee benefit extends to surviving spouses of veterans who died on active duty or as a result of a service-connected disability. |
| | 38 U.S.C. § 3704(c)(2); U.S. Department of Veterans Affairs, *Pre-Loan Frequently Asked Questions*, homeloans.va.gov/faq preln htm (last visited July 7, 2009). | Loans guaranteed by the U.S. Department of Veterans Affairs assist eligible veterans in the purchase of a home by protecting private lenders against loss if the veteran fails to repay the mortgage. The guarantee requires that the veteran certify an intent to occupy the property, but if the veteran is in active duty status and unable to occupy, the veteran's spouse can fulfill the occupancy requirement. |
| | 38 U.S.C. § 4215; 5 U.S.C. § 2108 | Surviving spouses and certain spouses enjoy certain preferences in federal employment and job training. |
| | 38 C.F.R. § 39.5(a) | Spouses of veterans are entitled to interment in state-operated veterans' cemeteries if the veteran is eligible for burial. |

4

163

| Topic | Citation | Effect on Marriage |
|---|---|---|
| Medicare | 42 U.S.C. § 1395i-2 | Marriage allows an ineligible individual who has never worked or who has not worked long enough to qualify for free hospital insurance based on his or her spouse's work record. |
| | Centers for Medicare & Medicaid Services, *Medicare and You 2009*, CMS Publication No. 10050 (Sept. 2008), medicare.gov/Publica tions/Pubs/pdf/10050.pdf | Once a person qualifies for Medicare Part A (hospital insurance) – including by qualifying on the basis of his or her spouse's eligibility for Medicare Part A even though he or she would not independently qualify – he or she can enroll in Part B (medical insurance) by paying a monthly premium. Anyone enrolled in both Medicare Part A and Part B may enroll in Part C, which provides additional benefits. When a person receives coverage under Medicare Part A, Part B, or Part C, he or she is eligible to receive prescription drug coverage under Part D by paying a monthly premium. |
| Medicaid | 42 U.S.C. § 1396r-5(b)(1) | The income of a spouse is not deemed available to a married Medicaid applicant receiving institutionalized care. |
| | 42 U.S.C. § 1396r-5(d) | After an institutionalized spouse is determined to be eligible for medical assistance, in determining the amount of the institutionalized spouse's income that is to be applied monthly to payment for the costs of care in the institution, a community spouse allowance is to be deducted from the institutionalized spouse's countable income. |
| | 20 C.F.R. §§ 416.1160, 416.1202 | The income and assets of a spouse are deemed available to a married Medicaid applicant. |
| | 42 C.F.R. § 433.36(g)(3)(i) | A state cannot place a lien on an institutionalized Medicaid recipient's property if the member's spouse is living in the home. |
| | 42 C.F.R. § 433.36(h)(2)(i) | A state can recover payments from the estates of deceased members. This recovery must be deferred when there is a surviving spouse. |
| Social Security | 42 U.S.C. § 402(b), (c) | If a worker is eligible for federal disability benefits, a spouse and/or a divorced spouse may qualify for up to 50% of the disabled worker's benefit amount. |
| | 42 U.S.C. § 402(b), (c) | When both members of a married couple are retired and collecting Social Security benefits, the lower-earning spouse can increase his or her benefit by up to one half of the higher-earning spouse's payment. |
| | 42 U.S.C. § 402(e), (f) | After a worker's death, a surviving spouse and/or ex-spouse may receive the worker's higher benefit, instead of his or her own benefit, as long as the spouse is at least sixty years old, was married to the worker for at least nine months, and is not currently married to someone else. |
| | 42 U.S.C. § 402(i); 20 C.F.R. §§ 404.390 – 404.391 and § 404.347 | A surviving spouse is entitled to a one-time lump-sum death benefit of $255 if the surviving spouse was "living in the same household with the deceased at the time of death," if the surviving spouse applies for the benefit "prior to the expiration of two years after the date of death …," and if the deceased spouse was "fully or currently insured" at the time of death. |
| | 42 U.S.C. § 1382 | When two eligible individuals are spouses who live together, only one is eligible for Supplemental Security Income benefits in a given month. |
| | 42 U.S.C. §§ 1382a, 1382b; Social Security Administration, *Understanding Supplemental Security Income*, socialsecurity.gov/ssi/text-income-ussi.htm (last visited July 7, 2009) | For purposes of determining eligibility for Supplemental Security Income benefits, the resources of a spouse are deemed to be those of the applicant as well, with certain limited exclusions. |

5

| Topic | Citation | Effect on Marriage |
|---|---|---|
| **Public Safety Officers Benefit Program** | 42 U.S.C. § 3796; Bureau of Justice Assistance, *Public Safety Officers' Benefits Program*, .ojp.usdoj.gov/BJA/gr ant/psob/psob_main html (last visited July 7, 2009) | If a public safety officer dies in the line of duty, his or her spouse is entitled to death benefits.  As of October 1, 2008, the benefit amount is a one-time payment of $315,746. |
| | 42 U.S.C. § 3796d-1; 38 U.S.C. § 3532; Bureau of Justice Assistance, *Public Safety Officers' Benefits Program: Education Assistance Benefits*, .ojp.usdoj.gov/BJA/gr ant/psob/psob_education.html (last visited July 7, 2009) | If a public safety officer dies or is permanently disabled in the line of duty, his or her spouse is entitled to payment for education expenses, including tuition and fees, room and board, books, supplies, and other education-related costs.  As of October 1, 2008, the maximum award for a full-time student is $915.00 per month of class attendance. |
| **Child Support Enforcement** | 42 U.S.C. §§ 659, 660 | The federal government assists in enforcing the support obligations of parents to their children and the spouse with whom the children are living.  Federal courts have jurisdiction to hear enforcement matters, and the federal government withholds payment due to an individual if that individual owes child support. |
| **Older Americans Act** | 42 U.S.C. § 3030g-21 | Nutrition services, including congregate and home delivery meals, are provided to older individuals (age sixty and over) and their spouses, irrespective of the spouse's age. |
| **Railroad Retirement Act** | 45 U.S.C. § 59 | 45 U.S.C. § 51 creates liability for injuries to employees due to railroad negligence.  Any right of action given to a person suffering injury survives to his or her personal representative, for the benefit of the surviving spouse. |
| | 45 U.S.C. § 231a(c) | Spouses of railroad workers are entitled to retirement and disability annuities to which railroad workers are entitled. |
| | 45 U.S.C. § 231a(c)(2) | An annuity may also be payable to the divorced wife or husband of a retired employee if their marriage lasted for at least ten consecutive years, both have attained age sixty-two for a full month, and the divorced spouse is not currently married. |
| **Federal Court Privileges** | *Trammel v. United States*, 445 U.S. 40 (1980) | In federal courts, under the testimonial privilege, an individual cannot be compelled to testify against his or her spouse. |
| | *Blau v. United States*, 340 U.S. 332 (1951) | In federal courts, confidential communications between spouses are privileged.  The privilege can be asserted by either spouse. |
| **Health Insurance Portability and Accountability Act (HIPAA)** | U.S. Department of Labor, *Portability of Health Coverage*, .dol.gov/dol/topic/heal th-plans/portability htm (last visited July 7, 2009) | Special enrollment rights allow spouses of a covered employee to enroll outside of a group plan's open enrollment period. |

Exhibit 27

FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EDWIN BLESCH, TIMOTHY
SMULIAN, FRANCES HERBERT,
TAKAKO UEDA, SANTIAGO ORTIZ,
PABLO GARCÍA, KELLI RYAN, LUCY
TRUMAN, HEATHER MORGAN and
MARIA DEL MAR VERDUGO,

 Plaintiffs,

v.

ERIC H. HOLDER, JR., United States
Attorney General; JANET NAPOLITANO,
Secretary of the Department of Homeland
Security; ALEJANDRO MAYORKAS,
Director, United States Citizenship and
Immigration Services; ROBERT M.
COWAN, Center Director, National
Benefits Center, United States Citizenship
and Immigration Services, and DANIEL
M. RENAUD, Director, Vermont Service
Center, United States Citizenship and
Immigration Services,

 Defendants.

---

CIVIL ACTION DOCKET NO.

_____

**COMPLAINT**

**CV 12 - 1578**

**AMON, CH.J.**

ORENSTEIN J.

## PRELIMINARY STATEMENT

This is a constitutional challenge to the so-called Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7, as it applies to the immigration rights of lesbian and gay bi-national couples.

1.   Plaintiffs are five committed, loving couples, lawfully married by the government of South Africa and the States of Vermont, Connecticut, and New York.  In each couple, one spouse is an American citizen and the other spouse a foreign national. If they were different-sex couples, the federal government would recognize the foreign spouse as an "immediate relative" of a United States citizen, thereby allowing the

American spouse to petition for an immigrant visa for the foreign spouse and place the

foreign spouse on the path to lawful permanent residence and citizenship.  Solely because

of DOMA and its unconstitutional discrimination against same-sex couples, however,

these Plaintiffs are being denied the immigration rights afforded to other similarly

situated bi-national couples.  This is an action to remedy that hateful, harmful, and

unlawful discrimination.

2.      Each of the Plaintiff couples were legally married, and there is no question

that each couple's marriage is recognized in the jurisdiction in which the American

spouse resides.  For example, Frances Herbert and Takako Ueda were lawfully married in

2011 in Vermont.  Thus, if Takako were a man instead of a woman, she would have

already been recognized as an "immediate relative," allowing her to attain lawful

permanent residence and to remain in the United States.

3.      Section 3 of DOMA, however, upends that normal operation of the law.

DOMA creates, for the first time in our nation's history, a federal definition of marriage

that excludes same-sex couples.  While DOMA is not an immigration statute, its

restrictive definition of marriage affects over 1,000 federal laws, including laws relating

to immigration.  Thus, although federal immigration laws apply on their face to all

lawfully married couples, same-sex couples, such as Frances and Takako, are denied their

rights by operation of DOMA.

4.      The discriminatory impact of DOMA is particularly acute in the

immigration context.  For immigration purposes, whether the federal government

recognizes a couple's marriage can determine whether a family may remain in the United

States and live together, or may be torn apart.

2

5.      The ability to maintain their families together is, of course, of the highest concern for the Plaintiff couples and for thousands of other bi-national couples in this country.  But the federal government also has set the preservation of families as a national priority.  That is why the Immigration and Nationality Act ("INA") allows a United States citizen to file a petition with United States Citizenship and Immigration Services ("USCIS") on behalf of a foreign national spouse for classification as an immediate relative and allows immediate relatives to apply for lawful permanent resident status and to remain lawfully in the United States.  There is no annual limit on the number of visas available to foreign national spouses of American citizens.  As a nation, we want to keep families together, not rip them apart.

6.      Those values have been reaffirmed repeatedly in federal laws and policies and in statements by members of Congress (Democrats and Republicans alike):

> Family unification is the cornerstone of immigration to the United States.  Prolonging the separation of spouses from each other, and from their children, is inconsistent with the principles on which this nation was founded. . . .  The family structure is one of our great Nation's strongest assets.

136 Cong. Rec. H8631 (daily ed. Oct. 2, 1990) (statement of Rep. McGrath (R)).

> The reunification of families serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and well-being of the nation.  Psychologically and socially, the reunion of family members with their close relatives promotes the health and welfare of the United States.

U.S. Select Comm'n on Immigr. and Refugee Pol'y, U.S. Immigration Policy and the National Interest 112–13 (1981).

7.      Ironically, it is the federal government that threatens to tear bi-national families apart.  Because of DOMA, the federal government does not recognize the

marriages of same-sex couples and, therefore, denies them the immigration rights afforded to other married couples. As a result, these couples live their lives at constant risk of separation.

8. As described below, the five Plaintiff couples are like other married couples. They met, fell in love, and chose to build a life together. They too committed themselves to one another in good times and in bad, in sickness and in health. They have honored and kept that commitment to one another. They have chosen to be together and to make the United States their family's home. However, because they are married to someone of the same sex, they are denied the federal immigration benefits to which different-sex married couples are entitled. They are at constant risk of being forced apart or forced to leave the United States to stay together.

9. Section 3 of DOMA, as applied to immigration laws, is unconstitutional.

## JURISDICTION

10. This action arises under the Constitution of the United States and the laws of the United States. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and to grant mandamus relief pursuant to 28 U.S.C. § 1361.

## VENUE

11. Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the defendants are officers and employees of the United States of America, and because Plaintiffs Edwin Blesch, Timothy Smulian, Santiago Ortiz and Pablo García reside in this judicial district. There is no real property involved in the action.

4

170

## PARTIES

12.     Plaintiff Edwin Blesch is a United States citizen.  He is married to Plaintiff Timothy Smulian, a native of South Africa.  They live together in Orient, New York.

13.     Plaintiff Frances Herbert is a United States citizen.  She is married to Plaintiff Takako Ueda, a native of Japan.  They live together in Dummerston, Vermont.

14.     Plaintiff Heather Morgan is a United States citizen.  She is married to Plaintiff Maria del Mar Verdugo, a native of Spain.  They live together in New York, New York.

15.     Plaintiff Santiago Ortiz is a United States citizen.  He is married to Plaintiff Pablo García, a native of Venezuela.  They live together in Elmhurst, New York.

16.     Plaintiff Kelli Ryan is a United States citizen.  She is married to Plaintiff Lucy Truman, a native of the United Kingdom.  They live together in Sandy Hook, Connecticut.

17.     Defendant Eric H. Holder, Jr. is currently the Attorney General of the United States.  The Attorney General is the chief federal officer responsible for the enforcement of all federal statutes in accordance with the Constitution of the United States.  He is sued in his official capacity.

18.     Defendant Janet Napolitano is currently the Secretary of Homeland Security.  The Secretary of Homeland Security is charged with the administration and enforcement of the Immigration and Nationality Act.  She is sued in her official capacity.

19.     Defendant Alejandro Mayorkas is currently the Director of the United States Citizenship and Immigration Services.  The Director of the United States Citizenship and Immigration Services is charged with operating the immigration system

and is ultimately responsible for granting immigration and citizenship benefits.  He is sued in his official capacity.

20.      Defendant Robert M. Cowan is currently the Center Director of the United States Citizenship and Immigration Services National Benefits Center.  Defendant Cowan denied Plaintiff Frances Herbert's I-130 Petition for Alien Relative and Plaintiff Takako Ueda's I-485 Application to Register Permanent Residence or Adjust Status.  He is sued in his official capacity.

21.      Defendant Daniel M. Renaud is currently the Director of the United States Citizenship and Immigration Services Vermont Service Center.  Defendant Renaud denied Plaintiff Edwin Blesch's I-130 Petition for Alien Relative and Plaintiff Kelli Ryan's I-130 Petition for Alien Relative.  He is sued in his official capacity.

**FACTS PARTICULAR TO INDIVIDUAL PLAINTIFFS**

22.      Plaintiffs are all U.S. citizens or the legal spouses of U.S. citizens, residing in New York, Connecticut, or Vermont.  Each of the Plaintiff couples is made up of one spouse who is a United States citizen and one spouse who is a foreign national.  All of the Plaintiff couples were legally married and are recognized as lawfully married spouses under the laws of the state in which they live.

23.      For each of the Plaintiff couples, the citizen spouse has petitioned for an immigrant visa so that the foreign national spouse might become a lawful permanent resident of the United States.  These petitions would be considered on the merits if the spouses were of a different sex.  However, all of Plaintiffs' petitions have been or will be denied solely by operation of Section 3 of DOMA because they are the same sex as their spouse.

6

Plaintiffs Edwin Blesch and Timothy Smulian

24.    Edwin and Tim are a dedicated and loving couple.  They have been
together for nearly thirteen years.  They live together in Orient, New York.

25.    Edwin, who was born in 1940 in New York, worked as a professor of
English at Nassau Community College in Garden City, New York for more than thirty
years until he retired.  Tim, a citizen of South Africa and Great Britain, born in 1946, also
is retired after working as an architectural designer, a film and television make-up artist
and an environmental education officer.

26.    Edwin and Tim met in Cape Town, South Africa on August 13, 1999.
Edwin, who was 58 at the time, had been traveling in South Africa with friends.  When
Edwin's friends had to leave unexpectedly, he decided to stay in South Africa and
explore Cape Town.  He met Tim when he walked into a British tea and coffee emporium
where Tim was working.  They felt an immediate connection; after talking for hours, they
made plans to meet the following day.  They spent the remainder of Edwin's stay
together.

27.    Edwin learned that he was HIV-positive in 1987 and discussed his status
with Tim the first time they met.  Tim, himself HIV-negative, had been working as an
AIDS counselor for a number of years before he met Edwin.  Edwin's HIV status did not
change the way Tim felt for Edwin.

28.    Before he met Tim, Edwin had never had a relationship where he lived
with anyone, though he had longed for a committed relationship all of his life.  When he
retired, he resigned himself to being single.  But when Edwin met Tim, he knew that his
life had changed.  Tim had also believed he would not meet anyone with whom he would
want to share his life.  He was in the process of buying a house in the country in South

7

Africa and planned to live out his retirement there alone.  When he met Edwin, he knew his life had changed as well.

29.     Unfortunately, Edwin had to leave South Africa soon after he and Tim met.  When Edwin returned to the United States, he contacted Tim immediately and invited him to visit.  Having shared briefly in Tim's life in South Africa, Edwin wanted to share his own life in the United States with Tim.  Tim came for a visit and stayed for ten days.

30.     After Tim's visit, Edwin knew that he had to find a way to be with Tim, but they did not want to violate any of the United States' immigration laws.  Therefore, for each of the next eleven years, Tim and Edwin spent six months in the United States and then six months abroad.

31.     After successfully petitioning their town on Long Island to recognize domestic partnerships, Edwin and Tim proudly became one of the first couples in the town to register as domestic partners on June 13, 2005.  Then when Suffolk County began registering domestic partnerships two years later, Edwin and Tim were, again, one of the first couples in line.  They married in South Africa on August 13, 2007, shortly after marriage equality passed in that country and on the eighth anniversary of the day they met.  Their South African marriage is legally recognized in their home state of New York, and would be recognized by the United States but for DOMA.

32.     A few years ago, multiple health conditions including HIV/AIDS, complications of HIV therapies, cardiac conditions and degenerative spine disease began to take a toll on Edwin's health.  He was no longer able to spend six months in South Africa because it was too far from his doctors.  To continue to comply with United States

8

174

immigration law, Edwin and Tim began to spend much of each year in Canada.  Because
Edwin's Medicare does not cover him in Canada, however, he was twice forced to return
to the United States for necessary medical care.  Tim, heartbroken, could not accompany
Edwin to his doctors (as he always does), fearful he would be denied entry to the United
States during those six-month periods.

33.     On March 29, 2011, Edwin filed an I-130 Petition for Alien Relative with
USCIS on behalf of Tim, his legal spouse.  On March 14, 2012, USCIS notified Edwin
that his petition was denied, stating:  "DOMA applies as a matter of federal law whether
or not your marriage is recognized under state law. Your spouse is not a person of the
opposite sex.  Therefore, under the DOMA, your petition must be denied."

Plaintiffs Frances Herbert and Takako Ueda

34.     Frances and Takako are a loving and committed married couple who live
together in the Dummerston, Vermont home that they have shared for eleven years.

35.     Frances was born in Michigan in 1960 and has been living in Vermont for
the past twenty-two years.  She works as an in-home elder-care provider.

36.     Takako was born in Japan in 1955.  In 1979, Takako left Japan to come to
the United States to study at Aquinas College in Grand Rapids, Michigan.  It was during
her first Fall semester at Aquinas College that Takako met Frances, and their lives
changed forever.

37.     Frances and Takako shared a strong bond from the moment they met.
Since Takako was far from home, Frances welcomed Takako into her own family,
inviting her to family events and holidays.  Their relationship grew stronger as time
passed.

9

175

38.     Sadly, when Takako graduated from college in 1983, she was forced to return to Japan and leave Frances. Although they were far apart, Frances and Takako did not forget about each other. Upon Takako's departure, Frances began writing Takako letters. She would continue to write until she and Takako were reunited in the United States years later.

39.     Upon returning to Japan, Takako, bound to family and societal pressure, married a man. But she never stopped thinking of Frances; she never stopped loving her.

40.     Frances, too, could not stop thinking of Takako. In 1996, when Frances was about to undergo open heart surgery, Frances realized that she longed to have Takako in her life and started writing to Takako more fervently. In 1999, Frances went to Japan to visit Takako, needing to see the woman she loved.

41.     During the three weeks Frances was in Japan, the connection that the two women felt toward one another was rekindled. Those three weeks changed how they would live the next twelve years.

42.     Takako divorced her husband to be with Frances. In 2000, twenty years after they first met, Takako left her family, friends, country and culture behind and came to the United States on a B1/B2 visitor visa.

43.     In 2001, Takako was granted F1 student status, and she began nine years of college study. She graduated with an associate's degree with honors in 2004 and graduated magna cum laude with a bachelor's degree from Keene State College in May 2010. She then entered a twelve-month period of Optional Practical Training ("OPT").

44.     The couple held a commitment ceremony on September 30, 2000, surrounded by family and friends. Among those participating were Frances's parents and

10

176

sister, who traveled from Michigan. The ceremony was filled with joy and love. On April 26, 2011, Frances and Takako legally married each other in their home in Dummerston, Vermont. This simple ceremony, too, was deeply meaningful, celebrating Frances and Takako's eleven years together as a family.

45.     On September 2, 2011, Frances filed an I-130 Petition for Alien Relative with USCIS on behalf of Takako. That same day, Takako filed an I-485 Application to Register Permanent Residence or Adjust Status. The Petition and Application were both filed within the grace period following the expiration of Takako's OPT status.

46.     On December 1, 2011, USCIS notified Frances that her petition was denied, stating: "DOMA applies as a matter of federal law whether or not your marriage is recognized under state law. Your spouse is not a person of the opposite sex. Therefore, under the DOMA your petition must be denied." Because it was predicated upon approval of the I-130 Petition, Takako's I-485 Application was also denied.

<u>Plaintiffs Heather Morgan and Maria del Mar Verdguo</u>

47.     Heather and Maria del Mar ("Mar") are a devoted and loving couple. They are newlyweds, but have known each other for fourteen years.

48.     Heather was born in 1976 and raised in New Jersey. She holds a bachelor's degree in psychology from Cornell University, graduating in 1998. She is a marketing director for a global non-profit organization in New York.

49.     Mar is a native of Madrid, Spain, where she was born in 1969. In Madrid, she worked for a Spanish newspaper company for sixteen years, then for Spain's leading business school and for the American company, General Electric. Mar currently works in marketing for a Spanish-language newspaper in New York.

11

177

50.    Heather and Mar met in 1998, when Heather moved to Madrid to teach

English after college.  They met through a mutual friend who asked Mar to look after

Heather.  Mar and her friends immediately accepted Heather and treated her like an old

friend.  Mar in particular took a special interest in Heather.  Mar would often invite

Heather to stay with her and her family for weekends.

51.    After Heather left Spain and moved back to New Jersey, she and Mar

stayed in touch and remained close.  That following summer, in 1999, Mar came to visit

Heather and her family in New Jersey for three weeks.  Heather's family immediately

welcomed Mar, just as Mar's family had welcomed Heather.  During the ensuing years,

Heather always took her vacations with Mar and their friends.  Although separated by

distance and circumstance, the two remained incredibly close.

52.    In January 2007, Mar came to the United States to study English.  For the

first time, she and Heather were able to spend time together on a day-to-day basis while

Heather worked and Mar studied.  Although at this time they were still just friends, it was

clear that their relationship was far more intimate than just friendship.  Heather and Mar

spent all of their significant moments together, talked regularly, and took care of each

other.  Simply, they loved each other.

53.    In May 2007, Mar returned to Spain to start a new job.  The following

summer—as she always did when she had time for vacation—Heather returned to Spain

to see Mar.  The two shared a wonderful few weeks together.

54.    After Heather returned to the United States, though, she felt differently

than she usually did after visiting Spain.  While she usually was energized and upbeat,

12

178

this time she felt a profound longing to go back. In October 2008, Heather returned to Madrid and to Mar. It was on this trip that Heather and Mar realized they were in love.

55.     In November 2008, anxious to see Heather, Mar came to New York and the two were able to spend time together as a couple for the first time. In February 2009, Mar returned to the United States on a tourist visa and then decided to stay and go to school. In February 2011, Mar was fortunate to find an employer to sponsor her for a temporary H1-B skilled worker visa, which she currently holds.

56.     With Mar in New York, their relationship blossomed. All of their friends and family observed how they lit up when they were together. Everyone immediately knew what had taken Heather and Mar ten years to discover—that they are soul-mates.

57.     Heather could not wait to propose to Mar, which she did in November 2009. On August 19, 2011, in front of forty of their closest friends and family, Heather and Mar were married in New York City by a Rabbi. It was one of the best days of their lives.

58.     For Mar, Heather is her dream come true. She is "home" to her. Heather considers herself the luckiest person in the world to have Mar in her life. Now married, they are longing to grow their family. As Heather says, "Mar is magical with children and it would be an injustice for Mar not to have kids." Unfortunately, Heather and Mar have been forced to put those plans on hold because they are not sure whether they will be able to raise their children together in the United States.

59.     On March 28, 2012, Heather filed an I-130 Petition for Alien Relative with USCIS on behalf of Mar, her legal spouse. Because of DOMA, this Petition is certain to be denied.

13

179

Plaintiffs Santiago Ortiz and Pablo García

60.     Santiago and Pablo have maintained a loving and committed relationship for over twenty years.

61.     Santiago is a Puerto Rican American who was born in New York City in 1955.  He worked as a school psychologist with the Rochester City School District, the New York City School District and for a time at Island Academy at Rikers Island.  He holds a bachelor's degree from the University of Puerto Rico and a master's degree in school psychology from Alfred University.  Santiago retired in 1995.

62.     Pablo was born in 1960 in Venezuela.  In Caracas, he worked as a copywriter in an advertising agency and as a playwright.  In New York, he writes Spanish-language plays for local theaters.  He has an associate's degree, a bachelor's degree and a master's degree and is currently in his second year at the Graduate Center of the City University of New York working toward his Ph.D.  He volunteers teaching a Spanish GED class at Columbia University and volunteers with a number of arts programs targeting youth.

63.     Pablo and Santiago met in 1991 in Caracas.  They became enamored with each other immediately.

64.     Soon after meeting, Pablo accompanied Santiago to Puerto Rico to meet Santiago's family.  Santiago then returned to Caracas with his mother to meet Pablo's family.  Although they were both afraid of how their families would react to their relationship, all agreed that the two men were made for each other and accepted them immediately.

65.     Santiago learned that he was living with HIV in 1987.  Pablo is HIV-negative.  At the time they met, no effective treatments were available for HIV.

14

180

Santiago, therefore, knew that he could die, and he wanted more than anything for Pablo
to be with him during the rest of his life. Santiago asked Pablo to come to New York,
promising Pablo's mother that he would take care of him. To be with the man he loved,
Pablo left his family, friends and culture behind.

66.     Living together as a couple, their romance blossomed, and Pablo extended
his lawful stay in the United States. After that time expired, the couple made the difficult
decision to have Pablo remain in the United States without an authorized immigration
status. That means, for Pablo, that he cannot go to Venezuela and visit his mother or the
rest of his family. He could not attend his father's funeral, or visit his grave. He has
given that up out of love for his spouse. Santiago, in return, has made the trip to
Venezuela on Pablo's behalf, bringing Pablo's love and respect to his family from whom
he is separated because of DOMA.

67.     In 1993, they registered as domestic partners in New York City. They
were legally married in Stamford, Connecticut on May 2, 2011.

68.     On March 29, 2012, Santiago filed an I-130 Petition for Alien Relative
with USCIS on behalf of Pablo, his legal spouse. That same day, Pablo filed an I-485
Application to Register Permanent Residence or Adjust Status. Because of DOMA, the
Petition and Application are certain to be denied.

Plaintiffs Kelli Ryan and Lucy Truman

69.     Kelli and Lucy have been a couple for over eleven years. They are both
highly educated, talented and respected immunologists.

70.     Kelli was born in Milwaukee, Wisconsin in 1972. She holds a bachelor of
science from Marquette University and a doctorate in immunology from the Department
of Microbiology and Immunology at Emory University. After obtaining her doctorate,

Kelli relocated to the United Kingdom for postdoctoral training at the University of Edinburgh and later for further training at the University of Newcastle Upon Tyne, United Kingdom. She is currently a Senior Scientist at Boehringer Ingelheim Pharmaceuticals in Ridgefield, Connecticut.

71.     Lucy was born in the United Kingdom in 1968. She holds a bachelor of science in biochemistry and physiology from the University of London, a bachelor of medicine from the University of Southampton (UK), and a doctorate in philosophy in immunology from the University of Edinburgh. Currently, Lucy is a Postdoctoral Fellow in Human Translational Immunology at Yale University, where she is the recipient of an International Fellowship from the UK charity, Leukaemia and Lymphoma Research.

72.     Kelli and Lucy first met in Edinburgh, Scotland in 2000 when Kelli was completing her postdoctoral training and Lucy was training as an ear, nose and throat surgeon. As fate would have it, they started working in the same lab on the same day, where they shared a very small office with two other researchers. They quickly developed a friendship, which over time evolved into a romantic relationship. By 2001, they were a couple.

73.     In 2004, Kelli and Lucy moved to Newcastle, United Kingdom. Eager to formalize their already strong commitment to each other, they entered into a civil partnership on July 20, 2006. For Kelli, Lucy and their friends and family, this was a celebration filled with happiness and love. It was held in an old maritime building in Tynemouth, England. Lucy's nephews were the ring bearers and Lucy's sister helped organize the flowers. They continued their celebration into the weekend at Alnmouth, a

16

182

small town on the Northumberland coast, where they danced and enjoyed the company of their loved ones.

74.     In 2007, Kelli was offered a job in Connecticut.  Lucy decided to remain in the United Kingdom to finish her studies and training.  Samson, their brown-spotted cat, went with Kelli to Connecticut, but not before Kelli and Lucy obtained a European Union pet passport for him, listing both of them as his owners.

75.     During their time apart, Lucy visited Kelli often.  With Lucy's frequent travels to the United States, she feared each time that she would not be allowed entry to be with her partner.

76.     In May 2009, Lucy came to the United States with a B1/B2 visitor visa. She then received a post-doctoral fellowship at Yale and was granted a temporary H1B skilled worker visa in July 2009.

77.     On March 18, 2010, Lucy and Kelli were legally married in Newtown, Connecticut.

78.     Throughout their friendship, courtship, civil union and marriage, Kelli and Lucy have lived their lives as any other loving, committed couple.  They have enjoyed each other in good times—vacations in Belgium, Switzerland and Spain—and supported each other in bad times—the loss of Kelli's mother following a long fight with cancer. They have become a part of each other's families and have been embraced by each other's friends.

79.     Lucy's buoyant exuberance perfectly complements Kelli's calm, gentle nature.  Their friends say that they are perfect for each other.  Now, they seek only to remain together, legally, in the United States.

17

183

80.     On November 14, 2011, Kelli filed an I-130 Petition for Alien Relative with USCIS on Lucy's behalf.  On March 27, 2012, USCIS notified Kelli that her petition was denied, stating:  "DOMA applies as a matter of federal law whether or not your marriage is recognized under state law.  Your spouse is not a person of the opposite sex.  Therefore, under the DOMA your petition must be denied."

\*     \*     \*

81.     As couples, Kelli and Lucy, Edwin and Tim, Frances and Takako, Santiago and Pablo, and Heather and Mar are as different from each other as are any couples.  And they are as similar to each other as are all couples.  They love each other, with all the joy and pain that love encompasses.  They are married, with all of the promise that marriage brings.  Unlike married, different-sex couples, however, they face a risk of being torn apart by the United States government, perhaps forced to live separately or to leave the country.  DOMA threatens their marriages while purporting to "defend" marriage.  It does violence not only to these five couples, not only to the institution of marriage, but to the Constitution of the United States.

## STATUTORY FRAMEWORK

The Relevant Immigration Framework

82.     Under the INA, United States citizens may petition for their "children, spouses, and parents" to be classified as "immediate relatives," who are therefore eligible for an immigrant visa and lawful permanent residence in the United States.  8 U.S.C. §§ 1151(b)(2)(A)(i), 1154.

83.     To petition for an immigrant visa on behalf of his or her spouse, the United States citizen must file an I-130 Petition for Alien Relative with USCIS.  8 C.F.R. § 204.1(a)(1) (2009).  If the adjudicator "determines that the facts stated in the petition

18

184

are true and that the alien in behalf of whom the petition is made is an immediate relative," then the adjudicator "shall . . . approve the petition." 8 U.S.C. §1154(b). Therefore, an I-130 is approved where the foreign national is a bona fide "spouse" of an American citizen under the INA. 8 U.S.C. §§ 1151(b), 1154(b), (c).

84.     The INA does not define the term "spouse." Rather, an individual's marital status typically is governed by the law where the marriage was celebrated. *See Matter of Dela Cruz*, 14 I. & N. Dec. 686 (BIA 1974) ("the law is clear . . . [t]he validity of a marriage is generally governed by the law of the place of celebration").

85.     At the same time or after the citizen spouse files the Form I-130 Petition, the foreign national spouse may file a Form I-485 Application to Register Permanent Residence or Adjust Status in order to gain status as a lawful permanent resident of the United States. *See* 8 C.F.R. § 245.2. The foreign national's status may be adjusted if: "(1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." 8 U.S.C. § 1255(a); *see also* 8 C.F.R. § 245.1.

86.     Lawful permanent residency allows a foreign national to reside in the United States, to work here, and to travel in and out of the country with limited restrictions. 8 U.S.C. § 1101(a)(20); 8 C.F.R. §§ 274a.12(a)(1), 316.5(c)(1). As the name implies, that status is permanent—a lawful permanent resident may remain in the United States indefinitely, so long as the person abides by the nation's immigration laws. 8 U.S.C. § 1101(a)(20). Three years after obtaining lawful permanent residence, the spouse of a United States citizen may apply to naturalize to become a United States

19

185

citizen.  8 U.S.C. § 1430(a).  The naturalization statute again recognizes the primacy of

the marital relationship by reducing the time to apply from five years to three for spouses

of United States citizens.  8 U.S.C. § 1427(a); 8 U.S.C. § 1430(a).

The Defense of Marriage Act

87.     The federal government defers to the states' determinations of whether a

couple is validly married, because marriage is within the states' core powers.  *See Elk*

*Grove Unified Sch. Dist.* v. *Newdow*, 542 U.S. 1, 12 (2004); *Ankenbrandt* v. *Richards*,

504 U.S. 689, 716 (1992) (Blackmun, J., concurring).

88.     When DOMA was enacted in 1996, it changed that longstanding practice,

but only for same-sex couples.  Specifically, Section 3 of DOMA provides that "[i]n

determining the meaning of any Act of Congress, or of any ruling, regulation, or

interpretation of the various administrative bureaus and agencies of the United States, the

word 'marriage' means only a legal union between one man and one woman as husband

and wife, and the word 'spouse' refers only to a person of the opposite sex who is a

husband or a wife."  1 U.S.C. § 7.

89.     When DOMA was enacted, six justifications were given for this unequal

treatment of gay men and lesbians:  (1) defending and nurturing the institution of

heterosexual marriage; (2) promoting and encouraging heterosexuality; (3) protecting

"democratic self-governance"; (4) preserving government resources; (5) promoting moral

disapproval of homosexuality; and (6) encouraging "responsible procreation" and child-

rearing.  H.R. Rep. No. 104-664 (1996).  None of these purported justifications provides

even a rational basis for DOMA, nor is there any other rational basis for the law.

90.     Congress's proffered interests in defending heterosexual marriage and

promoting heterosexuality are both invalid and illogical.  Tradition alone cannot provide

20

186

a legitimate basis for a discriminatory law. *See Heller* v. *Doe*, 509 U.S. 312, 326 (1993). Even if it could, DOMA does not promote heterosexuality or "heterosexual marriage," as DOMA confers no rights on different-sex couples. It gives them nothing. It just denies rights to same-sex couples.

91.     DOMA likewise cannot be justified by claims that it protects state sovereignty or preserves scarce resources. DOMA does just the opposite. It eliminates states' longstanding sovereign power to define marriage, and creates inconsistency between the federal and state definitions of marriage. The Congressional Budget Office also has recognized that DOMA does not save the federal government even one penny. Instead, DOMA costs the federal government billions of dollars. Cong. Budget Office, U.S. Cong., *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* 1 (June 21, 2004), http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/55xx/doc5559/06-21-samesexmarriage.pdf.

92.     Moral disapproval of homosexuality—though surely the real motive behind DOMA—cannot serve as a legitimate basis for a discriminatory law. *See Lawrence* v. *Texas*, 539 U.S. 558, 577-78 (2003); *Romer* v. *Evans*, 517 U.S. 620, 631-35 (1996). As the Supreme Court explained in *Romer*, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." 517 U.S. at 634-35 (quoting *Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 534 (1973)).

93.     Finally, DOMA does nothing to promote either "responsible procreation" or responsible child-rearing. To the contrary, DOMA injures children by denying them

the safety and security of having the marriages of their parents federally recognized, and,

for bi-national couples, possibly forcing their parents apart.

### CLAIM FOR RELIEF

94.     Plaintiffs reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

95.     As a direct result of DOMA, USCIS treats legally married same-sex

couples differently than legally married different-sex couples.  Solely because theirs are

marriages between two people of the same sex, the United States citizen Plaintiffs were

or will be denied the I-130 Petition for Alien Relative they filed on behalf of their same-

sex, foreign-national spouses.  In addition, solely because theirs are marriages between

two people of the same sex, the foreign-national Plaintiffs were or will be denied a Form

I-485 Application to Register Permanent Residence or Adjust Status.  Had they been

different-sex couples, Plaintiffs' I-130 Petitions and I-485 Applications would have been

considered on the merits and would have been granted.  Accordingly, DOMA

discriminates on the basis of sexual orientation.

96.     Because DOMA, as applied by USCIS, requires this disparity of treatment

with regard to the adjudication of Plaintiffs' Petitions for Alien Relative and, ultimately,

Applications for Lawful Permanent Residence Status for the foreign-national Plaintiffs, it

creates a classification that singles out one class of valid marriages—those of same-sex

couples—and subjects persons in those marriages to differential treatment compared to

other similarly situated couples.  This disparate treatment is without justification and in

violation of the right of equal protection secured by the Fifth Amendment to the

Constitution of the United States.

22

97.    Additionally, DOMA violates the right of equal protection secured by the Fifth Amendment to the Constitution because it discriminates on the basis of sex. DOMA recognizes marriages where one spouse is a man and the other spouse is a woman. But where both spouses are women, or both spouses are men, DOMA prevents federal recognition of these valid marriages. For example, if Edwin were female instead of male, he would have had his I-130 petition for his spouse Tim granted. Because the only difference between different-sex and same-sex bi-national spouses is the sex of the spouses, DOMA unlawfully discriminates on the basis of an individual's sex.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs pray that this Court:

1.    Declare DOMA, 1 U.S.C. § 7, unconstitutional as applied to Plaintiffs.

2.    Enjoin the Defendants from continuing to discriminate against Plaintiffs by treating them differently based on their sexual orientation and sex.

3.    Compel USCIS to adjudicate the I-130 petition of Santiago Ortiz on behalf of his spouse, Pablo García, on the merits, without regard to sex or sexual orientation.

4.    Compel USCIS to adjudicate the I-130 petition of Heather Morgan on behalf of her spouse, Maria del Mar Verdugo, on the merits, without regard to sex or sexual orientation.

5.    Compel USCIS to reopen and re-adjudicate the I-130 petition of Edwin Blesch on behalf of his spouse, Timothy Smulian, on the merits, without regard to sex or sexual orientation.

23

189

6.      Compel USCIS to reopen and re-adjudicate the I-130 petition of Frances Herbert on behalf of her spouse, Takako Ueda, on the merits, without regard to sex or sexual orientation.

7.      Compel USCIS to reopen and re-adjudicate the I-130 petition of Kelli Ryan on behalf of her spouse, Lucy Truman, on the merits, without regard to sex or sexual orientation.

8.      Grant such other and further relief as the Court deems equitable and proper.

9.      Award Plaintiffs reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

Dated: New York, New York
April 2, 2012

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Eric Alan Stone
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3326
estone@paulweiss.com

Victoria Neilson
Thomas R. Plummer (application for admission to
    EDNY in process)
Immigration Equality
40 Exchange Place, #1705
New York, New York 10005-2701
(212) 714-2904
vneilson@immigrationequality.org
tplummer@immigrationequality.org
*Attorneys for Plaintiffs*

25

191

# Exhibit 28

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:12-cv-01578-CBA

Blesch et al v. Holder et al
Assigned to: Chief Judge Carol Bagley Amon
Cause: 28:1361 Petition for Writ of Mandamus

Date Filed: 04/03/2012
Jury Demand: None
Nature of Suit: 465 Other Immigration Actions
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 12/18/2012 | 27 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Status Conference held on 12/18/2012. Counsel for parties present. Stay is continued pending US Supreme Court's decision in United States v. Windsor. (Court Reporter Victoria Torres Butler.) (Fernandez, Erica) (Entered: 12/18/2012) |
| 12/10/2012 | | SCHEDULING ORDER: Telephone Status Conference set for 12/18/2012 at 2:30 PM before Chief Judge Carol Bagley Amon. Plaintiff's counsel Eric Stone is directed to set up the conference with all involved parties and telephone chambers at 718-613-2410. Ordered by Chief Judge Carol Bagley Amon on 12/10/2012. (Baek, Hanna) (Entered: 12/10/2012) |
| 12/04/2012 | 26 | NOTICE of Appearance by Aaron Goldsmith on behalf of All Defendants (aty to be noticed) (Goldsmith, Aaron) (Entered: 12/04/2012) |
| 11/27/2012 | 25 | NOTICE of Appearance by Timothy M. Belsan on behalf of All Defendants (aty to be noticed) (Belsan, Timothy) (Entered: 11/27/2012) |
| 11/27/2012 | | ORDER EXTENDING STAY: Upon consent of the parties, the stay imposed by this Court on July 25, 2012 is extended, pending the U.S. Supreme Court's decisions on eight certiorari petitions that ask the Court to review the constitutionality of DOMA. Consideration of these petitions is currently scheduled for Nov. 30, 2012. A status conference will be scheduled sometime after Nov. 30 to determine the schedule for this case. Ordered by Chief Judge Carol Bagley Amon on 11/27/2012. (Baek, Hanna) (Entered: 11/27/2012) |
| 11/14/2012 | 24 | NOTICE by Bipartisan Legal Advisory Group *Regarding Second Notice of Pertinent Recent Legal Developments* (Bartolomucci, H) (Entered: 11/14/2012) |
| 11/05/2012 | 23 | NOTICE by Edwin Blesch, Pablo Garcia, Frances Herbert, Heather Morgan, Santiago Ortiz, Kelli Ryan, Timothy Smulian, Lucy Truman, Takako Ueda, Maria Del Mar Verdugo re 22 Notice (Other) / *Response to Intervenor-Defendant's Notice of Pertinent Recent Legal Developments* (Attachments: # 1 Exhibit A) (Stone, Eric) (Entered: 11/05/2012) |
| 11/01/2012 | 22 | NOTICE OF PERTINENT RECENT LEGAL DEVELOPMENTS (Marziliano, August) (Entered: 11/02/2012) |

| 07/25/2012 | 21 | Minute Entry for proceedings held before Chief Judge Carol Bagley Amon:Status Conference held on 7/25/2012. Counsel for parties present. Status conference held by telephone before Chief Judge Amon on 7/25/12. The case is stayed pending the Second Circuit's resolution of Windsor v. United States, No. 12 CV 2335 (2d Cir) (Court Reporter Charisse Kitt.) (Fernandez, Erica) (Entered: 07/26/2012) |
|---|---|---|
| 07/17/2012 | | <u>NOTICE OF TELEPHONE STATUS CONFERENCE</u>: Re: 20 . A status conference will be held by telephone on July 25, 2012 at 4:00pm before Chief Judge Amon. Mr. Bartolomucci is directed to coordinate the conference call to chambers 718-613-2410. (Liberatore, Marie) (Entered: 07/17/2012) |
| 07/16/2012 | 20 | Proposed Scheduling Order *re: Proposed Motion to Stay Proceeding and Responsive Pleading Deadline* by Bipartisan Legal Advisory Group (Bartolomucci, H) (Entered: 07/16/2012) |
| 06/18/2012 | | ORDER : re 19 Stipulation - the parties have agreed, contingent on the Court's approval, to a (30) day extension of the responsive pleading deadline in this action to July 18, 2012. APPLICATION GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 6/15/2012. (Liberatore, Marie) (Entered: 06/18/2012) |
| 06/15/2012 | 19 | STIPULATION re 1 Complaint, *Stipulation to Extend Time to Respond to Complaint* by Bipartisan Legal Advisory Group (Bartolomucci, H) (Entered: 06/15/2012) |
| 06/12/2012 | 18 | NOTICE of Appearance by Kerry W. Kircher on behalf of Bipartisan Legal Advisory Group (aty to be noticed) (Kircher, Kerry) (Entered: 06/12/2012) |
| 06/01/2012 | | ORDER: re 16 Stipulation filed. The parties and proposed intervenor, the Bipartisan Legal Advisory Group of the U.S. House of Representatives, have stipulated to a 14-day extension of the responsive pleading deadline. The new responsive pleading deadline will be June 18, 2012. Application for the extension is GRANTED. So Ordered by Chief Judge Carol Bagley Amon on 6/1/2012. (Liberatore, Marie) (Entered: 06/01/2012) |
| 05/31/2012 | 17 | ORDER granting 9 Unopposed Motion to Intervene by the Bipartisan Legal Advisory Group of the U.S. House of Representatives. The House's motion to intervene in this matter to defend the constitutionality of Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7, is granted. Ordered by Chief Judge Carol Bagley Amon on 5/30/2012. (Turner-Dodge, Lee) (Entered: 05/31/2012) |
| 05/30/2012 | 16 | STIPULATION re 1 Complaint, *Stipulation to Extend Time to Respond to Complaint* by Robert M. Cowan, Eric H. Holder, Jr, Alejandro Mayorkas, Janet Napolitano, Daniel M. Renaud (Carlson, Jesi) (Entered: 05/30/2012) |
| 05/29/2012 | 15 | RESPONSE to Motion re 9 Notice of MOTION to Intervene *and Unopposed Motion to Intervene* filed by All Defendants. (Attachments: # 1 Proposed Order) (Carlson, Jesi) (Entered: 05/29/2012) |
| 05/25/2012 | 14 | NOTICE by Robert M. Cowan, Eric H. Holder, Jr, Alejandro Mayorkas, Janet Napolitano, Daniel M. Renaud (Attachments: # 1 Attachments 1-3) (Carlson, Jesi) (Entered: 05/25/2012) |
| 05/24/2012 | 13 | NOTICE by Bipartisan Legal Advisory Group *of Supplemental Authority* (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B) (Bartolomucci, H) (Entered: 05/24/2012) |

| 05/16/2012 | 12 | NOTICE of Appearance by Thomas Roy Plummer on behalf of Edwin Blesch, Pablo Garcia, Frances Herbert, Heather Morgan, Santiago Ortiz, Kelli Ryan, Timothy Smulian, Lucy Truman, Takako Ueda, Maria Del Mar Verdugo (aty to be noticed) (Plummer, Thomas) (Entered: 05/16/2012) |
|---|---|---|
| 05/15/2012 | 11 | Letter *Re: Motion to Intervene Pursuant to Chief Judge Amon's Motion Practice Rule 3(D)* by Bipartisan Legal Advisory Group (Bartolomucci, H) (Entered: 05/15/2012) |
| 05/15/2012 | 10 | MEMORANDUM in Support re 9 Notice of MOTION to Intervene *and Unopposed Motion to Intervene* filed by Bipartisan Legal Advisory Group. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L) (Bartolomucci, H) (Entered: 05/15/2012) |
| 05/15/2012 | 9 | Notice of MOTION to Intervene *and Unopposed Motion to Intervene* by Bipartisan Legal Advisory Group. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order) (Bartolomucci, H) (Entered: 05/15/2012) |
| 04/10/2012 | 8 | SUMMONS Returned Executed by Heather Morgan, Maria Del Mar Verdugo, Frances Herbert, Lucy Truman, Edwin Blesch, Takako Ueda, Pablo Garcia, Santiago Ortiz, Kelli Ryan. Eric H. Holder, Jr served on 4/3/2012, answer due 6/4/2012. (Stone, Eric) (Entered: 04/10/2012) |
| 04/10/2012 | 7 | SUMMONS Returned Executed by Heather Morgan, Maria Del Mar Verdugo, Frances Herbert, Lucy Truman, Edwin Blesch, Timothy Smulian, Takako Ueda, Pablo Garcia, Santiago Ortiz, Kelli Ryan. Alejandro Mayorkas served on 4/3/2012, answer due 6/4/2012. (Stone, Eric) (Entered: 04/10/2012) |
| 04/10/2012 | 6 | SUMMONS Returned Executed by Heather Morgan, Maria Del Mar Verdugo, Frances Herbert, Lucy Truman, Edwin Blesch, Timothy Smulian, Takako Ueda, Pablo Garcia, Santiago Ortiz, Kelli Ryan. Janet Napolitano served on 4/3/2012, answer due 6/4/2012. (Stone, Eric) (Entered: 04/10/2012) |
| 04/10/2012 | 5 | SUMMONS Returned Executed by Heather Morgan, Maria Del Mar Verdugo, Frances Herbert, Lucy Truman, Edwin Blesch, Timothy Smulian, Takako Ueda, Pablo Garcia, Santiago Ortiz, Kelli Ryan. Robert M. Cowan served on 4/3/2012, answer due 6/4/2012. (Stone, Eric) (Entered: 04/10/2012) |
| 04/10/2012 | 4 | SUMMONS Returned Executed by Heather Morgan, Maria Del Mar Verdugo, Frances Herbert, Lucy Truman, Edwin Blesch, Timothy Smulian, Takako Ueda, Pablo Garcia, Santiago Ortiz, Kelli Ryan. Daniel M. Renaud served on 4/3/2012, answer due 6/4/2012. (Stone, Eric) (Entered: 04/10/2012) |
| 04/09/2012 | 3 | NOTICE of Appearance by Jesi J. Carlson on behalf of All Defendants (aty to be noticed) (Carlson, Jesi) (Entered: 04/09/2012) |
| 04/04/2012 | 2 | NOTICE of Appearance by Scott Dunn on behalf of All Defendants (aty to be noticed) (Dunn, Scott) (Entered: 04/04/2012) |
| 04/02/2012 | | FILING FEE: $ 350.00, receipt number 4653041905 (Davis, Kimberly) (Entered: 04/03/2012) |
| 04/02/2012 | | Summons Issued as to Robert M. Cowan, Eric H. Holder, Jr, Alejandro Mayorkas, Janet Napolitano, Daniel M. Renaud, U.S. Attorney and U.S. Attorney General (Davis, Kimberly) (Entered: 04/03/2012) |

195

| 04/02/2012 | 1 | COMPLAINT against Robert M. Cowan, Eric H. Holder, Jr, Alejandro Mayorkas, Janet Napolitano, Daniel M. Renaud, filed by Heather Morgan, Maria Del Mar Verdugo, Frances Herbert, Lucy Truman, Edwin Blesch, Timothy Smulian, Takako Ueda, Pablo Garcia, Santiago Ortiz, Kelli Ryan. (Attachments: # 1 Civil Cover Sheet) (Davis, Kimberly) (Entered: 04/03/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/08/2013 16:10:53 | | |
| **PACER Login:** | ch0154 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cv-01578-CBA |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# Exhibit 29

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

COZEN O'CONNOR, P.C.                    :
1900 Market Street                     :
Philadelphia, PA 19103                 :
                                       :   Case Number: 2:11-cv-00045
        Plaintiff,                     :
                                       :   Judge: C. Darnell Jones, II
              v.                       :
                                       :
JENNIFER J. TOBITS                     :
7442 N. Hoyne Avenue, Apt. 2N          :
Chicago, Illinois 60645                :
                                       :
DAVID M. FARLEY and                    :
JOAN F. FARLEY, h/w                    :
6510 Woodbrook Drive                   :
Roanoke, Virginia 24018                :

        Defendants.

**COZEN O'CONNOR'S FIRST AMENDED COMPLAINT FOR INTERPLEADER**

Plaintiff, Cozen O'Connor, P.C. ("Cozen O'Connor"), by its attorneys, hereby

files its complaint for interpleader and avers:

1.      Plaintiff, Cozen O'Connor, brings this action for interpleader pursuant to

Federal Rule of Civil Procedure 22, because it is exposed to multiple liability due to the

competing beneficiary claims of Jennifer J. Tobits and David M. Farley and Joan F.

Farley in connection with the distribution of benefits under the Cozen O'Connor Profit

Sharing Plan issued to decedent Sarah Ellyn Farley.

**I.      JURISDICTION, PARTIES, AND VENUE**

2.      Cozen O'Connor is a corporation incorporated under the laws of the state

of Delaware with its principal offices in the Commonwealth of Pennsylvania.

3.      Jennifer J. Tobits is a resident of the State of Illinois.  Ms. Tobits claims

that she is the surviving spouse of decedent, Sarah Ellyn Farley.

198

4.      David M. Farley and Joan F. Farley, husband and wife, are residents of the State of Virginia.  David and Joan Farley are the surviving father and mother of decedent, Sarah Ellyn Farley.

5.      This Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

6.      Venue is proper in this district pursuant to 28 U.S.C.A. § 1391, because the property that is the subject of this action is situated in this district, and pursuant to 29 U.S.C. § 1132(e)(2), because the Cozen O'Connor Profit Sharing Plan is administered in this district.

## II.      THE PROFIT SHARING PLAN

7.      On or about January 1, 2007, Sarah Ellyn Farley, Cozen O'Connor's employee, became eligible to participate in the Cozen O'Connor Profit Sharing Plan (hereinafter, the "Plan") whereby Cozen O'Connor promised to distribute the value of Ms. Farley's accounts to her Beneficiary upon Ms. Farley's death.  The Plan is subject to the provisions of ERISA, 29 U.S.C. §§ 1101 *et seq*.

8.      The Plan has a current value of approximately $40,820.20 with a cash value of $35,666.08.  An additional estimated $5,154.12 cash contribution will be made during the calendar year 2011, but no earlier than July 2011.

9.      Cozen O'Connor had not received a valid designation of Beneficiary form from Ms. Farley prior to her death.

## III.     COMPETING BENEFICIARIES UNDER THE PLAN

10.     Ms. Farley died on September 13, 2010.

11.     Following Ms. Farley's death, David and Joan Farley presented a

designation of Beneficiary form to Cozen O'Connor, purporting to show that Ms. Farley

had designated them as her Beneficiaries under the Plan and had represented her present

marital status as "single." (A true copy of this designation of Beneficiary form is

attached hereto as Exhibit A; see also letter from Jonathan W. Michael, counsel for David

and Joan Farley, to Vincent R. McGuinness, Esq., dated November 11, 2010, a true copy

of such letter is attached hereto as Exhibit B.)

12.     This designation of Beneficiary form bears the date of September 12,

2010, the day before Ms. Farley's death. It purports to have Ms. Farley's signature above

"Participant's Signature." It also purports to have the signature of Ms. Farley's spouse

notarized which is inconsistent with the declaration that she is "single" and, in any event,

is not signed by her spouse. Accordingly, Cozen O'Connor cannot determine the validity

of this designation of Beneficiary form.

13.     On November 30, 2010, Ms. Tobits advised Cozen O'Connor that she

intended to file a claim with respect to the accounts owed to Ms. Farley's Beneficiary

under the Plan. (A true copy of the letter by Ms. Tobits addressed to Cozen O'Connor's

counsel, H. Robert Fiebach, dated November 30, 2010, is attached hereto as Exhibit C.)

14.     Ms. Tobits presented Cozen O'Connor with a copy of a Marriage

Certificate executed on February 17, 2006 in Toronto, Ontario, Canada between Sarah

Ellyn Farley and Jennifer Jean Tobits. (A copy of the Marriage Certificate, represented

to be a true and correct copy of the original Marriage Certificate by Ms. Tobits, is

attached hereto as Exhibit D.)

15. Under article VI, section 6.2(a) of the Plan, "[u]pon the death of a Participant . . . all amounts credited to such Participant's Combined Account shall become fully Vested. The Administrator shall direct the Trustee . . . to distribute the value of the deceased Participant's accounts to the Participant's Beneficiary," (A true copy of article I of the Plan, entitled "Definitions," article VI of the Plan, entitled "Determination and Distribution of Benefits," and article IX of the Plan, entitled "Miscellaneous," are attached hereto as Exhibit E.)[1]

16. Article VI, section 6.2(e) instructs that:

> (e) Unless otherwise elected in the manner prescribed in Section 6.6, the Participant's surviving Spouse shall receive a death benefit equal to the Pre-Retirement Survivor Annuity. The Participant may designate a Beneficiary other than the Spouse to receive that portion of the Participant's death benefit which is not payable as a Pre-Retirement Survivor Annuity. The Participant may also designate a Beneficiary other than the Participant's Spouse to receive the Pre-Retirement Survivor Annuity but only if:

>> (1) the Participant and the Participant's Spouse have validly waived the Pre-Retirement Survivor Annuity in the manner prescribed in Section 6.6, **and the Spouse has waived the right to be the Participant's Beneficiary**, or

>> ***

>> (3) the Participant has no Spouse, or

>> ***

(Exh. E) (emphasis supplied.)

---

[1] Due to its voluminous size, Cozen O'Connor has not attached the Plan in its entirety, but rather has attached the relevant articles of the Plan. Cozen O'Connor will produce the Plan in its entirety if this Court so wishes and directs.

17.    "Spouse" is defined under article I, section 1.55A to mean "the person to whom the Participant has been married throughout the one-year period ending on . . . the date of the Participant's death." (Id.)

18.    Under article VI, section 6.2(f):

> (f)  In the event no valid designation of Beneficiary exists, or if the Beneficiary is not alive at the time of the Participant's death, the death benefit will be paid in the following order of priority to:
>
> > (1) the Participant's surviving Spouse;
> >
> > ***
> >
> > (3) the Participant's surviving parents, in equal shares; or
> >
> > ***

(Id.)

19.    Additionally, under article IX, section 9.3, the Plan "shall be construed and enforced according to the [Internal Revenue Code], the [Employee Retirement Income Security Act (the "Act")], and the laws of the Commonwealth of Pennsylvania, other than its laws respecting choice of law, to the extent not pre-empted by the Act." (Id.)

20.    Ms. Tobits' signature does not appear on the designation of Beneficiary form in the space reserved for spousal consent to beneficiary designation. (See Exh. B.)

21.    By reason of these conflicting claims of the defendants, plaintiff is uncertain as to which defendant is entitled to distribution of the accounts owed to Ms. Farley's Beneficiary under the Plan.

5

WHEREFORE, Cozen O'Connor, P.C., respectfully requests that the court adjudge:

a)      That the defendants be required to interplead and settle among themselves their respective claims to the money due under the Plan;

b)      That each defendant be restrained from commencing any action against Cozen O'Connor on the Plan;

c)      That Cozen O'Connor be permitted to pay into the registry of the court all amounts due under the Plan and upon such deposit be discharged from all liability arising from the Plan; and

d)      That Cozen O'Connor be awarded its costs and attorneys' fees.

Respectfully submitted,

COZEN O'CONNOR

By: _____

H. Robert Fiebach, Esq. (PA #02812)
Jay Dorsch, Esq. (PA #42827)
Jill M. Caughie, Esq. (PA #307269)
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000 (t)
(215) 665-2013 (f)

*Attorneys for Plaintiff,*
*Cozen O'Connor*

Dated:  January 24, 2011

Exhibit 30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAJ SHANNON L. MCLAUGHLIN; | ) |
| CASEY MCLAUGHLIN; | ) |
| LTC VICTORIA A. HUDSON; | ) |
| MONIKA POXON; | ) |
| COL STEWART BORNHOFT (RET); | ) |
| STEPHEN MCNABB; | ) Civil Action No. _____ |
| LT GARY C. ROSS; | ) |
| DAN SWEZY; | ) |
| CPT STEVE M. HILL; | ) |
| JOSHUA SNYDER; | ) |
| A1C DANIEL HENDERSON; | ) |
| JERRET HENDERSON; | ) |
| CW2 CHARLIE MORGAN; | ) |
| KAREN MORGAN; | ) |
| CAPT JOAN DARRAH (RET); | ) |
| JACQUELINE KENNEDY, | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) **COMPLAINT** |
| | ) |
| LEON E. PANETTA, in his official capacity as | ) |
| Secretary of Defense; | ) |
| ERIC H. HOLDER, JR., in his official capacity as | ) |
| Attorney General; | ) |
| ERIC K. SHINSEKI, in his official capacity as | ) |
| Secretary of Veterans Affairs; | ) |
| UNITED STATES OF AMERICA, | ) |
|     Defendants. | ) |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF**

Preliminary Statement

1.    This is an action by current and former active duty members of the United States armed forces seeking equal benefits for equal work.  Specifically, the Plaintiffs seek the same recognition, family support and benefits for their same-sex spouses that the military has provided and currently provides to opposite-sex spouses of current and former service members.  These

206

benefits include medical and dental benefits, basic housing allowances, travel and transportation allowances, family separation benefits, military ID cards, visitation rights in military hospitals, survivor benefits, and the right to be buried together in military cemeteries.

2.      Providing spousal benefits is important to the well-being of all military families, and the military's ability to attract and retain the best and brightest members of the armed services. During this time of war, the need to provide spousal benefits is particularly acute because the men and women in uniform who put their lives on the line every day in service to their country must remain focused on the task at hand.  All service members should be confident that, if they should die serving their country, their country will assure that their families are provided for in their absence.  The military makes that promise to its service members who are married to spouses of the opposite sex, and it recognizes that it is critical to our national security that this promise be kept.  For the very same reasons, the military's inability to make that promise to its service members who are married to a spouse of the same sex is a threat to national security.

3.      Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. § 2201-2202, and Federal Rule of Civil Procedure 57.  Specifically, Plaintiffs seek a determination that the so-called Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7, is unconstitutional as applied to military spousal benefits.  To the extent that the definitions of "spouse" in Title 10, Title 32 and Title 38 prevent the recognition of same-sex spouses, Plaintiffs also seek a determination that these provisions suffer from the same constitutional defects as Section 3 of DOMA.

4.      There is no enumerated power in the Constitution that allows the federal government to define marriage in such a way as to deny Plaintiffs the benefits they seek, and the Tenth Amendment entrusts the regulation of marriage to the states.  As applied to military benefits in this context, these statutes deny the Plaintiffs equal protection, place an unconstitutional

2

condition upon the fundamental constitutional right to marry in accordance with state law, and are legislative penalties imposed on persons in same-sex marriages that constitute impermissible bills of attainder in violation of Article I, § 9.

5.     Plaintiffs also seek an award of attorneys fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.   The government cannot maintain that its position in denying the Plaintiffs' claims for spousal benefits is "substantially justified" when the President and the Attorney General have acknowledged that DOMA Section 3 is unconstitutional.   Like members of the Federal Judicial Branch, Executive Branch officials take an oath to uphold the Constitution.   While the courts may have the last word as to whether a legislative enactment is constitutional, the political branches have the first word.   And where, as here, the President and the Attorney General acknowledge a law is unconstitutional, they should not enforce it.   In this case, the Executive Branch has enforced DOMA and specifically denied each Plaintiff spousal benefits on the basis of that statute.

6.     In spite of the fact that the Commander in Chief and the Attorney General have concluded that DOMA is unconstitutional, the Department of Defense has stated that DOMA, "and the existing definition of 'dependent' in some laws, prohibit the extension of many military benefits -- such as medical care, travel and housing allowances, and other benefits -- to same sex couples."   Memorandum for Secretaries of the Military Departments, Repeal of Don't Ask, Don't Tell and Future Impact on Policy at 4 (Jan. 28, 2011) ("Stanley Memorandum").

7.     On July 8, 2010, this Court held that Section 3 of DOMA is unconstitutional in Commonwealth of Massachusetts v. United States Department of Health and Human Services, 698 F. Supp. 2d 234 (D. Mass. 2010) (Tauro, J.) ("Massachusetts") and Gill v. Office of Personnel Management, 699 F. Supp. 2d 374 (D. Mass. 2010) (Tauro, J.).

3

8.      In the consolidated appeal of <u>Massachusetts</u> and <u>Gill</u> before the First Circuit, the government conceded that "Section 3 of DOMA violates the Constitution's equal protection guarantee" and "Section 3 of DOMA is unconstitutional." <u>Commonwealth of Massachusetts v. United States Department of Health and Human Services</u>, Nos. 10-2204, 10-2207 and 10-2214, Gov't Resp. in Support of Pet. For Initial Hearing En Banc, at 4 (1st Cir. filed July 7, 2011).

9.      Because these consolidated cases raise the same constitutional challenges to Section 3 of DOMA, the Plaintiffs have filed this case as a related case pursuant to Local Rule 40.1(G).  <u>See also</u> <u>Massachusetts</u>, 698 F. Supp. 2d at 239-241 (addressing constitutionality of DOMA as applied to burial benefits for same-sex military spouses under Veterans Affairs grants).

10.     It would be futile for Plaintiffs to appeal the denial of spousal benefits to the Board for Corrections of Military Records or otherwise undertake further administrative review of the denial decisions because the denial of Plaintiffs' benefits entails a substantial constitutional question, appeal would prove futile, and the Board for Corrections of Military Records will not provide Plaintiffs with a genuine opportunity for adequate relief as that relief requires correcting an act of Congress, an action beyond the Board's authority.

Background

11.     The Plaintiffs commend several of the named Defendants -- the Secretary of Defense, the Attorney General, and the United States (under the leadership of President Obama) -- for working to eliminate the military's long-standing practice of discriminating against gay and lesbian service members by repealing the so-called "Don't Ask, Don't Tell" policy ("DADT"), formerly codified at 10 U.S.C. § 654, and allowing for open service in the military by gays and lesbians.  Regrettably, the repeal of DADT, alone, does not guarantee equal treatment for gay and lesbian service members.

4

12.     DOMA precludes the military from providing same-sex married couples with the same spousal benefits that are afforded to opposite-sex married couples.  Section 3 of DOMA provides:  "In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."  1 U.S.C. § 7.

13.     Even in the absence of DOMA, questions would persist as to whether spousal benefits are available to same-sex couples under Title 10, concerning active-duty benefits; Title 32, concerning National Guard benefits; and Title 38, concerning veterans' benefits.  Because same-sex marriages were not legal prior to the enactment of DOMA and DADT has only been recently repealed, there has been no opportunity to determine whether those titles would exclude same-sex spouses independently from DOMA.

14.     The definition of "spouse" in Title 38 prevents recognition of same-sex spouses:  "[t]he term 'spouse' means a person of the opposite sex who is a wife or husband."  38 U.S.C. § 101(31).  Similarly, Title 38 provides, "The term 'surviving spouse' means … a person of the opposite sex who was the spouse of a veteran at the time of the veteran's death…."  38 U.S.C. § 101(3).

15.     The definitions of "spouse" in Title 10 and Title 32 are not as clear in their application to same-sex marriages, as they both provide that "'spouse' means husband or wife, as the case may be."  10 U.S.C. § 101(f)(5); 32 U.S.C. § 101(18).

16.     Each service member or retiree Plaintiff sought recognition for his or her spouse, which would have enabled his or her family to receive the same benefits that are provided to opposite-

sex married couples, but that recognition was denied.  Therefore, the Plaintiffs file this suit because, while the repeal of DADT was an important first step in the military's march for equality, it is time to take the next step and provide equal benefits for equal work.

17.     The Plaintiffs do not anticipate that the United States will contest this suit because the government agrees that Section 3 of DOMA is unconstitutional.  As noted in Paragraph 7, the government has conceded that DOMA is unconstitutional before the First Circuit in the appeal of the Massachusetts and Gill cases.

18.     In addition, in a February 23, 2011 letter to Congress, Attorney General Holder wrote:

> After careful consideration, including a review of my recommendation, the President has concluded that given a number of factors, including a documented history of discrimination, classifications based on sexual orientation should be subject to a more heightened standard of scrutiny.  The President has also concluded that Section 3 of DOMA, as applied to legally married same-sex couples, fails to meet that standard and is therefore unconstitutional.  Given that conclusion, the President has instructed the Department not to defend the statute in such cases.  I fully concur with the President's determination.

19.     More recently, on October 1, 2011, President Obama addressed the Human Rights Campaign, stating:

> I vowed to keep up the fight against the so-called Defense of Marriage Act. There's a bill to repeal this discriminatory law in Congress, and I want to see that passed.  But until we reach that day, my administration is no longer defending DOMA in the courts.  I believe the law runs counter to the Constitution, and it's time for it to end once and for all.  It should join "Don't Ask, Don't Tell" in the history books.

20.     Nor do the Plaintiffs anticipate that the Secretary of Defense will oppose the relief sought by the Plaintiffs in this lawsuit.  The military has no interest in seeing that some of its service members receive fewer benefits, or in having those benefits distributed unequally among similarly-situated service members.   To the contrary, the military has eschewed any governmental interest in a service member's sexual orientation whatsoever.  The military's often-

repeated mantra since DADT's repeal was announced is that "[s]exual orientation is a personal

and private matter," and sexual orientation is deemed so irrelevant that the military will not even

collect data concerning the sexual orientation of its service members.  Stanley Memorandum at

4.

21.    The military has emphasized repeatedly that providing these benefits is necessary to

compete with the private sector to maintain quality enlistment and retention, and that the

assurance that a service member's family will be provided for in the event the service member

dies serving their country is important for maintaining morale and faithful service.

22.    Moreover, the military recognizes the link between the payment of benefits and national

security, explaining that service members who are distracted by thoughts that their loved ones

are not being cared for may render the service members less effective combatants:  "Success in

modern warfare demands the full utilization of every ounce of both the physical and mental

strength and stamina of its participants.  No soldier can be and remain at his best with the

constant realization that his family and loved ones are in dire need of financial assistance."  Sen.

Rpt. 93-235 (June 20, 1973), reprinted in 1973 U.S.C.C.A.N. 1579, 1585.  Because the military

believes that the provision of these benefits serves the interest of national security, it is doubtful

the military would support the penalty that DOMA inflicts upon its service members.

23.    The military also has steadfastly opposed treating similarly-situated service members

differently when it comes to compensation and benefits.  For example, the military opposed

legislation to pay a special death benefit to survivors of 14 service members and 1 federal

civilian accidentally killed by friendly fire in Iraq in 1994, explaining "[w]e are concerned that

enactment of this bill would create inequities in the treatment of survivors of service members

dying on active duty."  H.R. Rep. No. 106-270, at 7 (1999).  Because DOMA effectively creates

inequities in the treatment of survivors based on whether they are in a same-sex or opposite-sex marriage with a military spouse, the Plaintiffs expect that the Department of Defense will find the disparate treatment equally troubling and a serious threat to recruitment and retention.

24.     In addition, the military appreciates that unequal treatment threatens unit cohesion.  The Army specifically has given guidance that "[l]eaders are expected to dispassionately enforce standards and correct behaviors that undermine unit cohesion."  Army DADT Contingency Planning Vignettes No. 9 (Feb. 25, 2011); S. REP. No. 1647 at 3339-40 (1960) ("The effectiveness of [personnel] performance is directly related to the fairness and wisdom inherent in the policies under which personnel are employed").  For example, the military has emphasized that it will not build separate living or bathroom facilities for gay and straight service members because "separate facilities would create divisions within units and inappropriately isolate a portion of the force."  Air Force, Repeal of Don't Ask, Don't Tell:  Air Force Frequently Asked Questions at 3.  The military has emphasized that even "[p]ublicly joking about this issue [sexual orientation] is inappropriate behavior, as it undermines unit cohesion; and harassment or abuse based on sexual orientation is unacceptable."  Id.  This stance is consistent with Department of Defense policy, which is "to treat all members with dignity and respect."  Stanley Memorandum at Cover Letter.  If joking about sexual orientation is unacceptable and if separate facilities are a threat to unit cohesion, then telling gay and lesbian service members they will be provided with fewer benefits than their heterosexual counterparts would be even more divisive.  This unfair practice would undoubtedly compromise cohesion among unit members, sending a clear message that some members of the unit are not equal.

25.     The military does not appear to support such discrimination based on sexual orientation, which it deems a "personal and private matter."  To the contrary, its DADT repeal guidance is

8

213

emphatic that there will be "ZERO tolerance for harassment, violence, or <u>discrimination of any kind</u>."  Navy, Repeal of Don't Ask, Don't Tell at 2 (emphasis added); <u>see also</u> Marine Corps, slide presentation "Repeal of Don't Ask, Don't Tell (DADT)" at 5 (The Department of Defense and the Marine Corps maintain: "Zero tolerance for harassment, violence or discrimination"). Given the military's "zero tolerance" for discrimination based on sexual orientation, it is unconscionable that DOMA forces the military to engage in the very discrimination that it prohibits its service members from engaging in through its "zero tolerance" policy.

26.     In other contexts, the military has acknowledged the need to provide for same-sex spouses of its service members.  For instance, the military has recognized the significance of spouses in the lives of gay and lesbian service members by emphasizing that emergency leave is available if the same-sex spouse becomes ill because the "sexual orientation of the Soldier's partner has no bearing on the decision [to support a soldier's family]."  <u>Army DADT Contingency Planning Vignettes</u> No. 5 (Feb. 25, 2011).  The Department of Defense also is continuing to "study" whether there are benefits that are not constrained by DOMA that can be provided to same-sex spouses.  Stanley Memorandum at 5.

Jurisdiction and Venue

27.     This action arises under the Constitution of the United States.  Because the action involves a federal question, jurisdiction is proper pursuant to 5 U.S.C. §§ 8912 and 8991, and 28 U.S.C. §§ 1331 and 1346(a)(2).

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) and 28 U.S.C. § 1402(a)(1) because Plaintiffs Shannon L. McLaughlin and Casey McLaughlin reside in this district, and because the events giving rise to these claims arose in this district.

9

Plaintiffs

Plaintiffs Shannon and Casey McLaughlin

29.  Plaintiff Major Shannon L. McLaughlin, ARNG, is a citizen of the United States.  She resides in Boston, Massachusetts.  She is legally married, pursuant to the laws of the Commonwealth of Massachusetts, to her wife, Plaintiff Casey McLaughlin.

30.  Major McLaughlin is a member of the United States Army, currently serving in the Massachusetts National Guard in Milford, Massachusetts.  She began her military service in 1998.  Major McLaughlin has deployed overseas in support of Operation Enduring Freedom.  She and her wife Casey first met in 1998.  They were married on December 15, 2009 in Foxborough, Massachusetts.

31.  Plaintiffs are the parents of ten-month-old twins named Grace and Grant.  While Grace and Grant are eligible for the benefits attendant to Major McLaughlin's service, her wife Casey -- a former high school teacher and now a stay-at-home mother -- is not.

32.  On October 19, 2011, at approximately 3:15 p.m., Major McLaughlin went to the Administration Office of the Massachusetts National Guard, located at Joint Force Headquarters in Milford, Massachusetts to obtain benefits for Casey.  She was told that same-sex legal spouses are excluded from the Defense Enrollment Eligibility Reporting System ("DEERS") and that they are therefore not entitled to the benefits that Plaintiff sought.

33.  Because the only way for Plaintiffs to obtain the benefits sought is by first registering with DEERS, their inability to register with the system constitutes an effective denial of the benefits sought.  Similarly-situated heterosexual couples are permitted to enroll their legal spouses in the DEERS system.

10

215

<u>Plaintiffs Victoria A. Hudson and Monika Poxon</u>

34.     Plaintiff Lieutenant Colonel Victoria A. Hudson, USAR, is a citizen of the United States. She resides in Hayward, California.  She is legally married, pursuant to the laws of the State of California, to her wife, Plaintiff Monika Poxon.

35.     Lieutenant Colonel Hudson is a member of the United States Army Reserve.  She began her military service in 1979.  She and her wife Monika met in 2000 and have been together since 2001.  They were married on November 1, 2008 in Alameda County, California.

36.     Even though Monika gave birth to the couple's daughter, the Army recognizes Lieutenant Colonel Hudson as a single parent and requires her to regularly submit and maintain a "Family Care Plan."  If she were to fail to maintain this plan with annual certification, Lieutenant Colonel Hudson could be subject to discharge and separation from the Army.

37.     On Friday, October 14, 2011 at approximately 9:30 a.m., Lieutenant Colonel Hudson visited the Parks Reserve Forces Training Area ID Office to register Monika in DEERS. Lieutenant Colonel Hudson was greeted by Angelina Gattis, a civilian worker, who notified the couple that same-sex spouses cannot be registered in DEERS.  Consequently they cannot receive the benefits they have sought.

<u>Plaintiffs Stewart Bornhoft and Stephen McNabb</u>

38.     Plaintiff Colonel Stewart Bornhoft, USA (Ret.), is a citizen of the United States.  He resides in Bonita, California.   He is legally married, pursuant to the laws of the State of California, to his husband, Plaintiff Stephen McNabb.

39.     Colonel Bornhoft began his military service when he entered the United States Military Academy in 1965.  He served two voluntary tours in Vietnam, commanding both a combat engineer company and an infantry headquarters company, and then at Fort Bragg, North

Carolina, he commanded a construction engineer company.  He later commanded two districts in the US Army Corps of Engineers, the Charleston District in South Carolina and the Omaha District, which is one of the largest in the country.  He and his husband Stephen met in 1996 and have been together ever since.  They were married on September 21, 2008 in San Diego, California.

40.     In July of 2009, Colonel Bornhoft's appendix perforated and he was rushed to the Naval Medical Center of San Diego for emergency surgery.  During this ordeal, Colonel Bornhoft was afraid that his husband would be denied access to his hospital room.

41.     On October 11, 2011, at approximately 1:45 p.m., Colonel Bornhoft went to the Marine Corps Recruit Depot ID Card Processing Center in San Diego, California to obtain benefits for Stephen.  Even though Stephen is already enrolled in the DEERS system because of his own military service, Colonel Bornhoft was told that same-sex legal spouses are not entitled to the benefits that he sought.

Plaintiffs Gary C. Ross and Dan Swezy

42.     Plaintiff Lieutenant Gary C. Ross, USN, is a citizen of the United States.  He resides in Tucson, Arizona.  He is legally married, pursuant to the laws of Vermont, to his husband Plaintiff Dan Swezy.

43.     Lieutenant Ross is in the United States Navy, currently serving with the Joint Interoperability Test Command at Fort Huachuca, Arizona.  His military service began in 1995. He served as a Surface Warfare Officer, as one of the Decommissioning Officers of the USS Valley Forge, as a Reactor Division Officer on the USS John C. Stennis, as the Pacific Fleet Commander at Recruit Training Command in Great Lakes, Illinois, and as the Alternate Chairman for the Coalition Warrior Interoperability Demonstration's Assessment Working

12

Group.  He was the second American in history to receive the Admiral De Grasse Award given on behalf of the French Chief of Naval Operations in recognition for leadership in seamanship, navigation and ship handling.  He and his husband met in 2000 while Lieutenant Ross was attending the United States Naval Academy.  They were married in Vermont at 12:01 a.m. on September 20, 2011.  This was the very moment that the Don't Ask, Don't Tell Repeal Act became effective.

44.    Plaintiffs are not able to afford health insurance for Dan, who must travel to Mexico for many health care services.  This past September, Dan was crossing the Mexico-United States border on his way back from a medical procedure.  Gunfire broke out at the border, and a customs agent and many civilians were hurt.  Ever since that time, Plaintiffs have been especially anxious about Dan's health, knowing that he will have to cross the border to obtain care.

45.    On October 14, 2011, at approximately 11:00 a.m., Lieutenant Ross went to the DEERS/ID Office at Fort Huachuca, Arizona to obtain benefits for his husband.  He was told that the DEERS system does not allow same-sex couples to be enrolled, and that attempts to enroll same-sex spouses result in an error message.  He also was told that military ID cards are only available for spouses who are enrolled in DEERS.

Plaintiffs Steve M. Hill and Joshua Snyder

46.    Plaintiff Captain Steve M. Hill, USAR, is a citizen of the United States.  He resides in Columbus, Ohio, but is currently on deployment in Iraq.  He is legally married, pursuant to the laws of the District of Columbia, to his husband, Plaintiff Joshua Snyder.

47.    Captain Hill is currently serving in the United States Army in Iraq.  Captain Hill's military service began in 1988.  During his tenure with the military, he has been stationed in Germany, Asia and Egypt.  He also served in Iraq during Operation Desert Storm.  He and his

13

husband met in 2010.  They were married in the Congressional Cemetery in Washington, D.C. at the grave of Leonard Matlovich on May 3, 2011.  Matlovich, a deceased Vietnam veteran, successfully sued the Air Force for retirement benefits after he was discharged for acknowledging his sexual orientation.

48.   Just days after the couple's wedding, Captain Hill returned to duty in Tikrit, Iraq. Because the Army does not recognize Joshua as Captain Hill's spouse, if Captain Hill were to be killed while on deployment, the Army would be unwilling to return his body to Joshua, and Joshua would not receive a surviving spouse death benefit.

49.   On September 26, 2011, at approximately 3:00 p.m., Captain Hill spoke with Major Richard Sugarman, Command Judge Advocate, Al Asad Air Base, Iraq about obtaining benefits for his husband, Plaintiff Joshua Snyder.  During that conversation, Captain Hill was told that he could not enroll Joshua in the DEERS system and that enrolling same-sex legal spouses in that system is impossible.  Plaintiff also was told that Joshua cannot receive benefits that opposite-sex legal spouses receive because the Army is following the law.

Plaintiffs Daniel and Jerret Henderson

50.   Plaintiff Airman First Class Daniel Henderson, USAF, is a citizen of the United States. He resides in Cheyenne, Wyoming.  He is legally married, pursuant to the laws of the State of Iowa, to his husband, Plaintiff Jerret Henderson.

51.   Airman First Class Henderson is currently serving in the United States Air Force in Cheyenne, Wyoming.  His military service began in 2010, and he has been stationed in Lackland, Texas and in Cheyenne, Wyoming.  He and his husband met in 2009 and were married in Sidney, Iowa, on May 19, 2011.

14

52.     Plaintiffs cannot afford medical insurance for Jerret.  In March of 2010, Jerret fell down a flight of stairs while at work and suffered severe injuries.  He has trouble walking and needs surgery, but the couple cannot afford this necessary treatment.

53.     On September 21, 2011, at approximately 10:30 a.m., Airman First Class Henderson went to the Military Personnel Flight Office in Cheyenne, Wyoming to obtain benefits for Jerret. At that time, he was told that same-sex spouses are not eligible for DEERS registration.  On September 26, 2011, he received a phone call indicating that he was denied the housing allowance that he sought because same-sex couples are not entitled to the allowance.

Plaintiffs Charlie and Karen Morgan

54.     Plaintiff Chief Warrant Officer Charlie Morgan, ARNG, is a citizen of the United States. She resides in Rye, New Hampshire.  She and her wife, Plaintiff Karen Morgan, are married pursuant to the laws of the State of New Hampshire.

55.     Chief Warrant Officer Morgan is currently serving in the New Hampshire National Guard and is stationed at Joint Force Headquarters in Concord, New Hampshire.  Chief Warrant Officer Morgan is a full-time member of the Army National Guard in the Active Guard Reserve.  Chief Warrant Officer Morgan's military service began in 1982.  Since that time, she has served in Kuwait, Qatar and Iraq.  She and her wife, Plaintiff Karen Morgan, met in 1997 and have been together since August of that year.  They were married in New Hampshire on October 24, 2011.

56.     In 2008, Chief Warrant Officer Morgan was diagnosed with breast cancer, and has undergone chemotherapy, radiation treatment and a double mastectomy.  On September 1, 2011, Chief Warrant Officer Morgan was diagnosed with recurring cancer.  Plaintiffs are especially concerned with obtaining all the death benefits and burial rights that opposite-sex couples receive.

57.     In late July of 2011, Chief Warrant Officer Morgan received an application to participate in the mandatory Yellow Ribbon Reintegration Event.  During that time, Chief Warrant Officer Morgan and Karen were in a legally-recognized civil union.  Families are strongly encouraged to attend this event, and the application requested information about Chief Warrant Officer Morgan's spouse.  Because Karen is not a DEERS dependent, she is not permitted to attend this event.  After contacting United States Senator Jeanne Shaheen about this problem, Charlie received a letter, addressed to Senator Shaheen, from Major General William N. Reddel, III of the New Hampshire National Guard.  That letter, dated September 26, 2011 stated that "[p]articipation at a Yellow Ribbon Event is a military benefit limited to Service members and their families as recognized by the Defense Enrollment Eligibility Reporting System (DEERS).  Specifically, the Defense of Marriage Act (DOMA) prohibits the extension of many benefits to same sex couples . . . . I am sorry that we could not provide a better solution to this issue."  Ultimately, due to Senator Shaheen's intervention, the military granted a one-time exception.

58.     On October 25, 2011 at approximately 2:00 p.m., Plaintiffs entered the ID Card section located at Pease Air Force Base in Portsmouth, New Hampshire to obtain benefits for Karen.  Sue Williams, the customer service representative, attempted to process Karen into the RAPIDS system in order to register her for DEERS.  After entering Karen's information, Ms. Williams encountered an error message stating "sponsor and spouse cannot have the same gender" in red letters in the notes section of the screen.

Plaintiffs Joan Darrah and Jacqueline Kennedy

59.     Plaintiff Captain Joan Darrah, USN (Ret.) is a citizen of the United States.  She resides in Alexandria, Virginia.  She is legally married, pursuant to the laws of the District of Columbia, to her wife, Plaintiff Jacqueline Kennedy.

16

60.     On September 11, 2001, Captain Darrah was stationed at the Navy Annex, located just above the Pentagon.  That morning she attended a briefing at the Pentagon that ended just seven minutes before the building was hit by American Airlines flight #77.  The space she had been in was destroyed, and seven of her co-workers were killed.  Had Captain Darrah been killed or injured, Jacqueline would not have been notified -- Captain Darrah dared not include Jacqueline's name in any of her emergency paperwork due to her fear of DADT and its repercussions.  The experience caused Plaintiffs to fully comprehend the sacrifice that living under the DADT regime demanded.  It caused them to reevaluate their lives together, and they decided to retire one year earlier than they had planned.

61.     On December 17, 2010, Captain Darrah and Jacqueline were married at the Einstein Memorial in Washington, D.C.  This date coincided with their twentieth anniversary as a couple.

62.     On Monday, October 24, 2011, at approximately 9:41 a.m., Captain Darrah spoke with Mr. Lowrie at customer service at the Personnel Support Detachment Office in Washington, D.C.  Captain Darrah asked Mr. Lowrie whether she could update her DEERS profile to include Jacqueline.   Mr. Lowrie told Captain Darrah that same-sex spouses are not recognized by DEERS.

The Defendants

63.     Defendant Leon E. Panetta is the duly appointed, confirmed, and acting Secretary of Defense of the United States.   In that official capacity, Defendant is the federal official responsible for the administration of the United States Army, Navy, Marine Corps, and Air Force.  Defendant is named in his official capacity only.

64.     Defendant Eric H. Holder, Jr. is the duly appointed, confirmed, and acting Attorney General of the United States.   In that official capacity, Defendant is the federal official

17

222

responsible for all enforcing federal statutes in accordance with the Constitution.  Defendant is named in his official capacity only.

65.     Defendant Eric K. Shinseki is the duly appointed, confirmed, and acting Secretary of Veterans Affairs of the United States.  In that official capacity, Defendant is the federal official responsible for the administration of Veteran's Affairs.  Defendant is named in his official capacity only.

66.     The United States of America is named as a defendant because this action challenges the constitutionality of an Act of Congress.  28 U.S.C. § 2403(A).

<u>Facts</u>
<u>Military Benefits</u>

67.     The current military family benefits regimes of Title 10, Title 32 and Title 38, particularly as modified by DOMA, fail to address the modern military.  These laws were crafted at a time when gays and lesbians were precluded from openly serving in the military, and when same-sex marriages were not legal in the United States.  While Congress may have assumed that Title 10, Title 32 and Title 38 effectively covered all military spouses in the past, that is not the current reality.  The military is a reflection of our society as a whole.  Now that same-sex marriages are legal, and gays and lesbians can serve openly in the military, service members -- such as the Plaintiffs -- with same-sex spouses do serve in the ranks.  To maintain the uniformity of benefits that Congress believed it was creating in Title 10, Title 32 and Title 38, the definition of "spouse" must include these same-sex spouses as well.

68.     Plaintiffs seek all the support services and benefits available to their peers who have opposite-sex spouses, including retirement benefits, an additional housing allowance, family separation benefits, extended coverage for TRICARE, a military ID card for the service

18

223

member's spouses and, in the event the service member dies serving their country, the spousal death benefit.

DOMA

69.     DOMA provides, in relevant part, "[i]n determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."  1 U.S.C. § 7.

70.     In passing DOMA, 1 U.S.C. § 7, Congress took the unprecedented step of preemptively subordinating an entire classification of marriages and, indeed, an entire class of people. Plaintiffs are among those affected.

71.     At the time of DOMA's passage in 1996, same-sex marriage did not exist in any state and the Act existed in a vacuum.

72.     Today, however, DOMA operates to effectively subordinate Plaintiffs' legally recognized same-sex marriages.  As a result, Plaintiffs have been denied the privileges normally available to all service members by virtue of their immutable status as gays and lesbians.

73.     As a direct result of DOMA's application to federal military benefits, Plaintiffs have been denied the status and protections enjoyed by their peers in opposite-sex marriages.

74.     In passing DOMA, Congress set forth four rationales.  First, Congress cited a government interest in defending and nurturing the institution of traditional, heterosexual marriage.  H.R. Rep. No. 104-664, 12 (1996).  Second, Congress affirmed an interest in defending traditional notions of morality.  Id. at 15.  Third, Congress stated its interest in protecting state sovereignty and democratic self-governance.  Id. at 16.  Finally, Congress maintained that DOMA furthers its

19

224

interest in preserving scarce government resources.  Id. at 18.  None of these stated objectives is furthered by the Act; moreover, these objectives do not justify the Act's unconstitutional exclusion of same-sex marriages from federal recognition for the purposes of military benefits. Rather than a "defense of marriage," DOMA would require the Plaintiffs to divorce and marry someone else of the opposite sex to obtain spousal benefits.

75.     This Court already has held DOMA unconstitutional in Massachusetts and Gill.

76.     If not for the restrictive definition of "spouse" in DOMA, and the definitions in Title 10, Title 32 and Title 38, to the extent those definitions would prohibit recognition of same-sex spouses, Plaintiffs, as legally-married members of the military, would receive the same benefits as their peers with opposite-sex spouses.  Yet, because the military must obey these statutes it is forced to single out the Plaintiffs, to deny the validity of their legally-recognized marriages, and to deny them the benefits they should receive.

Legalization of Same-Sex Marriage

77.     Same-sex marriages are legal in Connecticut, Iowa, Massachusetts, New Hampshire, New York, Vermont and Washington, D.C., and some same-sex couples were legally married in California.

78.     Massachusetts was the first state in the country to legalize same-sex marriage.  On November 18, 2003, the Massachusetts Supreme Judicial Court invalidated a state constitutional provision that prohibited same-sex marriage in Goodridge v. Department of Public Health, 798 N.E.2d 941 (Mass. 2003).  Same-sex marriages in Massachusetts began on May 17, 2004.

79.     On May 15, 2008, the California Supreme Court overturned a state ban on same-sex marriage.  Same-sex marriages in California began on June 16, 2008.  California stopped performing same-sex marriages on November 5, 2008 as a result of the passing of Proposition 8.

80.     On April 3, 2009 the Iowa Supreme Court invalidated a state law that prohibited same-sex marriage in <u>Varnum v. Brien</u>, 763 N.W.2d 862 (Iowa 2009).  Same-sex marriages in Iowa began on April 27, 2009.

81.     On April 7, 2009, the Vermont state legislature passed a bill recognizing same-sex marriage.  Same-sex marriages in Vermont began on September 1, 2009.

82.     On June 3, 2009, the New Hampshire state legislature approved a bill legalizing same-sex marriage in that state.  Same-sex marriages in New Hampshire began on January 1, 2010.

83.     On December 18, 2009, the District of Columbia's Mayor Adrian Fenty signed a bill passed by the Council of the District of Columbia recognizing same-sex marriage.  Same-sex marriages in the District of Columbia began on March 9, 2010.

Repeal of DADT

84.     On December 22, 2010, President Obama signed the Don't Ask, Don't Tell Repeal Act of 2010.  Pursuant to that Act, the repeal of 10 U.S.C. § 654 became effective on September 20, 2011.  Since that time, Plaintiffs have openly acknowledged their legal, same-sex marriages and have applied for federal military benefits for their spouses.  The extension of these benefits was effectively denied to each Plaintiff when they were denied the opportunity to add their legally recognized same-sex spouses to DEERS or were otherwise denied the opportunity to apply for benefits.

21

<u>Causes of Action</u>

<u>TITLE 10</u>

COUNT I:  TITLE 10, INDEPENDENTLY AND AS MODIFIED BY DOMA,
<u>VIOLATES PLAINTIFFS' EQUAL PROTECTION RIGHTS</u>

85.     Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Victoria A. Hudson, Monika
Poxon, Gary C. Ross, Dan Swezy, Steve M. Hill, Joshua Snyder, Daniel Henderson, Jerret
Henderson, Charlie Morgan and Karen Morgan reallege and incorporate by reference all
allegations contained within paragraphs 1-84 as if set forth fully herein.

86.     Title 10 of the United States Code governs, <u>inter alia</u>, benefits for members of the armed
services.

87.     DOMA requires the federal government to treat couples in same-sex marriages
differently than couples in opposite-sex marriages.  DOMA's application to federal military
benefits in Title 10 mandates unequal treatment, rendering same-sex marriages non-existent for
the purposes of military benefits.  Consequently, Plaintiffs were denied military benefits that
have been extended to their peers in opposite-sex relationships in violation of the right of equal
protection secured by the Fifth Amendment of the Constitution of the United States.

88.     To the extent that the definition of "spouse" in 10 U.S.C. § 101(f)(5) can be construed,
independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it suffers from
the same constitutional defects as Section 3 of DOMA.

COUNT II:  TITLE 10, INDEPENDENTLY AND AS MODIFIED BY DOMA,
VIOLATES THE TENTH AMENDMENT AND CONSTITUTIONAL PRINCIPLES
OF FEDERALISM

89.     Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Victoria A. Hudson, Monika
Poxon, Gary C. Ross, Dan Swezy, Steve M. Hill, Joshua Snyder, Daniel Henderson, Jerret

Henderson, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

90.    The Tenth Amendment to the United States Constitution expressly reserves to the states all powers except those limited powers granted to the federal government.

91.    The Tenth Amendment preserves for the states the authority to regulate and define marriage for their citizens.

92.    Congress lacks the authority under Article I of the United States Constitution to regulate the field of domestic relations, including marriage.

93.    DOMA represents an unprecedented, unjustified and unconstitutional expansion of federal regulation into the field of domestic relations, including marriage.

94.    Section 3 of DOMA violates the Tenth Amendment, exceeds Congress' Article I powers, and runs afoul of the Constitution's principles of federalism by undermining the states' sovereign authority to define marriage and regulate the marital relationships and status of their citizens, as applied to Title 10.

95.    As a direct result of DOMA's unconstitutional expansion of federal regulation into the field of domestic relations, Plaintiffs have been denied federal military benefits that have been extended to their peers in opposite-sex marriages.

96.    To the extent that the definition of "spouse" in 10 U.S.C. § 101(f)(5) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

COUNT III:  TITLE 10, INDEPENDENTLY AND AS MODIFIED BY DOMA,
PLACES AN UNCONSTITUTIONAL CONDITION ON THE FUNDAMENTAL RIGHT TO
MARRY IN ACCORDANCE WITH STATE LAW

97.   Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Victoria A. Hudson, Monika Poxon, Gary C. Ross, Dan Swezy, Steve M. Hill, Joshua Snyder, Daniel Henderson, Jerret Henderson, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

98.   Section 3 of DOMA forces Plaintiffs to renounce their fundamental constitutional right to marry in accordance with state law to obtain federal military spousal benefits under Title 10.  To obtain federal military spousal benefits, the Plaintiffs would have to divorce their same-sex spouses and then marry someone of the opposite sex.  This imposes an unconstitutional condition on the exercise of the fundamental constitutional right to marry the person of one's choice in accordance with state law.

99.   To the extent that the definition of "spouse" in 10 U.S.C. § 101(f)(5) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

COUNT IV:  TITLE 10, INDEPENDENTLY AND AS MODIFIED BY DOMA,
IS AN IMPERMISSIBLE BILL OF ATTAINDER

100.   Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Victoria A. Hudson, Monika Poxon, Gary C. Ross, Dan Swezy, Steve M. Hill, Joshua Snyder, Daniel Henderson, Jerret Henderson, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

101.   Article I, Section 9 of the United States Constitution states that "No Bill of Attainder or ex post facto Law shall be passed."

24

102.    The Bill of Attainder clause prohibits as unconstitutional any law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.

103.    As a direct result of DOMA's application to federal military benefits in Title 10, the federal government imposes a disability upon a clearly identifiable class of persons involved in legally-recognized same-sex marriages, including Plaintiffs, for no purpose other than to punish them.  Plaintiffs were denied federal military benefits that they would otherwise be entitled to if not for their membership in this clearly identifiable class.  Thus, through DOMA, Plaintiffs have been subjected to an unconstitutional Bill of Attainder.

104.    To the extent that the definition of "spouse" in 10 U.S.C. § 101(f)(5) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

<u>TITLE 32</u>

COUNT V:  TITLE 32, INDEPENDENTLY AND AS MODIFIED BY DOMA,
<u>VIOLATES PLAINTIFFS' EQUAL PROTECTION RIGHTS</u>

105.    Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

106.    Title 32 of the United States Code governs, <u>inter alia</u>, benefits for members of the National Guard.

107.    DOMA requires the federal government to treat married couples in same-sex marriages differently than married couples in opposite-sex marriages.  DOMA's application to federal military benefits in Title 32 mandates unequal treatment, making certain marriages non-existent

25

230

for the purposes of military benefits. Consequently, Plaintiffs were denied military benefits that have been extended to their peers in opposite-sex relationships in violation of the right of equal protection secured by the Fifth Amendment of the Constitution of the United States.

108. To the extent that the definition of "spouse" in 32 U.S.C. § 101(18), can be construed, independent of Section 3 of DOMA to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

COUNT VI: TITLE 32, INDEPENDENTLY AND AS MODIFIED BY DOMA, VIOLATES THE TENTH AMENDMENT AND CONSTITUTIONAL PRINCIPLES OF FEDERALISM

109. Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

110. The Tenth Amendment to the United States Constitution expressly reserves to the states all powers except those limited powers granted to the federal government.

111. The Tenth Amendment preserves for the states the authority to regulate and define marriage for their citizens.

112. Congress lacks the authority under Article I of the United States Constitution to regulate the field of domestic relations, including marriage.

113. DOMA represents an unprecedented, unjustified and unconstitutional expansion of federal regulation into the field of domestic relations, including marriage.

114. Section 3 of DOMA violates the Tenth Amendment, exceeds Congress' Article I powers, and runs afoul of the Constitution's principles of federalism by undermining the states' sovereign authority to define marriage and regulate the marital relationships and status of their citizens, as applied to Title 32.

26

115.   As a direct result of DOMA's unconstitutional expansion of federal regulation into the field of domestic relations, Plaintiffs have been denied federal military benefits that have been extended to their peers in opposite-sex marriages.

116.   To the extent that the definition of "spouse" in 32 U.S.C. § 101(18), can be construed, independent of Section 3 of DOMA to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

### COUNT VII:  TITLE 32, INDEPENDENTLY AND AS MODIFIED BY DOMA, PLACES AN UNCONSTITUTIONAL CONDITION ON THE FUNDAMENTAL RIGHT TO MARRY IN ACCORDANCE WITH STATE LAW

117.   Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

118.   Section 3 of DOMA forces Plaintiffs to renounce their fundamental constitutional right to marry in accordance with state law to obtain federal military spousal benefits under Title 32.  To obtain federal military spousal benefits, the Plaintiffs would have to divorce their same-sex spouses and then marry someone of the opposite sex.  This imposes an unconstitutional condition on the exercise of the fundamental constitutional right to marry the person of one's choice in accordance with state law.

119.   To the extent that the definition of "spouse" in 32 U.S.C. § 101(18) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

COUNT VIII:  TITLE 32, INDEPENDENTLY AND AS MODIFIED BY DOMA,
IS AN IMPERMISSIBLE BILL OF ATTAINDER

120.   Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Charlie Morgan and Karen Morgan reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

121.   Article I, Section 9 of the United States Constitution states that "No Bill of Attainder or ex post facto Law shall be passed."

122.   The Bill of Attainder clause prohibits as unconstitutional any law that legislative determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.

123.   As a direct result of DOMA's application to federal military benefits in Title 32, the federal government imposes a disability upon a clearly identifiable class of persons involved in legally-recognized same-sex marriages, including Plaintiffs, for no purpose other than to punish them.  Plaintiffs were denied federal military benefits that they would otherwise be entitled to if not for their membership in this clearly identifiable class.  Thus, through DOMA, Plaintiffs have been subjected to an unconstitutional Bill of Attainder.

124.   To the extent that the definition of "spouse" in 32 U.S.C. § 101(18) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it suffers from the same constitutional defects as Section 3 of DOMA.

28

233

<u>TITLE 38</u>

COUNT IX:  TITLE 38, INDEPENDENTLY AND AS MODIFIED BY DOMA,
<u>VIOLATES PLAINTIFFS' EQUAL PROTECTION RIGHTS</u>

125.   Plaintiffs Stewart Bornhoft, Stephen McNabb, Joan Darrah and Jacqueline Kennedy

reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set

forth fully herein.

126.   Title 38 of the United States Code governs, <u>inter alia</u>, benefits for armed services

veterans.

127.   DOMA requires the federal government to treat married couples in same-sex marriages

differently than married couples in opposite-sex marriages.  DOMA's application to federal

military benefits under Title 38 mandates unequal treatment, making certain marriages non-

existent for the purposes of military benefits.  Consequently, Plaintiffs were denied military

benefits that have been extended to their peers in opposite-sex relationships in violation of the

right of equal protection secured by the Fifth Amendment of the Constitution of the United

States.

128.   To the extent that the definitions of "spouse" in 38 U.S.C. §§ 101(3) and 101(31) can be

construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, it

suffers from the same constitutional defects as Section 3 of DOMA.

COUNT X:  TITLE 38, INDEPENDENTLY AND AS MODIFIED BY DOMA,
VIOLATES THE TENTH AMENDMENT AND CONSTITUTIONAL PRINCIPLES OF
FEDERALISM

129.   Plaintiffs Stewart Bornhoft, Stephen McNabb, Joan Darrah and Jacqueline Kennedy

reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set

forth fully herein.

130.    The Tenth Amendment to the United States Constitution expressly reserves to the states all powers except those limited powers granted to the federal government.

131.    The Tenth Amendment preserves for the states the authority to regulate and define marriage for their citizens.

132.    Congress lacks the authority under Article I of the United States Constitution to regulate the field of domestic relations, including marriage.

133.    DOMA represents an unprecedented, unjustified and unconstitutional expansion of federal regulation into the field of domestic relations, including marriage.

134.    Section 3 of DOMA violates the Tenth Amendment, exceeds Congress' Article I powers, and runs afoul of the Constitution's principles of federalism by undermining the states' sovereign authority to define marriage and regulate the marital relationships and status of their citizens, as applied to Title 38.

135.    As a direct result of DOMA's unconstitutional expansion of federal regulation into the field of domestic relations, Plaintiffs have been denied federal military benefits that have been extended to their peers in opposite-sex marriages.

136.    To the extent that the definitions of "spouse" in 38 U.S.C. §§ 101(3) and 101(31) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, they suffer from the same constitutional defects as Section 3 of DOMA.

COUNT XI:  TITLE 38, INDEPENDENTLY AND AS MODIFIED BY DOMA, PLACES AN UNCONSTITUTIONAL CONDITION ON THE FUNDAMENTAL RIGHT TO MARRY IN ACCORDANCE WITH STATE LAW

137.    Plaintiffs Stewart Bornhoft, Stephen McNabb, Joan Darrah and Jacqueline Kennedy reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

30

138.   Section 3 of DOMA forces Plaintiffs to renounce their fundamental constitutional right to marry in accordance with state law to obtain federal military spousal benefits.  To obtain federal military spousal benefits, the Plaintiffs would have to divorce their same-sex spouses and then marry someone of the opposite sex.  This imposes an unconstitutional condition on the exercise of the fundamental constitutional right to marry the person of one's choice in accordance with state law.

139.   To the extent that the definitions of "spouse" in 38 U.S.C. §§ 101(3) and 101(31) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, they suffer from the same constitutional defects as Section 3 of DOMA.

### COUNT XII:  TITLE 38, INDEPENDENTLY AND AS MODIFIED BY DOMA, IS AN IMPERMISSIBLE BILL OF ATTAINDER

140.   Plaintiffs Stewart Bornhoft, Stephen McNabb, Joan Darrah, and Jacqueline Kennedy reallege and incorporate by reference all allegations contained within paragraphs 1-84 as if set forth fully herein.

141.   Article I, Section 9 of the United States Constitution states that "No Bill of Attainder or ex post facto Law shall be passed."

142.   The Bill of Attainder clause prohibits as unconstitutional any law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.

143.   As a direct result of DOMA's application to federal military benefits in Title 38, the federal government imposes a disability upon a clearly identifiable class of persons involved in legally-recognized same-sex marriages, including Plaintiffs, for no purpose other than to punish them.  Plaintiffs were denied federal military benefits that they would otherwise be entitled to if

31

not for their membership in this clearly identifiable class.  Thus, through DOMA, Plaintiffs have been subjected to an unconstitutional Bill of Attainder.

144.    To the extent that the definitions of "spouse" in 38 U.S.C. §§ 101(3) and 101(31) can be construed, independent of Section 3 of DOMA, to prevent recognition of same-sex spouses, they suffer from the same constitutional defects as Section 3 of DOMA.

WHEREFORE, Plaintiffs pray for a judgment and order:

(a)    Declaring that Title 10, independently and as modified by DOMA, 1 U.S.C. § 7, cannot be constitutionally applied to deny benefits to same-sex married couples, including Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Victoria A. Hudson, Monika Poxon, Gary C. Ross, Dan Swezy, Steve M. Hill, Joshua Snyder, Daniel Henderson, Jerret Henderson, Charlie Morgan and Karen Morgan;

(b)    Declaring that Title 32, independently and as modified by DOMA, 1 U.S.C. § 7, cannot be constitutionally applied to deny benefits to same-sex married couples, including Plaintiffs Shannon L. McLaughlin, Casey McLaughlin, Charlie Morgan and Karen Morgan;

(c)    Declaring that Title 38, independently and as modified by DOMA, 1 U.S.C. § 7, cannot be constitutionally applied to deny benefits to same-sex married couples, including Plaintiffs Stewart Bornhoft, Stephen McNabb, Joan Darrah and Jacqueline Kennedy;

(d)    Enjoining Defendants from continuing to discriminate against Plaintiffs because they have lawfully married someone of the same gender.  Specifically, Plaintiffs ask the Court to issue an injunction requiring Defendants to consider Plaintiffs' claims for benefits without regard to the gender of their spouses;

(e)    Granting such other relief as the Court may deem just, including an award of reasonable attorneys' fees and allowed costs pursuant to 28 U.S.C. § 2412.  President Obama swore to

uphold the Constitution, taking the same oath as the members of this Court.  The President has stated his view that Section 3 of DOMA, as applied to same-sex couples who are legally married under state law, violates the equal protection component of the Fifth Amendment, and this Court has agreed.  Yet, the President also has informed the Department of Justice that Section 3 of DOMA will continue to be enforced by the Executive Branch, despite its unconstitutionality. This conflicted position of the Executive Branch enforcing a law it knows to be unconstitutional is not substantially justified.  See 5 U.S.C. § 504(a)(2).

MAJ Shannon L. McLaughlin
Casey McLaughlin
LTC Victoria A. Hudson
Monika Poxon
COL Stewart Bornhoft (Ret)
Stephen McNabb
LT Gary C. Ross
Dan Swezy
CPT Steve M. Hill
Joshua Snyder
A1C Daniel Henderson
Jerret Henderson
CW2 Charlie Morgan
Karen Morgan
CAPT Joan Darrah (Ret)
Jacqueline Kennedy

By their Attorneys,

/s/ Ian McClatchey
Ian McClatchey, BBO No. 676664
IMcClatchey@Chadbourne.com
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5303 (phone)
(646) 710-5303 (fax)

/s/ John M. Goodman
John M. Goodman
JGoodman@SLDN.org
David McKean
DMcKean@SLDN.org
SERVICEMEMBERS LEGAL DEFENSE NETWORK
Post Office Box 65301
Washington, DC 20035
(202) 621-5401 (phone)
(202) 797-1635 (fax)

/s/ Abbe David Lowell
Abbe David Lowell
ADLowell@Chadbourne.com
Christopher D. Man
CMan@Chadbourne.com
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 974-5600 (phone)
(202) 974-5602 (fax)

239

# Exhibit 31

# BOARD OF VETERANS' APPEALS

## DEPARTMENT OF VETERANS AFFAIRS
### WASHINGTON, DC 20420

IN THE APPEAL OF
CARMEN J. CARDONA

SS

DOCKET NO. 11-01 921          )     DATE     30 Aug. 11ₐₛ
                             )
                             )

On appeal from the
Department of Veterans Affairs Regional Office in Hartford, Connecticut

## THE ISSUE

Entitlement to additional dependency compensation for a dependent spouse.

## REPRESENTATION

Veteran represented by:     Michael Wishnie, Attorney

## ATTORNEY FOR THE BOARD

P. Sorisio, Counsel

IN THE APPEAL OF                    SS 
CARMEN J. CARDONA

## INTRODUCTION

The Veteran had active service from July 1988 to May 2000.

This matter comes before the Board of Veterans' Appeals (BVA or Board) from a
June 2010 determination of the Department of Veterans Affairs (VA) Regional
Office (RO) in Hartford, Connecticut, which denied the Veteran's claim for
additional dependency benefits.

The June 2010 determination reflects that the Veteran is receiving additional
compensation for one dependent, her child. Thus, for clarity, the Board has
characterized the issue on appeal as being for entitlement to additional dependency
compensation for a dependent spouse.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R.
§ 20.900(c)(1) (2010) because this case "involves interpretation of law of general
application affecting other claims." 38 U.S.C.A. § 7107(a)(2) (West 2007).

## FINDINGS OF FACT

1. The Veteran's combined disability evaluation for VA compensation benefits is
80 percent.

2. As of October 28, 2008, the State of Connecticut legally recognizes same sex
marriages.

3. The Veteran and R.H., who are both of the same sex, were legally married on
May 14, 2010, in the State of Connecticut.

4. The Veteran and R.H. were both residents of the State of Connecticut at the time
of their marriage and this is a valid marriage under VA laws and regulations.

5. R.H. is not a "spouse" for VA purposes.

- 2 -

IN THE APPEAL OF                                     SS 
    CARMEN J. CARDONA

## CONCLUSION OF LAW

The criteria for entitlement to additional dependency compensation for a dependent spouse have not been met. 38 U.S.C.A. §§ 101, 103, 1115 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.1, 3.4, 3.50, 3.205 (2010).

## REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Veteran seeks to obtain additional VA dependency compensation benefits for her same-sex spouse, R.H. She contends that her marriage is considered valid by the State of Connecticut and that Connecticut recognizes her spouse as a dependent. *See* Notice of Disagreement, received June 11, 2010. The Veteran also contends, via her attorney representative, that the denial of spousal benefits to a service-connected Veteran in a same-sex marriage violates the Fifth and Tenth Amendments to the U.S. Constitution. *See* April 2011 Motion for Advancement on the Docket (Motion).

### *Veterans Claims Assistance Act of 2000 (VCAA)*

As provided for by the VCAA, VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2010). Pursuant to 38 C.F.R. § 3.159(b)(3), however, no duty to provide 38 U.S.C.A. § 5103(a) notice arises when, as a matter of law, entitlement to the benefit claimed cannot be established. In this regard, the Board finds that the facts of this case are not in dispute, and the Veteran's representative has acknowledged the same. *See* April 2011 Motion, p. 6 ("[t]he facts of this case are undisputed and BVA has no fact-finding role to play."). Rather, the disposition of this appeal turns solely on the law. As the facts are not in dispute, and the case involves a matter of law, any deficiencies under the VCAA duty to notify are rendered moot.

In May 2011, the Veteran's attorney submitted additional, pertinent evidence to the Board, to include a license and certificate of marriage. In the letter accompanying

- 3 -

IN THE APPEAL OF                                    SS 
   CARMEN J. CARDONA

this evidence, it was noted that the Veteran "waives her right to referral of this evidence to the agency of original jurisdiction for review." As such, the Board accepts the evidence into the record and will consider it in making this decision. 38 C.F.R. § 20.1304(c) (2010). As noted, the facts of this case are uncontested and all evidence necessary for adjudication of this appeal is present in the claims file.

In sum, no further analysis of the RO's compliance with VA's duties to notify and assist is warranted in the present case, as the claim is being denied as a matter of law.

*Legal Criteria and Analysis*

The law provides that an additional amount of compensation may be payable for a spouse, child, and/or dependent parent, where a Veteran is entitled to compensation based on disability evaluated as 30 percent or more disabling. 38 U.S.C.A. § 1115 (West 2002 & Supp. 2011); 38 C.F.R. § 3.4(b)(2) (2010). VA law defines a "spouse" as a person of the opposite sex whose marriage to the Veteran meets the requirements of 38 C.F.R. § 3.1(j). 38 U.S.C.A. § 101(31)(West 2002); 38 C.F.R. § 3.50(a) (2010). "Marriage" means a marriage valid under the law of the place where the parties resided at the time of the marriage, or the law of the place where the parties resided when the right to benefits accrued. 38 U.S.C.A. § 103(c) (West 2002); 38 C.F.R. § 3.1(j) (2010).

Under the General Statutes of Connecticut, no persons may be joined in marriage until both have complied with the provisions of sections 46b-24 to 46b-27, inclusive, and 46b-29 to 46b-33, inclusive, and have been issued a license by the registrar for the town in which the marriage is to be celebrated, which bears the certification of the registrar that the persons named therein have complied with the provisions of said sections. CONN. GEN. STAT. § 46b-24(a) (2010). Further, such license, when certified by the registrar, is sufficient authority for any person authorized to perform a marriage ceremony in Connecticut to join such persons in marriage, provided the ceremony is performed within the town where the license was issued and within a period of not more than sixty-five days after the date of application. *Id.* § 46b-24(b). Connecticut law also states that each person who

- 4 -

IN THE APPEAL OF                              SS 
CARMEN J. CARDONA

joins any person in marriage shall certify upon the license certificate the fact, the
time and place of the marriage, and return it to the registrar of the town where it was
issued, before or during the first week of the month following the marriage. *Id.*
§ 46b-34.

In *Kerrigan v. Commissioner of Public Health*, 957 A.2d 407, 482 (Conn. 2008),
the Connecticut Supreme Court held that in accordance with state constitutional
requirements, "same sex couples cannot be denied the freedom to marry."

The undisputed facts of this appeal are as follows. The Veteran is currently service-
connected for carpal tunnel syndrome of the right hand, evaluated as 50 percent
disabling, and carpal tunnel syndrome of the left hand, evaluated as 40 percent
disabling, both effective November 4, 2005. According to the record, the Veteran's
combined evaluation for disability compensation is 80 percent. In light of the
criteria noted above, the Veteran is potentially eligible for additional dependency
compensation for a spouse. *See* 38 C.F.R. § 3.4(b)(2)(2010).

On a VA Form 21-686c, received at the Hartford RO on May 24, 2010, the Veteran
noted her marriage to R.H. on May 14, 2010, in Norwich, Connecticut. In the
"Remarks" section of this document, the Veteran stated that she wanted to add her
spouse to her service-connected disability allowance benefit. In response to this
request, the Hartford RO sent the Veteran a letter dated June 4, 2010, that denied
the claim for additional compensation for a dependent spouse. The letter stated that
because the requirement of 38 C.F.R. § 3.50(a) (defining "spouse" for VA
purposes) was not met, the claim was denied. It noted that the Veteran was being
paid for one dependent, her child. In response to a timely Notice of Disagreement,
the RO issued a Statement of the Case in November 2010 that denied the claim,
again, because the requirement of 38 C.F.R. § 3.50(a) was not met. A timely
Substantive Appeal was received on January 11, 2011. The Veteran did not request
a Board hearing.

The record reflects that the Veteran's gender is female. *See* February 2000 Report
of medical examination and corresponding report of medical history; March 2002
VA Form 21-526; Connecticut License and Certificate of Marriage. The record

IN THE APPEAL OF                              SS 
    CARMEN J. CARDONA

also reflects that prior to May 14, 2010, the Veteran had never been married. *See* March 2002 VA Form 21-526; June 2008 VA Form 21-686c; and December 2008 VA Form 21-686c. A Connecticut License and Certificate of Marriage reflects that the Veteran married R.H. on May 14, 2010 in Norwich, Connecticut. *See* 38 C.F.R. § 3.205(a)(1)(2010). The License and Certificate of Marriage also indicates R.H.'s gender is female. Thus, the Veteran, a female, was legally married to R.H., a female, in Norwich, Connecticut, a state that, as noted, legally recognizes that "same sex couples cannot be denied the freedom to marry." *Kerrigan*, 957 A.2d at 482. Additionally, the License and Certificate of Marriage indicates that both the Veteran and R.H. were residents of Norwich, Connecticut at the time of the marriage. Based on the above facts and Connecticut laws, the Board finds that the Veteran and R.H. have complied with the General Statutes of Connecticut for a valid marriage in that state and were legally married on May 14, 2010. *See, e.g.*, Connecticut License and Certificate of Marriage; *Kerrigan*, 957 A.2d at 482. Therefore, this is a valid marriage under VA law. 38 U.S.C.A. § 103(c) (West 2002); 38 C.F.R. § 3.1(j)(2010).

However, VA law defines "spouse" as "*a person of the opposite sex*." 38 U.S.C.A. § 101(31)(West 2002); 38 C.F.R. § 3.50(a)(2010) (emphasis added). Under the facts and controlling law, the Board must deny this claim for additional dependency compensation for a spouse because the requirement of 38 C.F.R. § 3.50(a) that a spouse be a person of the opposite sex has not been met. In short, R.H. is not a "spouse" for VA purposes.

The Board acknowledges the Veteran's and her representative's arguments that Connecticut recognizes her spouse as a dependent, but VA law does not. In this regard, in addition to statutes enacted by Congress and controlling legal precedent, the Board's jurisdictional statute provides that the Board is bound by regulations of the Department, instructions of the Secretary, and the precedent opinions of the chief legal officer of the Department. 38 U.S.C.A. § 7104(c) (West 2007). Thus, the Board is bound by the statutory and regulatory definitions of "spouse" previously noted, which does not support a finding of entitlement to additional dependency compensation for R.H. as a dependent spouse.

- 6 -

IN THE APPEAL OF                    SS 
    CARMEN J. CARDONA

The Veteran, through her representative, has also raised constitutional arguments, to include violation of the Fifth and Tenth Amendments to the U.S. Constitution, which the Board fully acknowledges. *See Smith (Morgan) v. Derwinski*, 2 Vet. App. 137, 141 (1992)(the Board is not free to ignore assertions made by a claimant in support of their appeal.). Specifically, in an April 2011 Motion and a May 2011 letter, the Veteran set forth her contentions regarding the constitutionality of the definitions of marriage contained in 38 U.S.C.A. § 101(31), 1 U.S.C.A. § 7, and 38 C.F.R. § 3.50(a). The Veteran argues that these statutes and regulation have illegally classified individuals on the basis of sex and sexual orientation thereby denying them of valuable property by way of VA benefits. Her constitutional contentions also include denial of equal protection under the law, infringement on a fundamental right, and infringement by the Federal government upon the traditional governmental functions of the state in violation of the Tenth Amendment. *See* May 2011 letter.

Initially, the Board recognizes that the United States Court of Appeals for the Federal Circuit has held that there is a property interest in entitlement to VA benefits. *See Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009) (holding that entitlement to benefits is a property interest protected by the Due Process Clause of the Fifth Amendment). Notwithstanding the recognition of this property interest, the Board must deny the claim for additional dependency compensation for a dependent same-sex spouse as previously stated.

The Board is aware of Congress' decree that "[t]he Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans." 38 U.S.C.A. § 511(a) (West 2002). There are, however, limitations to this Congressional mandate. In *Johnson v. Robison*, the United States Supreme Court noted the principle that adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies. 415 U.S. 361, 368 (1974) (citations omitted). The United States Court of Appeals for Veterans Claims (Veterans Court) has also acknowledged this principle on a number of occasions. *See Saunders v. Brown*, 4 Vet. App. 320, 326 (1993) (citing *Johnson*) ("[i]t has generally been thought that

IN THE APPEAL OF                                    SS 
   CARMEN J. CARDONA

the adjudication of the constitutionality of congressional enactments is 'beyond the
jurisdiction of administrative agencies,' including the BVA"); *see also*
*Giantcaterino v. Brown*, 7 Vet. App. 555, 557 (1995) (stating that the Board may
express an opinion on a constitutional claim but it is not required to do so). The
Veterans Court has noted that administrative agencies are entitled to pass on
constitutional claims, but are not required to do so. *Id.* (*citing Plaquemines Port v.
Federal Maritime Comm'n*, 838 F.3d 536, 544 (D.C. Cir. 1988)). The critical role
for the administrative agency is to ensure that the necessary factual development
has been undertaken to help the court resolve the constitutional issue. *See id.*

In the instant case, as discussed, there are no factual matters in dispute. Rather, the
sole issue is a legal issue, which, also as discussed, is not supported under
applicable law. Regarding the remaining constitutional questions, in light of the
above precedential case law, the Board declines to express an opinion as to the
constitutional arguments regarding the statute and regulation at issue, as the Board
has no jurisdiction to remedy the constitutional challenge. Neither 38 U.S.C.A.
§ 7104 (West 2002), which defines the jurisdiction of the Board, nor 38 U.S.C.A.
§ 511(a) (West 2002), which defines the authority of the Secretary of VA, confers
upon the Board jurisdiction to consider constitutional challenges to statutes enacted
by Congress or implementing regulations promulgated by the Secretary. Similarly,
the Board does not have the jurisdiction or legal authority to ignore or rule
unconstitutional a law, regulation or precedential decision of the General Counsel.
*Hornick v. Shinseki*, 24 Vet. App. 50, 52 (2010) ("The Board is 'bound in its
decisions by the . . . precedent opinions of the chief legal officer of the
Department.'" (quoting 38 U.S.C. § 7104(c))). Notably, the jurisdiction of the
Board is different than the jurisdiction of the Veterans Court, which is empowered
by statute to make determinations regarding constitutional claims. *See* 38 U.S.C.A.
§ 7261(a)(1), (a)(3)(B) (West 2002); *see Raugust v. Shinseki*, 23 Vet. App. 475, 479
(2010) (noting that the Court has jurisdiction to consider constitutional challenges
to statutes and regulations). The Board recognizes that such constitutional
challenges must first be made at the agency level to build a factual record or to
resolve the dispute on other grounds. *Ledford v. West*, 136 F.3d 776 (Fed. Cir.
1998). As set forth in this decision, the facts have been presented, and they are not
in dispute.

IN THE APPEAL OF                                    SS 
CARMEN J. CARDONA

The Veteran, through her representative, recognizes that the Board lacks jurisdiction
to decide the constitutional challenge, as set forth in the April 2011 Motion and
May 2011 letter. Those documents cite to a previously issued Board decision as
support for the proposition that the Board does not have jurisdiction to decide
constitutional questions. Notably, decisions of the Board are not precedential, and
the decision cited by the Veteran is not controlling in this case. 38 C.F.R.
§ 20.1303 (2010). Nevertheless, as outlined by the caselaw cited above, although
the Board has the ability to express an opinion on a constitutional claim, the Board
has no jurisdiction to remedy a constitutional challenge of a law that is binding on
the Board. Such challenge is more appropriate for the Veterans Court, which
possesses the necessary jurisdiction for constitutional questions. *See*
38 U.S.C.A. § 7261(a)(1), (a)(3)(B) (West 2002).

In conclusion, for the reasons discussed, the Board finds no legal basis to support
the Veteran's claim for additional dependency compensation benefits for her
spouse, R.H., as R.H. is not a "spouse" as defined by VA law. The Board
acknowledges and is sympathetic to the arguments advanced by the Veteran,
especially in light of her honorable service. The Board also fully recognizes the
sensitivity of the issue of same sex marriage, as well as the popular and political
nature of this issue. However, VA law governing the definition of "spouse" is clear
and specific, and the Board is bound by that law. As the disposition of this claim is
based on the law, and not on the facts of the case, the benefit of the doubt doctrine
does not apply and the claim must be denied based on a lack of legal merit under
the law. *See Sabonis v. Brown*, 6 Vet. App. 426, 430 (1994) (stating that where the
law and not the evidence is dispositive, the claim should be denied because of the
absence of legal merit or the lack of entitlement under the law).

IN THE APPEAL OF                                SS 
CARMEN J. CARDONA

## ORDER

Entitlement to additional dependency compensation for a dependent spouse is
denied.

_____

LAURA H. ESKENAZI
Veterans Law Judge, Board of Veterans' Appeals

- 10 -

**Department of Veterans Affairs**

### YOUR RIGHTS TO APPEAL OUR DECISION

The attached decision by the Board of Veterans' Appeals (BVA or Board) is the final decision for all issues addressed in the "Order" section of the decision. The Board may also choose to remand an issue or issues to the local VA office for additional development. If the Board did this in your case, then a "Remand" section follows the "Order." However, you cannot appeal an issue remanded to the local VA office because a remand is not a final decision. *The advice below on how to appeal a claim applies only to issues that were allowed, denied, or dismissed in the "Order."*

If you are satisfied with the outcome of your appeal, you do not need to do anything. We will return your file to your local VA office to implement the BVA's decision. However, if you are not satisfied with the Board's decision on any or all of the issues allowed, denied, or dismissed, you have the following options, which are listed in no particular order of importance:

- Appeal to the United States Court of Appeals for Veterans Claims (Court)
- File with the Board a motion for reconsideration of this decision
- File with the Board a motion to vacate this decision
- File with the Board a motion for revision of this decision based on clear and unmistakable error.

Although it would not affect this BVA decision, you may choose to also:

- Reopen your claim at the local VA office by submitting new and material evidence.

There is *no* time limit for filing a motion for reconsideration, a motion to vacate, or a motion for revision based on clear and unmistakable error with the Board, or a claim to reopen at the local VA office. None of these things is mutually exclusive - you can do all five things at the same time if you wish. However, if you file a Notice of Appeal with the Court and a motion with the Board at the same time, this may delay your case because of jurisdictional conflicts. If you file a Notice of Appeal with the Court *before* you file a motion with the BVA, the BVA will not be able to consider your motion without the Court's permission.

**How long do I have to start my appeal to the Court?** You have **120 days** from the date this decision was mailed to you (as shown on the first page of this decision) to file a Notice of Appeal with the Court. If you also want to file a motion for reconsideration or a motion to vacate, you will still have time to appeal to the Court. *As long as you file your motion(s) with the Board within 120 days of the date this decision was mailed to you,* you will then have another 120 days from the date the BVA decides the motion for reconsideration or the motion to vacate to appeal to the Court. You should know that even if you have a representative, as discussed below, *it is your responsibility to make sure that your appeal to the Court is filed on time.*

**How do I appeal to the United States Court of Appeals for Veterans Claims?** Send your Notice of Appeal to the Court at:

**Clerk, U.S. Court of Appeals for Veterans Claims**
**625 Indiana Avenue, NW, Suite 900**
**Washington, DC 20004-2950**

You can get information about the Notice of Appeal, the procedure for filing a Notice of Appeal, the filing fee (or a motion to waive the filing fee if payment would cause financial hardship), and other matters covered by the Court's rules directly from the Court. You can also get this information from the Court's website on the Internet at: http://www.uscourts.cavc.gov, and you can download forms directly from that website. The Court's facsimile number is (202) 501-5848.

To ensure full protection of your right of appeal to the Court, you must file your Notice of Appeal **with the Court,** not with the Board, or any other VA office.

**How do I file a motion for reconsideration?** You can file a motion asking the BVA to reconsider any part of this decision by writing a letter to the BVA clearly explaining why you believe that the BVA committed an obvious error of fact or law, or stating that new and material military service records have been discovered that apply to your appeal. It is important that such letter be as specific as possible. A general statement of dissatisfaction with the BVA decision or some other aspect of the VA claims adjudication process will not suffice. If the BVA has decided more than one issue, be sure to tell us which issue(s) you want reconsidered. Issues not clearly identified will not be considered. Send your letter to:

**Director, Management, Planning and Analysis (014)**
**Board of Veterans' Appeals**
**810 Vermont Avenue, NW**
**Washington, DC 20420**

VA FORM
AUG 2009   **4597**   Page 1

CONTINUED

Remember, the Board places no time limit on filing a motion for reconsideration, and you can do this at any time. However, if you also plan to appeal this decision to the Court, you must file your motion within 120 days from the date of this decision.

**How do I file a motion to vacate?** You can file a motion asking the BVA to vacate any part of this decision by writing a letter to the BVA stating why you believe you were denied due process of law during your appeal. For example, you were denied your right to representation through action or inaction by VA personnel, you were not provided a Statement of the Case or Supplemental Statement of the Case, or you did not get a personal hearing that you requested. You can also file a motion to vacate any part of this decision on the basis that the Board allowed benefits based on false or fraudulent evidence. Send this motion to the address above for the Director, Management, Planning and Analysis, at the Board. Remember, the Board places no time limit on filing a motion to vacate, and you can do this at any time. However, if you also plan to appeal this decision to the Court, you must file your motion within 120 days from the date of this decision.

**How do I file a motion to revise the Board's decision on the basis of clear and unmistakable error?** You can file a motion asking that the Board revise this decision if you believe that the decision is based on "clear and unmistakable error" (CUE). Send this motion to the address above for the Director, Management, Planning and Analysis, at the Board. You should be careful when preparing such a motion because it must meet specific requirements, and the Board will not review a final decision on this basis more than once. You should carefully review the Board's Rules of Practice on CUE, 38 C.F.R. 20.1400 -- 20.1411, and *seek help from a qualified representative before filing such a motion.* See discussion on representation below. Remember, the Board places no time limit on filing a CUE review motion, and you can do this at any time.

**How do I reopen my claim?** You can ask your local VA office to reopen your claim by simply sending them a statement indicating that you want to reopen your claim. However, to be successful in reopening your claim, you must submit new and material evidence to that office. *See* 38 C.F.R. 3.156(a).

**Can someone represent me in my appeal?** Yes. You can always represent yourself in any claim before VA, including the BVA, but you can also appoint someone to represent you. An accredited representative of a recognized service organization may represent you free of charge. VA approves these organizations to help veterans, service members, and dependents prepare their claims and present them to VA. An accredited representative works for the service organization and knows how to prepare and present claims. You can find a listing of these organizations on the Internet at: http://www.va.gov/vso. You can also choose to be represented by a private attorney or by an "agent." (An agent is a person who is not a lawyer, but is specially accredited by VA.)

If you want someone to represent you before the Court, rather than before VA, then you can get information on how to do so by writing directly to the Court. Upon request, the Court will provide you with a state-by-state listing of persons admitted to practice before the Court who have indicated their availability to represent appellants. This information, as well as information about free representation through the Veterans Consortium Pro Bono Program (toll free telephone at: (888) 838-7727), is also provided on the Court's website at: http://www.uscourts.cavc.gov.

**Do I have to pay an attorney or agent to represent me?** An attorney or agent may charge a fee to represent you after a notice of disagreement has been filed with respect to your case, provided that the notice of disagreement was filed on or after June 20, 2007. *See* 38 U.S.C. 5904; 38 C.F.R. 14.636. If the notice of disagreement was filed before June 20, 2007, an attorney or accredited agent may charge fees for services, but only after the Board first issues a final decision in the case, and only if the agent or attorney is hired within one year of the Board's decision. *See* 38 C.F.R. 14.636(c)(2).

The notice of disagreement limitation does not apply to fees charged, allowed, or paid for services provided with respect to proceedings before a court. VA cannot pay the fees of your attorney or agent, with the exception of payment of fees out of past-due benefits awarded to you on the basis of your claim when provided for in a fee agreement.

**Fee for VA home and small business loan cases:** An attorney or agent may charge you a reasonable fee for services involving a VA home loan or small business loan. *See* 38 U.S.C. 5904; 38 C.F.R. 14.636(d).

**Filing of Fee Agreements:** In all cases, a copy of any fee agreement between you and an attorney or accredited agent must be sent to the Secretary at the following address:

Office of the General Counsel (022D)
810 Vermont Avenue, NW
Washington, DC 20420

The Office of the General Counsel may decide, on its own, to review a fee agreement or expenses charged by your agent or attorney for reasonableness. You can also file a motion requesting such review to the address above for the Office of the General Counsel. *See* 38 C.F.R. 14.636(i); 14.637(d).

Exhibit 32

1              SUPPLEMENTAL DECLARATION OF TODD FERNANDEZ

2        1. I execute this declaration to supplement my earlier declaration in support

3

4   of plaintiffs' motions for a preliminary injunction and class certification in *Aranas*

5   *v. Napolitano*, No. SACV12-01137 CBM (AJWx). As recounted in my prior

6   declaration dated November 2, 2012, I am an active member of Out4Immigration, a

7

8   non-profit grass roots volunteer-driven group that works to addresses the widespread

9   discriminatory impact of U.S. immigration laws on the lives of same-sex bi-national

10  couples and their families. I also work with several other organizations advocating

11

12  for marriage equality, including GetEqual, ActOnPrinciples, and the New York

13  Immigration Coalition.

14       2. Though it concedes § 3 of the Defense of Marriage Act, 1 U.S.C. § 7

15

16  (DOMA), is unconstitutional, the Administration continues to this day to enforce

17  the statute to deny same-sex bi-national couples equal treatment under the

18  Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.* (INA), and thus to cast

19

20  otherwise eligible spouses of U.S. citizens and lawful permanent residents into the

21  undocumented underground. The Administration's policy and practice of enforcing

22  an unconstitutional statute have not changed since I executed my earlier declaration,

23

24  and the Administration's policy and practice continue to visit irreparable injury on

25  same-sex bi-national couples and their families.

26

27

28

1      3. Immigrants in same-sex marriages who would qualify for lawful status

2    but for DOMA § 3 are being stripped of authorization to work in the United States.

3
4    CIS routinely advises such persons that unless they leave the country they will

5    accumulate time in undocumented status precluding their entering the United States

6    for up to ten years. This policy and practice place enormous pressure on immigrants
7
8    in same-sex marriages to self-deport, with or without their spouses.

9      4. The Administration's continued adherence to DOMA § 3 requires these

10   immigrants either to stop working entirely, depriving them of any way to support
11
12   themselves, or else to work unlawfully as undocumented aliens, often in substandard

13   conditions and/or for substandard wages.

14
15     5. Immigrants in same-sex marriages have no ability to travel abroad, even for

16   family emergencies. For immigrants with elderly parents or ailing relatives abroad,

17   the inability to travel inflicts a grave emotional injury. Even domestic travel is

18   difficult because of airport and highway immigration checkpoints.
19

20     6. The Administration's enforcing DOMA § 3 to deny immigrants in same-

21   sex marriages lawful status exposes them to a constant threat of arrest and detention,

22   both by federal immigration authorities, and by local police in several states that
23
24   regularly arrest undocumented immigrants.

25     7. It is clear that the Administration's enforcing DOMA § 3 continues to cause

26   same-sex couples and their children extreme psychological hardship, including
27

28

1    anxiety, fear of family separation, fear of deportation, sleeplessness, and despair.

2    Members of these families, like all families, are emotionally and economically

3

4    interdependent. Uncertainty in one spouse's immigration status, personal liberty,

5    work, and ability to travel afflicts the entire family. Consigning immigrant members

6    to the undocumented underground adds to the many hardships same-sex couples

7

8    routinely face on account of their sexual orientation. I accordingly urge the Court to

9    grant such couples preliminary injunctive relief at the earliest possible time.

10   I declare under penalty of perjury of the laws of the State of New York that the

11

12   foregoing is true and correct and that if called to testify with respect thereto I could

13   do so competently.

14        Executed this _3/_ day of Macrh, 2013, at New York, New York.

15

16

17

18   / / /                        Todd Fernandez

19

20

21

22

23

24

25

26

27

28

3

Exhibit 33

SUPPLEMENTAL DECLARATION OF ELISSA BARRETT

I, Elissa Barrett, declare and say as follows:

1. I execute this supplemental declaration in further support of plaintiffs' motions for class certification and preliminary injunction in *Aranas v. Napolitano*, No. SACV12-01137 CBM (AJWx). As explained in my earlier declaration, I am Vice-President and General Counsel at Bet Tzedek Legal Services ("Bet Tzedek"), a non-profit corporation based in Los Angeles, California, and founded in 1974 by a group of lawyers, rabbis and activists who sought to act upon a central tenet of Jewish law and tradition: namely, to advocate the just causes of the poor and the helpless. My responsibilities include management of Bet Tzedek's legal projects, which formerly included the Lesbian, Gay, Bisexual, Transgender, Queer Access to Justice Project ("LGBTQ A2J").

3. Bet Tzedek's LGBTQ A2J project was discontinued in late 2012 due to lack of funding. Although we no longer directly provide services to LGBTQ as part of the LGBTQ-A2J project, we still serve many individuals in this community. Based on my current knowledge and experience, I have no reason to believe that the challenging legal issues faced by members of the LGBTQ community have been resolved. The many challenges LGBTQ individuals face are only exacerbated when they lack lawful immigration status. Many LGBTQ people are low-income and struggle with poverty. When denied lawful immigration status, the plight of LGBTQ people can become wholly untenable.

4. The Administration's policy and practice regarding enforcement of § 3 of the Defense of Marriage Act, 1 U.S.C. § 7 (DOMA), continues to place a devastating and unjust burden on bi-national same-sex couples. As far as I know, since my earlier declaration there has been no improvement at all in the discriminatory treatment of same-sex couples seeking immigration benefits. Pursuant to DOMA § 3, U.S. Citizenship and Immigration Services (CIS), continues to deny immigration petitions predicated on wholly lawful same-sex marriages, strips immigrant members of such marriages of work authorization, reduces them to undocumented immigrants, and leaves them in fear of a "knock on the door" resulting in arrest and detention. CIS also continues to advise immigrant members of same-sex marriages that they should leave the country so as to avoid accruing time here in undocumented status that will bar them from entering the United States for up to a decade.

5. These hardships only add to the stress and stigmatization LGBTQ persons routinely experience. Same-sex couples are typically under substantial pressure. As part of a long-term same-sex couple, I can attest to that fact personally. Reducing an immigrant spouse to undocumented status places additional pressure on family relationships, tests the bonds of marriage and can lead to negative health consequences. I accordingly urge the Court to enter preliminary relief sparing same-sex couples from further irreparable injury.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of April, 2013, at Los Angeles, California

Elissa Barrett

3

CERTIFICATE OF SERVICE

SACV12-01137 CBM (AJWx)

I hereby certify that on this 13th day of April, 2013, I electronically filed the foregoing SUPPLEMENTAL EXHIBITS 23-33 with the Clerk of Court by using the CM/ECF system, which provided an electronic notice and electronic link of the same to all attorneys of record through the Court's CM/ECF system.

Dated:  April 13, 2013                                    /s/      Peter Schey

/ / /